FILED
2024 Jun-13  AM 11:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

_____

TOFOREST JOHNSON,                    )
                                     )
Petitioner,                          )
                                     )        Case No. 2:16-cv-01945-RDP
v.                                   )
                                     )
TERRY RAYBON,                        )        CAPITAL CASE
Warden of William C. Holman          )
Correctional Facility,               )
                                     )
Respondent.                          )
_____      )

## AMENDED PETITION FOR A WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY UNDER A DEATH SENTENCE

Petitioner Toforest Johnson, through counsel, respectfully petitions this Court for a writ

of habeas corpus under 28 U.S.C. § 2254.  Mr. Johnson respectfully requests that the Court

vacate his conviction and sentence of death, which were imposed by an Alabama court in

violation of the United States Constitution.

Mr. Johnson respectfully submits this amended petition to comply with this Court's order

dated February 15, 2024.  (*See* Doc. # 32 at 3.)  The amended petition is identical to Mr.

Johnson's original petition, which was filed in 2016, with the following exceptions.  First, Mr.

Johnson has amended Claim II, pursuant to the Court's order.  (*See* Doc. #30; Doc. #32 at 3.)

Second, Mr. Johnson has updated the sections of the statement of facts and procedural history

that pertain to Claim II.  (*See*, *infra*, ¶¶ 31, 54-55.)  Third, now that Respondent has submitted

the state-court record, Mr. Johnson has updated all record citations to comply with the CM/ECF

numbering system.  (*See* Doc. # 32 at 3.)  And fourth, Mr. Johnson has updated these introductory paragraphs.

Since the filing of the original petition, the need for a new trial for Mr. Johnson has become even more clear.  Evidence developed in the state-court proceedings has further undermined the integrity of the State's case and the constitutionality of Mr. Johnson's conviction.  In addition, both the Jefferson County District Attorney and the original lead trial prosecutor have called for a new trial for Mr. Johnson.  (Doc. # 36-63 at 11-12.)  This is precisely the type of case in which federal habeas relief is warranted.

## STATEMENT OF FACTS

1.      In the early morning hours of July 19, 1995, Jefferson County Deputy Sheriff William G. Hardy was shot to death in the parking lot of the Crown Sterling Suites hotel in Birmingham, Alabama.  (Doc. # 36-16 at 18-22; Doc. # 36-18 at 189-192.)  Toforest Johnson was one of four people charged with the murder of Deputy Hardy, and one of at least seven who was originally a suspect in the crime.  (Doc. # 36-17 at 129.)  The State dismissed the charges against two of Mr. Johnson's co-defendants after a witness admitted to lying about their involvement.  (Doc. # 36-17 at 129.)  The State proceeded to trial against Mr. Johnson and another co-defendant, Ardragus Ford.  The two men were tried separately.  In Mr. Johnson's case, the State claimed Mr. Johnson was the shooter.  In Mr. Ford's case, the State claimed Mr. Ford was the shooter.  In each trial, the jury was unable to agree on a guilt phase verdict, so both men were tried again.  At their subsequent trials, Mr. Ford was acquitted; Mr. Johnson was convicted and sentenced to death.  (Doc. # 36 at 11, 13.)

2.      At Mr. Johnson's trials, the State presented no physical or forensic evidence linking him to the crime, no eyewitness or accomplice testimony implicating him, and no

inculpatory statements made to the police.  (Doc. # 36-17 at 165; Doc. # 36-18 at 60-64; Doc. # 36-18 at 136-138.)  Nevertheless, he was convicted at his second trial.  (Doc. # 36-6 at 78.)  When later asked under oath to assess the State's evidence against Mr. Johnson, the lead trial prosecutor testified: "I don't think the State's case was very strong."  (Doc. # 36-47 at 138.)  Indeed, the evidence indicates that the State has tried, convicted, and sentenced to death an innocent man.

3.      For the benefit of the Court's resolution of Mr. Johnson's claims, what follows is a detailed factual account of the case, beginning with the night of July 18, 1995, when Deputy Hardy was killed.

*The Murder of William Hardy*

4.      At the time of his death, Deputy William Hardy was a twenty-year veteran with the Jefferson County Sheriff's Department, moonlighting as a private security guard at the Crown Sterling Suites in Birmingham.[1]

5.      On July 19, 1995, sometime between 12:30 a.m. and 1:00 a.m., Deputy Hardy was shot and killed in the parking lot of the hotel.  Several hotel guests, who later testified as State witnesses at Mr. Johnson's trials, heard two gunshots that night, fired within seconds of each other.  A number of witnesses told the police that they saw a car leaving the scene after the shooting, including a witness named John Renfro, who saw a white 1968 or 1969 Chevrolet Malibu speed out of the hotel parking lot with its lights out.  None of the descriptions the witnesses provided matched the car that the State agrees Mr. Johnson was in that night: a black two-door 1971 Chevrolet Monte Carlo.  (Doc. # 36-3 at 150-153; Doc. # 36-5 at 98.)

---

[1] As the trial court explained, "The Embassy Suites Hotel was the official name of the hotel just prior to the incident in this case, however, the name of the hotel on the date of the incident was the Crown Sterling Suites.  Subsequent to this incident the name has been changed once again to the Embassy Suites Hotel and, as a consequence, various witnesses use both of these names in describing the same hotel."  (Doc. # 36-13 at 163.)

6.      An autopsy revealed that Deputy Hardy died of multiple gunshot wounds.  Dr. Robert Brissie, chief medical examiner for Jefferson County, testified that Deputy Hardy was shot twice.  (Doc. # 36-24 at 101, 105; *see also* Doc. # 36-2 at 88 (prosecutor noting that only two shots were fired); Doc. # 36-31 at 192 (same).)  Only two shell casings were found in the parking lot, and later tests determined that they were both fired from the same gun.  (Doc. # 36-3 at 129; Doc. # 36-5 at 65.)  Together, the testimony of the hotel guests and that of the forensic experts established that Deputy Hardy was shot twice in rapid succession by the same gun.  In other words, Deputy Hardy was shot by one person.  (Doc. # 36-17 at 138.)

*Investigation and Pre-Trial Proceedings*

7.      At least ten witnesses clearly remember seeing Mr. Johnson and Mr. Ford at a club called Tee's Place at the time that Deputy Hardy was shot.  (Doc. # 36-26 at 166-168 (Zavala Holt (formerly Zavala Crumel)); Doc. # 36-26 at 57 (Barbetta Hunt); Doc. # 36-26 at 116-17 (Kimberly Colvin); Doc. # 36-26 at 189-191 (Velonique Sanders); Doc. # 36-25 at 136-37 (Somia Abercrombie); Doc. # 36-25 at 138-140 (Deidre Carter); Doc. # 36-27 at 27-28 (Kenyarra Hubbard); Doc. # 36-27 at 29-30 (Stanley Chandler); Doc. # 36-5 at 42-59 (Christy Farris); Doc. # 36-5 at 18-42 (Montrice Dunning).)  Several of these witnesses came forward and testified at the first trials of Mr. Johnson and Mr. Ford, but were not called to testify at Mr. Johnson's second trial; others were simply never contacted by Mr. Johnson's defense investigator or lawyers, despite their willingness to testify.  (Doc. # 36-25 at 166-68; Doc. # 36-26 at 57-59; Doc. # 36-26 at 116-17; Doc. # 36-26 at 189-91; Doc. # 36-25 at 136-37; Doc. # 36-25 at 138-140; Doc. # 36-27 at 138-39; Doc. # 36-27 at 29-30.)

8.      It is undisputed that, at approximately 4:00 a.m. on the morning of the murder, Mr. Johnson was with Ardragus Ford and two women, Yolanda Chambers and Latanya

Henderson, in the parking lot of a Super 8 Motel in Homewood, just outside Birmingham. (Doc. # 36-17 at 139.) They were approached by a Homewood police officer who had received a dispatch to investigate a "suspicious" vehicle.[2] The car that they were in was a 1971 black Monte Carlo that belonged to Mr. Ford. (Doc. # 36-17 at 139-141.)

9.      The four individuals were questioned and patted down, but no weapons were found, and nothing suspicious was uncovered. (Doc. # 36-3 at 154, 158.) Mr. Johnson was arrested on an outstanding misdemeanor traffic warrant and was taken to the Birmingham City Jail. (Doc. # 36-3 at 155.) The others were released and asked to take a taxi home because none of them had a valid driver's license. The car remained in the parking lot and was later impounded, taken to the evidence bay at the Jefferson County Sheriff's Office Headquarters, and searched. Nothing incriminating was found in the car. (Doc. # 36-17 at 139-41.)

10.      Latanya Henderson later testified that Mr. Johnson, Mr. Ford, and Ms. Chambers picked her up at her house that night at approximately 2:00 a.m. and asked her to go with them to get something to eat. (Doc. # 36-3 at 139-40.) Despite intense pressure from investigators with the Jefferson County Sheriff's Department, who repeatedly demanded that she could either be "a defendant or a witness," Ms. Henderson never wavered from her assertion that she was at home at the time Deputy Hardy was killed, that the other three did not pick her up until 2:00 a.m., and that nobody mentioned anything about a shooting that night. (Doc. # 36-3 at 139-40, 143.) The police even went so far as to charge Ms. Henderson with hindering prosecution, a charge that was dismissed on the morning that she agreed to testify at Mr. Johnson's trial. Even then,

---

[2] The dispatch requested that Officer Evans approach the car because a security guard from a motel across the street believed it matched the vague description of a "dark-colored" car that was seen at the Crown Sterling Suites that night. (Doc. # 36-17 at 186.) Officer Evans later testified falsely that a witness had provided a specific description for a black early 1970s Monte Carlo. (Doc. # 36-3 at 149-151.)

however, she continued to insist that she was not at the hotel when Deputy Hardy was killed and did not know anything about it.  (Doc. # 36-3 at 146-47.)

11.     Yolanda Chambers, on the other hand, provided investigators with a number of stories, virtually all of which she later admitted to be false and were independently shown to be false.  Ms. Chambers and her mother approached the police approximately a week after the murder and told them that Ms. Chambers was in the parking lot at the time Deputy Hardy was killed, and that she saw the entire incident.  (Doc. # 36-17 at 141.)  Ms. Chambers initially told police that a man named "Mike" shot Deputy Hardy.  Ms. Chambers described "Mike" as six feet tall, two hundred pounds, with a dark gold tooth on his right side.  (Doc. # 36-17 at 141.)

12.     Soon after implicating "Mike," Ms. Chambers changed her story and implicated a man named Quentin McClain, who was questioned by police and later released when Ms. Chambers changed her story again, this time naming a man named Reggie Richardson.  Mr. Richardson was questioned by the police and he, too, was later released when Ms. Chambers changed her story yet again.  (Doc. # 36-17 at 142.)

13.     Ms. Chambers then named five men and Latanya Henderson as the people involved in Deputy Hardy's shooting.  The men that Ms. Chambers named were Quintez Wilson, Omar Berry, Leon Colvin, Ardragus Ford, and Toforest Johnson.  According to this version of her story, she drove to the hotel that night in Mr. Ford's car, along with Mr. Ford, Mr. Johnson, and Ms. Henderson.  Her understanding was that they were going to the hotel to participate in a drug deal.  When they got to the hotel, they met up with Mr. Berry and Mr. Wilson, who participated in some kind of exchange with Mr. Colvin, at which time Deputy Hardy came out of the hotel and asked what was going on.  According to Ms. Chambers, Toforest Johnson then

pulled out a gun and shot Deputy Hardy and returned to the car with "blood dripping from his hands." Then, everyone fled. (Doc. # 36-24 at 150 – Doc. # 25 at 99; Doc. # 36-17 at 142.)

14.     Latanya Henderson told the police that Ms. Chambers was lying, and that Ms. Chambers had called her with a plan to make some money by making up a story to get the reward money offered in the case. (Doc. # 36-17 at 142-43.) Ms. Henderson remained steadfast in her assertion that she was not at the hotel that night, and, in fact, was adamant that Ms. Chambers could not have been at the hotel at the time Deputy Hardy was killed either. (Doc. # 36-17 at 142-43.) Ms. Henderson told the police that Ms. Chambers had been calling her repeatedly that night from a friend's house at precisely the time she later claimed to have been at the Crown Sterling Suites. Phone records later introduced on behalf of Mr. Ford at his trial corroborated Ms. Henderson's account, as did testimony from the friend whose house Ms. Chambers was at during the time Deputy Hardy was killed. (Doc. # 36-17 at 143.) Mr. Ford's counsel also admitted into evidence phone records establishing that Ms. Chambers was paging Mr. Ford at the time Deputy Hardy was killed, and therefore could not have been with him at the time. (Doc. # 36-17 at 142-43.)

15.     Nevertheless, on the word of Yolanda Chambers, the five men were arrested, and four of them were charged with the capital murder of Deputy Hardy. The fifth, Leon Colvin, was charged with hindering prosecution. At a press conference announcing the arrests, Jefferson County Chief Deputy Sheriff Jim Woodward insisted that "[w]e believe they were all present at the time of the shooting." (*See* Doc. # 36-27 at 44 ("Police confident they got right men in deputy's slaying," *Birmingham News*, July 28, 1995, at 1).)

16.     A preliminary hearing was held on September 18, 1995. At that hearing, the prosecution presented the testimony of Ms. Chambers, who changed her story once again.

Instead of naming Mr. Johnson as the triggerman, as she had earlier told the police, she testified at the preliminary hearing that Omar Berry and Quintez Wilson fired the fatal shots at Deputy Hardy, and that Mr. Ford and Mr. Johnson had been in on a drug deal that went awry and ended in the deputy's death. Preliminary Hearing, *State v. Johnson*, Sept. 18, 1995, at 60-65. When Deputy Hardy came out of the hotel to see what was going on, "Omar drew his gun and shot him," Ms. Chambers testified. *Id.* at 60. Moments later, according to Ms. Chambers, Deputy Hardy was shot again, this time by Quintez Wilson. *Id.* at 62. Judge R.O. Hughes found sufficient probable cause to bind all five men over for grand jury action. (Doc. # 36-17 at 144.)

17.     On January 10, 1996, the lead detective on the case, Sergeant Tony Richardson, testified before the grand jury. Sergeant Richardson testified that Ms. Chambers was now claiming that Ardragus Ford and Omar Berry were the ones who fired the shots that killed Deputy Hardy. (Doc. # 36-17 at 144-45.) Sergeant Richardson told the grand jury, under oath, that the State's investigation corroborated Ms. Chambers's account: "[O]ur investigation reveals that there's no doubt Yolanda Chambers is telling us the truth. Sure she didn't come in and tell it from the start. We expect that. But she's 15 years old and she's street wise. But it's no doubt she's telling us the truth." (Doc. # 36-36 at 96.) Two days later, on January 12, 1996, all five men were indicted, four of them on charges of capital murder, and Mr. Colvin on the charge of hindering prosecution. (Doc. # 36 at 20-21.)

18.     When Mr. Berry and Mr. Wilson had been incarcerated for more than 18 months, Ms. Chambers changed her story yet again. This time she told police that Mr. Berry and Mr. Wilson were not even in the hotel parking lot that night. Her new story was that she was in the parking lot with Mr. Ford, Mr. Johnson, and Ms. Henderson, and that Mr. Ford was the one who shot Deputy Hardy. The State dismissed the charges against Mr. Berry and Mr. Wilson, and they

were subsequently released from the County Jail.  *See* "Murder charges dropped against 2 in deputy's '95 slaying," *Birmingham News*, October 9, 1996, at 1-B (reporting that prosecutor Jeff Wallace asked the court to dismiss the cases against Mr. Berry and Mr. Wilson "after testimony of the star witness, Yolanda Chambers, began falling apart").  The charges against Mr. Ford and Mr. Johnson remained.

19.      A few weeks later, at a pre-trial hearing in Mr. Ford's case, Ms. Chambers admitted that she was not actually at the Crown Sterling Suites at the time Deputy Hardy was killed, and that she had just told the police what they wanted to hear because she was afraid of becoming a defendant herself.  *Ford v. State*, Case No. CC 96-385, Oct. 23, 1996, at 11-12, 26-27.  Despite Ms. Chambers's testimony at the pre-trial hearing that she was not at the scene of the crime and had made up everything she had told the police, the prosecutions of Mr. Johnson and Mr. Ford pressed on.

*Mr. Ford's First Trial*

20.      Mr. Ford was tried first, in August of 1997.  By the time Mr. Ford's trial began, Ms. Chambers had changed her story yet again.  She returned to her claim that she had indeed been in the hotel parking lot with Mr. Ford, Mr. Johnson, and Ms. Henderson, and that Mr. Ford—not Mr. Johnson—had shot Deputy Hardy, for no apparent reason.  (Doc. # 36-33 at 33.) This was the theory presented at Mr. Ford's first trial, and the State called Ms. Chambers as its star witness.  (Doc. # 36-33 at 7-183.)

21.      The prosecution admitted to Mr. Ford's jury that Ms. Chambers had lied in the past, but vouched for her testimony and urged the jury to credit her account that Mr. Ford had killed the deputy: "She didn't ask for this role, but she came in here and told you the truth. . . . She came in here and told it to each one of you."  (Doc. # 36-36 at 28.)  Moreover, the

9

prosecutor elicited testimony from Dr. Brissie, the medical examiner, that the shots fired at Deputy Hardy appeared to be shot at an upward angle.  (Doc. # 36-32 at 183.)  Mr. Ford is paralyzed from the waist down and requires the aid of a wheelchair at all times.  In his closing argument, the prosecutor emphasized that the evidence indicated that the shots were fired by someone in a wheelchair:

> Well you look at that probe sticking out of Bill Hardy's mouth and see if it doesn't point down to a wheelchair.  You see where that bullet came from.  You look at that angle, and know that it came through his outstretched hand at a sharp angle upward into his mouth*, see if it didn't come right out of his wheelchair, because that's where it came from*.

(Doc. # 36-36 at 27 (emphasis added).)

22.    Mr. Ford was represented by attorneys Richard Jaffe and Derek Drennan, who presented an alibi defense.  Using phone records, they established that Latanya Henderson was telling the truth about where she was at the time of the murder, and that Ms. Chambers could not possibly have been at the hotel at that time.  They then called several witnesses who testified that they clearly remembered seeing Mr. Ford and Mr. Johnson together at Tee's Place on the night of the murder.  The first trial of Mr. Ford ended in a mistrial, when the jury was unable to reach a verdict.  (Doc. # 36-17 at 148.)

*Mr. Johnson's First Trial*

23.    Mr. Johnson was tried next.  As noted above, by the time the trials actually began, Ms. Chambers was no longer claiming that Mr. Johnson committed the murder.  As a result, despite the fact that her statements were the only reason Mr. Johnson was arrested in the first place, Ms. Chambers did not testify for the State at Mr. Johnson's trial.  (Doc. # 36-17 at 149.)

24.    Instead, the State's evidence against Mr. Johnson was comprised of the testimony of a woman who said that she overheard portions of several phone calls from a man at the

10

Jefferson County Jail, who said his name was "Toforest."  This witness, Violet Ellison, testified

that "Toforest" made incriminating statements about his involvement in the shooting of Deputy

Hardy during one of these phone calls.  (Doc. # 36-30 at 40-114.)  Violet Ellison claimed to be a

disinterested citizen who came forward with the information because she could not sleep at

night.  (Doc. # 36-30 at 106-07.)

25.     Both Violet Ellison and her daughter Katrina testified for the State.  Katrina

Ellison testified that, during July of 1995, she had a friend named Jerramey Roper, who was

locked up in the Jefferson County Jail.  (Doc. # 36-30 at 24.)  She had an arrangement with Mr.

Roper: he would call her from the pay phone at the jail and she would connect several "three-

way" calls to other friends of his.  (Doc. # 36-30 at 24-34.)  She would then put the phone down

and leave the room.  (Doc. # 36-30 at 30-31.)  The arrangement allowed Mr. Roper to make

several phone calls without having to put more money in the pay phone at the jail.  Soon friends

of Mr. Roper's at the jail, including an inmate named Fred Carter, began calling Katrina to have

her make similar three-way calls.  (Doc. # 36-30 at 24-26.)

26.     Katrina testified that during the first week in August of 1995, she connected

several three-way phone calls for an inmate at the Jefferson County Jail who referred to himself

as "Toforest."  (Doc. # 36-30 at 23-30.)  Violet Ellison testified that, prior to the calls made by

"Toforest," she had told Katrina that if she continued making calls for men at the jail, she would

begin listening in on the phone calls.  (Doc. # 36-30 at 40-41.)  Violet Ellison testified that the

first call from "Toforest" came on August 3, and that was the first call to which she admitted

listening.  (Doc. # 36-30 at 41.)

27.     Violet Ellison testified that during this August 3 phone call, of which she admitted

to having only heard portions, "Toforest" claimed to have "shot the fucker in the head" and then

11

"Fell[a]" shot once, and that they had killed Deputy Hardy because he was "messing up my shit." (Doc. # 36-30 at 54-56.)  "Fella" is the nickname of Quintez Wilson, one of the men who was originally charged with the murder of Deputy Hardy.  (Doc. # 36-4 at 89.)

28.     Several of the details of this overheard conversation are directly at odds with the physical evidence in the case and could not possibly be true.  (Doc. # 36-17 at 151.)  By the time of Mr. Johnson's first trial, it had been established that both bullet shells recovered at the scene had been fired from the same gun, just seconds apart.  Yet, according to Ms. Ellison's version, Mr. Johnson shot once, and then Quintez Wilson shot once.  (Doc. # 36-30 at 54-56.)  Not only is this account inconsistent with the physical evidence, it was directly contrary to the State's theory in Mr. Ford's first trial—that Mr. Ford had fired the shots that killed Deputy Hardy.  The State had long since dismissed all charges against Quintez Wilson and believed him to be innocent. (*See* Doc. # 36-24 at 142 (prosecutor Lawson referring to Omar Berry and Quintez Wilson as "two innocent folks").)

29.     That the State did not even believe Violet Ellison's account is evident from Sergeant Richardson's grand jury testimony, which took place several months *after* Ms. Ellison came forward with her story.  Sergeant Richardson, the lead State investigator on the case, did not even mention the Ellisons in his lengthy and detailed grand jury testimony, and he presented an account of what happened that night that was completely at odds with Ms. Ellison's story:

> The deputy is looking at all these people.  He starts a conversation with the other people or he says something to them.  Ardragus Ford spins in his wheelchair, pulls up a 9mm and fires a shot.  After he fires this shot, the deputy starts to stumble down the hill at which time he was shot again by Omar Berry.

(Doc. # 36-60 at 94.)

30.     The State had no other evidence against Mr. Johnson, and Violet Ellison's testimony formed the basis of the State's case at Mr. Johnson's trial.  The prosecution argued

during closing argument that her testimony was all the jury needed to convict Mr. Johnson of

capital murder, and that it was Toforest Johnson—not Ardragus Ford—who killed Deputy

Hardy.  (Doc. # 36-31 at 141-42.)

31.     As the lead trial prosecutor later explained under oath, the State's case against Mr.

Johnson "depended" on the testimony of this one witness, Violet Ellison.  (Doc. # 36-47 at 138.)

Unbeknownst to defense counsel, however, Ms. Ellison did not come forward with her story

simply because she wanted to be a good citizen.  Instead, according to the State's own records,

Ms. Ellison provided information "pursuant to the public offer of a reward."  (Doc. # 36-60 at

73.)  The State never informed Mr. Johnson or his counsel that Ms. Ellison was interested in

reward money, and it ultimately paid Ms. Ellison $5,000 without informing Mr. Johnson or his

counsel.  (Doc. # 36-60 at 66.)

32.     Mr. Johnson's lawyers, Darryl Bender and Erskine Mathis, put on an alibi defense

at Mr. Johnson's first trial.  They called witnesses, who, like the witnesses who testified at Mr.

Ford's trial, saw Mr. Johnson and Mr. Ford at Tee's Place at the time of the murder.  (Doc. # 36-

26 at 76-80; Doc. # 36-26 at 132-138; Doc. # 36-27 at 5-10.)  They also called one of the guests

staying at the hotel outside of which Deputy Hardy was killed.  This guest, Marshall Cummings,

testified that, from his hotel window, he saw a light-colored car leave the scene of the crime

seconds after he heard gunshots.  (Doc. # 36-44 at 4-6, 30-31.)  Mr. Cummings also testified that

he saw a six-foot-tall man get into the driver's side door of the car.  (Doc. # 36-44 at 4-6.)

33.     Sergeant Tony Richardson then testified for the defense that the car Mr.

Cummings saw moments after the shooting could not have been the car in which Mr. Johnson

was riding that night, because Mr. Johnson was in a *black* car with an *inoperable* driver's side

door.  (Doc. # 36-44 at 43-44.)  The State now concedes that the car Mr. Cummings saw was not

the car in which Mr. Johnson was riding in the night of the shooting.  (Doc. 36-53 at 119.)

Moreover, Mr. Johnson is five feet and five inches tall; thus, the six-foot-tall man Mr. Cummings

saw at the crime scene could not have been Mr. Johnson.

34.     The testimony of Mr. Cummings and Sergeant Richardson established that a

different person was present at the scene and may have been responsible for the shooting, and it

likely raised a reasonable doubt about the State's only evidence in an already weak case.  The

jury at this trial could not reach agreement as to Mr. Johnson's guilt, and the court declared a

mistrial.  (Doc. # 36 at 11.)

*Mr. Johnson's Second Trial*

35.     Mr. Johnson was tried again in August of 1998.  Over a defense objection, the

State struck six of the nine Black prospective jurors qualified to serve—a disproportionate strike

rate in a trial involving a Black defendant charged with killing a law enforcement officer.  (Doc.

# 36-2 at 60-65.)

36.     Once again, Violet Ellison testified for the State, providing the only evidence that

linked Mr. Johnson to the murder.  (Doc. # 36-4 at 41-97.)  At this trial, in response to defense

questioning about why she came forward when she did, Ms. Ellison once again testified that she

came forward with her story because "my conscience bothered me and I could not sleep."  (Doc.

# 36-4 at 86.)  Because the State had withheld from the defense the fact that Ms. Ellison actually

approached the police with her story in order to collect a large cash reward, the jury did not

know this information, nor was it told about Ms. Ellison's financial difficulties, which gave her

great incentive to do what she needed to do to collect the reward.  (Doc. # 36-38 at 109-194.)

37.     At this second trial, Mr. Johnson's lawyers called as alibi witnesses two women

with whom they had not met in years.  (Doc. # 36-5 at 18-59.)  Although they had spoken with

the lawyers just a couple weeks after the murder —when the night of July 18, 1995 was fresh in their minds—the women did not meet again with Mr. Johnson's lawyers until the morning they testified, when they ran into the lawyers at the courthouse and spoke to them for about ten minutes.  Their lack of preparation was evident, as they were repeatedly confused by the prosecutor on cross-examination.  (*See* Doc. # 36-5 at 54-59 (Christie Farris); Doc. # 36-5 at 33-39 (Montrice Dunning).)

38.     Mr. Johnson's lawyers also made the inexplicable decision to call Yolanda Chambers as a witness, despite the fact that her testimony was both directly at odds with the alibi witnesses who testified on Mr. Johnson's behalf, and comprised the only direct testimony putting Mr. Johnson at the scene of the murder.  Ms. Chambers testified that she had lied many times in the past, but that she was now telling the truth: she had been in the hotel parking lot with Mr. Ford, Mr. Johnson, and Ms. Henderson, and Mr. Ford had shot the Deputy for no apparent reason.  (Doc. # 36-4 at 112, 184-85.)  The defense made no attempt to reconcile the mutually exclusive defense theories it presented; it did not explain the fact that it had presented some testimony that Mr. Johnson was nowhere near the hotel at the time of the crime and other testimony that he was in the hotel parking lot.

39.     The prosecutors ridiculed Ms. Chambers's testimony, and called her a "liar" in closing argument:

> Never once, not one time, did we in our case put before you anything said by Yolanda Chambers.  And when she got on that witness stand you saw why. . . .  They put Yolanda Chambers into this case.  They called her.  They told you up front that she doesn't tell the truth.  And you saw her right there on that witness stand. . . .  [I]f you go back in the jury room and decide that Yolanda Chambers ought not to have been allowed to testify because she's a liar, or whatever you might decide about her, that's okay.  State didn't call her, the Defense did.  I want you to remember that.

(Doc. # 36-5 at 107-08.)

40.     Additionally, Mr. Johnson's lawyers failed to present ample available evidence that another inmate at the jail, a man named Fred Carter, often impersonated Mr. Johnson on the telephone.  (Doc. # 36-18 at 158-59.)  Incarcerated in the Jefferson County Jail while Mr. Johnson was awaiting trial, with easy access to the telephone, Mr. Carter often spoke with girls outside the jail.  (Doc. # 36-27 at 51.)  During these calls, he regularly claimed to be other inmates.  (Doc. # 36-27 at 51-52.)  Mr. Carter often impersonated other inmates, including Toforest Johnson, and pretended he was responsible for the crimes with which they were charged.  (Doc. # 36-27 at 57-59; Doc. # 36-27 at 60-62; Doc. # 36-27 at 63-65; Doc. # 36-27 at 66-68; Doc. # 36-27 at 69-71; Doc. # 36-27 at 72-73; Doc. # 36-27 at 74-76.)  Mr. Johnson's trial counsel never contacted witnesses to Mr. Carter's impersonations.  (Doc. # 36-27 at 59; Doc. # 36-27 at 61; Doc. # 36-27 at 64; Doc. # 36-27 at 68; Doc. # 36-27 at 71; Doc. # 36-27 at 73; Doc. # 36-27 at 75.)  Mr. Johnson's lawyers also failed to call numerous other witnesses who were available and willing to testify that they clearly remembered that Mr. Johnson was across town at the time of the murder.  (Doc. # 36-25 at 166-168; Doc. # 36-26 at 57-58; Doc. # 36-26 at 116-17; Doc. # 36-26 at 189-90; Doc. # 36-25 at 136-37; Doc. # 36-25 at 138-39; Doc. # 36-27 at 27-28; Doc. # 36-27 at 29-30.)

41.     As they had at his first trial (but in contrast to their theory at Mr. Ford's trials), the prosecutors presented the theory that Mr. Johnson and Quintez Wilson committed the murder, and suggested to the jury that the only reason the charges against Mr. Wilson had been dropped was that Ms. Ellison's testimony could not be used against Mr. Wilson and the State had no other evidence against him.  (Doc. # 36-5 at 81-83.)  As mentioned above, this theory of prosecution was entirely at odds with the State's theory at Mr. Ford's trials, during which the prosecution referred to Mr. Wilson and Mr. Berry as "two innocent folks."  (Doc. # 36-24 at 142.)

16

42.     The jury convicted Mr. Johnson of capital murder.  (Doc. # 36 at 13.)

43.     At the penalty phase,[3] the prosecution called one witness to testify that Mr. Johnson was on parole at the time of the murder for a minor drug offense.  (Doc. # 36-6 at 85-86; Doc. # 36 at 89.)  The defense case consisted of three witnesses whose testimony comprised a mere seventeen transcript pages.  (Doc. # 36-6 at 87-104.)  Most of the three mitigation witnesses' very brief testimony was spent begging for Mr. Johnson's life.  (Doc. # 36-6 at 98-101; Doc. # 36-6 at 102-04; Doc. # 36-6 at 97.)  Trial counsel did not introduce any records of any kind.  The entire penalty phase, including the arguments of counsel, lasted approximately thirty minutes.  By a 10 to 2 vote, the jury recommended a sentence of death, which the trial court later imposed after a sentencing hearing at which no further evidence was presented.  (Doc. # 36 at 35; Doc. # 36-6 at 149, 155.)

*Mr. Ford's Second Trial*

44.     Again represented by Richard Jaffe and Derek Drennan, Mr. Ford was tried for a second time in June of 1999.  (Doc. # 36-17 at 160.)  After disparaging the testimony of Yolanda Chambers and calling her a liar at Mr. Johnson's trial, the very same prosecutors called Ms. Chambers as their star witness at Mr. Ford's trial.  There, they asked the jury to *credit* Ms. Chambers's testimony that Mr. Ford was the one who killed Deputy Hardy.  The State did not suggest in any way that Quintez Wilson had anything to do with the murder.  (Doc. # 36-17 at 160.)

---

[3] Alabama's capital punishment statutes provide for a trifurcated trial: First, at the "guilt phase," the jury decides whether the accused is guilty of one of the nineteen categories of capital murder set out in Alabama Criminal Code § 13A-5-40(a).  Second, if the jury has convicted the defendant of capital murder at the first stage, the trial proceeds to the "penalty phase," in which the jury renders a sentencing recommendation to the trial court.  Third, the trial court holds a judicial sentencing hearing, called the "sentencing phase," after which the judge imposes a sentence. *See* Ala. Code §§ 13A-5-43, 13A-5-45, 13A-5-46, 13A-5-47.

45.     Mr. Ford did not present any evidence in his defense.  It took the jury only 40 minutes to acquit Mr. Ford of all charges.  *See* "Jury acquits Ford of deputy's murder," *Birmingham News*, June 12, 1999, at 9A.

## PROCEDURAL HISTORY

46.     Mr. Johnson is incarcerated on death row at Holman Correctional Facility in Atmore, Alabama.  His prisoner number is Z-651.

47.     Mr. Johnson was convicted of one count of capital murder and sentenced in the Circuit Court of Jefferson County in Birmingham Alabama, Alfred Bahakel, Circuit Judge, presiding.  (Doc. # 36-6 at 170.)

48.     Mr. Johnson was tried twice.  The first trial ended in a mistrial in December 1997, when the jury could not reach a verdict in the guilt phase of the trial.  (Doc. # 36 at 11.)  Mr. Johnson's second trial began on August 17, 1998.  On August 21, 1998, the jury returned a verdict of guilty for the capital offense, as charged in the indictment.  (Doc. # 36 at 11.)  Mr. Johnson did not testify during any of the proceedings.

49.     During the pre-trial, trial, and sentencing proceedings, J. Louis Wilkinson, Darryl Bender, and Erskine R. Mathis represented Mr. Johnson.  Mr. Wilkinson passed away prior to the start of Mr. Johnson's first trial.

50.     Judge Bahakel sentenced Mr. Johnson to death on October 30, 1998.  (Doc. # 36 at 11, 14-15; Doc. # 36-6 at 170.)

51.     On direct appeal, Joe Morgan, Jr. represented Mr. Johnson until Mr. Morgan was suspended from the bar, at which point J. William Cole took over Mr. Johnson's case.  The Alabama Court of Criminal Appeals affirmed Mr. Johnson's conviction and sentence. *Johnson v. State*, 823 So. 2d 1, 57 (Ala. Crim. App. 2001).

52.     Mr. Johnson filed a petition for writ of certiorari in the Alabama Supreme Court, which denied the writ, with one Justice dissenting.  *Ex parte Johnson*, 823 So. 2d 57 (Ala. 2001) (Johnstone, J., dissenting from denial of certiorari).  J. William Cole represented Mr. Johnson in the Alabama Supreme Court.

53.     The United States Supreme Court denied certiorari on May 20, 2002.  *Johnson v. Alabama*, 535 U.S. 1085 (2002).

54.     Mr. Johnson sought postconviction relief in state court following the conclusion of his direct appeal.

    a.     On April 30, 2003, Mr. Johnson filed a timely "Petition for Relief from Conviction and Sentence of Death Pursuant to Rule 32 of the Alabama Rules of Criminal Procedure," in the Tenth Judicial Circuit Court in Jefferson County, Alabama.  (Doc. # 36-12 at 112.)

    b.     Mr. Johnson amended his petition three times, culminating in a "Third Amended Petition for Relief from Conviction and Sentence of Death Pursuant to Rule 32 of the Alabama Rules of Criminal Procedure" filed on October 24, 2005, in the Tenth Judicial Circuit Court in Jefferson County, Alabama.  (Doc. # 36-17 at 122.)

    c.     On June 16, 2005, the State of Alabama filed an "Answer" to Mr. Johnson's Second Amended Petition (Doc. # 36-16 at 45), but failed to file any responsive pleading to his Third Amended Petition.

    d.     On May 24, 2006, the circuit court summarily denied the entire Third Amended Petition before the State even responded to the petition.  (Doc. # 36-12 at 93.)

e.   Mr. Johnson appealed the denial of his Third Amended Petition to the
Court of Criminal Appeals.  That court affirmed the denial of most of Mr.
Johnson's claims but remanded fourteen claims for an evidentiary hearing.
*Johnson v. State*, 379 So. 3d 994, 1003-19 (Ala. Crim. App. 2007).

f.   On remand, the circuit court admitted several affidavits in lieu of live
testimony and held an evidentiary hearing on April 29, 2008.

g.   On July 28, 2008, the circuit court issued an order denying relief on the
outstanding claims.  (Doc. # 36-27 at 108-123.)

h.   Mr. Johnson appealed the ruling on remand to the Court of Criminal
Appeals.  The court affirmed the denial of most of Mr. Johnson's claims
but remanded for an evidentiary hearing on Claim XIX(F)(5) and Claim
XIX(H).  *Johnson*, 379 So. 3d at 1019-46 (opinion on return to remand).

i.   On second remand, the circuit court denied the remanded claims following
an evidentiary hearing.  (Doc. # 36-52 at 48.)

j.   Mr. Johnson appealed the ruling to the Court of Criminal Appeals and that
court affirmed the denial of both Claim XIX(F)(5) and Claim XIX(H).
*Johnson*, 379 So. 3d at 1046-61 (opinion on return to second remand).

k.   On November 11, 2015, Mr. Johnson filed a timely rehearing application
in the Court of Criminal Appeals.  (Doc. # 36-54 at 2.)

l.   The Court of Criminal Appeals denied the application for rehearing with
an opinion on February 12, 2016.  *Johnson*, 379 So. 3d at 1061-63
(opinion on application for rehearing).  In this opinion, the court addressed
several claims it had previously failed to rule upon.  Accordingly, Mr.

Johnson filed a "Motion for Leave to File Second Application for
Rehearing Pursuant to Rule 40(a)(3)," seeking an opportunity to be heard
on these newly-ruled-upon claims. (Doc. # 36-55 at 184.) The Court of
Criminal Appeals denied this motion on February 16, 2016. (Doc. # 36-56
at 72.)

m.   Mr. Johnson filed a timely "Petition for Writ of Certiorari" in the Alabama
Supreme Court on February 26, 2016, which that court denied on
November 18, 2016. *Johnson*, 379 So. 3d at 994.

n.   Mr. Johnson then filed a petition for certiorari in the United States
Supreme Court on February 2, 2016. After the State conceded error with
respect to Mr. Johnson's claim under *Brady v. Maryland*, 373 U.S. 83
(1963), the Court granted certiorari, vacated the ruling below, and
remanded the case for further proceedings. *Johnson v. Alabama*, 582 U.S.
927 (2017).

o.   On remand, the Alabama Court of Criminal Appeals remanded the case
further and directed the circuit court to hold an evidentiary hearing.
*Johnson v. State*, 379 So. 3d at 1063-64.

p.   The circuit court held an evidentiary hearing and denied relief in 2019
(Doc. # 36-62 at 45-56), and the Alabama Court of Criminal Appeals
affirmed, *Johnson v. State*, 379 So. 3d at 1065-79.

q.   The Alabama Supreme Court denied certiorari on December 16, 2022,
*Johnson v. State*, 379 So. 3d at 994, and the United States Supreme Court

denied certiorari on October 2, 2023, *Johnson v. Alabama*, 144 S. Ct. 37 (2023).

55.     While the state proceedings were still in progress in December 2016, Mr. Johnson filed a petition for a writ of habeas corpus in this Court.  (Doc. # 1.)  This Court stayed the proceedings in 2017 and administratively closed the case in 2020 to allow for the state-court proceedings to conclude.  (Doc. # 14; Doc. # 26.)  On October 20, 2023, following the conclusion of the state-court proceedings, Mr. Johnson moved to reopen the case.  (Doc. # 29.) This Court granted Mr. Johnson's motion and subsequently issued a scheduling order.  (Doc. # 30; Doc. # 32.)  In the order, the Court directed Mr. Johnson to file an amended habeas petition within thirty (30) days of Respondent's submission of the state-court record.  (Doc. # 32.) Responded submitted the state-court record on May 14, 2024 (Doc. # 35; Doc. # 36), and Mr. Johnson now files this amended petition.

## GROUNDS FOR RELIEF

I.     **THE STATE UNCONSTITUTIONALLY STRUCK BLACK PROSPECTIVE JURORS ON THE BASIS OF RACE AT MR. JOHNSON'S CAPITAL TRIAL.**

56.     The prosecutors at Mr. Johnson's 1998 capital trial struck six of the nine black prospective jurors who were qualified to serve.  (Doc. # 36-2 at 60-62, 65.)  Mr. Johnson made a timely objection to the striking of prospective jurors on the basis of race.  (Doc. # 36-2 at 60-65); *Batson v. Kentucky*, 476 U.S. 79, 89, 96-98 (1986).  The trial court overruled the objection, summarily ruling without explanation that Mr. Johnson had failed to establish a prima facie case of race discrimination.  (Doc. # 36-2 at 66.)  On appeal, the Court of Criminal Appeals affirmed the trial court's ruling.  *Johnson*, 823 So. 2d at 17-21.  The Alabama Supreme Court denied certiorari review, but Justice Johnstone dissented, noting that the lower court's *Batson* analysis contained substantial errors.  *See Ex parte Johnson*, 823 So. 2d at 59-60 (Johnstone, J.,

dissenting from denial of certiorari).  Mr. Johnson now seeks relief on his *Batson* claim pursuant to 28 U.S.C. § 2254.

57.     The ruling of the Court of Criminal Appeals was contrary to and involved an unreasonable application of clearly established federal law and was based on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d); *Batson*, 476 U.S. at 89, 96-98; *Ford v. Georgia*, 498 U.S. 411, 415 (1991).  Therefore, § 2254(d) does not preclude this Court from addressing Mr. Johnson's *Batson* claim.

58.     This Court should find that Mr. Johnson established a prima facie case of race discrimination with respect to the State's peremptory strikes.  The Court should then proceed to steps two and three of the *Batson* analysis.  *See Madison v. Comm'r, Ala. Dept. of Corr.*, 677 F.3d 1333, 1339 (11th Cir. 2012).  Specifically, this Court should hold a hearing at which the trial prosecutors must provide race-neutral reasons for their strikes of the black prospective jurors.  *See Batson*, 476 U.S. at 97-98.  The Court then must determine whether Mr. Johnson has established purposeful discrimination based on all relevant circumstances.  *See id.* at 98.

**A.     Over a timely *Batson* objection, the state courts ruled that Mr. Johnson failed to establish a prima facie case of discrimination.**

59.     After Mr. Johnson's first trial resulted in a hung jury, a second trial was held in August 1998.  (Doc. # 36 at 11.)  There were forty-two prospective jurors in the pool from which the jury was selected.  (Doc. # 36-2 at 60, 65.)  Nine of the forty-two were black.  (Doc. # 36-2 at 60-61, 65.)  To select the twelve jurors, each party exercised fifteen peremptory strikes.  (Doc. # 36-2 at 58.)  The prosecution used six of its fifteen strikes to exclude black prospective jurors. (Doc. # 36-2 at 61-62, 65.)  Mr. Johnson's counsel struck one black prospective juror, a police officer, so the final jury included ten white jurors and two black jurors.  (Doc. # 36-2 at 61-62, 65.)

60.    Outside the presence of the jury, Mr. Johnson's counsel raised a timely objection to the State's strikes of the six black prospective jurors.  (Doc # 36-2 at 60-65.)  Under *Batson*, courts follow a three-step process for determining whether a peremptory strike constitutes race discrimination in violation of the Fourteenth Amendment.  First, the defendant must establish a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory intent.  *Batson*, 476 U.S. at 96-97.  Second, once the defendant has established a prima facie case, the prosecutors must provide race-neutral reasons for their strikes of the prospective jurors at issue.  *Id.* at 97-98.  Third, if race-neutral reasons are provided, the trial court must determine whether the defendant has established "purposeful discrimination."  *Id.* at 98.

61.    Mr. Johnson's counsel supported their *Batson* objection by noting numerous circumstances giving rise to an inference of discrimination, including the following:

(1)    Mr. Johnson was a black defendant charged with capital murder in connection with the killing a law enforcement officer.  (Doc. # 36-2 at 61, 65.)

(2)    Even before the striking of the jury, a higher percentage of black prospective jurors had been removed from the venire due to death qualification.  (Doc. # 36-2 at 64.)

(3)    The prosecution struck six of the nine black prospective jurors in the final pool, thereby further reducing the percentage of black jurors.  (Doc. # 36-2 at 61-62.)

(4)    Several of the black prospective jurors struck by the prosecutors did not reveal anything in voir dire that distinguished them from white prospective jurors who were accepted by the prosecution.  (Doc. # 36-2 at 62-63.)

(5)    One black prospective juror struck by the prosecution had a brother who was a Birmingham policeman and another had two cousins who were police officers, which suggest that they would have been favorable jurors for the prosecution in light of the fact that the victim in the case was a law enforcement officer.  (Doc. # 36-2 at 63, 65.)

(6)    Two of the black prospective jurors struck by the prosecutors had been victims of crime, which suggests they would have been favorable jurors for the prosecution in a criminal case.  (Doc. # 36-2 at 64-65.)

24

62.     The trial court summarily overruled the *Batson* objection, finding that Mr. Johnson failed to establish a prima facie case of discrimination.  The trial court's entire ruling on the *Batson* motion was as follows: "I do not find that you make a prima facie case for racial discrimination in violation of *Batson* or any of its progeny, and I make my ruling based not only on the motion and grounds that you asserted, but also on the responses of these jurors that I heard in the courtroom during voir dire."  (Doc. # 36-2 at 66.)

63.     On appeal, the Court of Criminal Appeals affirmed the trial court's ruling denying a prima facie case.  *Johnson*, 823 So. 2d at 17-21.  First, the court held that Mr. Johnson failed to present documentary evidence concerning the race and identity of the prospective jurors who were struck or accepted.  *Id.* at 18-19.  Second, the court held that the circumstances Mr. Johnson's counsel raised were insufficient to establish a prima facie case of discrimination, in part because the court could not conclude based on the record "that there [were] no valid race-neutral reasons" for the strikes.  *Id.* at 19-21.

64.     The Alabama Supreme Court denied certiorari over the dissent of Justice Johnstone.  *Ex parte Johnson*, 823 So. 2d at 57 (Johnstone, J., dissenting from denial of certiorari).

**B.     Section 2254 does not preclude review of Mr. Johnson's *Batson* claim.**

65.     To the extent that 28 U.S.C. § 2254(d) applies, the ruling of the Court of Criminal Appeals was contrary to, and an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts in light of the evidence presented.

66.     With respect to the state court's holding that Mr. Johnson was required to present documentary evidence to prove the race and identity of the prospective jurors who were struck and accepted, this ruling was contrary to and involved an unreasonable application of *Batson* and

*Ford*.  In *Ford*, the Supreme Court stated the following when addressing a *Batson* issue: "Although the jury selection on the first day was not transcribed, it is undisputed that the prosecution exercised 9 of its 10 peremptory challenges to strike black prospective jurors, leaving 1 black venire member seated on the jury."  *Ford*, 498 U.S. at 415.  Here, as in <u>Ford</u>, there was no dispute as to defense counsel's representations regarding the race of the jurors whom the prosecution struck.

67.     The state court's determination that Mr. Johnson failed to prove the race of the prospective jurors through documentary evidence was also unreasonable because Alabama jury lists in 1998 did not include the race of prospective jurors.  This was well known in Alabama at the time.  As Justice Johnstone wrote in his dissent from the denial of certiorari: "The law contains no requirement that the race of venirepersons be contained in any document available to defense counsel at trial.  As judges and lawyers who try cases know, jury lists do not state the race of any venireperson."  *Ex parte Johnson*, 823 So. 2d at 59 (Johnstone, J., dissenting from denial of certiorari).

68.     With respect to the state court's determination that Mr. Johnson failed to establish a prima facie case, that ruling was also an unreasonable application of, and contrary to, *Batson* as well as an unreasonable determination of the facts.  The state court imposed too high a burden at step one, requiring that Mr. Johnson prove that the prosecutors did not have race-neutral reasons for their strikes.  That is not the question at step one; the question is simply whether the totality of the relevant facts gives rise to an inference of discrimination.  *Batson*, 476 U.S. at 96-97.  As Justice Johnstone noted in his dissent, "The duty is on the State to establish its race-neutral reasons."  *Ex parte Johnson*, 823 So. 2d at 60 (Johnstone, J., dissenting from denial of certiorari).

C.    **Mr. Johnson established a prima facie case and is entitled to proceed to step two of the *Batson* process, at which the prosecutors must provide race-neutral reasons for their strikes of the black prospective jurors.**

69.    The prosecution's strikes of black prospective jurors on the basis of their race deprived Mr. Johnson of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and all other applicable federal law.

70.    Under a proper step one analysis, Mr. Johnson established a prima facie case of discrimination. The step one standard is not an onerous one. *See Batson*, 476 U.S. at 96-97. The circumstances raised by Mr. Johnson's counsel in the trial court give rise to an inference of discrimination.

71.    This Court should grant a *Batson* hearing and require the prosecutors to come forward with race-neutral reasons for their preemptory strikes. *See Madison*, 677 F.3d at 1339 ("[W]e reverse the district court's order and remand the case for the district court to complete the final two steps of the *Batson* proceeding."). After reasons are given, the Court must decide whether Mr. Johnson has established purposeful discrimination. *See Batson*, 476 U.S. at 97-98.

## II.    THE STATE WITHHELD MATERIAL EVIDENCE, VIOLATING MR. JOHNSON'S DUE PROCESS RIGHTS.

72.    At Mr. Johnson's 1998 capital trial, the State's case hinged on the testimony of one witness, Violet Ellison, who claimed she overheard Mr. Johnson confess on a three-way telephone call to shooting Deputy Hardy. In post-conviction proceedings, Mr. Johnson raised a claim under *Brady v. Maryland*, 373 U.S. 83 (1963), alleging that the State suppressed evidence that Ms. Ellison was hoping to receive a reward and was later paid for her testimony. Under *Brady*, "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment." *Id.* at 87; *see Smith v. Cain*, 565 U.S. 73, 75 (2012); *Kyles v. Whitley*, 514 U.S. 419, 432-33 (1995).

73.     After an evidentiary hearing, the state circuit court denied relief, finding that Mr. Johnson failed to establish suppression of the evidence.  (Doc. # 36-62 at 45-56.)  The Alabama Court of Criminal Appeals affirmed.  *Johnson v. State*, 379 So. 3d 994, 1065-79 (Ala. Crim. App. 2007).  The Alabama Supreme Court denied certiorari, *id.* at 994, as did the Supreme Court of the United States, *Johnson v. Alabama*, 144 S. Ct. 37 (2023).  Mr. Johnson now seeks relief on his *Brady* claim pursuant to 28 U.S.C. § 2254.

74.     The state court's decision that no *Brady* violation occurred involved an unreasonable application of clearly established federal law and was based on an unreasonable determination of the facts in light of the evidence in the record.  *See* § 2254(d).  Therefore, § 2254(d) does not preclude this Court from addressing Mr. Johnson's *Brady* claim, and this Court should find that the State suppressed material information that was favorable to the defense in violation of Mr. Johnson's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**A.     The State paid its key witness $5,000 without informing the defense, but the state courts held that this was not a due process violation.**

75.     After Deputy Hardy's murder, the sheriff's department set up a hotline to receive tips and offered a reward.  (Doc. # 36-58 at 135-36.)  A week later, still no arrest had been made.  News outlets published many details about the shooting.  (Doc. # 36-58 at 135-38; Doc. # 36-60 at 142-47.)  In one article, the Birmingham Police Chief cautioned that "too much information about the crime ha[d] been released."  (Doc. # 36-60 at 142.)  He warned that "[r]eleasing information about the circumstances of a death – like where and how many times someone was shot – makes it more difficult for authorities to determine whether the tips they receive are from

people who witnessed an incident or just heard about it from someone else . . . ."  (Doc. # 36-60 at 142.)

76.     After Mr. Johnson's arrest, news articles identified him as a suspect, disclosed that he was being held at the Jefferson County Jail, and noted that a reward had been offered for information regarding the case.  (Doc. # 36-58 at 135-38; Doc. # 36-60 at 142-47.)  Days later, Violet Ellison contacted the sheriff's office claiming to have information about the murder.  (Doc. # 36-4 at 71-72.)  Ms. Ellison said that she overheard a three-way phone call made from the jail in which a man referred to himself as "Toforest" and said that he and "Fellow"—a nickname for a man named Quintez Wilson—had shot Deputy Hardy.  (Doc. # 36-58 at 174.)[4]

77.     The State did not believe Ms. Ellison's story.  Ms. Ellison came forward on August 9, 1995; but five months later, the State presented a wholly different theory of the crime to the grand jury.  The State told the grand jury that its investigation revealed that there was "no doubt" Ardragus Ford and Omar Berry—not Mr. Johnson or Mr. Wilson—had shot Deputy Hardy.  (Doc. # 36-60 at 96-97.)  Sergeant Tony Richardson, the State's lead investigator, testified before the grand jury.  He described the crime as follows: "Ardragus Ford spins in his wheelchair, pulls up a 9mm and fires a shot.  After he fires this shot, the deputy starts to stumble down the hill at which time he was shot again by Omar Berry."  (Doc. # 36-60 at 94.)  In the three years after the grand jury proceeding, the State changed its theory of the case repeatedly.[5]

_____

[4] Ms. Ellison said she overheard additional three-way phone calls from the jail between August 4 and August 12, 1995, involving the man who referred to himself as "Toforest" and others.  (Doc. # 36-4 at 64-71.)  But she stopped listening to those calls and "put the phone down" when they "didn't have anything to do with" the murder.  (Doc. # 36-4 at 64, 71.)  The additional calls did not contain details of the shooting.  (Doc. # 36-4 at 64-71.)

[5] (See Doc. # 36-60 at 94 (State's theory in the grand jury proceeding); Doc. # 36-36 at 27 (State's theory at Mr. Ford's first trial); Doc. # 36-31 at 184 (State's theory at Mr. Johnson's first trial); Doc. # 36-5 at 81-82, 120 (State's theory at Mr. Johnson's second trial); Doc. 26-25 at 112, 114, 126 (State's theory at Mr. Ford's second trial).)

78.     During pretrial proceedings, Mr. Johnson's counsel requested that the prosecution disclose any information favorable to the defense, including promises to or agreements with state witnesses.  (Doc. # 36-60 at 83-86.)  The trial court ordered discovery (Doc. # 36-60 at 87-88), and the State produced various documents to the defense (Doc. # 36-36 at 72-73).  However, the State never informed the defense that Ms. Ellison knew about the reward and was hoping to be paid.

79.     At trial, Ms. Ellison was the centerpiece of the State's case against Mr. Johnson. The prosecutors wrote in their notes that Ms. Ellison was "the key to this case."  (Doc. # 36-59 at 57.)  Defense counsel observed, "[I]f you took Mrs. Ellison out of the mix, would Toforest Johnson even be anywhere around any of this?  No."  (Doc. # 36-6 at 6.)  As the lead trial prosecutor later testified, "I don't think the State's case was very strong, because it depended on the testimony of Violet Ellison in my opinion."  (Doc. # 36-60 at 56.)

80.     Ms. Ellison testified that, around the time of the crime, her 16-year-old daughter Katrina had a friend who was incarcerated at the Jefferson County Jail.  (Doc. # 36-4 at 66-67.) Katrina occasionally made three-way calls for her friend and other people at the jail so they could talk with multiple people without having to pay for additional calls.  (Doc. # 36-3 at 197-201; Doc. # 36-4 at 66.)  According to Violet Ellison, on August 3, 1995, Katrina made a three-way call, put the phone down, and left the room.  (Doc. # 36-4 at 49-50.)  Violet Ellison claimed that she then picked up the phone and overheard a man identify himself as "Toforest."  (Doc. # 36-4 at 60.)  She claimed that the man on the phone described Deputy Hardy's murder, saying that "Fellow" had shot one time, and then, "I shot the fucker in the head and I saw his head go back and he fell."  (Doc. # 36-4 at 61.)  Ms. Ellison waited six days to report this call to the police.  (Doc. # 36-4 at 85.)

30

81.     Ms. Ellison's story contradicted the physical evidence in the case.  For example,

Ms. Ellison testified that the man on the phone said there were two shooters.  (Doc. # 36-4 at 61.)

But the State's evidence indicated that there was only one shooter: two shots were fired in rapid

succession from the same gun.  (Doc. # 36-2 at 167; Doc. # 36-5 at 64-65.)  In addition, Ms.

Ellison claimed to have taken contemporaneous notes during the call she overheard.  (Doc. # 36-

4 at 51-59.)  But she admitted to "rewrit[ing] the notes," and many were written in past tense.

(Doc. # 36-4 at 52-53.)  Her notes also included information she learned from outside sources

after the call.  For example, she wrote Mr. Johnson's last name in her notes, but she testified that

the caller never said his own last name.  (Doc. # 36-60 at 138-140; Doc. 36-30 at 49-51.)  She

also included Deputy Hardy's nickname "Bill" in her notes because she knew Deputy Hardy

personally, but she testified that the caller never identified the victim by any name.  (Doc. # 36-

60 at 138; Doc. # 30 at 104-05.)

82.     On cross-examination, defense counsel sought to undermine Ms. Ellison's

credibility by pointing out the six-day delay between when she purportedly heard the man

confess on the phone and when she approached the police.  (Doc. # 36-4 at 85.)  Ms. Ellison

explained her motive for coming forward: "[M]y conscience bothered me and I could not sleep,

and that's why I came in."  (Doc. # 36-4 at 86.)  The lead prosecutor then argued to the jury:

> Violet Ellison is, in a case like this, some of the most important evidence one could
> find, because Violet Ellison came into this case, not as an investigator, not as
> someone who's out to get whoever did in [Deputy Hardy] . . . .  Violet Ellison was
> one of those people that just happens to be in the right place for us sometimes, much
> like an eyewitness is sometimes, except her evidence came by telephone and not by
> eyesight.

(Doc. # 36-5 at 83.)  The prosecutor added, "[S]he told you her conscience wouldn't let her do it.

And that's exactly the kind of response you would expect from a person who got into the case

like she did . . . ."  (Doc. # 36-5 at 88.)  The jury accepted the prosecutor's argument and found Mr. Johnson guilty.  (Doc. # 36-6 at 78.)

83.     In post-conviction proceedings, Mr. Johnson raised a claim under *Brady v. Maryland*, 373 U.S. 83 (1963), alleging that the State suppressed evidence during trial that Ms. Ellison knew about the reward and was hoping to receive it.  (Doc. # 36-17 at 173-74.)  Over the course of the next fifteen years—from 2003 to 2018—the *Brady* claim was the subject of extensive litigation in the Alabama courts and the United States Supreme Court.  The State initially denied the factual allegations in the claim and sought dismissal on procedural grounds.  (Doc. # 36-16 at 49.)  The Alabama courts accepted the State's procedural argument and dismissed the claim.  *Johnson v. State*, 379 So. 3d 994, 1010-11 (Ala. Crim. App. 2007).  But in 2017, the United States Supreme Court granted certiorari, vacated the ruling below, and remanded the case after the State conceded that the dismissal was improper.  *See Johnson v. Alabama*, 582 U.S. 927 (2017).  Following the remand, the State again argued that Mr. Johnson was not entitled to an evidentiary hearing, but the Alabama Court of Criminal Appeals rejected the State's arguments and remanded the case to the circuit court for an evidentiary hearing.  *Johnson v. State*, 379 So. 3d at 1063-64.

84.     In the circuit court, the State explicitly denied that it possessed any record related to a reward sought by, or awarded to, Violet Ellison.  The circuit court entered an order granting Johnson discovery of the State's file, including all documents concerning reward payments.  (Doc. # 36-58 at 36-38.)  In response, the State disclosed a file with no information about any reward payments to any witnesses.  The State told the court and Mr. Johnson that its file contained "[n]othing about anyone applying for a reward or being granted a reward."  (Doc. # 36-63 at 40.)

85.     However, a retired employee from the district attorney's office revealed to Mr.
Johnson's counsel that, at the time of Mr. Johnson's trial, the district attorney's office maintained
a separate set of reward files that contained documents about reward payments to witnesses.
(Doc. # 36-58 at 95-96.)  Mr. Johnson brought this information to the attention of the court.
(Doc. # 36-58 at 94-110.)  Only then, after representing in open court that the reward files did
not exist, did the State disclose its file regarding Ms. Ellison and the reward.  The file included a
copy of a check for $5,000, which the State paid to Ellison after Mr. Johnson's trial without
informing Mr. Johnson or his counsel.  (Doc. # 36-60 at 66.)  The file also included e-mail
correspondence between government officials specifically discussing Ms. Ellison's eligibility for
the reward and contemplating the wording of the reward paperwork to ensure its accuracy.  (Doc.
# 36-60 at 80-81.)  In addition, the file contained a letter written by then-District Attorney David
Barber requesting that the Governor grant the reward payment to Ellison.  The letter stated:
"Violet Ellison, *pursuant to the public offer of a reward*, gave information leading to the
conviction of Toforest Johnson in the Circuit Court of Jefferson County, Alabama, in the death
of Mr. Hardy."  (Doc. # 36-60 at 73 (emphasis added).)

86.     Mr. Johnson introduced these documents and others at the evidentiary hearing on
his *Brady* claim to show that the State was aware that Ms. Ellison knew about the reward offer
prior to trial and was later paid $5,000 for her testimony.  (Doc. # 36-58 at 135 – Doc. 36-60 at
147.)  In response, the State admitted that it paid Ms. Ellison $5,000 but argued that the payment
did not implicate *Brady*.  In its opening statement, the State claimed that Ms. Ellison did not
know about the reward until 2001, three years after Mr. Johnson's trial, when she heard about the
reward and *she contacted the district attorney's office to secure the payment.*  (Doc. # 26-60 at
166.)  The State then called Ms. Ellison, who testified that she first learned about the reward

when *the district attorney's office contacted her* "to come in and sign some papers" to receive $5,000 for her testimony from three years earlier.  (Doc. # 36-61 at 4-5.)  Following the hearing, the circuit court issued an order denying relief.  (Doc. # 36-62 at 45-46.)

87.     The Alabama Court of Criminal Appeals affirmed, holding that Mr. Johnson failed to show that Ms. Ellison knew about the reward at the time of trial and was hoping to receive it.  *Johnson v. State*, 379 So. 3d at 1065-79.  The court did not acknowledge that the State concealed its payment to Ms. Ellison for nearly two decades or that the State had explicitly denied, as recently as 2018, that Ms. Ellison ever sought or obtained the reward.  The court also failed to consider the contradictions between the State's and Ms. Ellison's versions of how the payment came about.  The court recognized that under longstanding Alabama law, "one must have knowledge of a reward at the time of performing the services for which the reward is offered in order to be entitled to the reward."  *Id.* at *1069 (*citing Gadsden Times v. Doe*, 345 So. 2d 1361, 1363 (Ala. Civ. App. 1977)).  But for the first time, the court held that this principle applies only to private rewards, and therefore Ms. Ellison would have been eligible for the reward even if she had not known about it until after Mr. Johnson's trial.  *Id.* at 1070-71.  Because the court found that the State did not suppress evidence, it did not address whether any evidence was favorable or material.

**B.     The state court's decision that the reward information was not suppressed was unreasonable.**

88.     The Alabama Court of Criminal Appeals, which was the last state court to review the *Brady* issue on the merits, held that Mr. Johnson failed to establish that the State suppressed the reward information.  *Johnson v. State*, 379 So. 3d at 1065-79.  That decision involved an

unreasonable application of clearly established federal law and was based on an unreasonable determination of the facts in light of the evidence in the record.  *See* 28 U.S.C. § 2254(d).

89.     The state appellate court based its conclusion concerning suppression on the factual determination that Johnson "did not prove that, at any time before or during Johnson's trial, Ellison knew about or hoped to get a reward." *Johnson v. State*, 379 So. 3d at 1079.  That determination was unreasonable in light of the evidence presented in the state court proceeding.  *See* § 2254(d)(2); *Miller-El v. Dretke*, 545 U.S. 231, 247-66 (2005).  The totality of the evidence demonstrates that Ms. Ellison knew about and was eligible for the reward from the start, which is why the State paid her in the end.  The State's own documents, when understood in their proper context and in light of the state law applicable at the time, make clear that Ms. Ellison knew about the reward prior to trial.  (Doc. # 36-60 at 66, 80-81.)  Moreover, at the evidentiary hearing in state court, Ms. Ellison's testimony directly conflicted with the State's own representations about how Ms. Ellison learned about the reward.  (*See* Doc. # 36-60 at 166, Doc. # 36-61 at 61-62.)

90.     In addition to relying on an unreasonable determination of the facts, the state court's decision is contrary to, and involves an unreasonable application of, clearly established federal law.  *See* § 2254(d)(1).  The Supreme Court has held repeatedly that a state violates *Brady* where it pays a critical witness for her testimony and conceals the payment from the defendant.  *See Banks v. Dretke*, 540 U.S. 668, 699 (2004); *Kyles v. Whitley*, 514 U.S. 419, 442 n.13 (1995); *United States v. Bagley*, 473 U.S. 667, 683-84 (1985).  Here, the State paid Ellison $5,000 and concealed the payment from Johnson.  The state court's ruling was an unreasonable application of *Brady*, *Banks*, *Kyles*, *Bagley*, and the Supreme Court's other *Brady* cases.

91.     The state court judgment is not entitled to deference under § 2254(d), and this Court must undertake a *de novo* review of the record.  *See Adkins v. Warden, Holman CF*, 710 F.3d 1241, 1255 (11th Cir. 2013); *Jones v. Walker*, 540 F. 3d 1277, 1288 n.5 (11th Cir. 2008).

### C.     Under de novo review, Johnson is entitled to a new trial due to the *Brady* violation.

92.     Under *de novo* review, the record supports a finding that Mr. Johnson has demonstrated, based on the totality of relevant circumstances, that the State violated Mr. Johnson's rights under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and all other applicable federal law.  Specifically, the record demonstrates that (1) the State suppressed evidence, (2) the suppressed evidence was favorable to the defense, and (3) the suppressed evidence was material.

93.     First, the State suppressed evidence.  The State paid Ellison $5,000 for her testimony, and Ms. Ellison would not have been eligible for such a reward if she did not have knowledge of the offer at the time she testified.  *See Gadsden Times v. Doe*, 345 So. 2d 1361, 1363 (Ala. Civ. App. 1977).  Moreover, the State's own file contained a 2001 letter written by then-District Attorney David Barber stating, "Violet Ellison, pursuant to the public offer of a reward, gave information leading to the conviction of Toforest Johnson in the Circuit Court of Jefferson County, Alabama, in the death of Mr. Hardy."  (Doc. # 36-60 at 73.)  The State concedes that it never disclosed the reward to Mr. Johnson's counsel.  In fact, it continued to deny that it made a $5,000 payment to Ellison until 18 years after Johnson first raised his *Brady* claim.  (*See* Doc. # 36-63 at 40.)

94.     Second, the suppressed evidence was favorable to the defense.  During pretrial proceedings, Mr. Johnson's counsel requested that the prosecution disclose any information favorable to the defense, including promises to or agreements with state witnesses.  (Doc. # 36-

60 at 83-86.)  If Mr. Johnson's trial counsel knew that Ms. Ellison was hoping to receive a reward, they would have used that information to undermine her credibility.[6]  The power of this line of impeachment is well recognized.  *See Kyles*, 514 U.S. at 442 n.13; *United States v. Bagley*, 473 U.S. 667, 683 (1985).

95.     Third, the suppressed evidence was material.  Under *Brady*, the materiality inquiry turns on whether there is a "reasonable probability" that the result would have been different if the suppressed evidence had been disclosed.  *Kyles*, 514 U.S. at 434-35.  Where the State's case was already weak, suppressed evidence takes on greater significance, particularly if it casts doubt on the State's most important evidence.  *See id*. at 441; *Banks v. Dretke*, 540 U.S. 668, 701 (2004).  The State's case against Mr. Johnson was weak.  The State presented no physical evidence or eyewitness evidence connecting Mr. Johnson to the crime, and Mr. Johnson maintained his innocence.  As the prosecutors prepared for trial, they referred to Ms. Ellison as "the key to this case" and wrote in their notes, "Where would we be without her?"  (Doc. # 36-59 at 57-58.)  In closing arguments, both sides focused on Ms. Ellison's testimony.  (Doc. # 36-5 at 83; Doc. # 36-6 at 6.)  And years after the trial, the lead prosecutor conceded, "I don't think the State's case was very strong, because it depended on the testimony of Violet Ellison . . . ."  (Doc. # 36-60 at 56.)  With Ms. Ellison's testimony undermined and no other evidence linking Mr. Johnson to the crime, there is a reasonable probability that at least one juror would not have voted to convict.  Mr. Johnson was denied his constitutional rights under *Brady* and the Fifth,

---

[6] Both of Mr. Johnson's trial attorneys confirmed in the state post-conviction proceedings that they would have used the suppressed reward information to impeach Ms. Ellison.  Attorney Erskine Mathis testified that he "absolutely" would have used information about Ms. Ellison hoping to receive a reward if he had known about it.  (Doc. # 36-59 at 74.)  He explained, "If [Ms. Ellison] had a motive to testify other than just to come up here and tell the truth, I feel like a jury needs to know that in making their determination as to guilt or innocence."  (Doc. # 36-59 at 74.) Attorney Darryl Bender testified, "Let's assume that I knew that the sheriff's department had gone out to her and told her, [t]here is some reward money that you would be subject to if you testified.  That would have been a great reason for me to bring it up."  (Doc. # 36-59 at 187.)

Sixth, Eighth, and Fourteenth Amendments to the United States Consitution.  This Court should

vacate Mr. Johnson's conviction.

### III.    THE STATE VIOLATED MR. JOHNSON'S DUE PROCESS RIGHTS WHEN IT KNOWINGLY PRESENTED FALSE TESTIMONY AGAINST HIM.

96.    During Mr. Johnson's trial, the State introduced testimony that it knew to be false,

violating Mr. Johnson's rights.  *See Napue v. Illinois*, 360 U.S. 264, 269 (1959).  There is a

reasonable likelihood that the false testimony could have affected the judgment of the jury and

indeed had a substantial influence on the verdict.  Mr. Johnson raised this claim in Claim V of

his Third Amended Petition.  (Doc. # 36-17 at 190-94.)  This Court should conduct an

evidentiary hearing, review the claim on the merits, vacate Mr. Johnson's conviction, and order a

new trial.

97.    *First*, the State presented the testimony of Violet Ellison in which she stated that

the reason she came forward with her story was that her conscience was bothering her.  Her

relevant testimony is as follows:

| | |
|---|---|
| DEFENSE COUNSEL: | But it was so important to you on the 3rd that you took these notes down verbatim about this conversation, and yet you took no action whatsoever about it for six days. |
| MS. ELLISON: | Because I did not want to get involved because I felt like if a person would shoot a police officer with a uniform on, what would they do to me?  And I did not want to get involved.  That's why I didn't talk.  And my conscience bothered me and I could not sleep, and that's why I came in. |

(Doc. 36-4 at 86.)  In fact, as the State knew, Ms. Ellison actually came forward pursuant to the

reward offer in the case.

98.    *Second*, the State elicited false testimony from Officer James Evans.  Officer

Evans was the Homewood police officer who approached Mr. Ford's car at the Super 8 motel in

38

Homewood at approximately 4:00 a.m. on the night of the shooting.  (Doc. # 36-3 at 151.)

Officer Evans testified falsely that he approached the car Mr. Johnson was in on the night of the

murder because a witness at the hotel had described seeing a 1972 black Monte Carlo (which

was the make and model of the car Mr. Johnson was in), and that that description had been

broadcast over the police radio.  (Doc. # 36-3 at 151.)  The State knowingly elicited this false

hearsay testimony, in an attempt to convince the jury that witnesses had seen Mr. Ford's Monte

Carlo at the Crown Sterling Suites that night.  (Doc. # 36-3 at 151 (Evans testifying that "[o]nce

we were in the parking lot we were able to locate a car matching the description of the BOLO

["be on the lookout"] that was given out of a early '70s model Monte Carlo black in color with a

black top").)  In addition to being rank hearsay, Officer Evans's testimony was false—there had

never been a "BOLO" for an early '70s model black Monte Carlo, only a vague description of a

dark-colored car, unknown make, with a cloth type top.  (Doc. # 36-17 at 184-85.)  Officer

Evans' testimony was obviously designed to create the impression that the exact car that Mr.

Johnson was in the night of the shooting was seen leaving the hotel immediately following the

shooting.  Because there was no eyewitness or forensic testimony presented linking Mr. Johnson

in any way to the crime scene, Officer Evans' false hearsay testimony was prejudicial.

99.     *Third*, the State also elicited the false testimony from Officer Evans that the

Monte Carlo Mr. Johnson had been in the night of the murder was never searched, when in fact

the prosecutor knew that it had been searched.  (Doc. # 36-3 at 160.)  This point was relevant

because the only other evidence that even tangentially connected Mr. Johnson to the crime was

the testimony of Latanya Henderson at his second trial that she saw Mr. Johnson with a gun on

the night of the murder.  However, she could not describe the alleged gun, and no gun was ever

recovered, despite the fact that she said Mr. Johnson hid the gun under the dashboard of Mr.

Ford's car, and that the police subsequently impounded and searched the car.  Officer Evans's

false testimony obviously implied that the gun Latanya Henderson said she saw Mr. Johnson

hide in the car would have still been in the car.  The prosecutor knew that this testimony was

false.  In fact, on July 26, 1995, Sergeant A.L. Finley of the Jefferson County Sheriff's

Department obtained a search warrant from Judge Bahakel to search the car.  Sergeant Finley

searched the car later that day and did not find a gun or anything else incriminating.  (Doc. # 36-

17 at 189.)  Even if Officer Evans did not know that the car was later searched, the prosecutor

knew it had been searched, and yet he elicited the false testimony anyway and compounded the

violation by repeating it in his closing argument.  (Doc. # 36-5 at 102.)

100.    The prosecution's presentation of evidence that it knew to be false deprived Mr.

Johnson of his right to due process, a fair trial, and a reliable sentence in violation of the Fifth,

Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and all other

applicable federal law.  The Court of Criminal Appeals unreasonably denied Claim III on the

ground that it could have been but was not raised at trial and on appeal.  *Johnson v. State*, 379

So. 3d 994, 1012 (Ala. Crim. App. 2007).  Following an evidentiary hearing, this Court should

review the claim on the merits, vacate Mr. Johnson's conviction, and order a new trial.

## IV.    TRIAL COUNSEL FOR MR. JOHNSON WERE CONSTITUTIONALLY INEFFECTIVE.

101.    The individual and cumulative effect of counsel's deficient performance denied

Mr. Johnson his right to effective assistance of counsel in violation of the Sixth, Eighth, and

Fourteenth Amendments to the United States Constitution.

102.    Mr. Johnson's lawyers utterly failed to investigate his capital case.  A year after

being appointed, his counsel finally moved for funding to hire an investigator.  (Doc. # 36-18 at

160-161.)  Mr. Johnson's counsel, who conceded in a written pleading that they did not have the

"expertise," "formal training," or the "capabilities and the time . . . to conduct all the investigation necessary and essential to provide the defendant with an adequate defense" (Doc. # 36-18 at 44-45), hired investigator Steve Saxon.  (Doc. # 36-18 at 44-46, 49-50).

103.    Mr. Saxon suffered from brain damage, alcoholism, and homelessness.  His documented IQ was 63.  (Doc. # 36-18 at 44-58.)  During the period that he was supposed to be working on Mr. Johnson's case, Mr. Saxon was consumed by his chronic legal, personal, and financial problems; he was arrested twice, for harassing two different women.  (Doc. # 36-18 at 51-56.)  In addition, on a day when Mr. Saxon's time sheet indicates he spent the entire day investigating Mr. Johnson's case, medical records indicate that Mr. Saxon was instead at a Birmingham hospital being evaluated for suicidal ideation and possible bipolar disorder.  (Doc. # 36-18 at 47.)   On another day he billed for watching the trial of the co-defendant, Ardragus Ford, he was actually in Bessemer Municipal Court paying a fine in one of the harassment cases he was arrested for while supposedly working on Mr. Johnson's case.  (Doc. # 36-18 at 47.) Unsurprisingly, Mr. Saxon never contacted any witnesses, exaggerated the hours that he worked on Mr. Johnson's case, and failed to obtain a single relevant document.  (Doc. # 36-18 at 45-51, 57-58.)

104.    Mr. Johnson's attorneys were forced to do what they could to make up for Mr. Saxon's inability to investigate, and they did speak with some witnesses.  But they were unable to follow up on the numerous avenues of investigation that needed to be pursued, and unreasonably failed to discover and present the numerous readily available alibi, impeachment, and mitigation witnesses who were willing to testify.  As Mr. Johnson's lawyers wrote in their initial request for funds to hire Mr. Saxon:

> Defendant's attorney does not have the expertise in criminal investigation work to investigate the facts and interview the witnesses surrounding the alleged crime with

41

which the Defendant is charged.  The Defendant's attorney has no formal training
in criminal investigation, nor do they have the capabilities and time to interview all
the potential witnesses and conduct all the investigation necessary and essential to
provide the Defendant with an adequate defense.

(Doc # 36 at 58.)

105.    There is a reasonable probability that, but for counsel's deficient performance, the

outcome of the trial would have been different.  *Strickland v. Washington*, 466 U.S. 668, 694

(1984); *Debruce v. Comm'r, Ala. Dep't of Corr.*, 758 F.3d 1263, 1279 (11th Cir. 2014).  Mr.

Johnson raised detailed claims of ineffective assistance of trial counsel in his Third Amended

Petition.  (Doc. # 36-18 at 41-164.)  The state courts afforded an evidentiary hearing with respect

to only some of these claims and denied other claims without granting an evidentiary hearing.

Even with respect to claims for which Mr. Johnson was granted a hearing, he was not permitted a

full and fair hearing.

> **A.    Trial counsel were ineffective for failing to investigate and call several
> witnesses who would have testified that another inmate impersonated Mr.
> Johnson while talking on the jailhouse phone.**

106.    Trial counsel performed deficiently by failing to investigate and call witnesses to

establish that another inmate actually made the "incriminating" call that convicted Mr. Johnson.

Had counsel presented this evidence, there is a reasonable probability that the jury would have

had a reasonable doubt as to Mr. Johnson's guilt, and the result of the trial would have been

different.  Mr. Johnson raised this claim in Claim XIX(F)(24) of his Third Amended Petition

(Doc. # 36-18 at 158-161) and presented evidence in support of it during postconviction

proceedings.  This Court should review the claim on the merits, vacate Mr. Johnson's conviction,

and order a new trial.

107.    During postconviction proceedings, Mr. Johnson presented ample, unrebutted

evidence of the availability of witnesses to testify and the lack of strategy involved in counsel's

failure to call these witnesses.  First, Mr. Johnson presented the testimony of Fred Carter, who testified via sworn affidavit that he impersonated Toforest Johnson's voice when he called Katrina Ellison and other women from the Jefferson County Jail.  (Doc. # 36-27 at 51-52.)  Mr. Carter testified that, during the time he was incarcerated with Mr. Johnson, "I would use the phone in the Jefferson County Jail and pretend to be Toforest Johnson, because I thought females would want to have phone sex with Toforest Johnson because the crime he was accused of was big news [around] Jefferson County at the time."  (Doc. # 36-27 at 51.)  Mr. Carter testified that one of the girls he spoke with while impersonating Toforest Johnson was Katrina Ellison.  (Doc. # 36-27 at 52.)  Mr. Carter testified that he knew the basic facts of the crime of which Mr. Johnson was accused.  (Doc. # 36-27 at 51-52.)

108.    Mr. Johnson then presented the testimony of six additional witnesses who were incarcerated with Mr. Carter and Mr. Johnson in the Jefferson County Jail.  Each of these witnesses corroborated Mr. Carter's account—namely, that Mr. Carter regularly impersonated other inmates, including Toforest Johnson, over the telephone—and that details of the Hardy murder were readily known around the jail.  (*See* Doc. # 36-27 at 57-59 (Jerramey Lyndell Roper); Doc. # 36-27 at 60-62 (Trent Benson); Doc. # 36-27 at 63-65 (Charles Cooper); Doc. # 36-27 at 66-68 (Costillo Arteen Johnson); Doc. # 36-27 at 69-71 (Bobby White); Doc. # 36-27 at 72-73 (Cortney Woods).)

109.    Trial counsel recognized that the State's argument at trial rested on the assertion that Toforest Johnson made these phone calls.  This is revealed by the fact that trial counsel filed a pre-trial motion and argued that Ms. Ellison's testimony should be excluded on the grounds that she could not properly authenticate Mr. Johnson's voice.  (Doc. # 36 at 82-83; Doc. # 36-28

at 112-161.)  Trial counsel should have also called readily available witnesses to challenge what they recognized to be the crux of the State's case.

110.    Trial counsel was well aware of some of these witnesses, and should have been aware of all of them.  Mr. Carter testified for the State in Mr. Johnson's trials, to establish Mr. Johnson's access to the jail telephone.  (Doc. # 36-3 at 183.)  During this testimony, Mr. Carter acknowledged knowing Katrina Ellison, and talking to her from the jail.  (Doc. # 36-3 at 181.) Yet defense counsel failed to interview him.  (*See* Doc. # 36-3 at 184 (defense counsel introducing himself on the cross-examination of Mr. Carter by saying, "Maybe you've met me before, I don't know").)  Accordingly, defense counsel failed to ask Mr. Carter on cross-examination anything about his impersonations of Mr. Johnson.  Mr. Carter testified in postconviction that he would have willingly explained what he had done.  (Doc. # 36-27 at 52.) According to Mr. Carter's testimony, "I never wanted anyone to get in trouble because of my impersonations.  I was just young and trying to have fun while locked up in Jefferson County Jail."  (Doc. # 36-27 at 52.)

111.    Defense counsel failed to elicit testimony from Mr. Carter (either on cross-examination or by calling him as a defense witness), or from others, regarding Mr. Carter's impersonations of Toforest Johnson—testimony that would likely have raised at least a reasonable doubt as to whether Mr. Johnson was the man claiming to be "Toforest" on the phone call Ms. Ellison claimed to have overhead.  Mr. Carter actually mentioned one of these witnesses, Jerramey Roper, during his testimony at Mr. Johnson's first trial, yet trial counsel also failed to speak with Mr. Roper.  (Doc. # 36-29 at 111; Doc. # 36-27 at 58-59.)  Had they spoken to Mr. Roper, defense counsel would have learned that Mr. Roper, who was incarcerated with Mr. Carter, overheard Mr. Carter make phone calls and pretend to be Mr. Johnson.  (Doc. # 36-

44

29 at 111; Doc. # 36-27 at 58-59.)  Mr. Roper testified that he was available to testify at the time of Mr. Johnson's trial and would have done so, had he been asked.  (Doc. # 36-29 at 111; Doc. # 36-27 at 58-59).[7]

112.   Mr. Johnson also presented the testimony of Kedric Johnson, who testified that Fred Carter impersonated people while he was incarcerated in the Department of Corrections ("DOC"), a fact that could have been learned by trial counsel had they requested Mr. Carter's DOC records, which postconviction counsel easily obtained, and which include documented evidence of repeated impersonations.  (Doc. # 36-27 at 74-78.)  Mr. Johnson also entered into evidence the DOC incident reports indicating that Mr. Carter had been disciplined for his impersonations prior to Mr. Johnson's trial.  (Doc. # 36-36 at 75-76.)  Kedric Johnson's name appeared in these reports, further suggesting that trial counsel could have easily obtained Kedric Johnson's name had they only requested Mr. Carter's DOC records.  (Doc. # 36-36 at 75-76.)

113.   Finally, Mr. Johnson presented the testimony of his trial lawyers to support this claim.  Mr. Mathis testified that he did not remember conducting any investigation into the jail phone calls or Mr. Carter's impersonations.  (Doc. # 36-37 at 35-36.)  Mr. Bender testified that he had no idea that Mr. Carter was known for impersonating Mr. Johnson, but that it would have been something he would have wanted to know.  (Doc. # 36-37 at 124.)  But Mr. Bender then admitted that he had never even considered the possibility that someone could have been impersonating Mr. Johnson during the phone call and that, as a result, he did not investigate that possibility.  (Doc. # 36-37 at 130.)

---

[7] To further support his claim, Mr. Johnson offered the testimony of Jason Marks, an investigator for Mr. Johnson's postconviction counsel.  Mr. Marks testified that he located Mr. Roper easily and that Mr. Roper, unprompted, discussed Mr. Carter's impersonations at length.  (Doc. # 36-27 at 53-54.)  This evidence further establishes that these witnesses were known to trial counsel, easy to locate, and readily available and willing to testify at Mr. Johnson's trial.

114.    Mr. Johnson's trial attorneys provided no viable explanation for why they did not investigate or call these witnesses.  Just the opposite; both thought the testimony would have been important.  (Doc. # 36-37 at 37, 124.)  Because the phone calls were the only evidence in the case, Mr. Mathis thought it was important to investigate their origin and content.  (Doc. # 36-37 at 37.)  Mr. Mathis also testified that if he had learned that Fred Carter was known for impersonating Mr. Johnson, he would have presented that evidence to the jury.  (Doc. # 36-37 at 37-38.)

115.    Trial counsel's failure to present evidence about Fred Carter's impersonations was not trial strategy because, due to their inadequate investigation, counsel did not know that these witnesses existed.  *See Debruce*, 758 F.3d at 1274 (stating that counsel "chose to abandon [his] investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible") (internal quotations omitted); *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991) (explaining that "our case law rejects the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them").

116.    Moreover, it was unreasonable for counsel not to investigate the origin and content of the jail phone calls.  Both Mr. Bender and Mr. Mathis agreed that Violet Ellison's testimony was the only evidence linking Mr. Johnson to the crime.  (Doc. # 36-37 at 26 (Mathis); Doc. # 36-37 at 115 (Bender).)  Because Ms. Ellison admitted that she had never met Toforest Johnson, and thus had no way of knowing whether the inmate she claimed to have overheard making incriminating comments was actually Mr. Johnson or someone else, it was imperative that trial counsel investigate the origin and content of the phone calls.

117.     Counsel's deficient performance prejudiced Mr. Johnson.  As trial counsel acknowledged at the remand hearing, the State's entire case rested on Ms. Ellison's testimony about the phone call.  (Doc. # 36-47 at 138.)  Therefore, evidence that another inmate in the jail routinely impersonated Mr. Johnson on the telephone would have significantly undermined the State's case.  (Doc. # 36-37 at 37-38.)  This evidence would likely have raised a reasonable doubt in the minds of the jurors, particularly because the overheard telephone call was the only piece of evidence linking Mr. Johnson to the crime.  Trial counsel acknowledged at the remand hearing that evidence that Fred Carter had impersonated Toforest Johnson and other inmates would have been important to Mr. Johnson's case.  (Doc. # 36-37 at 153.)  Considering the lack of evidence against Mr. Johnson, had trial counsel discovered and presented this evidence, there is a reasonable likelihood that the trial would have ended with a different result.

118.     The failure of Mr. Johnson's counsel to investigate and call witnesses to establish that another inmate actually made the phone call that convicted him deprived Mr. Johnson of his rights in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and all other applicable federal law.  The Alabama Court of Criminal Appeals denied Claim XIX(F)(24) on the merits.  *Johnson v. State*, 379 So. 3d 994, 1042-44 (Ala. Crim. App. 2007).  To the extent that 28 U.S.C. § 2254(d) applies, the state court denial was contrary to, and an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts in light of the evidence presented.  This Court should review the claim on the merits, vacate Mr. Johnson's conviction, and order a new trial.

**B.     Trial counsel were ineffective for failing to present additional favorable evidence that would have cast doubt on Mr. Johnson's guilt.**

119.     Trial counsel performed deficiently by failing to present evidence that would have cast doubt on Mr. Johnson's guilt, namely, evidence that a man who did not match Mr. Johnson's

description was seen at the scene of the murder getting into a car that did not match the car Mr.

Johnson was in that night.  As detailed below, trial counsel presented this testimony at Mr.

Johnson's first trial, which resulted in a hung jury, promised the testimony in opening statement

at his second trial, and then failed to present it.  Had counsel presented this evidence, there is a

reasonable probability that the jury would have had a reasonable doubt as to Mr. Johnson's guilt,

and the result of the trial would have been different.  Mr. Johnson raised this claim as Claim

XIX(F)(5) in his Third Amended Petition (Doc. # 36-18 at 141-44), and presented evidence in

support of it during postconviction proceedings.  This Court should review the claim on the

merits, vacate Mr. Johnson's conviction, and order a new trial.

120.    In Mr. Johnson's first trial, the defense presented ten witnesses, including

Marshall Cummings and Sergeant Richardson.  (Doc. # 36-28 at 110.)  Mr. Cummings was a

guest at the Crown Sterling Suites on the night of the shooting.  (Doc. # 36-43 at 77-78.)  He

testified that he was in his hotel room when he heard two gunshots within two to four seconds of

each other.  (Doc. # 36-43 at 79, 81-82.)  Mr. Cummings testified that he then looked out the

window and saw a tall man—"roughly, about six foot tall"—walk to a "light-colored" car, slam

the driver's side door shut, back up toward Deputy Hardy's body, drive with the car's lights off

until he reached the exit of the hotel parking lot, turn on the car's lights, and drive away from the

scene of the murder.  (Doc. # 36-44 at 4-6, 28, 30.)  Mr. Cummings testified that he did not see

anyone in a wheelchair in the parking lot.  (Doc. # 36-44 at 7.)

121.    The defense also called Sergeant Richardson, the lead detective on the case, to

testify on behalf of Mr. Johnson.  Sergeant Richardson testified that the car in which Mr.

Johnson was riding on the night of the shooting was a black Monte Carlo, owned by Ardragus

Ford. (Doc. # 36-44 at 43-44.) Sergeant Richardson testified that the driver's side door of that car would not open, and that Mr. Ford was confined to a wheelchair. (Doc. # 36-44 at 44-45.)

122.   The testimony of Mr. Cummings and Sergeant Richardson, considered together, was significant for several reasons. First, Mr. Cummings was the only eyewitness to testify for either side that he saw a potential suspect at the scene of the shooting. Second, Mr. Cummings saw this man just seconds after the shooting occurred. Third, Mr. Cummings's physical description of the man does not match Mr. Johnson. The record establishes that Mr. Johnson is only five-foot-five-inches-tall. (Doc. # 36-23 at 3.) Mr. Johnson would never be mistaken for a six-foot-tall man. Fourth, the color of the car Mr. Cummings saw drive away from the scene does not match the color of the car Mr. Johnson was riding in the night of the shooting. Fifth, the car Mr. Cummings saw at the scene had an operable driver's side door. The car Mr. Johnson was riding in on the night of the shooting did not. In sum, seconds after the shooting, Mr. Cummings saw a man who was significantly taller than Mr. Johnson walk through the parking lot where Deputy Hardy was shot to a car that was not the car in which Mr. Johnson was riding on the night of the shooting, open the driver's side door (which was inoperable in Mr. Johnson's car), get into the car, and drive away, keeping the car's headlights off until it left the parking lot. After hearing this testimony, the jury could not reach a verdict at the guilt phase of Mr. Johnson's first trial and Judge Bahakel declared a mistrial. (Doc. # 36 at 11.)

123.   At Mr. Johnson's second trial, the State again relied on the testimony of Violet Ellison. (Doc. # 36-47 at 138; Doc. # 36-48 at 112-114; Doc. # 36-49 at 120-123.) The record establishes that Mr. Johnson's lawyers planned to present the testimony of Mr. Cummings and Sergeant Richardson at the second trial as well. Both Sergeant Richardson and Mr. Cummings were under subpoena and available for the second trial; the State subpoenaed Sergeant

Richardson and Mr. Johnson's lawyers subpoenaed Mr. Cummings on the very day the second trial started.

124.     In his opening statement, Mr. Bender told the jurors, "[Y]ou'll hear from Tony Richardson during the course of this trial."  (Doc. # 36-2 at 101.)  In fact, Mr. Bender mentioned Sergeant Richardson seventeen times during his opening statement, repeatedly stressing how integral Sergeant Richardson was to the case.  (Doc. # 36-2 at 101, 103-04, 106-07, 111-14, 117-18.)  Mr. Bender explicitly promised the jurors that Sergeant Richardson would testify that the car Mr. Johnson was riding in on the night of the shooting had an inoperable door: "Tony Richardson will tell you that the driver's side door on Ardragus Ford's car will not open."  (Doc. # 36-2 at 117-18; *see also* Doc. # 36-2 at 118 ("[O]ne of the doors won't open, so obviously that doesn't fit.").)  After the State rested without calling Sergeant Richardson as a witness, defense counsel told the court that Sergeant Richardson would be the first defense witness.  (*See* Doc. # 36-4 at 99 ("Tony Richardson is going to be our first witness.").)  But defense counsel never called Sergeant Richardson.

125.     With respect to Mr. Cummings, Mr. Bender did not mention Mr. Cummings by name in his opening statement; however, Mr. Bender discussed the testimony of one or more hotel guests in his opening, and it is clear that he was referring to Mr. Cummings.  (Doc. # 36-2 at 117-18.)  And, as noted above, Mr. Bender told the jury it would hear important testimony from Sergeant Richardson about the inoperable door of the car in which Mr. Johnson was riding the night of the shooting.  (Doc. # 36-2 at 117-18.)  The only person who could testify regarding the functional door of the car in the hotel parking lot was Marshall Cummings.

126.     Trial counsel failed to call Mr. Cummings and Sergeant Richardson at the second trial and did not otherwise present the favorable evidence outlined above.  The failure was not

50

for lack of witness availability.  As discussed above, both Mr. Cummings and Sergeant

Richardson were under subpoena for the second trial.  Sergeant Richardson was actually in the

courtroom during some of the second trial.  (Doc. # 36-5 at 29-30.)  Moreover, Mr. Johnson

presented unrebutted testimony during the Rule 32 evidentiary hearing that both witnesses were

available and willing to testify and, had they been called, would have testified consistently with

their testimony at the first trial.  (Doc. # 36-43 at 199; Doc. # 36-44 at 32.)

127.    The jury never heard any of the testimony that counsel presented at Mr. Johnson's

first trial and that was promised in his opening statement at the second trial.  In fact, it was the

State that called the only eyewitness hotel guest, Larry Osborne, who testified at the second trial.

Mr. Osborne did not see anyone in the parking lot (Doc. # 36-2 at 171), and unlike Mr.

Cummings, Mr. Osborne could not provide any physical description of a potential suspect or any

information about a car with a functional driver's side door.

128.    Mr. Johnson established that trial counsel's failure to call the favorable defense

witnesses did not amount to reasonable trial strategy.  Mr. Mathis testified that he had "no

recollection" of why defense counsel failed to present the favorable evidence at the second trial

(Doc. # 36-48 at 129-30) and conceded that the failure to do so could have been a mistake (Doc.

# 36-48 at 130).

129.    Mr. Bender provided post hoc rationalizations for the failure to call the favorable

witnesses.  Because these rationalizations are unreasonable, demonstrably false, and directly

contradict the trial and postconviction records, they cannot constitute a legitimate strategic basis

for his actions.

130.    Mr. Bender contended that if he did not present the testimony of Sergeant

Richardson that he promised in his opening statement (and the record confirms he did not), it

could *only* have been because the State elicited the promised testimony anyway. (Doc. # 36-49 at 194.) Mr. Johnson disproved this contention by demonstrating that neither the State nor the defense presented any evidence about the inoperable car door during the second trial. Further, Mr. Bender was aware that the State had not presented this evidence, because he announced his intention to call Sergeant Richardson after the State rested its case (Doc. # 36-4 at 99), but then failed to do so.

131.     With respect to Mr. Cummings, Mr. Bender contended that he did not call him as a witness at the second trial because after the first trial, he spoke to "all 14" of the jurors, and their comments convinced him not to present Mr. Cummings's testimony at the second trial. (Doc. # 36-49 at 184-190.) Mr. Johnson disproved this second rationalization as well, by presenting testimony from eight of the twelve living members of the jury from the first trial.[8] All eight jurors confirmed that they did not speak with Mr. Bender or any defense lawyer or investigator about the case following the trial. (Doc. # 36-51 at 34-46.) The State made no attempt to contest the testimony related to the eight jurors. (Doc. # 36-51 at 48-49.)

132.     Mr. Johnson proved that counsel's failure to present this exculpatory testimony prejudiced him by demonstrating that there was a reasonable probability that, but for counsel's deficient performance, the result of the trial would have been different. As noted above, the State's case against Mr. Johnson was indisputably weak. The trial prosecutor, Jeff Wallace, testified in postconviction proceedings that the State's case "depended" on the testimony of one witness, Violet Ellison, and acknowledged, "I don't think the State's case was very strong." (Doc. # 36-47 at 138.)

---

[8] The eight jurors testified via sworn affidavit.

133.    The testimony of these credible and disinterested witnesses would have been consistent with Mr. Johnson's alibi defense, and indeed would have strengthened it. At the second trial, defense counsel called two alibi witnesses, Ms. Dunning and Ms. Farris. (Doc. # 36-5 at 18-59.) Both alibi witnesses remembered seeing Mr. Johnson at Tee's Place on the night of the shooting and were able to identify the shirt Mr. Johnson was wearing at Tee's Place as the same shirt he was wearing in his arrest photograph taken the night of the shooting. (Doc. # 36-5 at 23, 27, 47-51.) Both witnesses, however, were long-time friends of Mr. Johnson (Doc. # 36-5 at 19, 44), which provided an easy avenue for the prosecution to exploit their alleged bias in favor of Mr. Johnson. The testimony of Mr. Cummings and Sergeant Richardson, two highly credible witnesses who had no personal relationship with Mr. Johnson, would have significantly strengthened Mr. Johnson's alibi defense by placing a suspect on the scene who did not look like Mr. Johnson and by demonstrating that that suspect got into a car that was not the car in which Mr. Johnson was riding on the night of the shooting. Mr. Cummings's and Sergeant Richardson's testimony would have strengthened Mr. Johnson's defense and given the jury a reason to doubt Mr. Johnson's guilt.

134.    The failure of Mr. Johnson's counsel to present compelling evidence that would have cast doubt on his guilt deprived Mr. Johnson of his rights in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and all other applicable federal law. The Court of Criminal Appeals denied Claim XIX(F)(5) on the merits. *Johnson v. State*, 379 So. 3d 994, 1049-54 (Ala. Crim. App. 2007). To the extent that 28 U.S.C. § 2254(d) applies, the state court denial was contrary to, and an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts in light of

the evidence presented.  This Court should review the claim on the merits, vacate Mr. Johnson's

conviction, and order a new trial.

C.     **Trial counsel were ineffective for failing to call compelling alibi witnesses who were or should have been known to them.**

135.    Trial counsel performed deficiently by failing to call alibi witnesses who testified

at Mr. Johnson's first trial and at his codefendant's trials, as well as witnesses who were either

known or could have been discovered through competent investigation.  For example, Velonique

Sanders testified at Mr. Johnson's first trial that she clearly remembered seeing Mr. Johnson at

Tee's Place for several hours on the night of July 18 and morning of July 19, including during

the time Deputy Hardy was killed.  (Doc. # 36-31 at 58-62.)  Ms. Sanders was interviewed by the

police only a few weeks later, and confirmed Mr. Johnson's alibi.  (Doc. # 36-17 at 167.)  A

witness named Barbetta Hunt was also interviewed by the police soon after the murder of Deputy

Hardy.  (Doc. # 36-17 at 167.)  Like Ms. Sanders, she clearly remembered seeing Mr. Johnson at

Tee's Place at the time of the murder.  Ms. Hunt testified at both Mr. Johnson's and Mr. Ford's

first trials, but, like Ms. Sanders, was not called as a witness at Mr. Johnson's second trial.  (Doc.

# 36-31 at 107-124; Doc. # 36-35 at 74-96.)  A witness named Kimberly Colvin also testified at

Mr. Johnson's and Mr. Ford's first trials.   (Doc. # 36-31 at 81-104; Doc. # 36-34 at 100-109;

Doc. # 36-34 at 200 – Doc. # 36-35 at 31.)  Like Ms. Sanders and Ms. Hunt, she clearly

remembers seeing Mr. Johnson at Tee's Place at the time Deputy Hardy was killed but was not

called to testify at Mr. Johnson's second trial.  (Doc. # 36-17 at 167.)  These are only a handful

of the witnesses that were willing and able to testify that Mr. Johnson was nowhere near the

Crown Sterling Suites at the time Deputy Hardy was killed.  The failure to call these witnesses

was prejudicial because had counsel presented this evidence, there is a reasonable probability

that the jury would have had a reasonable doubt as to Mr. Johnson's guilt, and the result of the

trial would have been different.

> **1.    Trial counsel were ineffective in failing to call the alibi witnesses who testified in earlier trials (Claims XIX(F)(1) and (2)).**

136.    Trial counsel performed deficiently by failing to call alibi witnesses who testified

at Mr. Johnson's first trial and at Mr. Ford's first trial.  Had counsel called these witnesses, there

is a reasonable probability that the jury would have had a reasonable doubt as to Mr. Johnson's

guilt, and the result of the trial would have been different.  Mr. Johnson raised the claim

regarding the alibi witnesses who testified at his first trial in Claim XIX(F)(1) of his Third

Amended Petition, (Doc. # 36-18 at 136-137) and the claim regarding the alibi witnesses who

testified at Mr. Ford's first trial in Claim XIX(F)(2) of his Third Amended Petition (Doc. # 36-18

at 137).  As described below, he presented evidence in support of both claims during

postconviction proceedings.  This Court should review the claim on the merits, vacate Mr.

Johnson's conviction, and order a new trial.

137.    The witnesses who testified at Mr. Johnson's and Mr. Ford's first trials each

testified in postconviction proceedings that they were available and willing to testify in Mr.

Johnson's second trial, had they been asked.  (Doc. # 36-25 at 168 (Holt); Doc. # 36-26 at 58

(Hunt); Doc. # 36-26 at 117 (Colvin); Doc. # 36-26 at 190 (Sanders).)  These witnesses included

employees and customers at Tee's Place.  (Doc. # 36-25 at 166-168 (Holt); Doc. # 36-26 at 57-

59 (Hunt); Doc. # 36-26 at 116-17 (Colvin); Doc. # 36-26 at 189-91 (Sanders).)  The evidence

established that had the witnesses been called, they would have testified, consistently with their

prior testimony, that they saw Mr. Johnson and Mr. Ford at Tee's Place at the time of Deputy

Hardy's death.

138.    Trial counsel offered no viable explanation as to why these witnesses were not called at Mr. Johnson's second trial.  Mr. Mathis testified that he could not recall why these witnesses were not called.  (Doc. # 36-37 at 53-55.)  He conceded that the testimony of some of these witnesses may have contributed to the jury in Mr. Johnson's first trial being unable to reach a verdict.  (Doc. # 36-37 at 52.)

139.    Mr. Bender initially hypothesized that he failed to call one of these witnesses because she testified inconsistently.  (Doc. # 36-37 at 157, 167.)  This was disproved and Mr. Bender ultimately conceded that the testimony of the three alibi witnesses called at Mr. Johnson's first trial would have, in fact, been consistent with a theory of defense presented at Mr. Johnson's second trial, namely, that Mr. Johnson was at Tee's Place at the time that Deputy Hardy was killed.  (Doc. # 36-37 at 158.)

140.    Mr. Bender offered one explanation for why he failed to call three particular witnesses, Ms. Colvin, Ms. Hunt and Ms. Sanders, who were the alibi witnesses who testified at Mr. Johnson's first trial.  Mr. Bender testified that he believed that one of them obtained a criminal conviction during the time between the two trials.  (Doc. # 36-37 at 157.)  He could not remember which witness it was who may have obtained the criminal conviction.  (Doc. # 36-37 at 157.)  Mr. Johnson introduced unrebutted evidence during the remand proceedings establishing that *none* of the three witnesses received criminal convictions during the time between Mr. Johnson's two trials.  (Doc. # 36-27 at 31-40.)

141.    If trial counsel indeed decided not to call all three of these witnesses because they mistakenly thought that one of them had recently obtained a criminal conviction, that decision was the unreasonable product of a complete lack of investigation, as the criminal history (or lack thereof) of all three witnesses was readily obtainable from the clerk's office in the courthouse in

56

which Mr. Johnson was tried. *See Rompilla v. Beard*, 545 U.S. 374, 383 (2005) (finding deficient performance because of counsel's failure to obtain relevant records from courthouse where petitioner was tried); *see also Wiggins v. Smith*, 539 U.S. 510, 524 (2003). Indeed, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91; *see also Debruce*, 758 F.3d at 1274. No reasonable professional judgments supported the limitation of investigation in this case.

142. Counsel's deficient performance prejudiced Mr. Johnson because the State's case against Mr. Johnson was not strong, by the lead prosecutor's own admission. (Doc. # 36-47 at 138.) The fact that both of Mr. Johnson's and Mr. Ford's first trials ended with deadlocked juries suggests that the cases were close, and that the credible alibi witnesses likely contributed to the difference between a conviction and an acquittal or a hung jury.

143. The failure of Mr. Johnson's counsel to call these alibi witnesses deprived Mr. Johnson of his rights in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and all other applicable federal law. The Court of Criminal Appeals affirmed the circuit court's ruling on the merits with respect to Claims XIX(F)(1) and (2). *Johnson v. State*, 379 So. 3d 994, 1034-36 (Ala. Crim. App. 2007). To the extent that 28 U.S.C. § 2254(d) applies, the state court denial was contrary to and an unreasonable application of clearly established federal law and was based on an unreasonable determination of the facts in light of the evidence presented. This Court should review the claims on the merits, vacate Mr. Johnson's conviction, and order a new trial.

### 2. Trial counsel were ineffective for failing to call the alibi witnesses of whom they should have been aware (Claim XIX(F)(3)).

144.    Trial counsel also performed deficiently by failing to call additional alibi witnesses of whom they should have been aware.  Had counsel called these additional witnesses, there is a reasonable probability that the jury would have had a reasonable doubt as to Mr. Johnson's guilt, and the result of the trial would have been different.  Mr. Johnson raised this claim in Claim XIX(F)(3) of his Third Amended Petition (Doc. # 36-18 at 137-38) and presented evidence in support of it during postconviction proceedings.  This Court should review the claim on the merits, vacate Mr. Johnson's conviction, and order a new trial.

145.    The circuit court did not make any factual findings pertaining to this claim.  Its ruling on the merits was limited to the claims regarding "the decision by Johnson's trial counsel to call certain alibi witnesses, rather than others *of whom they were aware*."  (Doc. # 36-27 at 116 (emphasis added).)  Because of the incompetent investigation that trial counsel led, they were *not* aware of many potential alibi witnesses despite their ready availability.  (Doc. # 36-18 at 58-64.)  In fact, two potential alibi witnesses (Somia Abercrombie and Kenyarra Hubbard) were cited in Mr. Johnson's statement to the police (Doc. # 36-39 at 139, 161), and yet trial counsel failed to conduct any investigation with respect to these two witnesses (Doc. # 36-37 at 57-60).  Ms. Abercrombie and Ms. Hubbard, as well as Deirdre Carter and Stanley Chandler (additional alibi witnesses who were never contacted by the defense) testified during the state postconviction proceedings that they were willing and available to testify at Mr. Johnson's second trial.  (Doc. # 36-25 at 137 (Abercrombie); Doc. # 36-25 at 139 (Carter); Doc. # 36-27 at 28 (Hubbard); Doc. # 36-27 at 30 (Chandler).)  Had they been called, all four witnesses would have testified that they saw Mr. Johnson at Tee's Place at the time that Deputy Hardy was killed.

(Doc. # 36-25 at 136-37 (Abercrombie); Doc. # 36-25 at 138-39 (Carter); Doc. # 36-27 at 27-28 (Hubbard); Doc. # 36-27 at 29-30 (Chandler).)

146.    Trial counsel did not offer any explanation as to why these witnesses were not located and called to testify at Mr. Johnson's second trial.  In postconviction proceedings, Mr. Mathis testified that there was no strategic reason not to locate and interview these witnesses. (Doc. # 36-37 at 62.)  Mr. Mathis also testified that he and Mr. Bender should have called all available alibi witnesses.  (Doc. # 36-37 at 70.)

147.    When Mr. Bender was specifically asked if he remembered talking to Ms. Abercrombie, Ms. Carter, or Ms. Hubbard, he responded that he could not remember if he ever spoke to them.  (Doc. # 36-37 at 178.)  These witnesses confirmed in their postconviction testimony that they had never been contacted by Mr. Johnson's lawyers or investigator.  (Doc. # 36-25 at 137 (Abercrombie); (Doc. # 36-25 at 139 (Carter); (Doc. # 36-27 at 28 (Hubbard); (Doc. # 36-27 at 30 (Chandler).)

148.    The unrebutted evidence presented in postconviction establishes that counsel for Mr. Johnson acted unreasonably in failing to call additional and available alibi witnesses.  Trial counsel's failure to call these witnesses cannot qualify as trial strategy because, due to their inadequate investigation, counsel did not know that many of these witnesses existed.  Further, counsel's deficient performance prejudiced Mr. Johnson, given the weak evidence presented by the State at trial and the centrality of the alibi as a theory of defense.

149.    Mr. Johnson's counsel's failure to call alibi witnesses that were known or could have been discovered through competent investigation deprived Mr. Johnson of his rights in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and all other applicable federal law.  The Court of Criminal Appeals affirmed the

circuit court's ruling on the merits with respect to Claims XIX(F)(3).  *Johnson v. State*, 379 So.

3d 994, 1034-36 (Ala. Crim. App. 2007).  To the extent that 28 U.S.C. § 2254(d) applies, the

state court denial was contrary to and an unreasonable application of clearly established federal

law and was based on an unreasonable determination of the facts in light of the evidence

presented.  This Court should review the claim on the merits, vacate Mr. Johnson's conviction,

and order a new trial.

> **D.      Trial counsel were ineffective for inadequately selecting and preparing the
> two alibi witnesses who were called.**

150.     Trial counsel performed deficiently by inadequately selecting and preparing the

two alibi witnesses they called at Mr. Johnson's second trial, Christi Farris and Montrice

Dunning.  Had counsel performed reasonably, there is a reasonable probability that the jury

would have had a reasonable doubt as to Mr. Johnson's guilt, and the result of the trial would

have been different.  Mr. Johnson raised this claim in Claim XIX(F)(4) of his Third Amended

Petition (Doc. # 36-18 at 138-141) and presented evidence in support of the claim in

postconviction proceedings.  This Court should review the claim on the merits, vacate Mr.

Johnson's conviction, and order a new trial.

151.     Counsel performed deficiently in choosing to call Ms. Farris and Ms. Dunning.

Both were long-time friends of Mr. Johnson (Doc. # 36-16 at 68, 78-83 (Farris); Doc. # 36-16 at

43, 58 (Dunning)), and Ms. Farris testified that she sometimes referred to Mr. Johnson as her

brother or cousin (Doc. # 36-16 at 82).  Both witnesses had trouble remembering the night in

question.  (Doc. # 36-16 at 68, 78-83 (Farris); Doc. # 36-16 at 43, 56-63 (Dunning).)  Given the

many other alibi witnesses who were available to testify, none of whom had familial ties or were

close friends with Mr. Johnson, counsel unreasonably chose to call as witnesses two women

whose friendship and familial relationship with Mr. Johnson provided an easy avenue for the prosecution to exploit their alleged bias in favor of him.  (Doc. # 36-18 at 138-141.)

152.    Trial counsel also performed deficiently in failing to prepare either witness for their testimony at trial.  In the state postconviction proceedings, Ms. Farris and Ms. Dunning both testified that Mr. Johnson's trial counsel spent virtually no time meeting with them prior to trial.  (Doc. # 36-25 at 145-46 (Farris); Doc. # 36-26 at 27-28 (Dunning).)

153.    Trial counsel's selection of Ms. Dunning and Ms. Farris, and their failure to prepare them to take the witness stand, was especially unreasonable in light of the other alibi witnesses who were available to testify, as detailed above.  Moreover, counsel's choice not to call other alibi witnesses was not the product of a reasoned decision, but the result of misinformation or ignorance born from an inadequate investigation.  For this reason, trial counsel's alibi presentation constituted deficient performance.  *Williams v. Taylor*, 529 U.S. 362, 364 (2000); *Strickland*, 466 U.S. at 687.  Further, defense counsel's deficient performance prejudiced Mr. Johnson, because the evidence of guilt was weak and therefore effective alibi testimony from multiple reliable and unbiased witnesses would likely have resulted in a different result at trial (as it did at Mr. Johnson's first trial, which ended in a mistrial when the jury could not agree on guilt).

154.    The failure of Mr. Johnson's counsel to adequately select and prepare their alibi witnesses deprived Mr. Johnson of his rights in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and all other applicable federal law.  The Court of Criminal Appeals denied Claim XIX(F)(4) on the merits.  *Johnson v. State*, 379 So. 3d 994, 1036 (Ala. Crim. App. 2007).  To the extent that 28 U.S.C. § 2254(d) applies, the state court denial was contrary to and an unreasonable application of clearly established federal law

and was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d).  This Court should review the claim on the merits, vacate Mr. Johnson's conviction, and order a new trial.

### E.   Trial counsel were ineffective for presenting testimony that directly contradicted the defense theory.

155.    Mr. Johnson has always maintained that he was at Tee's Place, a club across town, when Deputy Hardy was shot, and his lawyers presented this alibi defense at his first trial. At his second trial, however, in addition to presenting this alibi defense through alibi witnesses, his lawyers also called Yolanda Chambers, who testified that Mr. Johnson was present when Deputy Hardy was shot but had nothing to do with the shooting.  (Doc. # 36-4 at 147, 149, 154.) The State presented no physical evidence, no eyewitness evidence, and no confession to the police that Mr. Johnson was present at the scene of the shooting of Deputy Hardy.  (Doc. # 36-17 at 165-68.)  Ms. Chambers, the defense witness, was the only person who put Mr. Johnson at the scene of the crime.  As detailed above, Ms. Chambers was a thoroughly unreliable witness who had acknowledged changing her story dozens of times, as all parties to the case were aware. (Doc. # 36-17 at 141.)

156.    In short, the only direct evidence that Mr. Johnson was present at the scene was presented by Mr. Johnson's own attorneys through a deeply untrustworthy witness, and it directly contradicted the alibi evidence presented by the same attorneys.  In Claims XIX(F)(7) and XIX(F)(9) of his Third Amended Petition, Mr. Johnson alleged that his counsel were ineffective for presenting the theory that Mr. Johnson was nowhere near the scene of the shooting at the time Deputy Hardy was killed *and* presenting, through Yolanda Chambers, testimony that he was present at the scene but did not have anything to do with the shooting. (Doc. # 36-18 at 147-48; Doc. # 36-18 at 150.)  Mr. Johnson's jurors could not possibly

reconcile the two theories espoused by his counsel: either he was there or he was not.  Mr. Johnson's lawyers made no attempt to reconcile their mutually exclusive theories for the jury.

157.    Trial counsel's deficient performance prejudiced Mr. Johnson.  Given the State's admittedly weak case (Doc. # 36-47 at 138), had trial counsel presented a cohesive defense theory and maintained their credibility before the jury, it is likely that the jury would have had a reasonable doubt about Mr. Johnson's guilt, and the result of the trial would have been different, as it was at Mr. Johnson's first trial, where the defense did not call Ms. Chambers as a witness.

158.    Mr. Johnson's counsel's presentation of inconsistent and mutually exclusive defenses at trial without making any attempt to reconcile them deprived Mr. Johnson of his rights in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and all other applicable federal law.  The Court of Criminal Appeals denied Claims XIX(F)(7) and XIX(F)(9) on the merits. *Johnson v. State*, 379 So. 3d 994, 1036-39 (Ala. Crim. App. 2007).  To the extent that 28 U.S.C. § 2254(d) applies, the state court denial was contrary to and an unreasonable application of clearly established federal law and was based on an unreasonable determination of the facts in light of the evidence presented.  This Court should review the claim on the merits, vacate Mr. Johnson's conviction, and order a new trial.

**F.    Trial counsel were ineffective for failing to object to the State's use of contradictory prosecution theories at the trials of Mr. Johnson and his co-defendant.**

159.    Trial counsel performed deficiently by failing to object to the use of contradictory prosecution theories at Mr. Johnson's trial and that of his co-defendant, Ardragus Ford.  Had counsel made this objection, there is a reasonable probability that it would have been granted and the result of the trial would have been different.  Mr. Johnson raised this claim as Claim

XIX(E)(4) of his Third Amended Petition.  (Doc. # 36-18 at 130.)  This Court should review the claim on the merits, vacate Mr. Johnson's conviction, and order a new trial.

160.    The undisputed forensic evidence establishes that the shots that killed Deputy Hardy could only have been fired by a single person, as opposed to by multiple people.  (Doc. # 36-17 at 194.)  Despite this fact, over the course of the four trials related to Deputy Hardy's murder (each of Mr. Johnson's and Mr. Ford's two trials), the State presented theories that at least three different people shot the deputy.  (Doc. # 36-17 at 194 – Doc. # 36-18 at 3.)  At Mr. Johnson's trials, the prosecutors presented the theory that Mr. Johnson and Quintez Wilson shot Deputy Hardy, while at Ardragus Ford's trials, the same prosecutors argued that it was Mr. Ford who fired the shots.

161.    At Mr. Ford's first trial, the State called Yolanda Chambers as a witness.  (Doc. # 36-17 at 195.)  Ms. Chambers testified that Mr. Ford, and only Mr. Ford, killed Deputy Hardy. (Doc. # 36-33 at 33.)  The State vouched for Ms. Chambers's credibility, stating that "she came in here and told you the truth."  (Doc. # 36-36 at 28.)  Further, in support of its theory that Mr. Ford shot the deputy, the State presented evidence that the angle of one of the shots established that the shooter was sitting down.  (Doc. # 36-32 at 183.)  The State offered this evidence in an attempt to prove that Mr. Ford, who is confined to a wheelchair, fired the shots.  (*See* Doc. # 36-36 at 27 ("You look at that angle, and know that it came through his outstretched hand at a sharp angle upward into his mouth, see if it didn't come right out of his wheelchair, because that's where it came from.").)

162.    At the next trial, Mr. Johnson's first trial, neither side called Yolanda Chambers. Instead, the State presented the theory, through the testimony of Violet Ellison, that Mr. Johnson

and Quintez Wilson each shot Deputy Hardy.  (Doc. # 36-25 at 54-56.)  This theory was directly

at odds with the theory the State presented at Mr. Ford's trial, just weeks earlier.

163.    At Mr. Johnson's second trial, however, the State offered yet another theory.

During Mr. Johnson's second trial, the defense called Ms. Chambers to testify.  (Doc. # 36-17 at

196.)  This time, however, the State argued to the jury that Ms. Chambers was a liar who could

not be believed.  The same prosecutor who had argued at Mr. Ford's first trial that Ms. Chambers

"came in here and told you the truth" now argued to Mr. Johnson's jury that Ms. Chambers was a

"liar" who could not be believed.  (*See* Doc. # 36-5 at 107-08 ("[I]f you go back in the jury room

and decide that Yolanda Chambers ought not to have been allowed to testify because she's a liar,

or whatever you might decide about her, that's okay.  *State didn't call her, the Defense did.  I*

*want you to remember that.*") (emphasis added).)  The prosecutor also emphasized to the jury:

"Never once not one time, did we in our case put before you anything said by Yolanda

Chambers.  And when she got on that witness stand you saw why."  (Doc. # 36-5 at 107.)

Further, when defense counsel attempted to elicit testimony concerning the trajectory and angle

of the bullets, which was admitted by the State in Mr. Ford's first trial, the State suggested that

the testimony was inconclusive.  (Doc. # 36-17 at 197; Doc. # 36-3 at 82-88; Doc. # 36-5 at 96-

98.)  Additionally, the State argued to the jury that Mr. Wilson was in some way involved in the

deputy's death and the only reason he was not charged was that the only evidence against him

was inadmissible, an argument not only at odds with its theory in Mr. Ford's trials but also the

police investigation.  (Doc. # 36-5 at 81-83.)  At this trial, Mr. Johnson was convicted and

sentenced to death.

164.    At Mr. Ford's second trial, which occurred after Mr. Johnson had been convicted

and sentenced to death, the State doubled back to the theory that Mr. Ford was the sole shooter of

Deputy Hardy.  After attacking Ms. Chambers's credibility at Mr. Johnson's second trial, the

State called Ms. Chambers to testify that she saw Mr. Ford shoot Deputy Hardy.  (Doc. # 36-24

at 131-32.)  Then, after ridiculing Mr. Johnson's lawyers for calling Ms. Chambers as a witness

at his trial, the prosecutor told Mr. Ford's jury that Ms. Chambers "had to be called to the

witness stand.  You'd think we were crazy if the case was over with and you hadn't heard from

somebody that says they were there."  (Doc. # 36-25 at 107; *see also* Doc. # 36-24 at 72

(prosecutor claiming in opening statement that "Bill Hardy met his death at the hands of this man

[indicating Mr. Ford]").)  The State never once during this trial suggested that Mr. Wilson was at

the scene of the murder.  In fact, one of the prosecutors referred to Mr. Wilson and Omar Berry

as "two innocent folks."  (Doc. # 36-24 at 142.)  Moreover, in a statement that it was required to

file with the court regarding its position on Mr. Ford's guilt, the State did not even mention

Quintez Wilson.  *See* "The Prosecution's Position Re The Guilt of Defendant Ardragus Ford,"

filed May 19, 1999, in *State v. Ford*, CC-96-385.

165.    Trial counsel's deficient performance prejudiced Mr. Johnson.  There is a

reasonable probability that, had trial counsel objected and/or filed a motion to dismiss, the

objection would have been sustained and the motion would have been granted.  Mr. Johnson

would not have been prosecuted because the State would have been left without a theory, or

evidence of guilt.  The failure of Mr. Johnson's counsel to object to the use of contradictory

prosecution theories under these circumstances deprived Mr. Johnson of his rights in violation of

the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and all

other applicable federal law.  The Court of Criminal Appeals denied this claim on the merits.

*Johnson v. State*, 379 So. 3d 994, 1031-34 (Ala. Crim. App. 2007).  To the extent that 28 U.S.C.

§ 2254(d) applies, the state court denial was contrary to and an unreasonable application of

clearly established federal law and was based on an unreasonable determination of the facts in light of the evidence presented. This Court should review the claim on the merits, vacate Mr. Johnson's conviction, and order a new trial.

### G. Trial counsel were ineffective for unreasonably failing to call John Renfro as a witness.

166. Trial counsel performed deficiently by failing to call as a witness John Renfro, a cab driver parked at the Crown Sterling Suites the night of Deputy Hardy's murder. Had counsel presented Mr. Renfro's testimony, there is a reasonable probability that the jury would have had a reasonable doubt as to Mr. Johnson's guilt, and the result of the trial would have been different. Mr. Johnson raised this claim in Claim XIX(F)(15) of his Third Amended Petition. (Doc. # 36-18 at 153.) This Court should conduct an evidentiary hearing, review the claim on the merits, vacate Mr. Johnson's conviction, and order a new trial.

167. While parked near the entrance to the hotel, Mr. Renfro suddenly heard gunshots, and only moments later saw a white 1968 or 1969 Chevrolet Malibu speed out of the hotel parking lot with its lights out. Mr. Renfro gave an audiotaped statement to the police about what he witnessed. His testimony would have been vitally important to the defense as he would have been able to establish that the car driven by the killer could not have been the black car that Mr. Johnson was in the night of the murder. Trial counsel were aware of Mr. Renfro's account of these events. However, notwithstanding Mr. Renfro's audiotaped statement describing these events, they failed to call him as a witness.

168. Mr. Johnson was prejudiced by counsel's failure to call Mr. Renfro. In a case where the evidence against Mr. Johnson was weak, testimony about a car speeding away from the murder scene—a car that looked nothing like the car that Mr. Johnson was indisputably in that night—would have created a reasonable doubt in the minds of the jurors. Mr. Renfro's

testimony would also have been consistent with Marshall Cummings's testimony from Mr. Johnson's first trial regarding the car seen leaving the scene.  (Doc. # 36-30 at 195.)  Had counsel called Mr. Renfro, there is a reasonable likelihood that the result of the trial would have been different.  (Doc. # 36-18 at 154.)

169.    The failure of Mr. Johnson's counsel to call Mr. Renfro as a witness deprived Mr. Johnson of his rights in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and all other applicable federal law.  The Court of Criminal Appeals held that Claim XIX(F)(15) was insufficiently pleaded pursuant to Alabama Rule of Criminal Procedure 32.6(b).  *Johnson v. State*, 379 So. 3d 994, 1016 (Ala. Crim. App. 2007).  To the extent that 28 U.S.C. § 2254(d) applies, the state court denial was contrary to and an unreasonable application of clearly established federal law and was based on an unreasonable determination of the facts in light of the evidence presented.  This Court should provide Mr. Johnson an opportunity to prove his allegations, and then order a new trial.

**H.    Trial counsel were ineffective for unreasonably failing to object when the State knowingly presented testimony and argued facts that it knew to be false.**

170.    In Claim V of the Third Amended Petition, Mr. Johnson alleged that the State presented testimony that it knew to be false, in violation of *Napue v. Illinois*, 360 U.S. 264, 269 (1959).  (Doc. # 36-17 at 190-94.)  Specifically, the State presented false testimony that Violet Ellison's testimony was motivated by her conscience, as opposed to her desire to obtain significant reward money (Doc. # 36-4 at 86); false testimony intended to suggest that a witness had seen a car at the Crown Sterling Suites that matched the description of the car Mr. Johnson was in that night (Doc. # 36-3 at 151); and false testimony that the car Mr. Johnson was in had not been searched (Doc. # 36-3 at 160).  As noted above, the Court of Criminal Appeals

68

unreasonably denied Claim V on the ground that it could have been but was not raised at trial and on direct appeal. *Johnson v. State*, 379 So. 3d 994, 1016 (Ala. Crim. App. 2007). To the extent that trial counsel were aware that the State was presenting false testimony and argument to the jury, counsel performed deficiently by failing to object and move to dismiss the case. Had counsel made such a motion, there is a reasonable probability it would have been granted. Mr. Johnson raised this claim as Claim XIX(F)(16) of his Third Amended Petition. (Doc. # 36-18 at 154-55.)

171. To the extent trial counsel were aware of the false nature of the State's testimony and argument, the failure of Mr. Johnson's counsel to object and move to dismiss the case deprived Mr. Johnson of his rights in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and all other applicable federal law. The Court of Criminal Appeals summarily dismissed Claim XIX(F)(16) as insufficiently pleaded pursuant to Alabama Rule of Criminal Procedure 32.6(b). *Johnson v. State*, 379 So. 3d 994, 1016 (Ala. Crim. App. 2007). To the extent that 28 U.S.C. § 2254(d) applies, the state court denial was contrary to, and an unreasonable application of, clearly established federal law and was based on an unreasonable determination of the facts in light of the evidence presented. Following an evidentiary hearing, this Court should review the claim on the merits, vacate Mr. Johnson's conviction, and order a new trial.

I. **Trial counsel were ineffective for unreasonably failing to move to prohibit the jury from considering an aggravating circumstance about which no evidence was presented.**

172. Trial counsel performed deficiently by failing to move to prohibit the jury from considering an aggravating circumstance about which no evidence was presented. Had counsel made such a motion, there is a reasonable probability that it would have been granted and the

result of the trial would have been different.  Mr. Johnson raised this claim in Claim XIX(F)(18) of his Third Amended Petition.  (Doc. # 36-18 at 155.)  This Court should review the claim on the merits, vacate Mr. Johnson's conviction, and order a new trial.

173.    The jury was permitted to consider the aggravating circumstance set forth in Alabama Code § 13A-5-49(7), namely, that "[t]he capital offense was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws[.]" However, the State did not present any evidence to support this aggravating factor.  Instead, the prosecutor improperly argued in his closing argument that, because the jury had convicted Mr. Johnson of capital murder for killing an "on duty" police officer, it could automatically consider this aggravator proven beyond a reasonable doubt.  (Doc. # 36-6 at 111-12.)

174.    There was no evidence adduced at trial to suggest that Deputy Hardy was "on duty" at the time he was killed, let alone that the murder was committed "to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws."  Nevertheless, this aggravating circumstance was submitted to the jury and later found by the trial court (without explanation) to be proven beyond a reasonable doubt.  (Doc. # 36 at 105.)

175.    In his closing argument in the penalty phase, the prosecutor improperly told the jury that, because it had already convicted Mr. Johnson of capital murder, this aggravating factor had already been established:

> Now, what are we talking about there?  We're talking about, in essence, that same capital element on which you decided Friday night.  In order to convict this defendant of capital murder, not only did you find that he committed an intentional murder, you found that he committed an intentional murder against someone who was on duty as a deputy sheriff or because of the performance of his duties as a deputy sheriff, even though he might have been technically off duty.
>
> In other words, the evidence presented last week has already established the existence of that aggravating circumstance.

70

(Doc. # 36-6 at 111-12.)

176.    In its oral charge to the jury at the conclusion of the penalty phase, the trial court failed to define this aggravating circumstance in any way.  The court simply read the statutory language.  (Doc. # 36-6 at 135.)  Accordingly, the jury was left with the mistaken impression that, by virtue of Mr. Johnson's conviction for capital murder, this aggravator had already been proven beyond a reasonable doubt.

177.    Unlike some aggravators, which may be considered proven in the penalty phase because they were necessarily found by the jury in the guilt phase, the aggravator defined in Ala. Code § 13A-5-49(7) is markedly different from the circumstances that made the murder capital under Ala. Code § 13A-5-40(a)(5).  Indeed, this aggravator is housed in a separate provision of the Alabama Code.  This is not an "overlap" case where an element of the capital offense and the death-qualifying aggravator are one and the same.  Here, they are different and require separate findings by the jury.  It was improper and prejudicial for the prosecutor to suggest that they were the same, and this error was only compounded by the fact that there was no evidence to support the aggravator in the first place.

178.    The failure of Mr. Johnson's counsel to move to prohibit the jury from considering an aggravating circumstance for which no evidence was presented deprived Mr. Johnson of his rights in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and all other applicable federal law.  On appeal, the Court of Criminal Appeals held that Claim XIX(F)(18) was insufficiently pleaded pursuant to Alabama Rule of Criminal Procedure 32.6(b).  *Johnson v. State*, 379 So. 3d 994, 1016 (Ala. Crim. App. 2007).  To the extent that 28 U.S.C. § 2254(d) applies, the state court denial was contrary to and an unreasonable application of clearly established federal law and was based on an unreasonable

determination of the facts in light of the evidence presented.  This Court should provide Mr.

Johnson an opportunity to prove his allegations, and then order a new trial.

> **J.** **Trial counsel were ineffective for unreasonably failing to present evidence that the car that Mr. Johnson was in on the night of the murder was searched by police, who found nothing.**

179.    Trial counsel performed deficiently by failing to present evidence that the police

failed to find anything incriminating when they searched the car that Mr. Johnson was in on the

night of the murder.  Had counsel presented this evidence, there is a reasonable probability that

the jury would have had a reasonable doubt as to Mr. Johnson's guilt, and the result of the trial

would have been different.  Mr. Johnson raised this claim in Claim XIX(F)(20) of his Third

Amended Petition.  (Doc. # 36-18 at 1354.)  This Court should review the claim on the merits,

vacate Mr. Johnson's conviction, and order a new trial.

180.    In opening statements, Mr. Johnson's trial counsel promised the jury that the

defense would present evidence that the police had searched the car that Mr. Johnson was in on

the night of Deputy Hardy's murder.  (Doc. # 36-2 at 117; Doc. # 36-18 at 156.)  However, Mr.

Johnson's trial counsel failed to follow through on this promise, even after the prosecution

elicited false testimony stating that the car was *not* searched that night.[9]  (Doc. # 36-3 at 160.)

181.    There is a reasonable probability that, but for his trial counsel's failure to present

this evidence, the result of the proceeding would have been different.  (Doc. # 36-18 at 156.)

Accordingly, the failure of Mr. Johnson's counsel to present evidence that police searched the

car Mr. Johnson was in on the night of the murder deprived Mr. Johnson of his rights in violation

of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and all

---

[9] Officer James Evans testified that the police never searched the car at the Super 8: "Now, we did look in the interior of the vehicle with our flashlights to make sure nothing was lying out in plain view, but we never did an inventory search of the vehicle, no, sir."  (Doc. # 36-3 at 160.)

other applicable federal law.  The Court of Criminal Appeals held that Claim XIX(F)(20) was

insufficiently pleaded pursuant to Alabama Rule of Criminal Procedure 32.6(b).  *Johnson v.*

*State*, 379 So. 3d 994, 1016 (Ala. Crim. App. 2007).  To the extent that 28 U.S.C. § 2254(d)

applies, the state court denial was contrary to and an unreasonable application of clearly

established federal law and was based on an unreasonable determination of the facts in light of

the evidence presented.  This Court should provide Mr. Johnson an opportunity to prove his

allegations, and then order a new trial.

> **K.      To the extent counsel should have questioned Ms. Ellison specifically about
> the reward offer and presented evidence about her financial situation,
> counsel were ineffective for unreasonably failing to do so.**

182.      As alleged in Claim II above, the State withheld from trial counsel Violet

Ellison's true motivation for coming forward with her story.  Thus, while trial counsel did

question Ms. Ellison as to why she came forward when she did, she was not questioned

specifically about her knowledge of a monetary reward, nor did trial counsel investigate Ms.

Ellison to determine her financial situation.  Trial counsel testified in postconviction that "[t]here

was nothing to indicate to me that [Ms. Ellison] was connected, associated with, looking for,

going to receive a reward in any way, so there was no reason for me to pry into this lady's

financial affairs.  There just wasn't."  (Doc. # 36-37 at 142.)  Of course, the primary reason trial

counsel were unaware of Ms. Ellison's expectation of the reward was that the State withheld this

information.  However, to the extent counsel should have asked Ms. Ellison specifically about

the reward and investigated her financial affairs, they unreasonably failed to do so.  Had counsel

presented this evidence, there is a reasonable probability that the jury would have had a

reasonable doubt as to Mr. Johnson's guilt, and the result of the trial would have been different.

Mr. Johnson raised this claim in Claim XIX(F)(8) of his Third Amended Petition.  (Doc. # 36-18

at 148-150; Doc. # 36-18 at 116-120.)  This Court should review the claim on the merits, vacate Mr. Johnson's conviction, and order a new trial.

183.     In postconviction proceedings, Mr. Johnson offered sufficient evidence of what counsel could have introduced at trial to offer effective assistance.  In addition to evidence regarding publicity about the reward offered in the case (Doc. # 36-36 at 37-46; Doc. # 36-27 at 92-93; Doc. # 36-37 at 140; Doc. # 36-27 at 31-50), Mr. Johnson also proffered evidence that Ms. Ellison suffered from severe financial difficulties, which indicates a possible financial motivation for her testimony.  (Doc. # 36-38 at 109 – Doc. # 36-39 at 120.)

184.     There is a reasonable probability that, but for trial counsel's failure to present this evidence, the result of the proceeding would have been different.  Trial counsel's deficient performance deprived Mr. Johnson of his rights in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and all other applicable federal law. The Court of Criminal Appeals unreasonably denied Claim XIX(F)(8) on the merits.  *Johnson v. State*, 379 So. 3d 994, 1037-38 (Ala. Crim. App. 2007).  To the extent that 28 U.S.C. § 2254(d) applies, the state court denial was contrary to and an unreasonable application of clearly established federal law and was based on an unreasonable determination of the facts in light of the evidence presented.  This Court should review the claim on the merits, vacate Mr. Johnson's conviction, and order a new trial.

**L.     Trial counsel were ineffective during the penalty phase for failing to present available, compelling mitigating evidence.**

185.     Trial counsel performed deficiently by failing to prepare and present a sufficient case at the penalty phase of the trial.  Had counsel prepared and presented a sufficient case at the penalty phase, there is a reasonable probability that the result of the trial would have been different.  Mr. Johnson raised this claim in Claim XIX(G) of his Third Amended Petition.  (Doc.

# 36-18 at 161-163.)  This Court should provide Mr. Johnson an opportunity to prove his allegations, and then order a new trial.

186.    In a capital case, trial counsel have the constitutional duty to fully investigate and prepare for the penalty phase of the trial.  *Wiggins v. Smith*, 539 U.S. 510, 534 (2003); *Williams v. Taylor*, 529 U.S. 362, 396 (2000); *Strickland v. Washington*, 466 U.S. 668, 690-91 (1984).  The trial court must consider "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."  *Lockett v. Ohio*, 438 U.S. 586, 604 (1978).  Thus, trial counsel "has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence."  *Porter v. Singletary*, 14 F.3d 554, 557 (11th Cir. 1994).

187.    Trial counsel's investigation of the potential mitigation case was deficient.  The sole defense investigator hired by Mr. Johnson's lawyers did not talk to a single member of Mr. Johnson's family, nor did he interview a single potential mitigation witness.  The attorneys themselves did not fill the void created by the investigator's incompetence.  Mr. Mathis acknowledged that he did not conduct any mitigation investigation.  (Doc. # 36-48 at 149-50.)  Mr. Bender, who conducted the only investigation and had previously represented to the court that he had neither the time nor training to do so (Doc. # 36-20 at 68-69), only managed to speak with a few family members.  No genuine mitigation investigation was ever conducted; not a single record or document (such as medical records, school records, employment records) was ever obtained by Mr. Johnson's attorneys.  Trial counsel for Mr. Johnson waived opening statement, admitted no exhibits into evidence, presented no expert testimony, and examined, very briefly, only three witnesses during the penalty phase of Mr. Johnson's trial.  The testimony of these witnesses comprised, in total, a mere 17 pages of transcript.  (Doc. # 36-6 at 87-97 (Donna

Johnson); Doc. # 36-6 at 97-101 (Bessie Burts); Doc. # 36-6 at 101 (Tony Green).)  The penalty

phase of Mr. Johnson's capital murder trial lasted less than half an hour, and the jury was told

virtually nothing about Mr. Johnson or the extremely impoverished and traumatic life he led

prior to his arrest in this case.

188.    Trial counsel also did not argue any specific statutory mitigating circumstances to

the jury.  Instead, counsel argued against the death penalty generally, and spent less than a page

of transcript discussing Mr. Johnson and his life.  (Doc. # 36-6 at 121.)  As a result of their

incompetent pre-trial investigation, trial counsel were inhibited and precluded from presenting a

constitutionally effective penalty phase case on Mr. Johnson's behalf.

189.    Substantial evidence was readily available to demonstrate a coherent mitigation

case that would have detailed the neglect, abandonment, and abuse that pervaded Mr. Johnson's

childhood; the extreme violence and abuse in his home; his family history of alcoholism and

poverty; his homelessness as a teenager; and a community ravaged by violence.  The jury that

sentenced Mr. Johnson to death after a penalty phase trial that lasted less than half an hour was

unaware of the extensive mitigating evidence that Mr. Johnson presented in postconviction.  At

one of the remand hearings, counsel presented eight mitigation witnesses and introduced

hundreds of pages of records documenting Mr. Johnson's social history.  (Doc. # 36-48 at 36-57;

Doc. # 36-48 at 57-82; Doc. # 36-47 at 142-187; Doc. # 36-48 at 174 – Doc. # 36-49 at 48; Doc.

# 36-47 at 187 – Doc. # 36-48 at 36; Doc. # 36-48 at 83-110; Doc. # 36-49 at 66-76; Doc. # 36-

49 at 76-104; Doc. # 36-44 at 172 – Doc. #36-47 at 94.)   Counsel also presented the expert

testimony of a clinical social worker, Lori James-Townes, who discussed the effects of the life

circumstances that the lay witnesses had described, concluding that Mr. Johnson's childhood had

been "toxic and dangerous." (Doc. # 36-50 at 101.) This evidence is detailed in Claim M below and expressly incorporated by reference herein.

190. Counsel also unreasonably failed to prepare their three mitigation witnesses to testify. Counsel did not prepare the witnesses for the questions that they would be asked, did not explain to them what kind of evidence or testimony is relevant in mitigation in a death penalty case, and did not conduct interviews that would have revealed vital information about additional witnesses who could have provided crucial documentary evidence and testimony in mitigation. Had the mitigating evidence that exists, which is detailed in Claim M below, been investigated and presented to the jury, along with appropriate expert assistance and testimony, there is a reasonable likelihood that the jury would not have recommended a sentence of death. *See Debruce v. Comm'r, Ala. Dept. of Corr.*, 758 F.3d 1263, 1279 (11th Cir. 2014) (stating that "[b]ecause the omitted mitigating evidence, when compared to what little was actually introduced at trial, undermines confidence in the outcome of [the] sentencing, [the defendant] suffered prejudice at the penalty phase of his capital murder trial"). There is also a reasonable likelihood that the trial court would not have imposed the death penalty.

191. The failure of Mr. Johnson's trial counsel to present a sufficient case at the penalty phase deprived Mr. Johnson of his rights in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and all other applicable federal law. The Alabama Court of Criminal Appeals unreasonably denied Claim XIX(G) as procedurally barred because it had allegedly been raised on direct appeal. *Johnson v. State*, 379 So. 3d 994, 1015 (Ala. Crim. App. 2007). Following an evidentiary hearing, this Court should review the claim on the merits, vacate Mr. Johnson's conviction, and order a new trial.

**M.**     **Trial counsel were ineffective for failing to investigate and present mitigating evidence in the sentencing phase of the trial.**

192.    Trial counsel performed deficiently by failing to develop and present mitigating evidence at the judicial sentencing phase.  Under Alabama law, after the jury furnishes the trial court with its sentencing recommendation, the trial court then holds a separate judicial sentencing hearing before it imposes a sentence.  *See* Ala. Code §§ 13A-5-43, 13A-5-45, 13A-5-46, 13A-5-47.  In this case, defense counsel presented no evidence at the judicial sentencing phase.  (Doc. # 36-6 at 160-171.)  Had counsel developed and presented mitigating evidence at the sentencing phase, there is a reasonable probability that the result of the trial would have been different.  Mr. Johnson raised this claim in Claim XIX(H) in his Third Amended Petition.  (Doc. # 36-18 at 64-124; Doc. # 36-18 at 163-64.)  This Court should review the claim on the merits, vacate Mr. Johnson's conviction, and order a new trial.

193.    Mr. Johnson proved, through the presentation of ample evidence at evidentiary hearings, that trial counsel were deficient because of their failures to adequately investigate and present readily available mitigating evidence and that these failures did not amount to trial strategy.  Mr. Johnson presented both the testimony of his attorneys and the extensive mitigation evidence that was available and should have been, but was not, presented during the sentencing phase.

194.    Mr. Bender alone undertook the mitigation investigation that was performed in the case.  (Doc. # 36-48 at 149-50.)  While Mr. Bender knew that he was permitted to present additional evidence at the judicial sentencing phase, he testified that his policy was to present all mitigating evidence at the penalty phase before the jury.  (Doc. # 36-49 at 127-28.)  Mr. Bender's testimony established that he was aware of the concept of mitigation at the time of Mr. Johnson's trial in 1998, and understood it to include parental neglect, poverty, physical abuse,

drug and alcohol abuse, domestic violence, and community history.  (*See* Doc. # 36-49 at 138, 147, 149, 150, 154, 167.)

195.    In postconviction proceedings, Mr. Johnson introduced the readily available evidence that trial counsel failed to uncover and present, further demonstrating the failure of his counsel and the resulting prejudice suffered during the judicial sentencing phase.  Mr. Johnson introduced eight mitigation witnesses, one expert witness, and hundreds of pages of records documenting and corroborating his social history.  The witnesses, each of whom the circuit court found to be "credible and their testimony compelling," (Doc. # 36-52 at 44), detailed the harrowing circumstances of Mr. Johnson's childhood, describing neglect and abandonment, extreme violence and abuse in the home, homelessness, a family history of alcoholism, poverty, and a community ravaged by violence.

196.    Mr. Johnson's trial counsel were aware that Mr. Johnson's childhood had not been easy, though their lack of investigation precluded them from understanding the true extent of the trauma Mr. Johnson endured.  Mr. Bender elicited testimony from Mr. Johnson's cousin, Tony Green, that "it was very difficult" for Ms. Johnson's mother to raise her children as a single mother (Doc. # 36-6 at 102-03), but sought no elaboration and provided no further evidence on the point.  In his closing argument, Mr. Mathis referenced the single fact that trial counsel had unearthed about Mr. Johnson's upbringing: that his mother had difficulty raising him and his brother alone.  (*See* Doc. # 36-6 at 121 ("[Mr. Johnson] was brought up by one parent.  They didn't have much.  They did the best they could.").)  Despite knowing that Mr. Johnson's childhood had been difficult, trial counsel failed to gather meaningful evidence about his childhood or present the available compelling evidence that was presented in postconviction.

197.    Counsel's failure to discover the evidence was a result of the deficiencies in their investigation.  Trial counsel acknowledged that they lacked the "expertise," "formal training," or "capabilities and the time . . . to conduct all the investigation necessary and essential to provide the defendant with an adequate defense." (Doc. # 36-20 at 69-70.)  As discussed above, the investigator they did hire was manifestly incompetent and conducted no work on behalf of Mr. Johnson.  For their part, Mr. Johnson's lawyers failed to take even basic steps to compile Mr. Johnson's social history.  For instance, Mr. Bender had spoken to only two of the eight mitigation witnesses who testified in Mr. Johnson's postconviction proceedings.  One of these two individuals was Mr. Johnson's cousin, Tony Green, who testified at the penalty phase of Mr. Johnson's trial.  Mr. Green explained at the evidentiary hearing that he did not even know that he would testify until the day before he took the stand, and that Mr. Bender simply told him to "get on the stand and beg for [Mr. Johnson's] life." (Doc. # 36-49 at 97-98.)  No interview or conversation with Mr. Green appears anywhere in Mr. Bender's timesheets. (Doc. # 36-47 at 98-113.)

198.    Counsel failed to uncover any of the critical mitigation evidence in Mr. Johnson's case, which consisted not of closely guarded family secrets, but of information that was known to extended family, friends, and neighbors alike.  For example, with respect to Ronald Johnson, Sr., Toforest Johnson's father, his severe alcoholism and the abuse that accompanied it were well known to every witness who testified during postconviction proceedings.  Trial counsel could have learned of this valuable evidence by speaking to any *one* of these witnesses.  Instead, counsel conducted a superficial investigation that could not, and did not, inform counsel of even the most basic circumstances of Mr. Johnson's life, such as his father's alcoholism and abuse. *See Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (finding deficient performance where counsel

had "abandoned [his] investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources"); *Debruce*, 758 F.3d at 1274 ("By failing to take even the first step of asking [the defendant] and his mother about the information in [a pre-trial competency report], [counsel] 'chose to abandon [his] investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible.'" (quoting *Wiggins,* 539 U.S. at 527-28)).

199.    Mr. Bender's purported reasons for not collecting any records also reflect a mistaken understanding of the law.  He testified that he believed all records obtained during the mitigation investigation would have to be turned over to the State whether he planned to introduce them or not.  (*See* Doc. # 36-49 at 170 ("Evidence that I have, I turn it over to the prosecutor. . . .  That's how I've always done it."); Doc. # 36-49 at 174 ("I think you do [have to turn over to the State records that are harmful to the defense]. And I've always done that.").)  This understanding of the law is incorrect; records obtained during the mitigation investigation that are not used at trial do not need to be turned over to the prosecution.  But, steadfast in this incorrect belief, Mr. Bender testified that his policy was not to gather any records in a capital case unless he was certain they would support his mitigation theory.  (Doc. # 36-49 at 173.)  And yet, a misunderstanding of law cannot form the basis of a strategic decision that justifies a failure to obtain and present favorable evidence.  *Hinton v. Alabama*, 571 U.S. 263, 274 (2014); *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986) ("The justifications Morrison's attorney offered for his omission betray a startling ignorance of the law—or a weak attempt to shift blame for inadequate preparation."); *Sullivan v. Sec'y Fla. Dep't of Corr.*, 837 F.3d 1195, 1205 (11th Cir. 2016); *Debruce*, 758 F.3d at 1273-74.

200.    Regardless of the adequacy of the investigation, it was unreasonable for trial counsel to fail to present the "credible," "compelling," and readily available mitigation evidence that was introduced at the Rule 32 hearing.  (Doc. # 36-52 at 21.)  Trial counsel's performance was deficient because they did not present this evidence, because there was no strategic reason for failing to do so, because social history records were easy to obtain, and because the witnesses were close family members or friends, all of whom were available and willing to testify at the trial.

201.    Counsel performed below the requisite standard for mitigation investigation and presentation of mitigation evidence.  Federal law establishes that collecting social history records is typically the "first step" in conducting a mitigation investigation, *Porter v. McCollum*, 558 U.S. 30, 39 (2009), and that such an obligation exists even where a defendant is unhelpful or actively obstructionist.  *Rompilla*, 545 U.S. at 381, 393; *see also Williams*, 529 U.S. at 395 (finding counsel ineffective in Williams's 1986 trial because they failed to conduct an investigation that would have "uncover[ed] extensive records graphically describing Williams' nightmarish childhood"); *Williams v. Allen*, 542 F.3d 1326, 1340 (11th Cir. 2008) (explaining that records may operate as "red flags" that prompt counsel to conduct additional investigation).

202.    As a result of Mr. Johnson's counsel's deficient performance in failing to investigate and present mitigation evidence during the sentencing phase, Mr. Johnson was prejudiced during his trial.  Prejudice for failure to present mitigation evidence is established after a "reweighing" of "the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding."  *Williams*, 529 U.S. at 397-98; *see also Brownlee*, 306 F.3d 1043, 1069 (11th Cir. 2000).  The mitigation evidence presented at Mr. Johnson's Rule 32 hearing is sufficient to undermine confidence in the trial court's balancing of

the aggravating and mitigating circumstances in this case and the death sentence that resulted. This is particularly true in light of counsel's failure to present any evidence at all in the sentencing phase, as well as Judge Bahakel's observation that *no* mitigating evidence was presented at Mr. Johnson's trial other than his age.  (*See* Doc. # 36 at 106 ("Upon consideration of all of the evidence brought forth at the trial of this case, the sentencing hearing and the pre-sentence investigation report, the Court finds that the only evidence arguably presented in mitigation was the fact that at the time the offense occurred the defendant was 22 years of age. The Court finds no other evidence in mitigation."); *see also Debruce*, 758 F.3d at 1278 ("Accordingly, we find that the Alabama Court of Criminal Appeals unreasonably applied *Strickland* in holding that the omitted evidence in this case had no reasonable probability of reducing DeBruce's sentence.  Because of trial counsel's deficient performance, DeBruce's jury was given almost no reason to spare his life as demonstrated by the paucity of mitigating evidence actually presented during the penalty phase and the fact that the state trial court found only one mitigating circumstance, DeBruce's age.").

203.   The detailed account of Mr. Johnson's traumatic upbringing conveyed by both witness testimony and documentary evidence presented at the Rule 32 hearing, and summarized below, starkly contrasts with the scant evidence Mr. Johnson's trial counsel presented.

204.   Mr. Johnson's mother, Donna Shelton, got pregnant by accident when she was seventeen years old.  (Doc. # 36-48 at 58-59.)  She married Ronald Johnson for one reason and one reason only: he was the man who had gotten her pregnant.  (Doc. # 36-48 at 62.)  At the age of seventeen, Donna was in no position to be a mother, but she resisted her own mother's plea that she have an abortion.  (Doc. # 36-48 at 61.)  Toforest Johnson was born on February 8, 1973.  (Doc. # 36-44 at 174.)

205.     Donna explained, "[R]eally I wasn't ready to have no kids."  (Doc. # 36-48 at 70.)
When her child was born, she attempted to hand off responsibility for raising her son to her
sister-in-law, Celia Green.  As Donna put it, "Celia raised my baby."  (Doc. # 36-48 at 70.)  But
Donna did not actually transfer custody of her baby to Celia, and Celia only cared for the child
sporadically, when she could.  (*See* Doc. # 36-48 at 70 ("I didn't give him to [Celia].  It was just
like she was a mother figure.").)  As a result, the child had no consistent maternal influence in
his life.  As a mother, Donna was "very unconcerned."  (Doc. # 36-47 at 173; Doc. # 36-49 at
87.)  Donna never even named the baby; instead, it was Celia who gave him the name Toforest
Onesha Johnson, months after he was born.  (Doc. # 36-48 at 29; *see* Doc. # 36-44 at 174
(Toforest Johnson birth certificate) (noting the addition of the name more than three months after
Toforest's birth).)[10]

206.     Toforest did have a paternal influence in his life, but it was not a positive one.
Toforest's father, Ronald Johnson, was a severe alcoholic who became violent and unpredictable
when he was drunk, which was every day.  (Doc. # 36-48 at 38; *see* Doc. # 36-50 at 5-14
(Ronald Johnson court records) (showing Ronald Johnson was arrested and pleaded guilty to
public intoxication in 1988 and was arrested and pleaded guilty to driving under the influence in
1991).)  Ronald began drinking when he was ten years old; on several occasions, he and his twin
brother stole moonshine their father had made, snuck under the house to drink it, and passed out.
(Doc. # 36-48 at 184-86.)  By age fifteen, Ronald had dropped out of school and began drinking
wine.  (Doc. # 36-48 at 189; Doc. # 36-47 at 75-76 (Ronald Johnson school records).)  Soon,
according to his brother Donald, "it got to be where he was drinking more and more . . . [I]t

---

[10]  In this section of the petition, counsel use Mr. Johnson's first name for clarity, in order to distinguish him from
his other family members.

didn't matter what type of whiskey he was drinking.  He'd just drink."  (Doc. # 36-48 at 189.)

Ronald's routine as an adult, on weekdays, was to wake up, go to work on a garbage truck, go to

an illegal shot house after work, stumble or drive home drunk, eat dinner, and pass out.  (Doc.

# 36-47 at 164-166, 170; Doc. # 36-48 at 63-64, 188-190, 194-198; Doc. # 36-49 at 80-81.)  On

weekends, he simply went straight to the shot house, returning multiple times throughout the day

for more alcohol.  (Doc. # 36-47 at 166-168.)  Toforest's father often took him and his little

brother (whom everyone called "Little Ron") to the shot house.  (Doc. # 36-47 at 165; Doc. # 36-

48 at 194.)  The boys waited outside while their father got drunk inside.  (Doc. # 36-48 at 40.)

At age fourteen, Toforest had to drive his father and little brother home from the shot house

when Ronald Johnson could not manage to drive himself and his sons.  (Doc. # 36-47 at 166.)

207.    Ronald Johnson's alcohol abuse was a major contributing factor to the daily

domestic violence and abuse that Toforest both experienced and witnessed.  (Doc. # 36-47 at

169-172; Doc. # 36-49 at 81-86.)  Ronald was "in a rage" when he drank, and he regularly beat

Donna in front of their children after coming home from the shot house.  (Doc. # 36-49 at 84.)

He also called Donna a "bitch" and a "whore."  (Doc. # 36-49 at 82.)  Toforest sometimes

"tr[ied] to come to the aid of his mom . . . [h]ysterically try[ing] to grab his dad maybe or pull

him off."  (Doc. # 36-49 at 84.)

208.    Ronald Johnson did not confine his abuse to his wife.  He also beat and terrorized

his two boys.  (Doc. # 36-47 at 154.)  When Toforest was fifteen, his father tried to kill him with

a shotgun.  Fortunately, Ronald missed, and Toforest escaped into the woods.  (Doc. # 36-47 at

171-72.)  After Toforest ran away, Ronald "went back in the house and started back drinking."

(Doc. # 36-47 at 172.)  When he was not beating or shooting at Toforest, Ronald made it known

that he did not care for his older son, telling him that "he wasn't nothing.  He wasn't anything

and he wasn't going to be anything.  And [saying] things [to him] like, 'I wish you hadn't been born.  You know, I wish you wasn't here.'"  (Doc. # 36-49 at 83.)

209.    Ronald and Donna Johnson's treatment of Toforest mirrored the abusive behavior they experienced growing up.  Indeed, Ronald and Donna repeated patterns they learned from their own parents.  (*See* Doc. # 36-50 at 59 (Lori James-Townes) (explaining how families repeat cycles of violence and substance and alcohol abuse).)  Ronald's father, James Johnson, became addicted to alcohol at a young age, verbally and physically abused his wife and children, and could not provide basic necessities for his family, such as regular meals.  (Doc. # 36-47 at 145-159; Doc. # 36-48 at 176-184; *see* Doc. # 36-50 at 31-39) (James and Mary Ella Johnson divorce Complaint and Answer) (detailing financial turmoil and physical abuse).)  When Ronald was an adolescent, his father (Toforest's grandfather) took him to the shot house and often needed him to drive home.  (Doc. # 36-47 at 153-54.)  James beat his children with a mining belt, which is "a lot heavier and wider" than an average belt.  (Doc. # 36-47 at 150-51.)

210.    When Toforest's father Ronald was a boy, he witnessed verbal and physical fights between his parents, which escalated quickly into extreme violence.  (Doc. # 36-47 at 154-159.)  Ronald saw his mother with bruises on her face as a result of his parents "passing licks back and forth on each other."  (Doc. # 36-47 at 158.)  And as Toforest would do a few decades later, Ronald tried to intervene in his parents' fights in order to protect his mother.  (Doc. # 36-48 at 180-81.)  Although Ronald's parents typically forced the children into a back room in the house when they started fighting, the children ran out of that room as soon as they heard struggling, in an often futile effort to protect their mother from their father's blows.  (Doc. # 36-48 at 180-81.)  On one occasion Ronald saw his father break his mother's arm when he swung at her with a hammer.  (Doc. # 36-48 at 180.)  On another occasion, Ronald's mother shot his father with a

shotgun in the jaw while their children were in the house.  (Doc. # 36-48 at 182-83; *see* Doc. # 36-46 at 25 (James and Mary Ella Johnson Divorce Complaint and Answer) (alleging that "without just cause or provocation [Mary Ella] fired a pistol at [James] while he was standing in the yard of the parties' home talking with the daughter of the parties").)

211.   Extreme domestic violence was prevalent on Toforest's mother's side of the family as well.  Donna too was the product of a violent, chaotic home.  She grew up in Mulga, Alabama, in a cramped four-room house, with her mother, her violent and abusive step-father, and thirteen other children.  (Doc. # 36-47 at 191-92; Doc. # 36-48 at 72.)  Her step-father, Charles "Drake" Burts, drank heavily (Doc. # 36-47 at 193-94), beat and verbally abused Donna's mother (Doc. # 36-47 at 196; Doc. # 36-48 at 73-74), fired a shotgun inside the house on at least one occasion, and on several occasions attempted to sexually assault both Donna and her sister Cornell.  (Doc. # 36-48 at 4, 11-12, 74-75; *cf.* Doc. # 36-46 at 3-18 (Drake Burts divorce records) (detailing Burts's pattern of extreme domestic violence).)  Donna's twin brother, Dexter Shelton, also drank heavily and sexually abused women.  (*See* Doc. # 36-44 at 182 – Doc. # 36-45 at 8 (Dexter Shelton court records) (showing dozens of charges and convictions for incidents including rape, indecent exposure, carrying a concealed weapon, public intoxication, reckless driving, driving while intoxicated, and disorderly conduct).)

212.   When Toforest was in the eighth grade, his parents separated, and Toforest and his mother moved in with another violent man, Jesse Stephens.  (Doc. # 36-18 at 90; Doc. # 36-48 at 23, 68; Doc. # 36-49 at 55.)  Donna worked full-time and usually left Toforest and his little brother alone with Jesse.  (Doc. # 36-49 at 57-61).  Jesse smoked crack cocaine in their apartment in front of Toforest and his little brother, and drank daily.  (Doc. # 36-48 at 42-43, 69;

87

*see also* Doc. # 36-45 at 58-93) (Jesse Stephens court records) (showing convictions for possession of controlled substances, theft of property, and check forgeries).)

213.    Jesse Stephens also physically and verbally abused Donna in front of Toforest. When Jesse got drunk, he acted "[i]n a rage, angry, just [a] madman."  (Doc. # 36-44 at 146.)  As one neighbor reported, "[Jesse] would curse [Donna], use profanity, call out names, didn't want her to go anywhere, didn't want her to have company.  He was abusive to her [saying things like] 'Bitch come back here.  Bitch do this.'"  (Doc. # 36-44 at 144.)  Jesse hit Donna in front of the boys, and Donna hid her black eyes under sunglasses.  (Doc. # 36-48 at 43-46; Doc. # 36-44 at 146.)

214.    The neighborhood surrounding Donna's and Jesse's home provided no refuge from drugs, violence, or poverty.  Their apartment was in the Tuxedo Projects, better known as the "Brickyard."  (Doc. # 36-48 at 20, 41-42, 66; Doc. # 36-49 at 87-88.)  In the late 1980s and early 1990s, the Brickyard was a violent, drug-ridden housing project, where children passed open-air drug markets on the way to school (Doc. # 36-48 at 44, 67; Doc. # 36-49 at 62) and learned to hit the ground when gunshots rang out, (Doc. # 36-48 at 46; Doc. # 36-49 at 64), and where young African-American men were murdered in broad daylight on a regular basis (Doc. # 36-48 at 22, 45-49, 92-94; Doc. # 36-49 at 63).  During a span of just a few years when Toforest was a teenager, no fewer than *seven* of his friends were murdered.  (*See* Doc. # 36-48 at 46-49; Doc. # 36-49 at 65-66 (testimony about the deaths of friends Adonis Beavers, Nagoosey Howard, Michael Moore, James Jones, Eddie Bowie, and Darrell Williams); Doc. # 36-48 at 48, 96 (testimony about the murder of girlfriend Tarnisha Foster); Doc. # 36-44 at 175-178) (death certificates).)  Also during that time, Toforest himself was shot in the chest.  He was only seventeen years old.  (Doc. # 36-48 at 92-94; Doc. # 36-49 at 65-68; Doc. # 36-46 at 58 – Doc.

# 36-47 at 9 (Toforest Johnson medical records).)  No one was ever arrested or prosecuted for the attempted murder of Toforest.  (Doc. # 36-48 at 168.)  And no one was ever arrested or prosecuted for any of the murders of Toforest's childhood friends and relatives.  (Doc. # 36-48 at 48-49.)

215.    Toforest's chaotic, violent, and unstable living situation forced him to become a caretaker for his younger brother, Little Ron, long before he was prepared for that responsibility. (Doc. # 36-44 at 181 (Ronald Johnson Jr. Department of Youth Services Order) (establishing that at one point Little Ron was in the custody of the Department of Youth Services).)  Toforest fed Little Ron, put him to bed, and did his best to make sure he was cared for when Toforest was out of the house.  (Doc. # 36-47 at 174.)  When Donna left the boys with her boyfriend, Jesse Stephens, Toforest tried to find a neighbor to watch over Little Ron.  (Doc. # 36-48 at 49; Doc. # 36-49 at 59-61.)  Even though Toforest was unable to complete school, he urged his younger brother to stay in school and stay out of trouble.  (Doc. # 36-48 at 51.)  Despite Toforest's efforts, Little Ron was often seen wandering around the projects all by himself at a young age. (Doc. # 36-49 at 59.)

216.    School was a struggle for Toforest, as it had been for his parents.  Neither Toforest nor his father managed to graduate from high school.  (Doc. # 36-47 at 75-76 (Ronald Johnson school records); Doc. # 36-47 at 77-93 (Toforest Johnson school records).)  Toforest's father never learned to read or write.  (Doc. # 36-47 at 159-60; Doc. # 36-48 at 187-89.)  Donna was considered "slow" by both her family members and her teachers, and she consistently did poorly in school.  (Doc. # 36-47 at 34-35 (Donna Johnson school records).)  Donna tried to stay in school, but after giving birth to Toforest and getting married, "she wasn't keeping up" and she also dropped out of high school.  (Doc. # 36-48 at 12.)  Toforest failed the first grade, repeated

grades, and dropped out during his tenth grade year.  (Doc. # 36-48 at 95; Doc. # 36-47 at 77-93 (Toforest Johnson school records).)

217.    Poverty compounded Toforest's family's problems.  Unable to read or write, Toforest's father, Ronald Johnson, worked on a sanitation truck.  (Doc. # 36-47 at 159-60; Doc. # 36-48 at 187-89.)  Most of Ronald's paycheck went straight to the shot house, where he either spent it on liquor or had it stolen from him after he passed out.  (Doc. # 36-48 at 195.)  As a result, the family did not have enough money to pay bills or buy food.  (Doc. # 36-48 at 195; *see* Doc. # 36-45 at 19-30 (Ronald and Donna Johnson court records) (showing lawsuit for failure to pay medical bills).)  The situation was no better after Donna moved in with Jesse Stephens, who strictly controlled Donna and any money that she earned.  In fact, Jesse, a drug addict and drug dealer, was the one who picked up Donna's paycheck every two weeks.  (Doc. # 36-48 at 27; *see also* Doc. # 36-44 at 179-80; Doc. # 36-45 at 31-57 (Garnishment Papers) (showing garnishment of wages against Donna Johnson and Jesse Stephens due to unpaid rent at multiple apartment complexes); Doc. # 36-45 at 60-69 (Jesse Stephens court record) (showing convictions for multiple forgeries of checks).)

218.    Without any stable home to rely on, Toforest constantly moved between the homes of family members and friends.  (Doc. # 36-48 at 38; Doc. # 36-49 at 94 ("[Toforest] just kind of bounced around from place to place.").)  Often he stayed wherever his mother happened to be living, even if that was the violent and drug-ridden Brickyard, or another apartment that was barely habitable.  (Doc. # 36-49 at 166.)  Just as often, however, he wandered the streets as a teenager, staying with friends here and there.  One friend, whose parents were strict and responsible, described how Toforest often just showed up unannounced and asked to spend the night.  (Doc. # 36-48 at 88.)  He did the chores and acted like a member of the family until it was

time once again to move on to another house. "We never knew when he was coming," she described. "I mean, he'd just show up. He'd, like, most times be walking when he came. And he just, you know, fell in with the rest of us." (Doc. # 36-48 at 88.) Nobody ever came looking for Toforest, called to check in on him, or came to pick him up to take him home. (Doc. # 36-48 at 88-89.) He often showed up at his uncle Donald's home, where Donald lived with his wife Rosa. (Doc. # 36-49 at 3.) At one point, Toforest asked his uncle if he could live with him permanently, but Donald and Rosa decided against this because they did not want to split up Toforest and Little Ron. (Doc. # 36-49 at 3-4.)

219.   The one occasionally protective force in Toforest's life was his aunt Celia Green, who cared for Toforest when she was able to do so. (Doc. # 36-48 at 70; Doc. # 36-49 at 89; *see also* Doc. # 36-47 at 14 (Toforest Johnson medical records) (listing Celia Green as Toforest's next of kin).) Toforest called Celia "Mama" and loved her like he loved his own mother. (Doc. # 36-48 at 31, 49; Doc. # 36-49 at 5, 89.) Celia never had custody of Toforest, and was unable to remove him from the violent and chaotic homes in which he lived, but she did let him stay with her once in a while, and she tried to buy him clothes and food when she could. (Doc. # 36-47 at 175.) Celia was a "great woman," the glue that held the family together. (Doc. # 36-49 at 4, 11.)

220.   In 1990, when Toforest was sixteen years old, Celia disappeared. For years, the family searched for Celia, posting and handing out fliers throughout the neighborhood. (Doc. # 36-49 at 6-7; Doc. # 36-44 at 172 (Missing Person's Bulletin for Celia Green).) The family believes she was murdered, (Doc. # 36-47 at 175; Doc. # 36-48 at 31, 50, 71; Doc. # 36-49 at 5, 89-90), but her body has never been found, and no one was ever prosecuted for her disappearance. For Toforest, the loss of Celia was devastating. (Doc. # 36-47 at 176; Doc. # 36-48 at 32, 71; Doc. # 36-49 at 90.) Celia disappeared around the same time that many of

Toforest's friends were murdered, and when he himself was the victim of gun violence.

Although Toforest rarely displayed his emotions in public, the trauma of the numerous losses in

his life, and particularly the loss of Celia, had a profound effect on him.  Celia's son, Tony

Green, recounted one night a couple years after Celia disappeared:

> I was working evening shift . . . [a]nd [Toforest] came by right before I was to go
> to work.  And he was—he was hurting pretty bad. . . .  And he said he couldn't get
> Mama [Celia] off his mind.  And that was a pretty long night.  I guess that's why it
> stands out.  I actually took off work and stayed there to comfort him.  We kind of
> wept together.

(Doc. # 36-49 at 91-101.)

221.    At the Rule 32 hearing, clinical social worker Lori James-Townes explained that

the circumstances described by the mitigation witnesses and corroborated by the records

constituted severe psychosocial risk factors in Toforest's life.  She explained that risk factors are

"events or circumstances in a person's life that . . . could create future problems for them, that

could be damaging, that could be harmful, that . . . the research looks at and says, if those things

are in existence, that they are more at risk for a damaging outcome."  (Doc. # 36-50 at 31.)

222.    Ms. James-Townes testified that the "primary" risk factor in Toforest's life was "a

family history of violence."  (Doc. # 36-50 at 42.)  She noted that Toforest's family was marked

by regular domestic violence for at least three generations on both sides of the family.  (Doc.

# 36-50 at 45.)  In families with this multigenerational history of violence, she explained, "before

your children are even born, you're more susceptible to exposing them to violence."  (Doc. # 36-

50 at 46.)  In addition, this violence "can have such a damaging impact that [the parents are] not

really able to parent."  (Doc. # 36-50 at 47.)  Further still, such families also often feature

desensitization to violence: when violence occurs, the family fails to seek help to address it.

(Doc. # 36-50 at 49.)

223.     Another significant risk factor that Ms. James-Townes identified in Toforest's life was his family's history of alcohol and drug abuse.  (Doc. # 36-50 at 63.)  Such family history suggests that the children will be more susceptible to drug and alcohol abuse themselves, both because they are biologically predisposed to addiction and because children often mimic their parents' behavior as adults.  (Doc. # 36-50 at 64-65.)  Ms. James-Townes also concluded that neglect was a risk factor in Toforest's life.  (Doc. # 36-50 at 72.)  Children who are neglected have "extremely higher . . . chance[s] of . . . damaging outcomes."  (Doc. # 36-50 at 78.)

224.     In addition to these factors, Ms. James-Townes found other risk factors: (1) Toforest's family had a consistent history of failure in school (Doc. # 36-50 at 78); (2) multiple generations of the family lived in poverty (Doc. # 36-50 at 83); (3) Toforest grew up in a community riddled with violence (Doc. # 36-50 at 90); and (4) Toforest suffered from unresolved grief due to the disappearance of his aunt Celia and the violent deaths of a number of his close friends (Doc. # 36-50 at 94).  Ms. James-Townes explained that the combination of these risk factors rendered Toforest's childhood environment "toxic and dangerous."  (Doc. # 36-50 at 101.)  Consideration of these risk factors, and the perilous environment they created, are key to "identify[ing] who [Toforest Johnson] is."  (Doc. # 36-50 at 102.)

225.     The failure of Mr. Johnson's counsel to adequately collect and present mitigating evidence deprived Mr. Johnson of his rights in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and all other applicable federal law. The Court of Criminal Appeals denied this claim on the merits.  *Johnson v. State*, 379 So. 3d 994, 1054-60 (Ala. Crim. App. 2007).[11]  To the extent that 28 U.S.C. § 2254(d) applies, the state

---

[11] The Court of Criminal Appeals mistakenly referred to this claim as a "penalty phase" claim rather than a "sentencing phase" claim.  *See Johnson*, 379 So. 3d at 1054.  The claim that trial counsel performed deficiently in the penalty phase of Mr. Johnson's trial, Claim XIX(G), was held to be procedurally barred, on the grounds that it was allegedly raised on direct appeal by appellate counsel.  *See id.* at 1015.

court denial was contrary to and an unreasonable application of clearly established federal law and was based on an unreasonable determination of the facts in light of the evidence presented. This Court should review the claim on the merits, vacate Mr. Johnson's conviction, and order a new trial.

## V.  APPELLATE COUNSEL FOR MR. JOHNSON WERE CONSTITUTIONALLY INEFFECTIVE.

226.    Mr. Johnson was denied his right to effective assistance of appellate counsel in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and all other applicable federal law.  There is a reasonable probability that, but for counsel's deficient performance, the outcome of Mr. Johnson's motion for new trial and direct appeal would have been different.  *Strickland v. Washington*, 466 U.S. 688, 694 (1984).

227.    Joe Morgan, Jr. represented Mr. Johnson in his motion for new trial and on direct appeal.  Soon after Mr. Morgan argued the appeal in front of the Court of Criminal Appeals, he pleaded guilty to violating the Alabama Rules of Professional Conduct in nine separate cases and was suspended from the Alabama Bar for two years.  The Alabama Supreme Court upheld Mr. Morgan's suspension, with then-Chief Justice Hooper concurring and expressing his opinion that the two-year suspension was too lenient, given Mr. Morgan's many previous reprimands from the State Bar.  *See Morgan v. Disciplinary Bd. of the Ala. State Bar*, 776 So. 2d 103, 103 (Ala. 2000).

### A.    Appellate counsel was ineffective for failing to raise the Court of Criminal Appeals' mistakes of fact and law on the issue of whether Deputy Hardy was on duty at the time of the murder.

228.    At the close of the State's case-in-chief, Mr. Johnson's counsel moved for a judgment of acquittal on the charge of capital murder because the State had failed to introduce any evidence that Deputy Hardy was "on duty" at the time of the murder, as required by Ala.

94

Code § 13A-5-40(a)(5).  (Doc. # 36-4 at 98-99.)  The trial court denied the motion without explanation.  (Doc. # 36-4 at 99.)

229.    At the time he was killed, Deputy Hardy was working as a private security guard for a hotel.  He was in his uniform but was being paid by the hotel.  Alabama law is clear that an off-duty police officer is only transformed into an on-duty officer if he either personally witnesses a misdemeanor or has received a report of a felony.  *See Robinson v. State*, 361 So. 2d 1113, 1114 (Ala. 1978).  Moreover, under Alabama law, the only evidence that can be considered on a motion for judgment of acquittal is evidence that was offered in the State's case-in-chief.  *See Ex parte Hunt*, 744 So. 2d 851, 859 (Ala. 1999).

230.    As discussed in detail above, the only evidence the State presented with respect to what happened in the hotel parking lot was the testimony of Violet Ellison.  Ms. Ellison testified that "Toforest" said that Deputy Hardy may have come out to investigate a "disturbance," which was part of his job as a private security guard.  (Doc. # 36-4 at 61.)  However, there was no evidence presented that Deputy Hardy witnessed a misdemeanor or had received a report of a felony.  Nevertheless, despite the absence of evidence supporting the charge of capital murder, the trial court denied the motion for judgment of acquittal.  (Doc. # 36-4 at 99.)[12]

231.    Mr. Johnson's first appellate counsel, Mr. Morgan, raised the claim regarding the issue of Deputy Hardy's on-duty status on direct appeal.  However, the Court of Criminal Appeals rejected the claim, relying on a mistaken understanding of the facts and an improper legal standard.  The Court of Criminal Appeals held that there was sufficient evidence for the jury to conclude beyond a reasonable doubt that Deputy Hardy was "on duty" at the time of the

---

[12] Mr. Johnson's capital murder conviction, despite any evidence that Deputy Hardy was "on duty," is particularly striking given that the same prosecutors who tried Mr. Johnson's case admitted to the jury in his co-defendant Ardragus Ford's case that the "evidence is weak, as to whether or not he was acting as a deputy sheriff."  (Doc. # 36-25 at 111.)

murder.  It stated, "[f]rom the evidence, the jury could have concluded that Deputy Hardy witnessed, or at least suspected, either a drug transaction—based on [Yolanda] Chambers's previous statements—or an imminent assault, based on Johnson's own admission that Monika Daniels was brandishing a pistol." *Johnson v. State*, 823 So. 2d 1, 43 (Ala. Crim. App. 2001).

232.    As Justice Johnstone asserted in his dissent from denial of certiorari, the Court of Criminal Appeals made several substantial errors in denying Mr. Johnson's claim.  First, as Justice Johnstone pointed out, "[t]he record lacks evidence that Deputy Hardy witnessed Monika Daniels 'brandishing a pistol.'" *Ex parte Johnson*, 823 So. 2d 57, 58 (Ala. 2001) (Johnstone, J., dissenting from denial of certiorari).  In fact, there was no evidence that Monika Daniels had brandished a pistol at all, let alone that Deputy Hardy witnessed such a thing.  At most, Ms. Ellison's hearsay testimony established that Ms. Daniels "had a gun" in the parking lot.  (Doc. # 36-4 at 61.)

233.    Second, as Justice Johnstone also pointed out, the Court improperly relied on testimony that was presented in Mr. Johnson's case-in-chief, evidence that was not in the record at the time Mr. Johnson moved for a judgment of acquittal. *Ex parte Johnson*, 823 So. 2d at 58 (Johnstone, J., dissenting from denial of certiorari).  Specifically, the Court improperly considered the testimony of Yolanda Chambers, who testified that she had previously made out-of-court statements to the effect that there had been a drug deal in the parking lot. *Johnson*, 823 So. 2d at 43.

234.    Once the Court's mistakes of fact and law are corrected, the State is left without any evidence that Deputy Hardy was on duty at the time of the murder.  Mr. Johnson's second appellate counsel, who was appointed to the case when Mr. Johnson's first appellate counsel was suspended by the Alabama Bar, mistakenly credited the Court of Criminal Appeals' erroneous

factual findings and failed to establish in his application for rehearing or petition for certiorari the problems with the Court's treatment of this claim.  For example, in his "Brief in Support of Application for Rehearing," Mr. Johnson's second appellate counsel quoted the Court's conclusion that Monika Daniels brandished a gun, and then went on to say that "Ms. Ellison did give [that] testimony."  (Doc. # 36-9 at 128.)  Appellate counsel also conceded that Monika Daniels "pulled out a gun," which is also not supported by the record.  (Doc. # 36-9 at 127-28.)  In fact, Ms. Ellison never testified that Mr. Johnson said that Monika Daniels brandished or pulled out a gun.

235.    The failure by Mr. Johnson's appellate counsel to properly raise this issue prejudiced Mr. Johnson, because it is likely that the Court of Criminal Appeals would have reached a different result had it been aware of its own mistaken understanding of the record and the governing law.  The failure of Mr. Johnson's counsel to raise the Court of Criminal Appeals' error of fact and law deprived Mr. Johnson of his rights in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and all other applicable federal law.  In Claim XII of his Third Amended Petition, Mr. Johnson alleged that his appellate counsel was deficient for failing to raise the Court of Criminal Appeals' mistakes of law and fact when he appealed that decision.  (Doc. # 36-18 at 21-24.)  The Court of Criminal Appeals held that this claim was insufficiently pleaded pursuant to Alabama Rule of Criminal Procedure 32.6(b).  *Johnson v. State*, 379 So. 3d 994, 1016 (Ala. Crim. App. 2007).  To the extent that 28 U.S.C. § 2254(d) applies, the state court denial was contrary to and an unreasonable application of clearly established federal law and was based on an unreasonable determination of the facts in light of the evidence presented.  Following an evidentiary hearing, this Court should review the claim on the merits, vacate Mr. Johnson's conviction, and order a new trial.

**B.      Appellate counsel was ineffective for unreasonably and inadequately raising specific ineffective assistance of counsel claims in a motion for a new trial and on direct appeal.**

236.    Mr. Johnson's appellate counsel unreasonably and inadequately raised certain ineffective assistance of trial counsel claims in a motion for a new trial and on direct appeal following Mr. Johnson's conviction.  Mr. Johnson raised these ineffective assistance of appellate counsel claims in Claim XX(10) (Doc. # 36-18 at 170-72) (regarding the motion for new trial) and Claim XX(11) (regarding the direct appeal) (Doc. # 36-18 at 172-73).

237.    In the motion for new trial, appellate counsel included a cursory "claim" regarding ineffective assistance of counsel, (Doc. # 36 at 109-111), which the circuit court summarily denied without a hearing.  (Doc. # 36 at 17.)  On direct appeal, appellate counsel included a "claim" regarding ineffective assistance of counsel in his appellate brief that consisted of five sentences of allegations.  (Doc. # 36-8 at 94.)

238.    At an evidentiary hearing on this claim of ineffective assistance of appellate counsel, Mr. Johnson will establish that Mr. Morgan alluded to trial counsel's ineffectiveness because he erroneously believed it was necessary to do so to preserve Mr. Johnson's right to raise such claims in a postconviction proceeding.  He was completely unaware that adding those sentences to the pleadings may have had the effect of *barring* review of some of Mr. Johnson's most compelling ineffective assistance of counsel claims.

239.    Mr. Morgan did not conduct any investigation into trial counsel's ineffectiveness prior to adding the few sentences to the motion for new trial and direct appeal brief, nor did he provide any details or supporting evidence for the allegations.  (Doc. # 36 at 109-10.)  On appeal, the Court of Criminal Appeals rejected Mr. Morgan's suggestions of ineffective assistance of

trial counsel, noting that the Court was "hard-pressed to even consider this to be a 'claim' of ineffective assistance of counsel." *Johnson v. State*, 823 So. 2d 1, 50 (Ala. Crim. App. 2001).

240.    Not only did appellate counsel raise these claims without having conducted any investigation in support of the claims, he did so without the benefit of a trial transcript, and without even having met Mr. Johnson.  Counsel never visited Mr. Johnson in prison, never spoke with Mr. Johnson's family about his case or life history, never hired any experts or consulted with any experts, never attempted to identify or interview other individuals likely to have known about Mr. Johnson's life history, did not attempt to present evidence in support of the motion for a new trial, and did not attempt to present any evidence in support of the ineffective assistance of counsel claims that appellate counsel raised.  Counsel unreasonably filed the motion for new trial a mere four days after being appointed to represent Mr. Johnson.

241.    Without the benefit of any investigation, or even a trial transcript, it was unreasonable for appellate counsel to have raised any claims related to ineffective assistance of trial counsel.  To the extent that these claims were raised despite the lack of evidence, these claims were raised deficiently.  By raising these claims, counsel's only impact on the claims was to allow the State to argue successfully that the claims were procedurally barred during Rule 32 proceedings.  Indeed, the Court of Criminal Appeals ruled that the following claims were procedurally barred because Mr. Morgan raised them in the motion for new trial or on direct appeal:

- "That the State knowingly presented a prosecution theory against him that was inconsistent with the theory used against his codefendant, Ardragus Ford." *Johnson v. State*, 379 So. 3d 994, 1012 (Ala. Crim. App. 2007) (Claim VI in the Third Amended Petition (Doc. # 36-17 at 194 – Doc. #36-18 at 3)).

- "That the trial court improperly considered a youthful offender adjudication and arrests that had not resulted in convictions." *Johnson*, 379 So. 3d at 1012 (Claim XIV in the Third Amended Petition (Doc. # 36-18 at 27-29)).

- "That trial counsel was ineffective, in part, because of inadequate resources available for his defense." *Johnson*, 379 So. 3d at 1015 (Claim XIX(A) in the Third Amended Petition (Doc. # 36-18 at 42-43)).

- "That trial counsel was ineffective for entrusting the investigation of the case to a brain-damaged, suicidal, racist, alcoholic homeless man with an IQ of 63." *Johnson*, 379 So. 3d at 1015 (Claim XIX(B) in the Third Amended Petition (Doc. # 36-18 at 43-58)).

- "That the lack of a competent investigation prejudiced Johnson in several significant ways." *Johnson*, 379 So. 3d at 1015 (Claim XIX(C) in the Third Amended Petition (Doc. # 36-18 at 59-120)).

- "That trial counsel performed deficiently in failing to call various experts during the trial phase." *Johnson*, 379 So. 3d at 1015 (Claim XIX(D) in the Third Amended Petition (Doc. # 36-18 at 120-124)).

- "That trial counsel was ineffective for failing to object to the manner of execution." *Johnson*, 379 So. 3d at 1015 (Claim XIX(E)(10) in the Third Amended Petition (Doc. # 36-18 at 125)).

- "That trial counsel failed to present 'extensive mitigating evidence' that it failed to uncover." *Johnson*, 379 So. 3d at 1015 (Claim XIX(C)(2) in the Third Amended Petition (Doc. # 36-18 at 64-115)).

242.   Had counsel not allegedly raised these claims prior to Rule 32 proceedings, the State would have had no argument that the claims should be procedurally barred and Mr. Johnson would have been permitted to raise them.  Mr. Johnson was prejudiced because the ineffective assistance of trial counsel claims that were held to be procedurally barred have merit, as Mr. Johnson intends to prove at an evidentiary hearing in this Court.  Accordingly, Mr. Johnson here incorporates by reference the underlying claims of ineffective assistance of counsel that are listed in the above paragraph, as a hearing on this claim of ineffective assistance of appellate counsel necessarily requires Mr. Johnson to present the evidence in support of the claims that were held to be procedurally barred in state court.

243.     In addition, the Court of Criminal Appeals unreasonably ruled that the following
three ineffective assistance of *appellate* counsel claims were procedurally barred, despite the fact
that they could not possibly have been raised by appellate counsel:

- "That appellate counsel failed to object to the trial court's improper consideration
  of criminal activity that had not resulted in a conviction to negate a statutory
  mitigating circumstance of no prior criminal history." *Johnson*, 379 So. 3d at
  1016 (Claim XX(8) in the Third Amended Petition (Doc. # 36-18 at 169)).

- "That appellate counsel failed to object to the manner of execution." *Johnson*,
  379 So. 3d at 1016 (Claim XX(12) in the Third Amended Petition (Doc. # 36-18
  at 173)).

- "That appellate counsel failed to raise on appeal that lethal injection and
  electrocution are unconstitutional per se and unconstitutional as performed by the
  State of Alabama." *Johnson*, 379 So. 3d at 1015 (Claim XXI in the Third
  Amended Petition (Doc. # 36-18 at 178-189)).

244.     Had counsel not allegedly raised the underlying ineffective assistance of trial
claims that relate to these three claims prior to Rule 32 proceedings, the Court of Criminal
Appeals would not have held them to be procedurally barred and Mr. Johnson would have been
permitted to raise them.  Mr. Johnson was prejudiced because the ineffective assistance of
counsel claims that were held to be procedurally barred have merit, as Mr. Johnson intends to
prove at an evidentiary hearing in this Court.  Accordingly, Mr. Johnson here incorporates by
reference the underlying claims of ineffective assistance of counsel that are listed in the above
paragraph, as a hearing on this claim of ineffective assistance of appellate counsel necessarily
requires Mr. Johnson to present the evidence in support of the claims that were held to be
procedurally barred in state court.

245.     Appellate counsel's ineffectiveness deprived Mr. Johnson of his rights in
violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States
Constitution, and all other applicable federal law.  Although Mr. Johnson pleaded these

ineffective assistance of appellate counsel claims in his Third Amended Petition and extensively briefed them on appeal to the Court of Criminal Appeals, that court failed to address either claim until Mr. Johnson once again argued them in his Application for Rehearing.  At that point, the Court of Criminal Appeals summarily ruled that Mr. Johnson's claims were "insufficiently pleaded, and moreover, are without merit."  *Johnson*, 379 So. 3d at 1063.  To the extent that 28 U.S.C. § 2254(d) applies, the state court denial was contrary to and an unreasonable application of clearly established federal law and was based on an unreasonable determination of the facts in light of the evidence presented.   Following an evidentiary hearing, this Court should review the claim on the merits, vacate Mr. Johnson's conviction, and order a new trial.

## VI.    THE ALABAMA DEATH PENALTY STATUTE AND THE PROCEDURE RESULTING IN MR. JOHNSON'S SENTENCE OF DEATH VIOLATE THE UNITED STATES CONSTITUTION.

246.    Alabama's capital sentencing scheme, which makes the imposition of the death penalty contingent on the factual findings of the judge—not the jury—is unconstitutional.  In Claim XXIV of his Third Amended Petition, Mr. Johnson alleged that the Alabama death penalty statute and procedure that resulted in his sentence of death violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United State Constitution.  (Doc. # 36-18 at 194-200.)  This Court should review the claim on the merits, vacate Mr. Johnson's conviction, and order a new trial.

247.    Alabama's capital punishment statutes provide for a trifurcated system.  First, at the guilt phase, the jury decides only whether the accused is guilty of one of the nineteen categories of capital murder set out in Alabama Criminal Code § 13A-5-40(a).  When a conviction is obtained, the capital trial then moves to the penalty and sentencing phases.  The punishment for the offense of capital murder in Alabama is either life imprisonment without the

possibility of parole or death.  *See* Ala. Code § 13A-5-45(a).  It is at the penalty and sentencing phases that the decision between life imprisonment without the possibility of parole and a death sentence is made.  *See* Ala. Code §§ 13A-5-45, 13A-5-47.

248.    At the second phase of a capital trial in Alabama, the penalty phase, a sentencing hearing occurs before the advisory jury.  *See* Ala. Code §§ 13A-5-45(a), 13A-5-46(a).  A death sentence may not be imposed unless there is an additional finding beyond a reasonable doubt of at least one of the ten aggravating circumstances listed in Alabama Criminal Code § 13A-5-49.  *See* Ala. Code § 13A-5-45(e).  At the penalty phase, the burden is on the State to establish any aggravating circumstances beyond a reasonable doubt.  *See id.*  The defendant may offer any mitigating circumstances, which the State may disprove by a preponderance of the evidence.  *See* Ala. Code § 13A-5-45(g).  The jury is told to recommend life in prison if it finds no aggravating circumstances.  *See* Ala. Code § 13A-5-46(e).  If the jury finds the existence of an aggravating circumstance, it then weighs the aggravating and mitigating circumstances.  The statute does not provide that aggravating circumstances must outweigh mitigating circumstances beyond a reasonable doubt; rather, upon finding that aggravating circumstances merely outweigh mitigating circumstances, the advisory jury is then required to recommend a sentence of death.  *See id.*  But the weighing assessment need not be unanimous.  *See* Ala. Code § 13A-5-46(f).  Indeed, in Mr. Johnson's case, the jury's verdict was not supported by findings of fact and the jury did not specify which aggravating or mitigating circumstances, if any, it found.  *See* Ala. Code § 13A-5-46(e).

249.    The third phase in Alabama's capital sentencing scheme returns the ultimate sentencing decision to the trial judge.  The Alabama Code explicitly states that the jury's verdict is advisory only and "is not binding on the court."  Ala. Code § 13A-5-47(e); *Bush v. Alabama,*

431 So. 2d 555, 559 (Ala. Crim. App. 1982) (stating that the trial court "is in no way bound by the jury's recommendation concerning sentence"), *aff'd*, 431 So. 2d 563 (Ala. 1983); *see also Harris v. Alabama*, 513 U.S. 504, 508-09 (observing that Alabama's capital sentencing statutes "give ultimate sentencing authority to the trial judge").  The judge independently determines whether one or more statutory aggravating circumstances exist and, if so, whether those aggravating circumstances outweigh any mitigating circumstances the judge finds to exist.  *See* Ala. Code §§ 13A-5-47(d)-(e).  The statute does not require that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt.  *See id.*  The trial judge, not the jury, makes the requisite findings to determine whether the defendant is legally eligible for a death sentence, and whether the defendant should, in fact, receive a sentence of death rather than life imprisonment without the possibility of parole as authorized by the jury's verdict of guilty.

250.    In all material respects, Alabama's capital sentencing procedures are the same as those struck down as unconstitutional by the United States Supreme Court in *Ring v. Arizona*, 536 U.S. 584, 609 (2002).  Alabama's capital sentencing procedures violate the now axiomatic rule that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000).

251.    Mr. Johnson's trial jury followed Alabama's procedures. Following the verdict of guilty, the case progressed to the non-binding advisory sentencing phase.  The jury was informed, on at least twenty occasions, that any decision concerning the sentence would only be a recommendation.[13]  This occurred contrary to United States Supreme Court precedent that

---

[13] (*See*, *e.g.*, Doc. # 36-6 at 131 ("it is left to you to determine . . . what the recommended sentence should be"); Doc. # 36-6 at 132 ("[i]n making your recommendation concerning what the punishment should be . . . "); Doc. # 36-6 at 133 (noting aggravating circumstances "which may be considered by the jury in recommending punishment"); Doc.

established "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *See Caldwell v. Mississippi*, 472 U.S. 320, 328-29 (1985).  The jury returned a non-unanimous advisory verdict, saying only that "[w]e, the jury, recommend that the defendant, Toforest Onesha Johnson, be punished by death. The vote is as follows: 10 death, 2 life without parole."  (Doc. # 36 at 35.)  The jury's recommendation did not contain any findings of aggravating or mitigating circumstances, nor did it indicate, if any were found, how the aggravating and mitigating circumstances were weighed, if indeed they were weighed at all.  Also pursuant to the statute, the jury's advisory verdict was not binding in any way on the court.  Ala. Code § 13A-5-47(e).

252.    Mr. Johnson's case proceeded to the judicial sentencing phase, which took place before the judge alone.  It was following this hearing, sixty-seven days after the jury was dismissed, that the trial court would sentence Mr. Johnson to death.  (Doc. # 36 at 14-15.)  Prior to imposing a sentence, the trial court ordered and reviewed a pre-sentence investigation report, and the trial court heard argument from both the State and Mr. Johnson's trial counsel.  (Doc. # 36-6 at 161-171.)  The trial court considered this additional information, which was never presented to the jury, and the trial court took into account a youthful offender conviction and arrests that had not resulted in convictions.

253.    On October 30, 1998, the trial court pronounced Mr. Johnson's sentence in open

---

# 36-6 at 135 ("before you can even consider recommending that the defendant's punishment be death"); Doc. # 36-6 at 135 ("aggravating circumstance or circumstances considered by you in determining what punishment is to be recommended in this case"); Doc. # 36-6 at 137 ("then you must return a verdict recommending that the defendant's punishment"); Doc. # 36-6 at 142 ("in determining what to recommend as the punishment in this case"); Doc. # 36-6 at 143 ("[i]t is your responsibility to determine the facts and recommend the punishment..."); Doc. # 36-6 at 145 ("in order to bring back a verdict recommending the punishment of death"); Doc. # 36-6 at 145 ("any number less than 10 cannot recommend the death penalty"); Doc. # 36-6 at 146 ("[i]n addition to the recommendation of either death or life imprisonment without parole"); Doc. # 36-6 at 147 ("then your verdict should be to recommend imprisonment for life without parole").)

court and issued a Sentencing Order.  (Doc. # 36 at 35.)  Therein, the trial court made factual findings as to whether the aggravating circumstances enumerated in § 13A-5-49 of the Alabama Code were present. The trial court found two aggravating circumstances.  It wrote: "The Court finds the following aggravating circumstances exist in this case: 1. The capital offense was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.  2. The capital offense was committed by a person under the sentence of imprisonment."  (Doc. # 36 at 105.)

254.    The trial court proceeded to determine which, if any, mitigating circumstances had been proven by a preponderance of the evidence.  In doing so, the trial court continued to make findings of fact that were not made by the jury and that were predicated on evidence not available to the jury.  Specifically, the trial court determined that "[u]pon consideration of all of the evidence brought forth at the trial of this case, the sentencing hearing and the pre-sentence investigation report, the Court finds that the only evidence arguably presented in mitigation was the fact that at the time the offense occurred the defendant was 22 years of age.  The Court finds no other evidence in mitigation."  (Doc. # 36 at 106.)  The court then sentenced Mr. Johnson to death.  (Doc. # 36-6 at 170.)

255.    The Sentencing Order shows that the trial court sentenced Mr. Johnson to death based on its own findings of fact that were not specifically made by the jury. Based on its additional factual findings, the trial court found the existence of two aggravating circumstances and, at best, one mitigating circumstance.  But for the trial court's findings of fact, Mr. Johnson would not have been eligible to receive a sentence of death.  Given the trial court's instructions to the jury at the punishment phase as detailed above, it remains unknown whether the jury unanimously found any aggravator to exist.

106

256.    After weighing the aggravating circumstances and mitigating circumstances it found to exist in Mr. Johnson's case—determinations that were predicated on information outside the record available to the jury—the trial court stated, "the Court finds that the aggravating circumstances outweigh any mitigating circumstances.  In making this determination the Court has considered the jury recommendation of death.  The Court finds that the aggravating circumstances outweigh any mitigating circumstances when the jury recommendation of death is taken into consideration."  (Doc. # 36 at 106; Doc. # 36-6 at 170.)

257.    Mr. Johnson was tried, convicted, and sentenced to death under an unconstitutional capital sentencing scheme.  The Sixth Amendment guarantees a trial by jury, not advice by jury.  The Sixth Amendment requires a jury to find all facts that are necessary to render a defendant eligible to receive a death sentence. The Sixth Amendment requires that all factual findings necessary to render a defendant eligible to receive a death sentence be found beyond a reasonable doubt.  The Sixth Amendment requires a jury to find all facts that are necessary to impose a sentence of death.  In these respects, Alabama's capital sentencing procedures diametrically contravene the United States Constitution, and all other applicable federal law.

258.    Moreover, several specific procedures applied to sentence Mr. Johnson to death violated the United States Constitution.  First, whatever role was given to the advisory jury in Mr. Johnson's case was unconstitutional since the jury was repeatedly told that it was only making a "recommendation."  Second, the factual findings of the trial court were a necessary predicate for Mr. Johnson to be eligible for and to receive a sentence of death.  But for the substantial fact-finding that the trial court performed after dismissing the jury—fact-finding that was based, in part, on an investigative report outside the trial record, and on other information

107

never presented to the jury—Mr. Johnson could not have received a sentence of death.  Third,
the two aggravating factors relied on by the trial court to sentence Mr. Johnson to death were not
pleaded in the indictment.  Fourth, while the trial court sentenced Mr. Johnson to death based on
two aggravating factors, it is unknown whether the jury found either of the aggravating factors to
exist.  Fifth, the jury was not instructed or required to find under the statute that the aggravating
factors outweighed the mitigating factors beyond a reasonable doubt and the trial court was not
required to find, nor did it indicate that it found, that the aggravating factors outweighed the
mitigating factors beyond a reasonable doubt.  Sixth, the jury was not instructed or required to
find unanimously that the aggravating factors outweighed the mitigating factors.  In these
specific ways, Mr. Johnson's sentence of death violates the fundamental requirements of the
Sixth Amendment.

259.    These errors, separately and collectively, deprived Mr. Johnson of his rights in
violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States
Constitution, and all other applicable federal law. The Alabama Court of Criminal Appeals
denied Claim XXIV on the merits.  *Johnson*, 379 So. 3d at 1015 n.1.  To the extent that 28
U.S.C. § 2254(d) applies, the state court denial was contrary to, and an unreasonable application
of, clearly established federal law, and was based on an unreasonable determination of the facts
in light of the evidence presented.  This Court should review the claim on the merits, vacate Mr.
Johnson's conviction, and order a new trial.

## CONCLUSION

260.    All of the claims for relief and references to violations of Mr. Johnson's federal
constitutional rights are expressly intended to, and by this reference do, allege violations of Mr.
Johnson's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States

Constitution, and their individual clauses and sections, as well as all other applicable federal law. Each of the claims pleaded herein relies on all facts pleaded throughout the petition, and the prejudice resulting from all constitutional errors must be considered cumulatively.

261.    Mr. Johnson was denied a full, fair, and adequate hearing in state court with respect to the claims raised herein.  Because Mr. Johnson was denied a hearing with respect to many of his postconviction claims, he has had no opportunity to prove their factual bases. Nevertheless, he was able to present evidence in support of some of his postconviction claims, and this evidence, as well as the allegations Mr. Johnson has not yet been afforded an opportunity to prove, sheds light on critical facts to which the jury at Mr. Johnson's trial was not privy.  With respect to each of the guilt phase claims raised herein, this Court should review the claim on the merits, vacate Mr. Johnson's conviction, and order a new trial.  With respect to each of the penalty and sentencing phase claims raised herein, this Court should review the claim on the merits, vacate Mr. Johnson's death sentence, and order a new sentencing trial.

## PRAYER FOR RELIEF

For the reasons set forth above and other such reasons as may be made upon amendment to this petition and an evidentiary hearing, Mr. Johnson respectfully requests that this Court grant him the following relief:

1.      Issue a writ of habeas corpus vacating Mr. Johnson's conviction and sentence of death;

2.      Afford Mr. Johnson an opportunity to respond to any responsive pleading by the Respondent;

3.      Hold an evidentiary hearing so that Mr. Johnson may present evidence in support of his claims, including evidence that he attempted, but was not permitted, to present in state proceedings;

4.      Grant Mr. Johnson discovery under Rule 6 of the Rules Governing § 2254 Cases in the United States District Courts and a sufficient period of time to conduct discovery;

5.      Permit Mr. Johnson, after additional factual development, an opportunity to brief and argue the issues presented in this petition;

6.      Grant such other relief as may be just and appropriate.

Respectfully submitted,

*/s/ Patrick Mulvaney*
Patrick Mulvaney
60 Walton Street, NW
Atlanta, GA 30303
Tel:     (404) 688-1202
Fax:     (404) 688-9440
pmulvaney@schr.org

*/s/ Ty Alper*
Ty Alper
U.C. Berkeley School of Law
Berkeley, CA 94720-7200
Tel:     (510) 643-7849
Fax:     (510) 643-4625
talper@law.berkeley.edu

## ATTORNEY'S VERIFICATION UNDER OATH

I affirm under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

This, the 17th day of June, 2024.

_____
Patrick Mulvaney

Subscribed and sworn to before me this, the 13th day of June, 2024.

_____
Notary Public

## CERTIFICATE OF SERVICE

I hereby certify that on June 13, 2024, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system, which will send the filing to the following:

James R. Houts
Assistant Attorney General
Office of the Alabama Attorney General
501 Washington Avenue
Montgomery, AL 36130
James.Houts@AlabamaAG.gov

/s/ Patrick Mulvaney
Patrick Mulvaney