FILED

2024 Jul-15  PM 02:59
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| TOFOREST JOHNSON, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No.  2:16-cv-001945-RDP |
| | ) | |
| TERRY RAYBON, Warden. | ) | |
| | ) | |
| Respondents. | ) | |

## RESPONDENT'S ANSWER TO PETITION

Respondent Terry Raybon, Warden of Holman Correctional Facility, answers Petitioner Toforest Johnson's amended petition for the federal writ of habeas corpus by a state prisoner (Doc. 37), denying that Johnson is entitled to relief.[1] Respondent admits that Petitioner is a state prisoner in the custody of the Alabama Department of Corrections. Because Petitioner is a state prisoner, federal review of his conviction and sentence is subject to the requirements of the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA").

---

[1] Counsel for Respondent is filing a request for a 14-day enlargement of time to file the accompanying brief due to conflicts that have arisen during the past month, including counsel's obligations in *Miller v. Hamm*, 2:24-cv-00197-RAH (M.D. Ala.), *Grayson v. Hamm*, 2:24-cv-376-RAH (M.D. Ala.), and oral argument in *Belcher v. State*, CR-23-0206 (Ala. Crim. App. June 18, 2024). Respondent believes that much of the information sought in the Court's February 15, 2024, Order (Doc. 32 at 4), is provided in his answer, as well.

"The habeas statute unambiguously provides that a federal court may issue the writ to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or law or treaties of the United States.'" *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (quoting 28 U.S.C. § 2254(a)). Habeas relief cannot be granted on a state prisoner's constitutional claim unless it has first been exhausted in state court. 28 U.S.C. § 2254(b)(1); *Medellin v. Dretke*, 544 U.S. 660, 666 (2005). A claim is not deemed exhausted unless the state prisoner has "invoke[d] one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). For Alabama prisoners like Johnson, this includes filing a petition for discretionary review in the Alabama Supreme Court. *See Smith v. Jones*, 256 F.3d 1135, 1140-41 (11th Cir. 2001).

Additionally, state prisoners must present their claims to the state courts in a manner making it clear it alleges a federal constitutional violation. "[T]o exhaust state remedies fully, the petitioner must make the state court aware that the claims asserted present federal constitutional issues. 'It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made.'" *Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998) (quoting *Anderson v. Harless*, 459 U.S. 4, 5-6 (1982)). A state prisoner must explicitly reference a specific federal constitutional right. The State does not waive its right to require exhaustion of state remedies under these guiding principles

2

unless it does so expressly, through counsel. *See* 28 U.S.C. § 2254(b)(3) (West 2023). Respondent does not waive the exhaustion requirement in this case.

A state court's denial of a petitioner's claim on adequate and independent procedural (state law) grounds generally precludes habeas review of that claim. *See Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991) ("The [independent and adequate state ground] doctrine applies to bar federal habeas relief when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement."); *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001). Even where a state court renders an alternative decision on the merits of a prisoner's federal constitutional claim, a "state court need not fear reaching the merits of a federal claim in an *alternative* holding" because by permitting a state court to reach a federal question and invoke an independent state law ground, "a state court may reach a federal question without sacrificing its interests in finality, federalism, and comity." *Harris v. Reid*, 489 U.S. 255, 265 n.10 (1989); *Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999) (same); *Alderman v. Zant*, 22 F.3d 1541, 1549 (11th Cir. 1994) (same); *see also Harris*, 489 U.S. at 263.

Federal claims adjudicated on the merits in state court must be reviewed deferentially. *Borden v. Allen*, 646 F.3d 785, 808 (11th Cir. 2011). This means that a state prisoner is not entitled to relief for a federal constitutional claim adjudicated on the merits in state court unless the state court's adjudication either (1) "resulted

in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Harrington v Richter*, 562 U.S. 86, 103 (2011). Put another way, a petitioner is entitled to habeas relief only if "the state court's ruling on the claim presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103; *see also Dunn v. Madison*, 138 S. Ct. 9, 12 (2017) (per curiam) (cleaned up) (denying habeas relief where "the state court's determinations of law and fact were not 'so lacking in justification' as to give rise to error 'beyond any possibility for fairminded disagreement.'").

This standard requires highly deferential review in a number of ways. First, "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Renico v. Lett*, 559 U.S. 766, 773 (2010). This means that a federal habeas court cannot issue the writ because it concludes "in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly," but only if the state court application is "objectively unreasonable." *Id.* (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000). This is a substantially higher standard than de novo review. *Renico*,

559 U.S. at 773 (citing *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). Such a standard is intended to be difficult for a state prisoner to meet, as federal courts cannot "lightly conclude that a State's criminal justice system has experienced the 'extreme malfunctio[n]' for which federal habeas relief is the remedy." *Burt v. Titlow*, 571 U.S. 12, 20 (2013) (quoting *Harrington*, 562 U.S. at 102-03). In short, a state court decision must be given "the benefit of the doubt." *Renico*, 559 U.S. at 773 (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).

Under § 2254(d)(1), a state-court decision can be contrary to clearly established federal law in two ways. First, it will be contrary to clearly established federal law when it reaches a conclusion or applies a legal rule opposite to that of the Supreme Court on a matter of law. *Williams*, 529 U.S. at 405. Second, it will be contrary to clearly established federal law if it confronts facts materially indistinguishable from those of relevant Supreme Court precedent and arrives at an opposite result. *Id*. State court decisions are examined in the light of the clearly established federal law as determined by Supreme Court on the date the state court decision was made, not at the time of the habeas petition. *Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2011). Clearly established federal law "refers to the holdings, opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision." *Carey v. Musladin*, 549 U.S. 70, 74 (quoting *Williams*, 529 U.S. at 412). "Circuit precedent cannot 'refine or sharpen a general principle of Supreme

Court jurisprudence into a specific legal rule'" that the Supreme Court has not announced. *Lopez v. Smith*, 574 U.S. 1, 7 (2014) (quoting *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013)).

A state court unreasonably applies Supreme Court precedent if the court identifies the correct governing rule but unreasonably applies it to the facts of the petitioner's case, or if it unreasonably extends (or refuses to extend) a legal principle from Court precedent to a new context where it should not (or should) apply. *Williams*, 529 U.S. at 407. Evaluating whether the application of a rule was unreasonable requires consideration of the rule's specificity. "The more general the rule, the more leeway [state] courts have in reaching outcomes in case-by-case determinations." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 662 (2004)). Not only is a reviewing court bound to the holdings of the Supreme Court in making this determination, but relief may not be granted "so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101.

A state court's determination of fact must be presumed correct in federal court. 28 U.S.C. § 2254(e) (West 2023); *see also McNair v. Campbell*, 416 F.3d 1291, 1297 (11th Cir. 2005). A petitioner bears the burden of rebutting this presumption of correctness by clear and convincing evidence. *Id*. As to testimonial evidence, "28 U.S.C. § 2254(d) gives federal habeas courts no license to redetermine

credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." *Marshall v. Longberger*, 459 U.S. 422, 434 (1983).

When necessary, a federal court may "look through" an unexplained decision "to the last related state-court decision that does provide a relevant rationale." *Wilson v. Sellers*, 584 U.S. 122, 125 (2018). When such a procedure becomes necessary, a federal court "should [] presume that the unexplained decision adopted the same reasoning." *Id*. However, the State "may rebut the presumption [(if necessary)] by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed." *Id*. at 125-26.

With this governing law in mind, Respondent answers the amended petition for writ of habeas corpus in accordance with Rule 5 of the Rules Governing Section 2254 Cases and this Court's February 15, 2024, Order (Doc. 32). As set forth more fully below, Respondent answers the petition by addressing its allegations, setting forth his defenses, and addressing the petition's lack of merit by identifying the relevant state court decision and applying the appropriate federal law under AEDPA's framework.

## STATEMENT OF FACTS

The Alabama Court of Criminal Appeals' decision affirming Johnson's

convictions and sentence on direct appeal contained the following statement of facts:

> The evidence adduced at trial tended to show the following. On July
> 19, 1995, between 12:30 a.m. and 1:00 a.m., Deputy Hardy was shot
> and killed in the parking lot of a hotel in Birmingham. Deputy Hardy
> had been working a second job as a nighttime security guard at the
> hotel. Deputy Hardy was paid by the hotel while "moonlighting" as a
> security guard, but he wore his deputy's uniform and drove his patrol
> car to the hotel.
>
> Barry Rushakoff, the night manager of the hotel, testified that at
> approximately 12:30 a.m., he heard two "popping noises" coming from
> the rear parking lot of the hotel. (R. 355.)[2] Rushakoff attempted to
> contact Deputy Hardy, who carried a portable radio with him, to
> investigate the noises, but Deputy Hardy did not respond. Rushakoff
> stated that he then received telephone calls from several guests of the
> hotel who reported that they had heard gunshots in the rear parking lot.
> Rushakoff telephoned emergency 911 to report the shots and to get
> backup support for Deputy Hardy. Rushakoff again attempted to
> contact Deputy Hardy over the radio, without success. Rushakoff then
> began walking to the rear of the hotel. On his way, Rushakoff passed a
> table in the atrium of the hotel where Deputy Hardy often sat. On the
> table, Rushakoff saw Deputy Hardy's radio, a cup of coffee, and a
> cigarette burning in an ashtray. When Rushakoff reached the glass
> doors at the rear of the hotel, he saw Deputy Hardy's body lying in the
> rear parking lot. Rushakoff returned to the front desk and telephoned
> 911 a second time to report that Deputy Hardy had been injured.
> Rushakoff stated that while he was on the telephone with the 911
> operator, a guest of the hotel, Leonard Colvin, came to the front desk
> to inquire about car keys that Michael Ansley, his stepson, was
> supposed to have left for him earlier in the evening. Rushakoff had the
> keys at the front desk, and he gave them to Mr. Colvin. After
> completing the 911 call, Rushakoff went to the rear parking lot to wait
> for the police to arrive. According to Rushakoff, he did not see anyone,

---

[2] (Doc. 36-2 at 133.)

other than Deputy Hardy, in the parking lot while he was waiting for the police.

Larry Osborne was a guest at the hotel on the night of July 18–19, 1995. He was staying in a third-floor room facing the rear parking lot. Osborne testified that he was awakened in the middle of the night by a gunshot. He looked at the clock, which reflected 12:40 a.m., and within a few seconds heard a second gunshot. Osborne stated that he went to the window of his room and looked at the rear parking lot. He did not see anyone in the lot, but he did see a car directly under his window slowly pull out of the lot without its headlights on. Osborne described the car as an early 1980s model General Motors vehicle that appeared to be "greenish." (R. 398.)[3] He stated, however, that the parking lot was illuminated by sodium vapor lights that cast a yellow tint on everything in the parking lot and that could have affected his perception of the color of the vehicle. Osborne stated that he remained in his hotel room until the ambulance arrived and Deputy Hardy's body became visible in a spotlight. He then went down to the parking lot and was later questioned by police.

Annie Colvin testified that she and her husband, Leonard Colvin, were also guests at the hotel on July 18–19, 1995. Colvin stated that she was driving her son's red Lexus coupe on July 18 and that she parked it in the parking lot at approximately 9:00 p.m. Her son, Michael Ansley, was supposed to drop off his second car, a gold Lexus sedan, pick up the red Lexus, and leave the keys to the gold Lexus at the hotel for Colvin sometime that evening. Colvin stated that she was awakened that night by gunshots and immediately woke her husband. Her husband went downstairs and retrieved the keys to the gold Lexus from the front desk of the hotel. The night manager, Rushakoff, stated that Ansley had dropped off the set of keys for Colvin at the front desk of the hotel at approximately 11:30 p.m. on July 18, 1995. Rushakoff stated that Ansley was driving a red sports car at the time.

Several law-enforcement officers from Homewood, Birmingham, and the Jefferson County Sheriff's Department responded to the "double ought" dispatch, meaning officer down, that resulted from Rushakoff's second 911 call. Officer Rett Tyler with the Homewood Police

---

[3] (Doc. 36-2 at 176.)

Department was the first officer to arrive on the scene. Officer Tyler stated that when he arrived, he saw the body of a deputy sheriff in the rear parking lot. Although he did not know Deputy Hardy personally, Officer Tyler stated that he recognized the Jefferson County deputy's uniform. When Officer Tyler arrived, Deputy Hardy was still breathing, but was unconscious as a result of bullet wounds to the head. Officer Tyler stated that Deputy Hardy's pistol was still in its holster. At this point, several other officers and emergency personnel began arriving on the scene. The emergency personnel worked on Deputy Hardy briefly and then transported him to a hospital, where he ultimately died.

Dr. Robert Brissie, chief medical examiner for Jefferson County, performed an autopsy on Deputy Hardy on July 19, 1995. The initial exterior examination of Deputy Hardy's body and clothes revealed a bullet hole in the front of Deputy Hardy's hat that corresponded to an entrance wound on the front of Deputy Hardy's forehead and a bullet hole in the back of the hat that corresponded to an exit wound on the back of Deputy Hardy's head. Dr. Brissie stated that the soot pattern on Deputy Hardy's hat and face indicated that the shot to the forehead was fired from between 12 and 20 inches away. In addition, the autopsy revealed that the bullet entered Deputy Hardy's forehead at approximately a 15–degree upward angle. Dr. Brissie's examination also revealed a wound to the little finger and base of the thumb of Deputy Hardy's left hand, and to Deputy Hardy's left jaw. Dr. Brissie stated that, in his opinion, a single bullet passed through the tip of the left small finger, entered and exited the base of the left thumb and then entered Deputy Hardy's left lower lip and jaw. However, he stated that it was possible that the wounds to the left hand and the left jaw were caused by two bullets rather than one. Dr. Brissie stated that Deputy Hardy died from multiple gunshot wounds.

Testimony showed that during the initial investigation of the scene several different descriptions of automobiles that had been seen leaving the area were given to police and dispatched to the local police departments. One BOLO ("be on the lookout") was issued for a white Caprice automobile with two to three occupants; another was issued for a black vehicle. In addition, during the investigation, Sgt. Charlie Richardson, an evidence technician with the Jefferson County Sheriff's Department, discovered two 9mm shell casings in the parking lot. Sgt. Richardson stated that ballistics tests indicated that both shell casings

had been fired from the same weapon. The weapon used to kill Deputy Hardy was never recovered.

James Evans, a patrol officer with the Homewood Police Department, testified that at approximately 4:00 a.m. on July 19, 1995, he received a dispatch to investigate a suspicious vehicle at a motel in Homewood; the vehicle matched the BOLO issued for a black vehicle. When he arrived at the motel, Officer Evans saw a 1972 black Monte Carlo automobile in the parking lot. A black male, later identified as Johnson, was standing by the driver's side door; another black male, later identified as Ardragus Ford, was seated in the front passenger seat of the car; a black female, later identified as Latanya Henderson, was seated in the backseat; and another black female, later identified as Yolanda Chambers, was exiting the motel. After approaching the vehicle, Officer Evans and his partner moved Johnson to the rear of the vehicle and attempted to remove Ford from the passenger seat. Because Ford was paralyzed, he was unable to get out of the vehicle until his wheelchair was retrieved from the trunk. The suspects were patted down, and Johnson was subsequently arrested on an outstanding warrant unrelated to the shooting of Deputy Hardy. A taxi was called for Ford, Henderson, and Chambers because none of them could produce a driver's license, but the vehicle was not searched or towed; it remained in the motel parking lot.

Latanya Henderson testified that Yolanda Chambers telephoned her at home several times between 10:30 p.m. and 11:00 p.m. on July 18, 1995. At approximately 2:00 a.m. on July 19, 1995, Henderson said, Chambers, Johnson, and Ford arrived at her home in Ford's vehicle and asked her to go with them to get something to eat. She agreed, and the four individuals drove to the motel. Henderson stated that she was carrying a .25 caliber handgun in her purse and that she also saw Johnson carrying a gun that night; she did not describe Johnson's gun. According to Henderson, when they pulled into the parking lot of the motel, they saw a police car behind them. Henderson stated that Johnson hid his gun underneath the dashboard of the car and that she got out of the car and hid her gun under the tire of another car parked in the parking lot. Henderson testified that the gun remained hidden when she left the scene, but that several days later, she told the police about her gun and it was retrieved from the parking lot. Henderson stated that she did not see Chambers, Ford, and Johnson until 2:00 a.m.

on July 19, 1995, and that she was not at the hotel when Deputy Hardy was shot. In addition, Henderson stated that she had previously been charged with hindering prosecution in relation to Deputy Hardy's murder, but that the charge had been dismissed the morning of her testimony.

Over objection, the State also presented evidence that Johnson had made several telephone calls in August 1995 from the Jefferson County jail that were overheard by a woman named Violet Ellison. Ellison testified that during these calls, she heard Johnson speak about the murder of Deputy Hardy and admit to shooting Deputy Hardy in the head. (See Part IX of this opinion for a detailed recitation of Violet Ellison's testimony.)

Johnson presented two alternative defenses at trial. First, through the testimony of Yolanda Chambers, Johnson asserted that, although he was present when Deputy Hardy was shot, he was not involved in the shooting and did not know the shooting was going to happen. Chambers testified that she was with Johnson, Ardragus Ford, and Latanya Henderson at the hotel on the night of July 18–19, 1995. She stated that when Deputy Hardy came out of the hotel, Ford, without warning, shot him once. Startled, Chambers looked away, and then heard a second gunshot. Chambers stated that she did not see who fired the second shot. Chambers admitted to lying to the police on several occasions during the investigation, and implicating several different people in Deputy Hardy's murder. Chambers testified that on different occasions she had told police that a man named Omar Berry had shot Deputy Hardy; that a man named Quintez Wilson had shot Deputy Hardy; and that Johnson had shot Deputy Hardy. Chambers also testified that she had told police (and she had testified at several different proceedings) that Deputy Hardy was murdered because he came out to the rear parking lot of the hotel and saw a drug deal being consummated. In addition, Chambers testified that she had told police that she, Johnson, Ford, and Henderson were at the hotel to rob Michael Ansley. However, she stated that all of her previous statements to the police and her previous testimony at different proceedings were lies and that this time she was telling the truth.

Second, through the testimony of Montrice Dunning and Christi Farris, Johnson asserted an alibi defense. Dunning and Farris both testified that

on a Tuesday night in July 1995, they were at "Tee's Place," a nightclub. They arrived at approximately 11:00 p.m. and left at approximately 2:00 a.m. Both stated that they saw Johnson at the nightclub several times between 11:00 p.m. and 2:00 a.m. and that Johnson walked them to their vehicle at 2:00 a.m. when they left. In addition, both stated that Johnson was wearing a navy blue "Tommy Hilfiger" brand shirt with stripes on the collar. (R. 849; 872.)[4] A mugshot of Johnson, taken when he was arrested in the early morning hours of July 19, 1995, was introduced into evidence by the defense. In the photograph, Johnson is wearing a navy blue "Tommy Hilfiger" brand shirt with stripes on the collar. On cross-examination, Dunning stated that she did not know which Tuesday night in July she had seen Johnson at the nightclub, but that Johnson's defense counsel had told her that it was on July 18, 1995. Farris stated on cross-examination that she was positive that it was on the second Tuesday in July when she had seen Johnson at the nightclub. We take judicial notice that the second Tuesday in July 1995 was July 11, 1995, one week before Deputy Hardy was killed on July 19, 1995.

*Johnson v. State*, 823 So. 2d 1, 9-13 (Ala. Crim. App. 2001); (Doc. 36-9 at pp. 170-73).

## PROCEDURAL HISTORY

Petitioner Johnson was tried in August 1998 and convicted of the murder of Deputy William Hardy, which occurred on July 19, 1995. (Doc. 36 at 20-21 (indictment); Doc. 36-6 at 78 (verdict).) Following the penalty phase, the jury recommended that Johnson be sentenced to death by a vote of 10-2. (Doc. 36-6 at 155.) The trial court followed the jury's recommendation and sentenced Johnson to death. (Doc. 36 at 90-108.)

---

[4] (Doc. 36-5 at 27, 50.)

Johnson filed a motion for new trial (Doc. 36 at 109-111), which was denied. Johnson appealed his conviction and sentence to the Alabama Court of Criminal Appeals, which affirmed both. *Johnson*, 823 So. 3d 1 (Ala. Crim. App. 2001); (Doc. 36-9 at 160-207.) Johnson sought rehearing, which was denied. (*Id*.)

Johnson petitioned the Alabama Supreme Court for certiorari review. That Court declined certiorari review (Doc. 36-10 at 232), and Johnson sought certiorari in the United States Supreme Court. That Court declined to review Johnson's case. (Doc. 36-11 at 150.)

Johnson then filed a timely petition for postconviction relief in the state trial court. (Doc. 36-12 at 108 to Doc. 36-13 at 119.) Johnson amended his petition three times, with his third amended complaint becoming the operative state postconviction pleading. (Doc. 36-17 at 122 to Doc. 36-18 at 202.) The trial court, at that time the same judge that presided over Johnson's original trial, summarily denied Johnson's petition in a written order dated May 24, 2006. (Doc. 36-19, at 56-133.)

Johnson appealed the denial of postconviction relief to the Alabama Court of Criminal Appeals. On appeal, the State conceded that several of Johnson's ineffective assistance of trial counsel claims had been improperly dismissed and should have been developed at an evidentiary hearing. The Alabama Court of Criminal Appeals affirmed much of the trial court's denial of postconviction relief,

but remanded the case for an evidentiary hearing on certain ineffective assistance of counsel claims. *Johnson*, 379 So. 3d at 1017-18; (Doc. 36-56 at 21-22.)

Following further proceedings in the state trial court, Johnson's claims were again denied. (Doc. 36-27 at 108-123.) Johnson again appealed to the Alabama Court of Criminal Appeals, and the State again conceded error. As to the proceedings on remand, the State conceded that Johnson should have been allowed to present additional evidence at the evidentiary hearing on a claim of ineffective assistance of counsel. As a result, that court again remanded the case for further proceedings and development of the record. *Johnson*, 379 So. 3d at 1046; (Doc. 36-56 at 44.)

The state trial court complied with the Alabama Court of Criminal Appeals' order remanding Johnson's case for further proceedings, denying relief on additional ineffective assistance of counsel claims after further evidentiary development. (Doc. 36-52 at 3-49.) On return to second remand, the Alabama Court of Criminal Appeals affirmed. *Johnson*, 379 So. 3d at 1061; (Doc. 36-56 at 55.) Johnson petitioned for rehearing, which was overruled after the court made additional findings. *Id*. at 1061-62. Johnson sought certiorari in the Alabama Supreme Court, which was denied. (Doc. 36-57 at 92.)

Thereafter, Johnson sought certiorari review in the United States Supreme Court. Based on an intervening change in state law, the State of Alabama conceded that vacating the state court decision and remanding would be advisable. (Doc. 36-

15

57 at 140, 148.) On June 26, 2017, the Court granted certiorari, vacated the judgment of the Alabama Court of Criminal Appeals, and remanded the case for further consideration. (Doc. 36-57 at 158.)

Due to the AEDPA's statute of limitations, Johnson filed a petition for writ of habeas corpus in this Court on December 5, 2016, prior to the Supreme Court's GVR. (Doc. 1.) In April 2017, the parties jointly recommended staying these proceedings until the Court ruled on Johnson's petition for writ of certiorari. (Doc. 13.) In a series of orders, this Court has stayed these proceedings, administratively closed the case, and held it in abeyance pending the resolution of Johnson's constitutional claims in state court. *See, e.g.*, (Docs. 17 (text); 23, 26.)

In response to the Supreme Court's "grant, vacate, and remand" order, the Alabama Court of Criminal Appeals remanded Johnson's case for further proceedings on his claim that his constitutional rights were violated because (he alleged) a witness testified at his trial with the hope of receiving a reward. *Johnson*, 379 So. 3d at 1063-64 (Doc. 36-56 at 56-57.) The trial court complied with the court's remand order, denying relief after additional evidentiary proceedings. (Doc. 36-62 at 45-56.) Johnson appealed that ruling but the trial court's judgment was affirmed. *Johnson*, 379 So. 3d at 1079; (Doc. 36-56 at 67.) Johnson again sought certiorari review in the Alabama Supreme Court, which was denied without opinion.

Johnson sought certiorari review in the United States Supreme Court which was denied on October 2, 2023. (Doc. 36-66 at 131.) These proceedings follow. (Doc. 32.)

## TRIGGER WARNING

Respondent Raybon's answer employs numerous block quote citations to place the relevant state court decisions before the Court in their entirety (as to each issue asserted). Respondent is aware that block quotations are generally disfavored in legal writing. *See* Kozinski, J., *The Wrong Stuff*, B.Y.U.L. Rev. 325, 329 (1992). Respondent utilizes block quotes (1) to provide the Court quick and easy access to the relevant state decision for AEDPA review of each issue presented (due to the unique nature of AEDPA deference and review); and, (2) in order to provide footnoted citations to document numbers to allow the Court to easily find testimony and documents referenced in those state court decisions. It is the latter purpose that Respondent prays the Court will find sufficient utility to justify this answer's heavy reliance on block quotations.

## RESPONSE TO THE ALLEGATIONS OF THE PETITION

## I.   THE ALLEGATION THAT THE STATE STRUCK PROSPECTIVE JURORS ON THE BASIS OF THEIR RACE IN VIOLATION OF THE CONSTITUTION.

Johnson first challenges the state court denial of his claim that prosecutors unconstitutionally struck prospective jurors based on their race. Johnson asserted his

*Batson v. Kentucky*, 476 U.S. 79 (1986), objection at trial and the state trial court

found that Petitioner failed to make a prima facie case of discriminatory strikes.

Johnson challenged this ruling on direct appeal. The Alabama Court of Criminal

Appeals affirmed the trial court's denial of Johnson's *Batson* objection, writing:

> Johnson contends that the State improperly used its peremptory strikes
> to discriminate on the basis of race, in violation of *Batson v.
> Kentucky,* 476 U.S. 79 (1986). (Issue II in Johnson's brief.)[5] Johnson
> maintains that he established a prima facie case of discrimination and
> that the trial court erred in not requiring the State to articulate race-
> neutral reasons for its strikes.

> After the jury was struck, but before it was sworn, the following
> occurred:

>> "[Johnson's counsel]: Judge, we started out with a pool of 42 to
>> strike from if you go ahead before we get to the 42 and discount
>> those people who were struck for cause yesterday, and that's what
>> I've done. You end up, out of the 42 remaining veniremembers,
>> with all of them being white except five black males: [F.R.], 584,
>> [C.W.], 657, [E.R.], 594, [C.B.], 366, and [C.H.], 479. And we
>> had four black females, [C.B.], 391, [T.J.], 491, [A.W.], 664, and
>> [F.W.], 659.

>> "That meant we started out with a 21 percent pool of black
>> veniremembers. The defense struck one, we struck [C.W.],
>> number 657, who is a police officer. We struck him because he's
>> a police officer and because of the fact that this capital murder
>> which we are defending is the capital murder of a police officer.
>> We didn't care whether he was white or green or yellow or blue,
>> he was a policeman, so we struck him. Turned out he was one of
>> our nine black people.

>> "The State of Alabama struck number 391, [C.B.], a black
>> female. They struck number 664, [A.W.], a black female. They

---

[5] (Doc. 36-8 at 63-67; Vol. 9, Tab # R-30, 48-52.)

struck number 366, [C.B.], a black male. They struck number 659, [F.W.], a black female. And they struck number 584, [F.R.], a black male. And they struck number 479, [C.H.], a black male. Leaving [E.R.], number 594, and [T.J.], number 491 as the only black people on the jury. And that still leaves us with one strike remaining so that we might pick alternates.

"I believe if we just take the two who are remaining, two divided by twelve equals—that would be, if those two remain on there and neither is struck as an alternate, we would end up with a 16 percent black population on the jury.

"The problem's not only with numbers, however. The strikes which the State made on [F.R.], for instance, number 584, [F.R.] said nothing whatsoever yesterday to give anybody, either the State or the defense, a reason to strike him, and other than the fact that he is black and this defendant is black, I see no reason for it.

"I've explained our strike of 657, [C.W.] because he's a police officer, has nothing to do with his race.

"[C.B.], number 366, who the State struck, he's a roofer, he lives in West End and he's single. I guess if they're striking everybody that's single, then that would be an articulable reason to strike him, but otherwise I can't imagine what would be, although I would suggest to the Court that there are other single people who have been left on the jury.

"[C.H.], number 479, gave no reason whatsoever to be struck. As a matter of fact, his brother ... is a Birmingham police officer, which might give some indication that the defense might want to strike him, but I can't for the life of me understand why the State would, other than it's because of the fact that he's black.

"Number 391, [C.B.], she was struck by the State. The only thing I can see in her particular situation is the fact that she was on a jury once before on a murder case and it ended up being a hung jury. Other than that, I can't see any reason to strike her.

"Same goes for [A.W.], number 654, who the State struck—664, pardon me, I gave the wrong number. She's a social worker here in Birmingham, her husband's a postman, she's been working at her job, the same job, for over five years, she was the victim of a car theft at one point. That's about all she told us, none of which is a reason to strike her.

"[F.W.], number 659, was our first alternate after we had had several people struck for cause, and several of those, I might add, who were struck for cause, rightfully, were struck because they didn't believe in the death penalty, and, as usual, a higher number of those were black than w[ere] white. But we lose those, anyway, so that has nothing to do with this motion.

"But the first person we got as an alternate was [F.W.] She lives in College Hills, she's a nursing assistant, she's been the victim of a burglary, she's been at her job for over five years. I believe it says—I'm having a hard time reading my writing—that she has two cousins who are police officers. I see no reason whatsoever for her to have been struck other than the fact that she is a black woman and this defendant is a black man.

"I would suggest to the Court that starting out with nine members, nine black members of a 42–member venire, and ending up with two, six of which were struck by the State, plus the reasons that I've set out does, in fact, make out a case for racially-motivated strikes, and I would ask that these members of the venire be placed back on the jury and we strike again.

"[The Court]: Any other motions?

"[Johnson's counsel]: No, sir.

"[The Court]: Or grounds?

"[Johnson's counsel]: No, sir.

"[The Court]: I do not find that you make a prima facie case for racial discrimination in violation of *Batson* or any of its progeny, and I make my ruling based not only on the motion and grounds

that you asserted, but also on the responses of these jurors that I heard in the courtroom during voir dire."

(R. 282–88.)[6]

Initially, we note that the record does not contain any documents that show the race of the prospective jurors on the venire or of the members of the jury itself. The jury strike list is not in the record, nor is the striking of the jury included in the trial transcript. Moreover, the record suggests that jury questionnaires were completed by the prospective jurors, but those, too, are absent from the record. Other than defense counsel's assertions in support of the *Batson* motion, there is simply no evidence in the record of the race of prospective jurors on the venire, of which prospective jurors were struck by the State and which were struck by the defense, or even of the identity or race of the jurors who ultimately sat on Johnson's jury. "It is the appellant's duty to provide this Court with a complete record on appeal." *Knight v. State,* 621 So. 2d 394, 395 (Ala. Crim. App. 1993). "'Where the record is silent on appeal, it will be presumed that what ought to have been done was not only done, but rightly done.'" *Owens v. State,* 597 So. 2d 734, 736 (Ala. Crim. App. 1992) (quoting *Jolly v. State,* 405 So. 2d 76, 77 (Ala. Crim. App. 1981). "This court will not presume error from a silent record." *Frazier v. State,* 758 So. 2d 577, 600 (Ala. Crim. App. 1999). *See also Roberts v. State,* 627 So. 2d 1114, 1116 (Ala. Crim. App. 1993).

Nevertheless, even assuming that defense counsel's assertions in support of the *Batson* motion are true—i.e., that the State did strike juror nos. 391, 664, 366, 659, 584, and 479, and that all of those jurors were indeed black—we would still uphold the trial court's ruling that Johnson failed to establish a prima facie case of racial discrimination.

"In *Batson v. Kentucky,* 476 U.S. 79 (1986), the United States Supreme Court set out the components of a prima facie case of racial discrimination in jury selection. In addition to showing that the State used peremptory challenges to remove members of a cognizable group to which he belongs and relying upon the fact that peremptory strikes permit discrimination, a claimant also

_____

[6] (Doc. 36-2 at 60-66.)

must show that these facts and any other relevant facts raise an inference that the prosecutor used his strikes in a discriminatory manner. In *Ex parte Branch,* 526 So. 2d 609, 622–623 (Ala. 1987), the Alabama Supreme Court explained that relevant factors could include, but were not limited to, the following: evidence that the jurors shared only the characteristic of their group membership and were heterogeneous in all other respects; a pattern of strikes against black jurors; past conduct of the prosecutor; type and manner of the prosecutor's questions during voir dire, including desultory voir dire; type and manner of questions to the challenged juror, including a lack of questions or meaningful questions; disparate treatment of veniremembers with the same characteristics or type of responses; disparate examination of members of the venire; circumstantial evidence of intent due to the use of most challenges to strike blacks; and the use of peremptory challenges to dismiss all or most black jurors."

*Madison v. State,* 718 So.2d 90, 101–102 (Ala. Crim. App. 1997).

Johnson offered no evidence, other than statistics and his counsel's opinion that no valid reasons for striking these jurors were revealed during voir dire, to show that the prosecutor exercised his strikes in a discriminatory manner. See, e.g., *Duncan v. State,* [827 So. 2d 838 (Ala. Crim. App. 1999)] (*Batson* motion in which counsel asserted only statistics and his opinion that nothing was revealed during voir dire to provide a legitimate reason for the strikes held insufficient to satisfy defendant's burden of proving a prima facie case). Johnson did not offer evidence, nor even allege, that the struck veniremembers shared only the characteristic of race, that there was a lack of meaningful voir dire directed at black veniremembers, that black and white veniremembers were treated differently, or that the prosecutor had a history of using peremptory challenges in a manner that discriminated against black veniremembers. Johnson noted only that the State used 6 (less than half of its 14) strikes to remove 6 of the 9 blacks from the venire, and that, in his counsel's opinion, no articulable reason for the strikes was revealed during voir dire. We do not find the statistics or defense counsel's assertions that in his opinion no legitimate reasons for the strikes were revealed during voir dire to be sufficient to establish a prima facie case of racial discrimination. "A circuit court's ruling on

a *Batson* objection is entitled to great deference, and we will reverse such a ruling only if it is clearly erroneous." *Talley v. State,* 687 So. 2d 1261, 1267 (Ala. Crim. App. 1996). "'[A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Davis v. State,* 555 So. 2d 309, 312 (Ala. Crim. App. 1989) (quoting *Powell v. State,* 548 So. 2d 590, 594 (Ala. Crim. App. 1988)). Based on the scant record before us, we simply cannot say with a "definite and firm conviction" that the trial court erred in finding that Johnson did not establish a prima facie case of racial discrimination.

We note that, contrary to Johnson's assertions at trial and on appeal, a review of voir dire reveals valid race-neutral reasons for striking at least three of the six jurors allegedly struck by the State, specifically, juror nos. 391, 659, and 479. During voir dire, juror nos. 391 and 479 expressed strong opposition to the death penalty and expressed doubt as to their ability to set aside those deep-seated personal beliefs; juror no. 659 stated that she had previously served on a criminal jury that had returned a not-guilty verdict. Clearly, the trial court took these facts into consideration when finding, based "on the responses of the[ ] jurors," that Johnson had failed to establish a prima facie case of racial discrimination. We also note that, although the transcript of voir dire does not suggest reasons for striking juror nos. 664, 366, and 584, as it does for the other jurors, as stated above, Johnson failed to include a complete record on appeal. The record does not contain the juror questionnaires that were apparently completed by prospective jurors. More importantly, however, the transcript of voir dire fails to reveal the jurors who answered affirmatively the prosecutor's question regarding prior arrests; rather than including the names of those people who indicated that they had been arrested, the transcript merely states: "Show of hands." (R. 57.)[7] Neither defense counsel nor the prosecutor attempted to have the names of those jurors who answered affirmatively included in the record. While we cannot presume that valid race-neutral reasons for peremptory strikes are present outside the record, we likewise cannot presume that there are no valid race-neutral reasons when the record is incomplete on the issue. Because there is simply nothing in the record before us suggesting that the State used its

---

[7] (Doc. 36-1 at 35.)

strikes in a discriminatory manner, we cannot say that the trial court's ruling on Johnson's *Batson* motion was clearly erroneous.

On appeal, Johnson contends for the first time that a prima facie case of racial discrimination existed because, he says, the six black jurors who were allegedly struck by the State shared characteristics with white jurors who were not struck. Because Johnson did not argue this point to the trial court, we may review it only for plain error. *See* Rule 45A, ALA. R. APP. P. As stated above, the record does not contain any documents indicating the race of prospective jurors, and it does not contain a jury strike list. In addition, the striking of the jury is not included in the trial transcript. We, therefore, have no way of knowing whether the State did not, in fact, strike white jurors who had the same characteristics as the black jurors who were allegedly struck. Simply put, we have no way of verifying Johnson's assertion in his brief. In addressing a similar issue in *Jenkins v. State,* 627 So. 2d 1034 (Ala. Crim. App. 1992), we stated:

> "There is no evidence in the record that the prosecutor used his strikes in a racially discriminatory manner. There is no indication of the racial composition of the jury, though a jury strike list is contained in the record. Neither do we know whether any minorities in fact served on the jury. The record simply does not support an inference of plain error on the alleged *Batson* violation. Our Supreme Court in *Ex parte Watkins,* 509 So.2d 1074 (Ala.1987), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987), refused to find plain error in a similar situation. It stated:

> "'The record as a whole simply does not raise an inference that the state engaged in the practice of purposeful discrimination. Under the plain error rule this Court will "notice any *plain error or defect* in the proceeding under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial rights of the petitioner." ... The defendant cannot successfully argue that error is plain in the record when there is no indication in the record that the act upon which error is predicated ever occurred

(i.e., the state's use of its peremptory challenges to exclude blacks).'

509 So.2d at 1076–77. *See Kuenzel v. State,* 577 So. 2d 474 (Ala. Crim. App. 1990) (stating that there was no evidence in the record to support the contention that the State of Alabama used its peremptory strikes to exclude blacks from the jury). 'Under the circumstances of this case, we cannot conclude that a prima facie case of purposeful discrimination has been established.' *Pierce [v. State],* 576 So. 2d [236,] 242 [(Ala. Crim. App. 1990)]."

627 So.2d at 1042.

Similarly, under the circumstances here, we simply cannot conclude that a prima facie case of racial discrimination has been established or that the trial court erred in denying Johnson's *Batson* motion. Accordingly, we find no error, plain or otherwise, as to this claim.

*Johnson*, 823 So. 2d at 17-21 (Doc. 36-9 at 176-80). Johnson alleges that the state court's resolution of his claim was an unreasonable application of clearly established federal law, but his petition cites only *Batson* and *Ford v. Georgia*, 498 U.S. 411 (1991), in support of this generalized allegation. As to the latter case, *Ford* was not violated by the state court resolution because Johnson's *Batson* claim was recognized as such; it was not treated as a challenge under *Swain v. Alabama*, 380 U.S. 202 (1965), as a ground for denial. *See Carey*, 549 U.S. at 74 (noting that clearly established federal law "refers to the holdings, opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.").

Nor is the state court's adjudication contrary to or an unreasonable application of *Batson*. In *Batson*, the Court offered two examples of circumstances that might

support a prima facie case of racial discrimination: "(1) engaging in a 'pattern' of strikes against venire members of one race, or (2) questions or statements during voir dire or in exercising challenges that suggest a discriminatory purpose." 476 U.S. at 97. Johnson clearly did not allege the existence of a prima facie case based on the second circumstance, and his reliance on the overall statistics of the jury selection process did not constitute an alleged "pattern" of discrimination.

While circuit precedent cannot sharpen or refine "clearly established federal law" for purposes of the AEDPA, it can support the reasonableness of the state court's decision. That is, the fact that the same legal rationales and factual analysis employed by the state court is employed by federal courts of appeals reflects on their reasonableness. First, even in the federal system, appellate courts "give great deference to a district court's finding of whether a prima facie case of impermissible discrimination has been established," noting that "*de novo* review is inappropriate." *United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1039 (11th Cir. 2005) (quoting *United States v. Allen-Brown*, 243 F.3d 1293, 1296-97 (11th Cir. 2001);[8] *see also*

---

[8] *Ochoa-Vasquez* is also a relevant federal decision reflecting the reasonableness of the state appellate court's concern about the lack of an identifiable record pertaining to voir dire and their deference to the trial court. *See Id*. at 1042-43 ("While the district court might have benefitted from knowing the exact number of Hispanic jurors that the government dismissed (whether the government knew it or not), it could observe first-hand whether visible judgments could be made about each juror's ethnicity in the venire… The only evidence available to this Court are the district court's observations of the venire in the record and the prosecutors' attempts to identify specific jurors as being Hispanic *after* Ochoa objected.").

*Batson*, 476 U.S. at 97 ("We have confidence that trial judges, experienced in supervising voir dire, will be able to decide if circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors."). Further, the Eleventh Circuit has also held that "a showing that a party used its authorized peremptory strikes against jurors of one race does not, standing alone, establish a prima facie case of discrimination." *Central Ala. Fair Hous. Ctr., Inc. v. Lowder Realty Co., Inc.*, 236 F.3d 629, 637 (11th Cir. 2000). Finally, the unchallenged presence of African-Americans on Johnson's jury "substantially weakens the basis for a *prima facie* case of discrimination in the peremptory striking of jurors of that race." *Id*. at 638. Thus, while circuit precedent cannot be used to refine "clearly established federal law" beyond the holdings of the Supreme Court, the existence of this precedent does speak to the inherent reasonableness of the state court's resolution of Johnson's federal claim.

For these reasons, Johnson is not entitled to relief under the AEDPA as to his claim that the state courts improperly denied his *Batson* challenge.

## II.    THE ALLEGATION THAT THE STATE WITHHELD MATERIAL EVIDENCE IN VIOLATION OF *BRADY V. MARYLAND*, 373 U.S. 83 (1963).

Johnson challenges the state court denial of his claim that the prosecution violated *Brady v. Maryland* by suppressing evidence a witness testified in the hope

of a reward. Johnson received an evidentiary hearing and presented evidence in support of his claim. After that hearing, the state trial court denied relief.

Johnson appealed the state trial court's denial of his *Brady* claim. On appeal, the Alabama Court of Criminal Appeals affirmed the denial of relief as to this claim, noting:

> "In his third amended Rule 32 petition, Johnson alleged:
>
>> "'The State also withheld crucial evidence regarding Violet Ellison's motivation for coming forward with her story. Although news of the large cash reward offered in the case was widespread, the State never disclosed to Mr. Johnson's lawyers that Ms. Ellison had specifically come forward with her story pursuant to the reward offer, although it knew this to be the case. Had Mr. Johnson's lawyers known that Ms. Ellison was specifically motivated by the reward money, they would have had in their possession powerful impeachment evidence with which to challenge her credibility on cross-examination.'
>
> \*      \*      \*
>
> On June 6, 2019, the circuit court held a hearing on Johnson's *Brady* claim.
>
> At the hearing, Johnson offered 28 documentary exhibits into evidence, including:
>
>> - A July 1995 letter from Jefferson County District Attorney David Barber asking then Governor Fob James to make an offer of reward for information leading to the arrest and conviction of the person or persons who killed Deputy Hardy (C. 461);[9]

---

[9] (Doc. 36-60 at 62; Vol. 60, Tab # R-129, p. 461.)

- Then Governor James's reward proclamation from 1995 offering up to $10,000 for information about the crime (C. 463);[10]

- Newspaper articles from 1995 about the crime and the reward offer (C. 134-37);[11]

- An August 2, 2001, e-mail from Barber to Kathy Faulk, an employee in then Governor Don Siegelman's office, asking about getting part of the reward money for Ellison's assistance with the case (C. 479);[12]

- Ellison's August 6, 2001, application for the reward (C. 470);[13]

- An August 7, 2001, letter from Barber to then Governor Siegelman requesting payment of $5,000 to Ellison (C. 472);[14]

- An August 13, 2001, letter from then Governor Siegelman's legal advisor to the State Finance Director requesting payment of $5,000 to Ellison (C. 469);[15] and

- A copy of an August 18, 2001, check for $5,000 that the State paid Ellison for her testimony in Johnson's case (C. 467).[16]

The State called Ellison to testify at the hearing. Johnson called one witness in rebuttal, Sandra Turner.

At the circuit court's request, Johnson filed a post-hearing brief and a proposed order in October 2019 and the State did likewise in November 2019. In March 2020, the circuit court denied the petition after considering the *Brady* claim, finding that Johnson did not show "by a preponderance of the evidence that witness Violet Ellison either came

---

[10]  (Doc. 36-60 at 64; Vol. 60, Tab # R-129, p. 463.)
[11]  (Doc. 36-58 at 135-38; Vol. 58, Tab # R-129, p. 134-37.)
[12]  (Doc. 36-60 at 80; Vol. 60, Tab # R-129, p. 479.)
[13]  (Doc. 36-60 at 71; Vol. 60, Tab # R-129, p. 470.)
[14]  (Doc. 36-60 at 73; Vol. 60, Tab # R-129, p. 472.)
[15]  (Doc. 36-60 at 70; Vol. 60, Tab # R-129, p. 469.)
[16]  (Doc. 36-60 at 68; Vol. 60, Tab # R-129, p. 467.)

forward or gave testimony out of a 'hope of reward' OR that the State had knowledge of such motivation at or before the time of trial' " (capitalization in original). (Supp. C. 54.)[17] Johnson timely appealed.

\*      \*      \*

Johnson argues that he is due "a new trial under *Brady v. Maryland*, 373 U.S. 83 (1963), because the State failed to disclose that Violet Ellison, its key trial witness, was motivated by a cash reward offer." (Johnson's brief, p. 18.)[18] The circuit court denied the claim because, it found, Johnson did not prove that Ellison was ever motivated by a reward. Thus, the State could not have suppressed evidence about Ellison and the reward because no such evidence existed. *See, e.g.*, *Gavin v. State*, 891 So. 2d 907, 986 (Ala. Crim. App. 2003) ("The State cannot suppress evidence that does not exist.").

Johnson argues that the circuit court erred in its findings denying him relief. Johnson argues first that, in finding that Johnson did not prove that Ellison was motivated by the State's reward offer, "the circuit court erred in evaluating both the State's reward records and ... Ellison's testimony." (Johnson's brief, p. 22.)[19] Johnson focuses on the August 7, 2001, letter from Barber to then Governor Siegelman requesting payment of $5,000 to Ellison. That letter stated:

> "Dear Governor Siegelman:
>
> "On August 2, 1995, Governor Fob James, Jr. issued a proclamation offering a reward for information leading to the arrest and conviction of the guilty person or persons of the death of Mr. William G. Hardy.
>
> "Violet Ellison, pursuant to the public offer of a reward, gave information leading to the conviction of ToForest Johnson in the Circuit Court of Jefferson County, Alabama, in the death of Mr. Hardy. An application has been submitted to the Honorable Alfred Bahakel, Circuit Judge, and he has signed an order

---

[17] (Doc. 36-62 at 55; Vol. 62, Tab # R-130, p. 54.)

[18] (Doc. 36-64 at 103.)

[19] (Doc. 36-64 at 107.)

authorizing the payment of half of said reward ($5,000) to the applicant.

"Enclosed are the following:

"1. Copy of Proclamation dated August 2, 1995.

"2. Order of Honorable Alfred Bahakel dated April 8, 2001.

"3. Application for Reward executed by Violet Ellison.

"It is respectfully requested that you approve payment of half of this reward ($5,000.00) by the State Comptroller to the applicant as set out in Judge Bahakel's Order. If you will direct the Comptroller to mail the check to me, I will make arrangements to deliver it to the applicant.

"If any further information is required, please advise me.

"Very truly yours,

"David Barber
"District Attorney"

(C. 472-73.)[20]

Johnson argues that Barber's use of the phrase "pursuant to the public offer of a reward" shows that "Ellison acted 'in consequence of,' or in pursuit of, the offer" (emphasis added). Citing the statement in *Gadsden Times v. Doe*, 345 So. 2d 1361, 1363 (Ala. Civ. App. 1977), that "one must have knowledge of a reward at the time of performing the services for which the reward is offered in order to be entitled to the reward," Johnson argues that "for Ms. Ellison to qualify for the reward, Mr. Barber had to believe that she knew about the reward offer when she provided information to the State." (Johnson's brief, p. 24.)[21]

The circuit court, after considering the testimony and all admitted exhibits, rejected these arguments. The court found:

---

[20] (Doc. 36-60 at 73-74; Vol. 60, Tab # R-129, p. 472-73.)
[21] (Doc. 36-64 at 109.)

"The only direct evidence offered by [Johnson] at the evidentiary hearing, which is argued to be evidence of both Ms. Ellison's motive for coming forward in 1995 and the State suppressing this evidence before trial in 1998, is a letter from District Attorney David Barber requesting a reward from the Governor for Ms. Ellison dated August 7, 2001. This court does not find this letter to be evidence by a preponderance of the evidence of either claim. On its face, it is evidence that the District Attorney sought a reward be paid to Ms. Ellison in 2001, for her testimony at Johnson's trial, which led to his conviction in 1998. The language used by Mr. Barber is not conclusive as to whether Mr. Barber or any other prosecutor or detective knew of any motivation in 1995 up until the trial in 1998 on Ms. Ellison's part. The letter ... while evidence to be considered by the court, is neither conclusive [n]or convincing evidence to rebut the testimony of Ms. Ellison at the hearing. [Johnson] argues the very specific language 'pursuant to' imparts intent on Ms. Ellison's part three years earlier before the trial, simply does not make logical sense. According to *Black's Law Dictionary* 1356 (9th ed. 2009), 'pursuant to' means that one acts 'in accordance with,' or 'as authorized by' a particular law or request. This court finds this language to be the legalese used to advise the Governor that Ms. Ellison was entitled to part of the reward that had been previously authorized in connection with Deputy Hardy's murder. It was necessary to accomplish the result Mr. Barber intended.

"Even if this court was convinced that this letter imparted motivation to Ms. Ellison for the reason she came forward with information in 1995, it certainly would not establish knowledge on the part of the District Attorney, his prosecutors, or law enforcement in this case. The Alabama Supreme Court has specifically held that *Brady* requires that 'the information requested by a criminal defendant be known to the prosecution,' *Ex parte Cammon*, 578 So. 2d 1089, 1091 (Ala. 1991). Mr. Barber was not called as a witness, or his affidavit introduced by [Johnson]; therefore, it was not established that Mr. Barber ever spoke to, met, or had any knowledge of the motivations of Ms. Ellison when she came forward in 1995 and later gave testimony at the trial in 1998. Nor were any detectives

or prosecutors alleged in the case called as witnesses or testimony offered by affidavits on the alleged *Brady* violation; therefore, no suppression of evidence has been established by a preponderance of the evidence as required in establishing a violation under *Brady*. *Freeman v. State*, 722 So. 2d 806, 811 (Ala. Crim. App. 1998). In regard to this prong of the test set forth in *Freeman*, speculation and conjecture will not support a finding that the State violated *Brady*. *See Bailey v. State*, 421 So. 2d 1364, 1369 (Ala. Crim. App. 1982). Moreover, even if Mr. Barber's letter convinced this Court that Mr. Barber had knowledge that Ms. Ellison came forward with information in hope of a reward, there is nothing in this letter and no other evidence of when Mr. Barber would have allegedly learned of Ms. Ellison's motivation. *See Thrasher v. State*, [295 So. 3d 118, 134 (Ala. Crim. App. 2019)] ('The State's possession or knowledge after trial of evidence potentially favorable to the defense is not a basis for a *Brady* claim.') In this case, the court finds no evidence 'that law enforcement officers or representatives of the prosecution ever discussed the possibility of a reward with [Ms. Ellison].' *McMillian v. State*, 594 So. 2d 1253, 1258 (Ala. Crim. App. 1991)."

(Supp. C. 49-50.)[22]

The record supports the circuit court's findings. The circuit court did not err in finding that the August 7, 2001, letter—including Barber's use of the phrase "pursuant to"—does not prove that Ellison came forward with information in hope of the reward or that the State ever knew of such a hope before Johnson's trial. And the circuit court did not err in finding that "[t]he letter ... is neither conclusive [n]or convincing evidence to rebut the testimony of Ms. Ellison at the hearing."

First, the circuit court's interpretation of the phrase "pursuant to" is reasonable. Consistent with the definition of "pursuant to" that the circuit court used, *Garner's Dictionary of Legal Usage* (3d ed. 2011) 737 defines the phrase as "(1) in accordance with; (2) under; (3) as

---

[22] (Doc. 36-62 at 49-51.)

authorized by; or (4) in carrying out." Garner writes, "Because the phrase means so many things, it is rarely—if ever—useful." *Id.*

And *Gadsden Times* does not support Johnson's position. The statement that Johnson cites from that decision addresses a reward offered by a private party, as a later statement clarifies:

> "[W]e are bound by the law of this state, which permits one to collect a reward *offered by a private party* only if he knew of such offer at the time of his action. *Morrell [v. Quarles*, 35 Ala. 544 (1860)]. The record reveals that Gulledge acted prior to the publication of any article which might reasonably have been construed to constitute an offer of reward by the *Times*. Thus, as a matter of law, there could have been no contract between the parties."

*Gadsden Times*, 345 So. 2d at 1364 (emphasis added). In Johnson's case, however, the Governor—not a private party—made the reward offer under § 15-9-1, ALA. CODE 1975. (C. 463.)[23] That section conditions the payment of a reward only upon a person "giv[ing] information leading to the arrest and conviction of the guilty person."

The circuit court made these findings about Ellison's testimony:

> "Ms. Ellison testified that she recalled giving testimony in 1998 at Johnson's trial. Ms. Ellison's testimony at trial was to conversations overheard on three-way phone calls that her 16-year-old daughter was making for inmates at the Jefferson County Jail. On one of these calls, she overheard a man identify himself as 'ToForest' admit to murdering Deputy Bill Hardy. Ms. Ellison contacted the Jefferson County Sheriff's Office six days later to give them the information she had and had made notes of. These notes were admitted at the trial and reintroduced at this evidentiary hearing. Ms. Ellison recalled contacting the Jefferson County Sheriff's Office on August 9, 1995, and meeting with investigators that same day.

---

[23] (Doc. 36-60 at 64; Vol. 60, Tab # R-129, p. 463.)

"Ms. Ellison testified that at the time she made the initial phone call to the office, she had no knowledge from any source that a reward had been offered. She had not read anything about a reward in the newspaper, heard about a reward on TV or discussed a reward with anyone. She also testified, that at the time she testified in this case, and that in all the time leading up to the trial, she was unaware of any reward. She did testify both at the trial on cross-examination and at the hearing, that she came forward and called the Sheriff's Office six days after she overheard the conversation, because 'I was troubled. My spirit was troubled by not—you know, by hearing this and not saying anything and doing anything about it.' She testified she couldn't sleep during this time. Ms. Ellison further testified at the hearing that before coming forward to the Jefferson County Sheriff's Office, she talked to her mother and her mother told her to tell the truth, and to do what she needed to do.

"Ms. Ellison testified that she did not know anything about a reward until about three years after she testified at Johnson's 1998 trial, when she received a call from someone in the Jefferson County District Attorney's Office asking her to 'come in and sign some papers.' She testified she waited 'a couple of days,' then went to the District Attorney's Office. Ms. Ellison identified a copy of the application for the reward that she signed on August 6, 2001. Ms. Ellison also identified a copy of the receipt for $5,000 in reward money that she signed on August 23, 2001. Ms. Ellison testified that the first time she knew about a reward was when she was contacted by the District Attorney's office in August of 2001.

"On cross-examination, Ms. Ellison testified that she read about Deputy Hardy's murder in a newspaper a couple of days after it happened. Ms. Ellison testified that she figured out that she knew Deputy Hardy's wife, because she worked at the bank where Ms. Ellison was a customer. She also testified that she had met Deputy Hardy at the dog track with his wife. Ms. Ellison was asked questions concerning her finances and gave testimony that she and her husband filed for bankruptcy some five years before going to the [Jefferson County Sheriff's Office] in 1990.

"After the State rested, [Johnson] called rebuttal witness Ms. Sandra Turner. Ms. Turner and Ms. Ellison have been next door neighbors for over 30 years. Ms. Turner testified that it was her personal opinion that Ms. Ellison was not truthful and that her reputation in the community was not good for truthfulness. On cross-examination, Ms. Turner admitted that her son and Ms. Ellison's granddaughter have a son together and there is bad blood between her and Ms. Ellison and in the family. She also admitted that her son had been sent to prison for being a 'watchman,' while another man raped Ms. Ellison's daughter.

"....

"Rather than speculate as to the meaning and knowledge imparted in a letter three years after the trial, and six years after Ms. Ellison came forward with information, or on numerous other circumstantial and irrelevant exhibits introduced at the hearing by [Johnson], it is critical that this court evaluate Ms. Ellison's credibility, both as a witness at the trial and the evidentiary hearing, as her testimony at the evidentiary hearing is completely contrary to the *Brady* violation claim made by [Johnson], and the sole issue to be decided by this court. ... [T]his court was not the trial judge in this case, but a thorough review of the trial record has been made. This court observed ... Ms. Ellison testify at the evidentiary hearing, such as the jurors in the trial did, before reaching a verdict of guilty and recommending a sentence of death. There is no question that Ms. Ellison was a critical witness for the State at both proceedings. The jurors' opinion of her credibility at the trial has been clearly established by the verdicts rendered. Her testimony at the hearing was consistent with her trial testimony and she was not impeached on cross-examination by [Johnson] at the hearing. It is not this court's role at this stage of the Rule 32 process to address the weight of evidence at the trial or the weight of Ms. Ellison's testimony at the trial, but her credibility then is relevant here and now.

"This court was very narrowly directed by the Court of Criminal Appeals to determine after a hearing whether [Johnson's] claim of a *Brady* violation has been proven by a preponderance of the

36

evidence. This requires this court to assess this witness's credibility. Ms. Ellison appeared before the court well dressed, well spoken and answered the questions both on direct and cross with confidence, deliberate in her testimony. She had a good recollection of dates, names, and meetings. She had a good recollection of the facts that she testified to at trial. She did not [waver] about any subject on cross-examination. Ms. Ellison testified on at least eight occasions while on the witness stand, that she had no knowledge from any source about a reward before she came forward and gave information to the Jefferson County Sheriff's Office on August 9, 1995, or before trial of the case in August of 1998. Johnson contends that 'the evidence from the trial and the 2019 hearing supports the conclusion that Ms. Ellison knew about the reward all along.' This court finds no convincing evidence to rebut Ms. Ellison's testimony at the hearing. Johnson's Exhibits of newspaper and television accounts reporting a reward are circumstantial evidence at best that Ms. Ellison must have known about the reward at the time she came forward or gave testimony at trial. Ms. Ellison admitted she followed the case in the media but was unaware of a reward. [Johnson's] Exhibits concerning pretrial publicity about the reward, are also evidence of possible pretrial knowledge of the reward by trial counsel. It is clear from the trial record that [Johnson's] trial counsel had knowledge of the reward and asked defense witness Yolanda Chambers during Johnson's 1998 trial about her seeking a reward. It is as likely as not that Ms. Ellison was deliberately not asked about the reward on cross as part of a strategy by trial counsel. In fact, Ms. Ellison has been clear and consistent about her motivation in coming forward both at the trial in 1998 and the hearing. At trial on cross-examination, Ms. Ellison said she waited six days to come forward because [she] didn't want to get involved. She said:

"'A. And I didn't know—reasons I didn't get in touch with anybody, I didn't even know how to get in touch with Patricia, because I didn't know where Patricia Hardy lived.

"'Q. But it was so important to you on the 3rd that you took these notes down verbatim about this conversation, and yet you took no action whatsoever about it for six days.

"'A. Because I did not want to get involved because I felt like if a person would shoot a police officer with a uniform on, what would they do to me? [A]nd I did not want to get involved. That's why I didn't talk. And my conscience bothered me and I could not sleep, and that's why I came in.' (Trial R. 708.)[24]

"At the evidentiary hearing on direct examination, she testified, 'I was troubled. My spirit was troubled by not—you know, by hearing this and not saying anything and doing anything about it.'

On cross-examination Ms. Ellison continued to explain her motivation for coming forward. On cross-examination she testified that

"'yes, my spirit was troubled about that. But in this world these days, you don't go out and try to tell people about what has happened. I did not do that. I waited until I felt like I was being—I was safe in going to these people to talk. People will hurt you. Because I talked to my mother. And my mother and my father had always told me to tell the truth.'

Ms. Ellison went on to testify that '[a]nd then I talked to my mother about it. And she said, "You have to do what you have to do but just be careful." That's what she said.'

"Johnson also contends that Ms. Ellison's financial condition at the time she came forward is circumstantial evidence of her motivation for a reward. She testified at the hearing that she lived on a fixed income, her husband's job had been discontinued and he was unemployed for a few weeks, and they had filed for bankruptcy some five years before she came forward with information. This court finds this argument to be contradicted by the facts actually presented by [Johnson]. There is no record until August 6, 2001, five years after she initially came forward and made a statement and three years following the conviction in this case, that she made an application for the reward. This certainly

---

[24] (Doc. 36-4 at 86.)

is contrary to the argument that she was in financial need and came forward motivated by substantial financial reward. In fact, the timing of her actions are completely consistent with her testimony that she knew nothing of a reward until she got a call from someone at the [District Attorney's] office to 'come in and sign some papers.' If her true motive was to seek a reward, this court would expect she would have made application for the reward as soon as possible after the conviction. There is no evidence that the State knew of her interest in a reward before her making the application, that the District Attorney invited her to do. Had the State known of either before the trial in this case, it would seem logical that the State would have started the process as soon as possible after the trial. The relevant focus in this court's <u>Brady</u> analysis is not how Ms. Ellison learned about the reward, although important here, but when she learned about the reward. Based on this Court's observation of Ms. Ellison's demeanor as well as her clear, consistent, and articulate testimony at the evidentiary hearing in this case, this court finds her testimony to be compelling and credible evidence that she did not learn of the reward until years after Johnson's trial. Ms. Ellison's testimony rebuts any evidence introduced by [Johnson]. Therefore, [Johnson's] <u>Brady</u> claim has failed to be proved by a preponderance of the evidence."

(Supp. C. 47-48, 51-53 (some citations omitted).)[25]

For many reasons, Johnson argues that Ellison's testimony was "impossible to believe." (Johnson's brief, p. 27.)[26] Before evaluating those reasons, however, we note that "[w]hen evidence is presented ore tenus, it is the duty of the trial court, which had the opportunity to observe the witnesses and their demeanors, and not the appellate court, to make credibility determinations and to weigh the evidence presented." *Ex parte Hayes*, 70 So. 3d 1211, 1215 (Ala. 2011). Here, the circuit court made extensive findings about Ellison's testimony. The circuit court found Ellison credible and relied on her testimony to deny Johnson's *Brady* claim. In *Washington v. State*, 95 So. 3d 26, 47 (Ala. Crim. App. 2012), this Court stated:

---

[25] (Doc. 36-62 at 48-49, 52-54.)
[26] (Doc. 36-64 at 112.)

"'The resolution of this factual issue required the trial judge to weigh the credibility of the witnesses. [That] determination is entitled to great weight on appeal. *State v. Klar*, 400 So. 2d 610, 613 (La. 1981). "When there is conflicting testimony as to a factual matter such as this, the question of the credibility of the witnesses is within the sound discretion of the trier of fact. [Those] factual determinations are entitled to great weight and will not be disturbed unless clearly contrary to the evidence." *Klar*, 400 So. 2d at 613.'

"*Calhoun v. State*, 460 So. 2d 268, 269-70 (Ala. Crim. App. 1984). *See also Brooks v. State*, 929 So. 2d 491, 496 (Ala. Crim. App. 2005); *State v. Cortner*, 893 So. 2d 1264 (Ala. Crim. App. 2004). 'A trial court's ruling on conflicting evidence will not be disturbed unless it is palpably contrary to the weight of the evidence.' *State v. Cortner*, 893 So. 2d at 1267-68."

Johnson first asserts that

"Ms. Ellison's 2019 [testimony] as to how she came to receive the reward in 2001 does not make sense. Ms. Ellison claimed that the State contacted her out of the blue in 2001, three years after Mr. Johnson's trial, and asked her to come, 'sign some papers,' and receive a reward."

(Johnson's brief, p. 28.)[27] The circuit court, however, found Ellison credible on this point, and Johnson's disagreement with the circuit court's finding does not show that the finding was "'palpably contrary to the weight of the evidence.'" *Washington*, *supra*. The documents Johnson offered at the hearing likewise do not show that the circuit court's findings about Ellison's testimony were wrong.

And as the State notes, Johnson offered no evidence from anyone employed in the Jefferson County District Attorney's Office to rebut Ellison's testimony. Indeed, during closing arguments, the circuit court told the parties that it would like to hear, either by affidavit or live testimony, "from [District Attorney] David Barber, from [prosecutor]

---

[27] (Doc. 36-64 at 113.)

Jeff Wallace, from [prosecutor] Theo Lawson, from deputy—or Sergeant Salter and Sergeant Richardson." (R. 213.)[28] Johnson objected to offering more evidence, however, stating that he thought he had proved his case. (R. 214.)[29] The State also objected to reopening the evidence because, in the State's view, Johnson knew about those witnesses but did not call them to testify—and he should not have another chance to prove his case. (R. 214-15.)[30]

Johnson again cites *Gadsden Times*, *supra*, to argue that Ellison was not eligible for the reward unless she knew about it when she gave information to the State. But as stated above, *Gadsden Times* does not support Johnson's position.

Johnson next asserts that the State "has repeatedly contradicted [Ellison's] account of the confession she claimed to have heard." (Johnson's brief, p. 28.)[31] In support of this assertion, Johnson cites what he says were conflicting theories of prosecution in the proceedings against Johnson's codefendants Ardragus Ford and Omar Berry. The circuit court, however, refused to consider those theories because, the court held, its decision had to be "based on an impartial review of the admissible evidence presented according to the law." (Supp. C. 54.)[32] And, the circuit court said, this Court's remand order did not instruct that court "to consider the weight or sufficiency of the evidence at the trial in this case or to make judgments concerning the conflicting theories of the prosecution of this case." (Supp. C. 54.)[33] In his initial brief on return to remand Johnson does not challenge the circuit court's rulings on these points. Thus, Johnson waived any challenge to them. *See, e.g.*, *Boshell v. Keith*, 418 So. 2d 89, 92 (Ala. 1982) ("When an appellant fails to argue an issue in its brief, that issue is waived.").

Johnson also asserts that the State, in its opening statement at the evidentiary hearing, "undermin[ed] Ms. Ellison's credibility" because, Johnson says, "it did not track her testimony concerning how she

---

[28] (Doc. 36-61 at 160.)
[29] (Doc. 36-61 at 161.)
[30] (Doc. 36-61 at 161-62.)
[31] (Doc. 36-64 at 113.)
[32] (Doc. 36-62 at 55.)
[33] *See* Note 32, *supra*.

learned about the reward." (Johnson's brief, p. 29 n.7.)[34] During its opening, the State asserted:

> "The State anticipates that Ms. Ellison when she testifies will inform the court when she contacted law enforcement, the sheriff's department, on August 9th, 1995, she didn't know anything about a reward, had not heard about a reward. When she testified in August of 1998, she didn't know about a reward, had not heard of a reward. A few years later, she had a conversation with someone who mentioned the reward. And I'm not going to get into that conversation. I don't want to get into hearsay before the court. But after that conversation, she made an inquiry to the district attorney's office. And she made an application. And this was in August of 2001, three full years after she testified."

(R. 18-19.)[35] According to Johnson, however, "Ellison then testified to an entirely different story—that the first time she ever heard of the reward was when the Office of the District Attorney contacted her years after the trial and asked her to accept a reward payment that she had not requested." (Johnson's brief, p. 29 n. 7.)[36]

The circuit court, however, rejected Johnson's assertion:

> "Johnson claims that statements made in the opening by the State at the June 6, 2019, evidentiary hearing constitute evidence which this Court should consider in assessing witness Violet Ellison's credibility and as part of this Court's Brady analysis. Because the statements of counsel are not evidence in this case, the fact that the State's summary of what the witness would testify to, does not match up in every respect with the [witness's] testimony under oath, does not support the argument made by [Johnson], that Ms. Ellison's testimony was not credible. *See Land v. State*, 678 So. 2d 201, 221 (Ala. Crim. App. 1995), *aff'd*, 678 So. 2d 224 (Ala. 1996)."

---

[34] (Doc. 36-64 at 114 n.7.)
[35] (Doc. 36-60 at 165-66.)
[36] (Doc. 36-64 at 114 n.7.)

(Supp. C. 53-54.)[37] Johnson has not shown that the circuit court erred in rejecting his assertions about the State's opening statement.

Johnson next asserts that "the confession that Ms. Ellison claimed to have heard contradicts the physical evidence in the case." (Johnson's brief, p. 29.)[38] Johnson asserts: "Ms. Ellison claimed to hear a man say that his name was 'ToForest' and that he and another man fired shots at Deputy Hardy. ... But the State's own evidence makes clear that one shooter fired two shots in rapid succession." (Johnson's brief, p. 29.)[39]

Johnson's trial counsel argued that the physical evidence in the case contradicted Ellison's testimony, and, as Johnson describes it, trial counsel "speculated that Ms. Ellison had embellished or altered what she had heard on the phone." (Johnson's brief, p. 34 (citing Trial R. 985-86).)[40]

As noted above, Johnson did not challenge the circuit court's refusal "to consider the weight or sufficiency of the evidence at the trial in this case." (Supp. C. 54.)[41] As also noted above, the circuit court found:

> "The jurors' opinion of [Ms. Ellison's] credibility at the trial has been clearly established by the verdicts rendered. Her testimony at the hearing was consistent with her trial testimony and she was not impeached on cross-examination by [Johnson] at the hearing. It is not this court's role at this stage of the Rule 32 process to address the weight of evidence at the trial or the weight of Ms. Ellison's testimony at the trial, but her credibility then is relevant here and now."

Johnson has not shown this Court that, considering the State's evidence at Johnson's trial, the circuit court erred in its conclusion that Ellison was a credible witness.

---

[37] (Doc. 36-62 at 54-55.)

[38] (Doc. 36-64 at 114.)

[39] *See* Note 38, *supra*.

[40] (Doc. 36-64 at 119 (citing Doc. 36-5 at 163-64).)

[41] (Doc. 36-62 at 55.)

Next, Johnson asserts that "Ms. Ellison claimed to have taken notes based directly on what she heard, but her notes include facts from other sources." (Johnson's brief, p. 29.)[42] But Johnson gives only one example of a "fact from other sources"—Johnson says that even though Ellison "testified unequivocally that the man on the phone 'didn't say Johnson, he just said ToForest,'" in her notes Ellison "repeatedly wrote 'Johnson' referring to the person she heard on the phone." (Johnson's brief, p. 30.)[43]

Johnson's trial counsel and his Rule 32 counsel cross-examined Ellison thoroughly about her notes. The circuit court found that Johnson did not impeach Ellison at the Rule 32 hearing, and Johnson has not shown that the circuit court erred in that finding.

Finally, Johnson asserts that Ellison's testimony at the Rule 32 hearing "that she followed the case closely in the news in 1995 ... undermines her claim that she had never heard of the public reward offer." (Johnson's brief, p. 30.)[44] He argues: "Given the way Ms. Ellison was following the case—a case in which a person she knew had been killed—it is implausible that she never heard about the reward offer." (Johnson's brief, p. 31.)[45] As the already quoted parts of the circuit court's order show, however, the court ruled against Johnson on this issue:

> "This court finds no convincing evidence to rebut Ms. Ellison's testimony at the hearing. Johnson's Exhibits of newspaper and television accounts reporting a reward are circumstantial evidence at best that Ms. Ellison must have known about the reward at the time she came forward or gave testimony at trial. Ms. Ellison admitted she followed the case in the media but was unaware of a reward [Johnson's] Exhibits concerning pretrial publicity about the reward, are also evidence of possible pretrial knowledge of the reward by trial counsel. It is clear from the trial record that [Johnson's] trial counsel had knowledge of the reward and asked defense witness Yolanda Chambers during Johnson's

---

[42] (Doc. 36-64 at 114.)
[43] (Doc. 36-64 at 115.)
[44] (Doc. 36-64 at 115.)
[45] (Doc. 36-64 at 116.)

1998 trial about her seeking a reward. It is as likely as not that Ms. Ellison was deliberately not asked about the reward on cross as part of a strategy by trial counsel. In fact, Ms. Ellison has been clear and consistent about her motivation in coming forward both at the trial in 1998 and the hearing.

"....

"... Based on this Court's observation of Ms. Ellison's demeanor as well as her clear, consistent, and articulate testimony at the evidentiary hearing in this case, this court finds her testimony to be compelling and credible evidence that she did not learn of the reward until years after Johnson's trial. Ms. Ellison's testimony rebuts any evidence introduced by [Johnson]. Therefore, [Johnson's] *Brady* claim has failed to be proved by a preponderance of the evidence."

Under our standard of review, we must give great weight to the circuit court's factual determinations and findings about Ellison's credibility. *Washington, supra.* Johnson has not shown that those determinations are """clearly contrary to the evidence.""" *Id.* Thus, he is due no relief.

In his reply, Johnson asserts:

"The problems with this capital case are so severe that both the Jefferson County District Attorney and the lead trial prosecutor from the case support a new trial for ToForest Johnson. Yet the State, now represented by the Office of the Attorney General, does not address any of the problems with the case in its brief. Instead, the State argues that this Court should ignore virtually everything—the District Attorney's position, legal authority that supports Mr. Johnson's <u>Brady</u> claim, the amicus brief of the Innocence Project, and even parts of the record that undermine the State's position. This Court should reject the State's approach, confront the realities of this case, and reverse the decision of the circuit court."

(Johnson's reply, p. 1.)[46] We must reject Johnson's request that we consider the wishes of the Jefferson County District Attorney or the former lead prosecutor in Johnson's case or that we consider the opinion of the Innocence Project about Johnson's conviction. The only issue before the circuit court on remand was giving Johnson a chance to prove his *Brady* claim.

On appeal, the only issue before this Court is whether the circuit court abused its discretion in denying Johnson's *Brady* claim. Johnson has not shown that the circuit court erred in finding that he did not prove that, at any time before or during Johnson's trial, Ellison knew about or hoped to get a reward. Thus, the State could not have known that Ellison knew about or hoped to get a reward, and Johnson is due no relief on his *Brady* claim. *See, e.g.*, *Gavin*, 891 So. 2d at 986 ("The State cannot suppress evidence that does not exist.").

*Johnson*, 379 So. 3d at 1068-79; (Doc. 36-56 at 60-67.)

Johnson's petition makes the bald assertion that the state court resolution of this claim "involved an unreasonable application of clearly established federal law." (Doc. 37, ¶ 74.) But Johnson's petition does not claim that the state courts reached a conclusion or applied a legal rule opposite to that of the Supreme Court on a matter of law. *See Williams*, 529 U.S. at 405. In fact, there is no question about whether the state court resolution applied the proper federal law in resolving Johnson's claim, as the state court clearly identified *Brady* as the controlling precedent and correctly set forth the legal analysis for a *Brady* claim. *See Johnson*, 379 So. 3d at 1068 (quoting *Jones v. State*, 322 So. 3d 979, 1024-25 (Ala. Crim. App. 2019) ("To prove a *Brady* violation, a defendant must show: (1) that the prosecution suppressed

---

[46] (Doc. 36-65 at 6.)

evidence, (2) that the evidence was of a character favorable to the defense, (3) that the evidence was material [or that the defendant was prejudiced].").

Instead, Johnson alleges that the state court resolution was "unreasonable" because the state court reached a different result than that reached in *Banks v. Dretke*, 540 U.S. 668, 699 (2004); *Kyles v. Whitley*, 514 U.S. 419, 442 n.13 (1995); and *United States v. Bagley*, 473 U.S. 667, 683-84 (1985).[47] (Doc. 37, ¶ 90.) *Banks* is the easiest comparator case to dispense with. That decision dealt with a paid informant, who instigated aspects of a crime at the urging of law enforcement. *Banks*, 540 U.S. at 698. That scenario is materially distinguishable from what Johnson alleges here.

As evidenced by Johnson's own citation to a *single footnote* in *Kyles*, the possibility of the witness's receipt of a reward was a tangential consideration in that case. There, the Court focused on the cumulative value of evidence that suppressed witness statements (of multiple witnesses) "would have resulted in a markedly weaker case for the prosecution and a markedly stronger on for the defense" with "the value of two of those witnesses… substantially reduced or destroyed." *Kyles*, 514 U.S. at 441. *Kyles* does not present "facts materially indistinguishable from those" of this case, even if this Court could evade the state court findings of fact.

---

[47] *See Williams*, 529 U.S. at 405 (noting a state court decision will be contrary to clearly established federal law if it confronts facts materially indistinguishable from those of relevant Supreme Court precedent and arrives at an opposite result).

In *Bagley*, the witnesses knew they were eligible for a reward at the time they testified, but their payment was predicated on the government's satisfaction with the end result of their testimony. 473 U.S. at 683-84.[48] Here, the state court decision noted that the witness did not testify with knowledge or hope of a reward (both of which did not come until after the trial). This situation is materially distinguishable from that presented in *Bagley*.

Thus, Johnson alleges that the state court resolution of this claim was based on an unreasonable determination of the facts. (Doc. 37, ¶¶ 89-90.) However, a state court's determination of fact must be presumed correct in federal court. 28 U.S.C. § 2254(e) (West 2023); *see also McNair*, 416 F.3d at 1297. A petitioner bears the burden of rebutting this presumption of correctness by clear and convincing evidence. *Id*. As to testimonial evidence, "28 U.S.C. § 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been

---

[48] Equally important, the Court made no determination of whether suppression of information about the witnesses' *possibility* of receiving a reward was prejudicial to the defendant under the facts of that case. *Bagley*, 473 U.S. at 684. Although the court of appeals found the suppression in that case to be prejudicial on remand, such circuit precedent does not constitute "clearly established federal law" for AEDPA purposes. "Circuit precedent cannot 'refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule'" that the Supreme Court has not announced. *Lopez*, 574 U.S. at 7 (quoting *Marshall*, 569 U.S. at 64). The state court's denial of Johnson's claim cannot be said to have been based on facts materially indistinguishable from those in *Bagley*, arriving at an opposite result. *Williams*, 529 U.S. at 405.

observed by the state trial court, but not by them." *Marshall*, 459 U.S. at 434. Because Johnson's entire claim is based on asking this Court to second-guess credibility determinations made by the state trial court, his claim should be denied.

Johnson's claim is based on his view that the "State's own documents, *when understood in their proper context and in the light of the state law applicable at the time*, make clear that Ms. Ellison knew about the reward prior to trial." (Doc. 37, ¶ 89 (emphasis added).) Unfortunately for Johnson, the state courts disagreed with his view of the "state law applicable at the time," and matters of state law interpretation are beyond the scope of this federal proceeding. Additionally, Johnson's use of the phrase "the proper context" is his attempt to evade the direct testimony of Ellison, who was found to be credible by the trial court.[49]

Johnson's arguments in the petition do not point to facts introduced at the state court evidentiary hearing. Thus, he has failed to rebut the presumption of correctness that attaches to the state court findings by clear and convincing evidence. For this reason, this claim in his petition is due to be denied.

---

[49] Additionally, Johnson never explains how the "proper context" involved Ellison waiting for three years after her trial testimony to sign an application for the reward money (Doc. 36-60 at 71; Vol. 60, Tab # R-129, p. 470), at the District Attorney's request and days *after* the District Attorney first inquired about the matter (Doc. 36-60 at 80; Vol. 60, Tab # R-129, p. 479), which is consistent with Ellison's testimony. If anything, the documents provide "context" that corroborates and strengthens Ellison's testimony.

## III.   THE ALLEGATION THAT THE STATE KNOWINGLY PRESENTED FALSE EVIDENCE AGAINST PETITIONER.

Johnson challenges the denial of Claim V of his state post-conviction petition, which alleged that the State knowingly presented false testimony against him. As Petitioner concedes, this claim was denied in state court because the allegations could have been (but were not) raised at trial or on direct appeal. (Doc. 37, ¶ 100.) As the Court of Criminal Appeals observed, "Johnson makes several different arguments [] that are procedurally barred in this Rule 32 proceeding [including] 2. That the State knowingly introduced false testimony against him at trial." *Johnson*, 379 So. 3d at 1012 (Doc. 36-22 at 51).

A state court's denial of a petitioner's claim on adequate and independent procedural (state law) grounds generally precludes habeas review of that claim. *See Coleman*, 501 U.S. at 729-30 ("The [independent and adequate state ground] doctrine applies to bar federal habeas relief when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement."); *Judd*, 250 F.3d at 1313. Johnson provides the boilerplate response that the state court's denial was "unreasonable," but he does not explain how he can avoid application of the state court's adequate and independent state law ground for denial. He offers no further explanation as to his characterization of the state court's enforcement of this procedural bar as "unreasonable," other than his own, obvious dislike of that outcome. While it is true that Johnson objected to the application of

50

the state procedural bar in his brief, he did so "as violative of the principles of fundamental fairness embodied in the Constitution" without citation to a single legal authority. (Doc. 36-20 at 190.) The state procedural bar applied to Johnson's case is firmly established and regularly followed, and Johnson provides no valid basis for federal evasion of this state law ground. *See Johnson v. Alabama*, 256 F.3d 1156, 1170 n.6 (11th Cir. 2001). Accordingly, Johnson is not entitled to further proceedings as to this claim, which is governed by the AEDPA.

## IV.   THE ALLEGATION JOHNSON RECEIVED INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL.

Johnson asserts several claims that he received the ineffective assistance of trial counsel in violation of *Strickland v. Washington*, 466 U.S. 668 (1984). Respondent answers each of those claims, individually, below.

### A.   The Claim Trial Counsel Were Ineffective for Failing to Investigate and Call Several Witnesses Who Would Have Testified That Another Inmate Impersonated Johnson While Talking on the Jailhouse Phone.

Johnson alleges that his trial counsel were ineffective for failing to call witnesses who would have testified that another inmate at the Jefferson County Jail could have impersonated Petitioner on overheard phone calls used as evidence by the State. The Alabama Court of Criminal Appeals was the last state court to decide this claim adversely to Johnson and it issued a decision setting forth its reasoning. That court explained its reasoning as follows:

Johnson next argues that counsel was ineffective for failing to call witnesses to testify that Fred Carter could have impersonated Johnson and made the telephone call that Ellison overheard from the Jefferson County jail.

The circuit court made the following findings concerning this claim:

> "The State responds that Violet Ellison testified that on August 4 she overheard Johnson speaking to a woman named 'Daisy.' Trial counsel called Daisy Williams to testify for the defense. Williams testified that she had known Johnson from when they lived in Pratt City. Williams also testified about a telephone conversation she had with Johnson in August. Williams's recall of the conversation was in stark contrast to what Ellison reported. Trial counsel's strategy was to attack what Ellison claimed she overhead Johnson say to Williams. Johnson now claims that trial counsel should have discovered and presented an alternative defense — that what Ellison overheard could have been Fred Carter impersonating Johnson on the telephone.

> "In *Hunt v. State*, 940 So.2d 1041, 1067 (Ala. Crim. App. 2005), the Alabama Court of Criminal Appeals held:

> "'"[T]he mere existence of a potential alternative defense theory is not enough to establish ineffective assistance based on counsel's failure to present that theory." *Rosario–Dominguez v. United States*, 353 F. Supp. 2d [500] at 513 [(S.D.N.Y.2005)].'

> "Trial counsel's strategy to impeach Ellison's testimony with the testimony of Daisy Williams was entirely reasonable. All of the affidavits submitted by Johnson to support this claim, with one exception, were executed by individuals that are currently in the custody of the Alabama Department of Corrections. Further, no affiant, not even Fred Carter, stated on the dates Violet Ellison said she overheard Johnson, that they heard Fred Carter impersonate Johnson.

> "Attorney Darryl Bender testified that he was aware of Fred Carter and that Fred Carter established for the State that Johnson made the phone calls. Mr. Carter attempted to explain to the jury

that Johnson was explaining what he was accused of not what he did. Attorney Bender felt that this helped the defense. Testimony further indicated that the trial attorneys were not aware of any alleged impersonations and there was no reason to challenge that the calls were made by Johnson. All of the evidence indicated that Johnson did make the calls. Said attorney testified that he considered all of the possibilities that were reasonable and attempted to explain away the phone calls by an impersonation was not reasonable. Attorney Bender also testified that he did talk to people at the jail about the contents of the phone calls but that he could not remember specifically.

"In *Strickland v. Washington*, [466 U.S. 668 [] (1984),] the Supreme Court established that a petitioner must show that counsel's performance was deficient and that he was prejudiced by the said deficient performance. The Supreme Court found that 'judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client the same way.' *Strickland v. Washington*, [*supra*]. Additionally, this Court would point out that 'effective representation does not entitle the defendant to an error-free trial, and showing that counsel made a mistake unfavorable to the defendant is not sufficient to establish inadequate representation.' *Saffold v. State*, 570 So. 2d 727, 731 (Ala. Crim. App. 1990).

> "Johnson has not met his burden of proof in showing that his attorneys were ineffective."

(Return to remand, C. 918–21.)[50]

Bender testified that Carter's testimony at Johnson's trial did not hurt Johnson's case but helped his case. Bender said:

> "[Carter] basically told the jury that our client was telling him what he was accused of — not what he actually did, but what he was accused of. And that was our argument relative to that telephone conversation.

> "Our argument was that Ms. Ellison picked the phone up in the middle of the conversation; she heard certain things; she interpreted that as him saying he did, in fact, when, in fact, he was saying to the young lady that he was talking to, this is what they say I, did — not what I actually did, but this is what they say I did — as I remember it now."

(Return to remand, Suppl. R. 238–39.)[51] Bender said that the defense theory was that Ellison did not overhear the entire conversation but that she heard only a portion of the conversation. Consistent with that theory, Bender and Mathis presented the testimony of Daisy Williams. Williams testified that in August 1995 her cousin, Fred Carter, telephoned her from the county jail, that she talked to Carter for a few minutes, and that Johnson then got on the telephone. She testified that she asked Johnson what he was in jail for and that he responded but he did not tell her that he had shot Deputy Hardy. Ellison testified that the first phone call she overheard was between a person named Johnson and a person named Daisy; it was in this conversation, Ellison said, that Johnson told Daisy that he had shot Deputy Hardy.

> "Impeachment strategy is a matter of trial tactics, and tactical decisions are not ineffective assistance of counsel simply because in retrospect better tactics may have been available. *Johnson v. Hofbauer*, 159 F.

---

[50] (Doc. 36-27 at 120-23.)
[51] (Doc. 36-37 at 238-39.)

Supp. 2d 582, 607 (E.D. Mich. 2001)." *Dell v. Straub*, 194 F. Supp. 2d 629, 651 (E.D. Mich. 2002). Counsel's action in calling Williams to rebut Ellison's testimony was not unreasonable.

Furthermore, on direct appeal, this Court stated the following concerning counsel's strategy:

> "[T]he State introduced the telephone records to show that telephone calls were, in fact, placed from the Jefferson County jail to the home of Violet Ellison. The records showed that calls were placed from a number assigned to the 9th Floor, Block B, of the Jefferson County jail (where Johnson was housed) to the telephone of Violet and Katrina Ellison. The records corroborate Violet and Katrina Ellison's testimony regarding the dates and times of the calls from Johnson. As the State correctly points out in its brief to this Court, because Johnson was clearly unable to deny the existence of the telephone calls, his trial counsel obviously adopted a strategy of denying the content of the those calls, i.e., that Johnson admitted that he had shot Deputy Hardy. Johnson has failed to show that this was not sound trial strategy, especially given the overwhelming evidence presented by the State proving the existence of the calls."

823 So.2d at 50.

Johnson failed to meet his burden of showing that counsel's performance was deficient and/or that he was prejudiced by counsel's performance.

*Johnson*, 379 So. 3d at 1042-44; (Doc. 36-56 at 41-42.)

Johnson's petition cites to *Debruce v. Comm'r, Ala. Dep't of Corrs.*, 758 F.3d 1263, 1274 (11th Cir. 2014), and *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991), to argue that his trial counsel's performance was not the result of strategy. (Doc. 37, ¶ 115.) However, circuit precedent is not the relevant touchstone for AEDPA review. *Lopez*, 574 U.S. at 7 (quoting *Marshall*, 569 U.S. at 64); *Williams*,

529 U.S. at 407. These arguments do nothing to advance Johnson's case for AEDPA relief.

Although Johnson's petition contains the boilerplate assertions that the state court's denial of this claim on the merits "was contrary to, and an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts in light of the evidence presented" (Doc. 37, ¶ 118), the petition does not cite to a single prior decision of the Supreme Court. In other words, Johnson has not identified any prior decision of the Supreme Court that he contends was decided differently with facts materially indistinguishable from those of his case. *See Williams*, 529 U.S. at 405. And while Johnson's petition repeats the allegations that he asserted in state court, he has offered no explanation as to why the Alabama Court of Criminal Appeals' factual determinations were unreasonable. For these reasons, Johnson's petition fails to establish that he is entitled to relief under the AEDPA as to this claim.

### B. The Claim Trial Counsel Were Ineffective for Failing to Present Additional Favorable Evidence to Cast Doubt on Johnson's Guilt.

Johnson claimed that his trial counsel were ineffective for failing to call two witnesses at his retrial. Both witnesses had testified at his first trial. The Alabama Court of Criminal Appeals was the last state court to decide this claim adversely to Johnson. That court denied relief, explaining its decision as follows:

56

Johnson argues that the circuit court erred in denying relief on his claim that his trial counsel were ineffective for failing to call Marshall Cummings and Sgt. Anthony Richardson to testify at Johnson's second trial after both had testified at Johnson's first trial, which had resulted in a mistrial.

At the postconviction evidentiary hearing, Johnson presented affidavits executed by Cummings and Sgt. Richardson and copies of the transcript of their testimony from Johnson's first trial. Cummings testified that he was staying at the Crown Sterling hotel at the time of the murder and that he was awakened by people talking in the parking lot at around midnight. He said that about 15 minutes later he heard two gunshots and that he looked out the window of his hotel room. He testified that he saw an individual walking casually toward a car that was parked next to the hotel. The car was light-colored tan or copper-colored and was probably an Oldsmobile Cutlass or a Chevrolet. (This description did not match the car that Johnson was riding in on the night of the murder.) The person took his time to get in the car and drove away from the hotel. After the car drove away, Cummings saw Deputy Hardy's body on the ground.

Sgt. Richardson testified that when Johnson was arrested he was with Ardragus Ford, Yolanda Chambers, and Latanya Henderson in Ford's automobile and that the driver's side door of Ford's car would not open.

The circuit court made the following findings concerning this claim:

> "At the evidentiary hearing, Mr. Mathis testified he could not remember specifically why he and Mr. Bender did not call Mr. Cummings or Sgt. Richardson to testify at Johnson's second trial.
>
> "Mr. Bender, in contrast, testified that he did recall why Mr. Cummings and Sgt. Richardson were not called. Mr. Bender testified that he spoke to all of the jurors from Johnson's first trial. Mr. Bender testified that these jurors told him that he and Mr. Mathis appeared desperate in suggesting that the individual Mr. Cummings saw was the person that murdered Deputy Hardy. Mr. Bender explained:

"'[The jurors] told me, what man would shoot a deputy sheriff between the eyes and leisurely walk away? Who would shoot a deputy sheriff between the eyes, get in his car in a leisurely sort of pace and just cruise out of the parking lot? Okay. And in talking to them and thinking about that, it made sense.'

"(H.R. 473)[52]

"Mr. Bender also expressed his opinion concerning Mr. Cummings's testimony that voices in the parking lot of the hotel woke him up. Mr. Bender explained:

"'So the conversation that Marshall Cummings heard was just like conversation you and I are having. It wasn't loud.... He testified that the conversation he heard was just people just talking at a normal sort of level, if these people were talking at a normal sort of level and they were in the parking lot where Bill Hardy got killed, Mr. Cummings wouldn't have heard it. They wouldn't have woke him up.'

"(H.R. 475–76)[53]

"Based on what jurors had told him, as well as his own opinion about Mr. Cummings's testimony that voices in the parking lot had woken him up, Mr. Bender concluded that 'Marshall Cummings didn't offer anything, thus I didn't call him again.'

"....

"While the affidavits presented by Johnson, concerning jurors' memories of who they spoke to after the first trial, when asked by [Johnson] some 17 years later, may conflict with Mr. Bender's testimony of when and where or if he spoke to jurors following his first trial, the affidavits do not refute Mr. Bender's explicit testimony concerning his memory about how those jurors characterized the impact of Mr. Cummings's testimony — that Mr. Cummings's testimony made the defense look desperate.

---

[52] (Doc. 36-49 at 186.)
[53] (Doc. 36-49 at 188-89.)

Further, Mr. Bender's opinion that Mr. Cummings's testimony that voices from the parking lot woke him up was not plausible was an additional reason for Bender's decision not to call him at Johnson's second trial. Mr. Bender testified that he agreed with the jurors' assessment, that Mr. Cummings had not witnessed the person who was the shooter in this case. The Court also notes that the State had already called witness Larry Osborne to testify in the case-in-chief, who was also a guest at the hotel. His testimony at the second trial was very similar to that of Mr. Cummings; however, he described the car moving away with lights off after the shooting as a 'light green or yellow' GM model car. Cummings's testimony would have been cumulative to Osborne's testimony.

"Moreover, in addition to two alibi witnesses, this Court notes that at Johnson's second trial, one of the alternative defenses Mr. Bender and Mr. Mathis presented was based on the testimony of Yolanda Chambers. Violet Ellison had been called by the State to give very damaging testimony from three-way jail calls, wherein Johnson was attributed to talking about the circumstances of the shooting and admitted to 'I shot the f___ in the head and saw his head go back. He shouldn't have been messing in my s___.' Because of this testimony Ms. Chambers was called to testify by the defense in rebuttal. Ms. Chambers had not been called in the first trial, when Cummings and Sgt. Richardson were called by [Johnson]. She testified that, although Johnson was with her, 20 feet from where Deputy Hardy was shot, it was the codefendant Ardragus Ford, who shot the deputy for no reason. Chambers testified that although Johnson was present at the Crown Sterling [hotel] when Deputy Hardy was shot, Johnson was not involved in the shooting and he did not know the shooting was going to take place. *See Johnson v. State*, 823 So. 2d 1, 12 (Ala. Crim. App. 2001). In fact, in light of [Johnson's] eliciting this testimony from Ms. Chambers, after the testimony of Violet Ellison in the State's case, the testimony of both Mr. Cummings and Sgt. Richardson was not necessary or relevant in the second trial, and even contradictory to Ms. Chambers's testimony and [Johnson's] theory of the case. Cummings's testimony was also cumulative to that of State's witness, Larry Osborne. This Court finds counsel's

decision not to call either of these two witnesses at the second trial to be a reasonable one. Additionally, having determined that Mr. Cummings's testimony was not helpful, this Court further finds that Mr. Bender and Mr. Mathis were not ineffective for failing to call Sgt. Richardson to testify that the driver-side door of the car Johnson was in the morning he was arrested did not open, as Ms. Chambers testified to the condition of the driver's door of the same car that Ardragus Ford was driving, occupied by her and Johnson at the crime scene, in [Johnson's] case.

"....

"This Court finds that Johnson has not proven counsel either ineffective or unreasonable in not calling witnesses Cummings and Sgt. Richardson in the second trial. This Court further finds that based on the testimony in the second trial of Ms. Violet Ellison and Larry Osborne called by the State, and Ms. Chambers, and two alibi witnesses called by [Johnson], and based upon the testimony of Mr. Bender at the evidentiary hearing, the decision not to call these witnesses was one of sound trial strategy at the time. There has been no evidence presented to even suggest that calling these witnesses would have resulted in a different outcome according to the requirements set forth in *Strickland* [*v. Washington*, 466 U.S. 668 [] (1984)]. To show prejudice, a petitioner must show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, [466 U.S.] at 694. This Court, therefore, finds that Johnson failed to prove that Mr. Bender and Mr. Mathis were ineffective for not calling either Mr. Cummings or Sgt. Richardson to testify at his second trial."

(Return to Second Remand, Second Suppl. C. 28–32.)[54]

Initially, we note that "[t]he decision not to call a particular witness is usually a tactical decision not constituting ineffective assistance of counsel." *Oliver v. State*, 435 So. 2d 207, 208-09 (Ala. Crim. App. 1983).

---

[54] (Doc. 36-52 at 29-33.)

> "'Trial counsel's decisions regarding what theory of the case to pursue represent the epitome of trial strategy.' *Flowers v. State*, 370 S.W.3d 228, 232 (2010). 'What defense to carry to the jury, what witnesses to call, and what method of presentation to use is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess.' *State v. Miller*, 459 S.E.2d 114, 127 (1995)."

*Clark v. State*, 196 So. 3d 285, 306 (Ala. Crim. App. 2015).

Mathis testified that he could not remember why he and Bender did not call Cummings to testify at Johnson's second trial. Bender testified that he represented Johnson in his first trial and that he talked to the 12 jurors and the 2 alternates after the first trial. He said:

> "One of the things that they told me was that we appeared desperate in trying to suggest that this guy that Marshall Cummings saw was the shooter when they said it was clear to them that he wasn't. They told me, what man would shoot a deputy sheriff between the eyes and leisurely walk away? Who would shoot a deputy sheriff between the eyes, get in his car in a leisurely sort of pace and just cruise out of the parking lot? Okay. And in talking to them and thinking about that, it made sense."

(Return to Second Remand, R. 472–73.)[55]

Counsel made a strategic decision not to call Cummings at Johnson's second trial based on counsel's conversations with the jurors from Johnson's first trial. "[S]trategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." *Occhicone v. State*, 768 So. 2d 1037, 1048 (Fla. 2000). "[T]he decision whether to call a defense witness is a strategic decision. We must afford such decisions 'enormous deference.'" *United States v. Kozinski*, 16 F.3d 795, 813 (7th Cir. 1994).

---

[55] (Doc. 36-49 at 185-86.)

Johnson argues that Bender's postconviction testimony conflicts with the affidavits of four jurors from Johnson's first trial who stated that they did not talk to counsel; therefore, Johnson argues, counsel could not have made a strategic decision. However,

> "'[w]hen conflicting evidence is presented ... a presumption of correctness is applied to the court's factual determinations.' *State v. Hamlet*, 913 So. 2d 493, 497 (Ala. Crim. App. 2005). This is true 'whether the dispute is based entirely upon oral testimony or upon a combination of oral testimony and documentary evidence.' *Parker Towing Co. v. Triangle Aggregates, Inc.*, 143 So. 3d 159, 166 (Ala. 2013) (citations omitted). 'The credibility of witnesses is for the trier of fact, whose finding is conclusive on appeal. This Court cannot pass judgment on the truthfulness or falsity of testimony or on the credibility of witnesses.' *Hope v. State*, 521 So. 2d 1383, 1387 (Ala. Crim. App. 1988). Indeed, it is well settled that, in order to be entitled to relief, a postconviction 'petitioner must convince the trial judge of the truth of his allegation and the judge must "believe" the testimony.' *Summers v. State*, 366 So. 2d 336, 343 (Ala. Crim. App. 1978). *See also Seibert v. State*, 343 So. 2d 788, 790 (Ala. 1977).'"

*Clark v. State*, 196 So. 3d 285, 300 (Ala. Crim. App. 2015). We must give deference to the circuit court's findings of fact on this claim.

Moreover, at Johnson's trial, Larry Osborne, also a guest at the Crown Sterling hotel, testified that at around 12:30 a.m. on July 19, 1995, he was awakened by what he thought were gunshots and that he walked to his window and observed a vehicle parked directly below his window. He said that the vehicle was a 1980s model Buick or Pontiac that looked greenish or grayish. On that evening, when Johnson was stopped by police he was in a 1982 black Chevrolet Monte Carlo automobile. Also, the last witness called by the State at Johnson's trial was Officer James Evans, the officer who stopped Johnson on the evening of the murder. Defense counsel asked the following question:

> "[W]e've had eyewitness testimony that the car that left the scene was an early '80s model greenish or grayish automobile, 4–door, early '80s. We had one policeman testify that he put out a BOLO

for a white Caprice, late model, but neither of them knew anything about a 1982 black Monte Carlo. What I'm getting at is do you have any idea what the source of this information was?"

(Trial R. 588.)[56] Counsel clearly showed that vehicles other than the vehicle Johnson was in when he was arrested were observed near the scene of the murder at the time of the murder. Indeed, the murder occurred in the parking lot of a hotel.

Also, on direct appeal, Johnson argued that his trial counsel were ineffective for failing to present the testimony of three witnesses who allegedly saw a vehicle leave the hotel parking lot shortly after the murder. In finding that counsel were not ineffective in this regard, this Court stated:

> "[T]he mere fact that the descriptions of the vehicle these witnesses saw leaving the scene did not match the vehicle in which Johnson was later found does not support Johnson's alibi defense. During trial, the State presented evidence that the police had received several different descriptions of vehicles allegedly seen leaving the rear parking lot of the hotel on the night of Deputy Hardy's murder and that the police had issued numerous BOLOs for those different vehicles. Only one of these numerous BOLOs matched the vehicle in which Johnson was found the next morning, the BOLO for a black vehicle. Testimony from three additional witnesses regarding three additional descriptions of vehicles that did not match the vehicle in which Johnson was later found would have been cumulative and would have added nothing to Johnson's defense.
>
> "... [Johnson] further maintains that his counsel should have stressed, as part of their trial strategy, the numerous and varying descriptions of vehicles from witnesses. The record reflects, however, that trial counsel did, in fact, stress the differing descriptions of vehicles that were given by witnesses at the scene during opening statements and during cross-examination of several witnesses."

---

[56] (Doc. 36-3 at 165.)

*Johnson*, 823 So. 2d at 49–50.[57]

The primary evidence presented by the State against Johnson at his second trial that had not been presented at his first trial was the testimony of Violet Ellison. Ellison testified that she overheard a telephone conversation between Johnson and a person named Daisy and that, during the conversation, Johnson confessed to shooting Deputy Hardy in the head. At Johnson's second trial, counsel presented the testimony of Yolanda Chambers. Chambers testified that she was with Johnson and Ford on the evening of the murder and that Ardragus Ford—not Johnson—shot Officer Hardy. Based on the evidence that was presented at Johnson's second trial, we cannot say that the failure to call Cummings to testify at Johnson's retrial resulted in any prejudice to him.

Neither was Johnson prejudiced by trial counsel's failure to call Sgt. Richardson as a witness at Johnson's second trial. Chambers testified that the driver's door of Ford's vehicle did open. (Trial Record, R. 756.)[58] Although Bender did testify at the postconviction hearing that the testimony that would have been elicited from Sgt. Richardson was elicited from Chambers, it is not necessary for this Court to reach the question whether counsel were, in fact, ineffective when we can resolve the issue by determining whether Johnson was prejudiced. "[T]here is no reason for a court deciding an ineffective assistance claim to ... address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. Sgt. Richardson's testimony about the car door would have discredited Chambers's testimony. Based on the evidence in this case, we cannot say that the failure to call Sgt. Richardson at Johnson's retrial resulted in prejudice to Johnson. Johnson failed to satisfy the two required components of *Strickland* analysis and is due no relief on this claim.

*Johnson*, 379 So. 3d at 1049-54.[59] Johnson's petition concedes the state court merits

determination but contains the same boilerplate assertion that the denial "was

---

[57] (Doc. 36-9 at 201.)

[58] (Doc. 36-4 at 134.)

[59] (Doc. 36-56 at 46-50.)

contrary to, and an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts in light of the evidence presented." (Doc. 37, ¶ 134.) However, Johnson does not cite to a single prior decision of the Supreme Court, meaning it would be impossible for the Court to apply the appropriate "contrary to or unreasonable application of" AEDPA analysis. Nor does Johnson explain how the state court decision was based on an unreasonable determination of the facts. This omission should be fatal to this claim, because Johnson fails to even address his trial counsel's testimony that there was an informed, strategic reason for their decision not to call these witnesses.

Based on the foregoing, Johnson is not entitled to relief as to this claim under the appropriate AEDPA analysis.

### C.    The Claim Trial Counsel Were Ineffective for Failing to Call Compelling Alibi Witnesses.

Johnson alleges that his trial counsel provided ineffective assistance when they failed to call various witnesses to provide an alibi. The Alabama Court of Criminal Appeals was the last state court to decide this claim adversely to Johnson. That court stated:

> Johnson argues that his trial counsel was ineffective for failing to investigate, discover, and present more alibi witnesses.

> The circuit court made the following findings on this claim:

>> "These ... claims were addressed in this Court's previous order on Rule 32 wherein this Court held: '[Johnson's] allegation that

trial counsel unreasonably failed to call Kimberly Colvin,' 'to testify at [Johnson's] second trial' is an incorrect statement. The subpoena audit list for [Johnson's] second trial set August 17, 1998, which was printed June 1, 1998, and is part of the court file, clearly shows trial counsel requested that subpoenas be issued to Kimberly Colvin, Barbetta Hunt, and Velonique Sanders, among others. The record is silent as to whether or not these individuals even responded to their respective subpoenas. If, in fact, the witnesses were present at trial and ready to testify, and trial counsel elected not to call them to the witness stand, it would be construed as trial strategy. Trial counsel presented two (2) alibi witnesses, Montrice Dunning and Christi Farris, who testified to seeing [Johnson] at a club called Tee's Place at the time Deputy William Hardy was murdered. No reasonable purpose would have been served by presenting redundant testimony of three (3) additional witnesses. Trial counsel may have felt that witnesses Montrice Dunning and Christi Farris were more credible and convincing than Kimberly Colvin, Barbetta Hunt, and Velonique Sanders. Either way, [Johnson] has failed to meet his burden of proof relative to this claim.

"[Johnson] alleges that trial counsel was ineffective during the guilt phase of the trial by failing to call alibi witnesses who were never contacted by investigator Steve Saxon or trial counsel, including but not limited to Mona Abercrombie, Diedre Carter, Kenyarra Hubbard, Charles Jordan, Stanley Chandler, Katrina Davis, Tina Parker, David Battle, Randall Betts and Armenia Gosha. [Johnson's] claim fails to meet the specificity requirements of Rule 32.6(b), Alabama Rules of Criminal Procedure; and [Johnson's] speculations and conjecture do not rise to meet the standard established by *Strickland v. Washington*, [466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)]. Additionally, [Johnson] has failed to rebut the presumption that counsel's actions were sound trial strategy pursuant to *Ex parte Womack*, 541 So. 2d 47, 66 (Ala. 1988). [Johnson's] claim is without merit and he has failed to meet the required burden of proof relative to this claim.

"Also, the issue of failure to call certain alibi witnesses was addressed on appeal wherein the Alabama Court of Criminal

Appeal is quoted as follows: 'Johnson maintains that this trial counsel were ineffective for not calling the three witnesses to testify in order to support his alibi defense.' ...

"After considering the testimony offered at the hearing in this cause there has been nothing to rebut the presumption that the decision by Johnson's trial counsel to call certain alibi witnesses, rather than other witnesses of whom they were aware, was nothing more than sound trial strategy pursuant to *Ex parte Womack*, *supra*."

(Return to remand, C. 913–15.)[60]

The record supports the circuit court's findings. Bender testified that they did not call the three alibi witnesses who testified at Johnson's first trial because one of them had been convicted of "something" after Johnson's first trial and one had an inconsistent version of the events that occurred on the evening of the murder. Two different alibi witnesses testified at Johnson's second trial. During the cross-examination of Bender, the following exchange occurred:

"[Assistant attorney general]: Do you recall telling me, Mr. Bender, that you didn't think it would have been beneficial to Mr. Johnson to parade a dozen or a dozen and a half witnesses from Tee's Place, that you tried to collect your best alibi witnesses?

"[Bender]: Right. It wouldn't have been. We talked to a bunch of people, some of them who claimed they had some knowledge: Oh, yeah, I saw him across the street at the car wash, yadda-yadda.

"We sort of pared it down to those witnesses who we believed best offered us the consistent testimony that sort of fit our theory. It would have been a mistake to march that many people in here with inconsistent sort of versions of what they saw and what happened. We just didn't think it was the right thing to do, and so we didn't."

---

[60] (Doc. 36-27 at 115-17.)

(Return to remand, Suppl. R. 282–83.)[61]

"[I]n the context of an ineffective assistance claim, 'a decision regarding what witnesses to call is a matter of trial strategy which an appellate court will not second-guess.'" *Curtis v. State*, 905 N.E.2d 410, 415 (Ind. Ct. App. 2009). "[T]he decision of which witnesses to call is quintessentially a matter of strategy for the trial attorney." *Boyle v. McKune*, 544 F.3d 1132, 1139 (10th Cir. 2008). "Whether to call a particular witness is a tactical decision and, thus, a 'matter of discretion' for trial counsel." *United States v. Miller*, 643 F.2d 713, 714 (10th Cir. 1981). "[W]e do not substitute our judgment for that of trial counsel as to whether other alibi witnesses, if available, would have been helpful." *State v. Lowery*, [] 347 S.E.2d 729, 739 (N.C. 1986).

> "The question is whether some reasonable lawyer at the trial could have acted as defense counsel acted in the trial at issue and not what 'most good lawyers' would have done. *Conklin v. Schofield*, 366 F.3d 1191, 1204 (11th Cir. 2004) (internal citations omitted). Even if counsel's decision appears to have been unwise in retrospect, the decision will be held to have been ineffective assistance only if it was 'so patently unreasonable that no competent attorney would have chosen it.' *Adams v. Wainwright*, 709 F.2d 1443, 1445 (11th Cir. 1983)."

*Dingle v. Secretary for Dep't of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007).

Johnson failed to meet his burden of establishing that counsel's actions were unreasonable or that he was prejudiced by their performance. The circuit court correctly denied relief on this claim.

*Johnson*, 379 So. 3d at 1034-36; (Doc. 36-56 at 34-35.) Not surprisingly, Johnson

acknowledges this merits determination and responds with the bald assertion that

"the state court denial was contrary to and an unreasonable application of clearly

---

[61] (Doc. 36-37 at 166-67.)

established federal law and was based on an unreasonable determination of the facts in light of the evidence presented." (Doc. 37, ¶ 143.) What Johnson does not do, however, is offer any explanation of what aspects of the state court decision he alleges was contrary to (or an unreasonable application of) federal law, he does not identify the "clearly established federal law" he wishes believes should have been applied to specific aspects of the state court's adjudication, and he does not specifically allege what facts were unreasonably determined.

Johnson has failed to provide any basis for this Court to reverse or move forward with this claim under the AEDPA. For this reason, this claim should be denied.

### D. The Claim Trial Counsel Were Ineffective for Inadequately Selecting and Preparing Two Alibi Witnesses Who Testified at his Trial.

The Alabama Court of Criminal Appeals was the last state court to decide this claim adversely to Johnson. That court affirmed the denial of relief as to this claim, explaining:

> Johnson next argues that counsel was ineffective for allegedly failing to prepare the two alibi witnesses who testified at Johnson's second trial.

> Concerning this claim, the circuit court stated:

>> "After considering the testimony offered at the hearing from Johnson's trial attorneys this Court does not find that said trial attorneys were ineffective in the preparation of the alibi witnesses or the selection of the alibi witnesses. Said trial

> attorneys appeared to have done a very good job in preparing for and presenting a defense to the state's claims. Johnson has failed to meet his burden of proof pursuant to *Strickland v. Washington*, 466 U.S. 668, [104 S.Ct. 2052, 80 L.Ed.2d 674] (1984)."

(Return to remand, C. 915.)[62]

The record shows that neither Mathis nor Bender were asked any questions concerning their preparation of the two alibi witnesses who testified at Johnson's second trial.

> > "When the record is silent as to counsel's reasons for his conduct, finding counsel ineffective would call for speculation by the appellate court. *See Gamble v. State*, 916 S.W.2d 92, 93 (Tex. App. – Houston [1st Dist.] 1996) (citing *Jackson v. State*, 877 S.W.2d [768] at 771 [(Tex. Crim. App. 1994)]). An appellate court will not speculate about the reasons underlying defense counsel's decisions."

> *Stults v. State*, 23 S.W.3d 198, 208 (Tex. App. 2000). *See also Rylander v. State*, 101 S.W.3d 107, 110–11 (Tex. Crim. App. 2003).

> Johnson failed to meet his burden of proof in regard to this claim; thus, relief was correctly denied.

*Johnson*, 379 So. 3d at 1036 (Doc. 36-56 at 36.) Johnson acknowledges this merits determination and responds with the bald assertion that "the state court denial was contrary to and an unreasonable application of clearly established federal law and was based on an unreasonable determination of the facts in light of the evidence presented." (Doc. 37, ¶ 154.) What Johnson does not do, however, is offer any explanation of what aspects of the state court decision he alleges was contrary to (or

---

[62] (Doc. 36-27 at 117.)

an unreasonable application of) federal law, he does not identify the "clearly established federal law" he believes should have been applied to specific aspects of the state court's adjudication, and he does not specifically allege what facts were unreasonably determined. For example, Johnson does not explain how it was unreasonable for the state court to determine that he had failed to carry his burden of proof when he failed to ask his trial counsel any questions about their decisions regarding either of these witnesses. For his part, Johnson does not cite to any "clearly established federal law" pertaining to counsel's duty to "prepare" witnesses to testify.

Johnson has failed to provide any basis for this Court to reverse or move forward with this claim under the AEDPA. For this reason, this claim should be denied.

### E.    The Allegation Trial Counsel Were Ineffective for Presenting Testimony that Directly Contradicted the Defense Theory.

The Alabama Court of Criminal Appeals was the last state court to decide this claim adversely to Johnson. That court affirmed the denial of relief as to this claim, explaining:

> Johnson next argues that his trial counsel was ineffective for presenting inconsistent and mutually exclusive defenses. At Johnson's second trial, counsel presented two alibi witnesses and the testimony of Yolanda Chambers. The alibi witnesses testified that they saw Johnson at a nightclub on the night of the murder. Chambers testified that she was with Johnson and Ford on the night of the murder and that Ford shot Deputy Hardy.

71

The circuit court made the following findings of fact on this claim:

> "Testimony presented at the hearing on the Rule 32 petition reflect that trial counsel was aware of the inconsistency of the theories of defense that were presented but strategically chose to do so. Trial counsel wanted to show that Johnson became a suspect because of the statements from Ms. Chambers and that she had offered many inconsistent statements. Trial counsel apparently sought to establish that the more reasonable explanation was that Johnson was at Tee's Place [a nightclub] and could not have killed Deputy Hardy."

(Return to remand, C. 915.)[63]

The Iowa Supreme Court in addressing the presentation of mutually exclusive defenses as it relates to a claim of ineffective assistance of counsel has stated:

> "The general rule is that a criminal defendant may present diverse theories of defense, even those as 'inconsistent' as insanity and alibi. *See* 22 C.J.S. CRIMINAL LAW § 54, at 192–93 (1961) ('[T]he fact that one defense is on the theory that accused did not commit the offense, as where he relies on alibi, does not deprive him of the right to avail himself of other defenses, although based on the theory of justification or excuse.'); *see also* 21 Am. Jur. 2d CRIMINAL LAW § 183, at 337–38 (1981) ('It is the right of an accused to utilize any and all defenses in his behalf, and to present as many defenses as he has or thinks he has.').

> "We have given at least tacit approval of the concept of inconsistent defenses in passing on a claim of ineffective assistance of counsel."

*State v. Broughton*, 425 N.W.2d 48, 50 (Iowa 1988).

---

[63] (Doc. 36-27 at 117.)

> "After a certain course has proven unsuccessful, it is easy to say some other one should have been tried instead. This is unfair to counsel, who must make a choice between existing alternatives before the fact. We have refused to assume the role of Monday morning quarterback in condemning counsel's judgment in choosing between what are frequently equally hazardous options available to him."

*State v. Newman*, 326 N.W.2d 788, 795 (Iowa 1982). *See also State v. Dickert*, 268 P.3d 515, 520 (N.M. Ct. App.2011) ("As a general rule, 'inconsistent defenses may be interposed in a criminal case.' 21 Am. Jur. 2d CRIMINAL LAW § 183 (2008). '[A] defendant may raise the alternative defenses of intoxication and noninvolvement in the offense....' "); *State v. Westmoreland*, [] 744 N.W.2d 919, 925 (Wisc. App. 2007) ("[I]t is not uncommon for lawyers to argue inconsistent defenses."); *People v. Elliott*, 8 Misc.3d 1020(A), 803 N.Y.S.2d 20 (2005) (not reported) ("While inconsistent defenses are permitted in New York and may constitute effective assistance of counsel, it is reasonable for a defense counsel to refuse to submit to a trier of fact inconsistent defenses."); *Gluzman v. United States*, 124 F. Supp. 2d 171, 174 (S.D.N.Y. 2000) ("Among the 'virtually unchallengeable' tactical decisions left to the judgment of trial counsel are determinations regarding the defense strategy adopted at trial."); *Brown v. Dixon*, 891 F.2d 490, 495 (4th Cir. 1989) ("Filtering from our analysis the 'distorting effects of hindsight' and recognizing the 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' we agree that the use of inconsistent defenses was objectively reasonable 'under prevailing professional norms.' "); *Hunt v. Nuth*, 57 F.3d 1327, 1332 n.2 (4th Cir. 1995) ("This Court has held ... that the presentation of inconsistent defenses does not necessarily constitute ineffective assistance.").

Bender represented Johnson in one trial that ended in a mistrial after the jury was deadlocked. Counsel made a strategic decision to present the two defenses in Johnson's second trial. Based on the facts in this case, we cannot say that counsel was ineffective for presenting the two defenses. Johnson failed to meet his burden of establishing that counsel's actions were unreasonable. Thus, relief was correctly denied on this claim.

*Johnson*, 379 So. 3d at 1036-37; (Doc. 36-56 at 36-37.) Johnson's petition (again) acknowledges this as a merits determination and responds with the bald assertion that "the state court denial was contrary to and an unreasonable application of clearly established federal law and was based on an unreasonable determination of the facts in light of the evidence presented." (Doc. 37, ¶ 158.) What his petition does not do, however, is offer any explanation of what aspects of the state court decision he alleges was contrary to (or an unreasonable application of) federal law, he does not identify the "clearly established federal law" he believes should have been applied to specific aspects of the state court's adjudication, and he does not specifically allege what facts were unreasonably determined. For example, Johnson does not explain how it was unreasonable for the state court to determine that counsel performed reasonably considering that the presentation of inconsistent defenses is lawful and permitted throughout the country. For his part, Johnson does not cite to any "clearly established federal law" pertaining to this issue. In fact, this claim in his petition cites to no "clearly established federal law" for AEDPA purposes.

Johnson has failed to provide any basis for this Court to reverse or move forward with this claim under the AEDPA. For this reason, this claim should be denied.

**F.     The Allegation Trial Counsel Were Ineffective for Failing to Object to the State's Use of Different Prosecution Theories at his Trial and the Trial of his Codefendant.**

The Alabama Court of Criminal Appeals was the last state court to decide this

claim adversely to Johnson. That court noted:

> Johnson argues that his counsel was ineffective because, he says, counsel failed to object to the State's presentation of inconsistent theories in Johnson's trials and the trials of his codefendant Ford. At Johnson's trials, the State's theory was that Johnson shot Deputy Hardy. At Ford's trials the State presented evidence that Ford shot Deputy Hardy and that Johnson was present when Deputy Hardy was shot.
>
> Johnson argued in his third amended petition that his trial counsel was ineffective because
>
>> "[c]ounsel did attempt to argue to the jury that the State was relying on inconsistent theories of prosecution in its cases against Mr. Johnson and Mr. Ford, R. 947–49,[64] but unreasonably failed to present any evidence of the inconsistent prosecution theories (to the extent it existed at the time), such as transcripts and pleadings from previous trials, and unreasonably failed to file a motion to dismiss the case on that ground. Had counsel raised this claim, there is a reasonable probability that the result of the proceedings would have been different, because the State would have been precluded from proceeding on inconsistent theories."
>
> (C. 1328.)[65]
>
> This Court has taken judicial notice of the record of Johnson's direct appeal. *See Nettles v. State*, 731 So. 2d 626, 629 (Ala. Crim. App. 1998). Counsel did move for a transcript of the trials of Johnson's codefendants, Omar Berry and Ardragus Ford. A notation on the front of this motion states that the motion was granted as to the witnesses

---

[64] (Doc. 36-5 at 125-27.)
[65] (Doc. 36-18 at 130.)

who were to be identified by Johnson's counsel. (Trial record, C. 60.)[66] Also, Mathis testified that he was present at Ford's trial for 1 or 2 days.

In its order denying relief, the circuit court noted that this claim had been addressed on direct appeal and that it had no merit. The circuit court stated:

> "[E]ven if the prosecution argued different theories concerning the killing of Deputy [William] Hardy, such theories do not amount to a violation of due process. 'Given the uncertainty of the evidence, it was proper for the prosecutors in the other co-defendant's cases to argue alternate theories as to the facts of the murder. The issue of whether the particular defendant on trial physically committed the murder was an appropriate question for each of the co-defendants' juries.' *Parker v. Singletary*, 974 F.2d 1562[ , 1578 (11th Cir. 1992)]."

(Return to remand, C. 911.)[67]

Many courts have recognized that the government may argue inconsistent theories in cases involving multiple defendants. In addressing this issue, federal courts have upheld the State's presentation of inconsistent evidence in codefendants' trials. The United States Court of Appeals for the Fifth Circuit has stated:

> "[The defendant] argues that his constitutional due process rights were violated when the government presented inconsistent theories at two criminal trials—namely, at Cooper's [codefendants'] trial the government argued that Cooper shot Marshall, and at [the defendant's] trial, the government argued that [the defendant] shot Marshall. We have held, though, 'a prosecutor can make inconsistent arguments at the separate trials of codefendants without violating the due process clause.' *Beathard v. Johnson*, 177 F.3d 340, 348 (5th Cir. 1999); *see also Nichols v. Scott*, 69 F.3d 1255, 1272 (5th Cir. 1995) ('Two things, however, may be said about the rather amorphous doctrine of judicial estoppel. First, there is no

---

[66] (Doc. 36 at 64.)
[67] (Doc. 36-27 at 113.)

indication in the authorities that it is constitutionally mandated. Second, it has apparently never been applied against the government in a criminal case.'). In any event, the inconsistencies were immaterial to the conviction since [the defendant] could have been convicted for the same offense, carjacking resulting in death and aiding and abetting the same, under both theories. *See United States v. Paul*, 217 F.3d 989, 998–99 (8th Cir. 2000) ('When it cannot be determined which of two codefendants' guns caused a fatal wound and either defendant could have been convicted under either theory, the prosecution's argument at both trials that the defendant on trial pulled the trigger is not factually inconsistent.'); *cf. Bradshaw v. Stumpf*, 545 U.S. 175, 187 [] (2005) (upholding a guilty plea where the defendant's assertions of inconsistency related entirely to which individual shot the victim but where 'the precise identity of the triggerman was immaterial to [defendant]'s conviction for aggravated murder.')."

*United States v. Frye*, 489 F.3d 201, 214 (5th Cir. 2007).

"Courts presented with situations where there are genuine evidentiary disputes as to who was responsible for a crime among various defendants have shown greater willingness to permit a prosecutor to argue inconsistent theories in separate trials. *See Beathard v. Johnson*, 177 F.3d 340, 348 (5th Cir. 1999) ('The record does not support such a claim. Price had two live eyewitnesses to the crime, both charged with capital murder and both accusing the other of being the most culpable.... Price, as well as every juror involved, knew that both of the stories could not have been true.'); *Parker v. Singletary*, 974 F.2d 1562, 1578 (11th Cir. 1992) ('But no due process violation occurred, because there was no necessary contradiction between the state's positions in the trials of the three co-defendants. Given the uncertainty of the evidence, it was proper for the prosecutors in the other co-defendants' cases to argue alternate theories as to the facts of the murder.')"

*United States v. Ganadonegro*, 854 F. Supp. 2d 1088, 1098 (D.N.M. 2012).

Other state courts addressing this issue have reached the same conclusion.

> "[W]e are in accord with the courts that hold that a due process violation will only be found when the demonstrated inconsistency exists at the core of the State's case. Discrepancies based on rational inferences from ambiguous evidence will not support a due process violation provided the two theories are supported by consistent underlying facts. We recognize that the evidence presented at multiple trials is going to change to an extent based on relevancy to the particular defendant and other practical matters. The underlying core facts, however, should not change. The few courts that have found due process violations did so in cases where the inconsistencies were inherent to the State's whole theory of the case or where the varying material facts were irreconcilable. It is this type of inconsistency that renders the conviction fundamentally unfair, thus violating due process."

*Sifrit v. State*, [] 857 A.2d 65, 82 (2004).

> "Courts have ... found no due process violation stemming from inconsistent arguments as to who was the killer in the relatively common circumstance where each defendant can be held equally guilty as an aider and abettor upon the same inconclusive evidence."

*State v. Poe*, [] 822 N.W.2d 831, 845 (2012).

There is no due-process violation when the State argues at one trial that one codefendant shot the victim and at the codefendant's trial argues that that codefendant shot the victim.

> "When it cannot be determined which of two defendants' guns caused a fatal <u>wound</u> and either defendant could have been convicted under either theory, the prosecutor's argument at both trials that the defendant on trial pulled the trigger is not factually inconsistent. Thus, because there was evidence that supported both theories, and since [the defendant] could have been

convicted of aiding and abetting under either theory, we find no error."

*United States v. Paul*, 217 F.3d 989, 998–99 (8th Cir. 2000).

Thus, because there is no merit to the legal theory underlying this claim of ineffective assistance, the claim was properly dismissed. *See, e.g.*, *Lee v. State*, 44 So.3d 1145, 1173 (Ala. Crim. App. 2009) (counsel cannot be ineffective for failing to raise a claim that has no merit).

*Johnson*, 379 So. 3d at 1031-34 (Doc. 36-56 at 33-34.) Johnson's petition contains the boilerplate assertions that the state court's denial of this claim on the merits "was contrary to, and an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts in light of the evidence presented" (Doc. 37, ¶ 165), but this claim in the petition does not cite to a single prior decision of the Supreme Court.

In other words, Johnson has not identified any prior decision of the Supreme Court that he contends was decided differently with facts materially indistinguishable from those of his case. *See Williams*, 529 U.S. at 405. And while Johnson's petition repeats the allegations that he asserted in state court, he has offered no explanation as to why the Alabama Court of Criminal Appeals' factual determinations were unreasonable. Johnson's failures are noteworthy, considering the ample legal precedent the state court cited for the proposition that there was nothing objectionable about the State's conduct. *See Brownlee v. Haley*, 306 F.3d 1043, 1066 (11th Cir. 2002) ("Counsel was not ineffective for failing to raise these

issues because they clearly lack merit."). For these reasons, Johnson's petition fails

to establish that he is entitled to relief under the AEDPA as to this claim.

**G.    The Allegation Trial Counsel Were Ineffective for Failing to Call John Renfro as a Witness.**

Petitioner raised this claim in his state court postconviction petition. The state

trial court dismissed this claim pursuant to Rule 32.6(b) of the Alabama Rules of

Criminal Procedure, writing:

> Petitioner avers specifically that trial counsel was ineffective "during the guilt phase of the trial" by unreasonably failing to call John Renfro as a witness. In Claim II Paragraph 113(9) of Petitioner's original Petition for Post Conviction Relief, he attests that the police audio-taped an interview with a taxi driver named John Russell Renfro who told the authorities that he was parked in the Crown Sterling Suites parking lot when he heard gunshots, then saw a white 1968 or 1969 Chevrolet Malibu speeding out of the parking lot with its lights off. Petitioner further attests that the prosecution never made this information or Mr. Russell's statement available to him prior to trial. Now Petitioner is alleging that trial counsel was ineffective for failing to call a witness of which, he previously alleged, they had no knowledge. Petitioner cannot have it both ways; his allegations are inconsistent and contradictory. Petitioner also contends that trial counsel "unreasonably failed to call other witnesses who saw cars leaving the scene of the murder that looked nothing like the car Petitioner was in." However, he fails to identify what other witnesses should have been called, and how their additional testimony would have benefited him. Petitioner's claim are not sufficiently specific pursuant to Rule 32.6(b), Alabama Rules of Criminal Procedure; and he has failed pursuant to *Strickland v. Washington*, *supra*, to prove ineffective assistance of counsel by virtue of this claim.

(Doc. 36-19 at 98-99.) Johnson appealed the dismissal of this claim, and the Alabama Court of Criminal Appeals affirmed finding that it was "properly dismissed by the trial court." *Johnson*, 379 So. 3d at 1015; (Doc. 36-56 at 20.)

Although the State courts applied Rule 32.6(b) of the Alabama Rules of Criminal Procedure, a state procedural bar, because that procedural bar focuses on the sufficiency of a pleading federal courts treat it as a ruling on the merits, subject to review under AEDPA deference. *See Borden v. Allen*, 646 F.3d 785, 808 (11th Cir. 2011). Thus, this Court must review the state court decision "focusing in on the factors for determining whether the [state court] petition presented a case sufficient to warrant relief under *Strickland v. Washington." Id.* at 813. The Court must do so in the light of the state court requirement that the "petition must contain a *clear and specific statement* of the grounds upon which relief is sought, *including full disclosure of the factual basis of those grounds*. A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings." ALA. R. CRIM. P. 32.6(b) (emphasis added).

Johnson's petition repeats its now-familiar boilerplate assertion that the state court's denial of this claim on the merits "was contrary to, and an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts in light of the evidence presented." (Doc. 37, ¶ 169.) Not

surprisingly, however, the petition cites to no "clearly established federal law" to support its bald accusation. As noted by the trial court, Johnson's state petition took the position that information about Renfro's statement had been suppressed by the State. There are no additional facts pleaded in the petition to explain why no reasonable lawyer would have failed to uncover Renfro's identity and value as a witness, in the light of Johnson's competing *Brady* claim. As such, the state court finding that this claim was insufficiently specific is not contrary to *Strickland*.

For these reasons, Johnson's petition fails to establish that he is entitled to relief under the AEDPA as to this claim.

### H.   The Allegation Trial Counsel Were Ineffective for Failing to Object When the State Allegedly Presented Testimony and Argued Facts it Knew to be False.

Johnson asserted this claim as Claim XIX(F)(16) in his state postconviction petition. (Doc. 36-18 at 154-55.) The state postconviction trial court denied the claim, writing:

> Petitioner avers specifically that trial counsel was ineffective "during the guilt phase of the trial" by failing to object and move for dismissal on due process grounds when the State presented testimony, and argued facts to the jury, that it knew to be false. This Court previously addressed Petitioner's allegation (raised in Claim V of his original Rule 32 Petition) that his "Constitutional rights were violated when the State knowingly presented false testimony against him" in Provision (23) of this Order, wherein this Court found specifically that Petitioner's claims are not meritorious, and are nothing more than a reiteration of prior complaints. This Court further found that said claims are precluded pursuant to Rules 32.2(a)(3) and 32.2(a)(5), Alabama Rules of Criminal Procedure. Petitioner now attacks trial counsel's failure to object to the State's presentation of purported "false" facts. Firstly, this Court would

point out the "Effectiveness of counsel does not lend itself to measurement by picking through the transcript and counting the places where objections might be made." *Stringfellow v. State*, 485 So. 2d 1238, 1243 (Ala. Crim. App. 1986). Simply because trial counsel did not make an objection at every possible instance does not automatically mean that Petitioner did not receive an adequate defense in the context of the constitutional right to counsel. *See Ex Parte Lawley*, 512 So. 2d 1370, 1373 (Ala. 1987). Secondly it is noted that "trial counsel are not obliged to object without regards to the merits of the objection." *See Palmes v. Wainwright*, 725 F.2d 1511, 1523 (11th Cir. 1984) []. Lastly, this Court finds that Petitioner has not only failed to show that trial counsel's performance was deficient, but he has also failed to show how the outcome of his trial would have been any different in the event trial counsel had objected to the presentation of the State's purported "false" facts. *See Strickland v. Washington*, 466 U.S. 668 [] (1984). Petitioner has failed to meet the required burden of proof relative to this claim.

(Doc. 36-19 at 99.) On appeal, the Alabama Court of Criminal Appeals affirmed, agreeing with the state trial court's application of Rule 32.6(b). *Johnson*, 379 So. 3d at 1016; (Doc. 36-56 at 20.)

Although the State courts applied Rule 32.6(b) of the Alabama Rules of Criminal Procedure, a state procedural bar, because that procedural bar focuses on the sufficiency of a pleading federal courts treat it as a ruling on the merits, subject to review under AEDPA deference. *See Borden*, 646 F.3d at 808. Thus, this Court must review the state court decision "focusing in on the factors for determining whether the [state court] petition presented a case sufficient to warrant relief under *Strickland v. Washington." Id.* at 813. The Court must do so in the light of the state court requirement that the "petition must contain a *clear and specific statement* of the grounds upon which relief is sought, *including full disclosure of the factual basis*

*of those grounds*. A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings." ALA. R. CRIM. P. 32.6(b) (emphasis added).

Johnson's petition contains the familiar accusation that this adjudication of his claim "was contrary to, and an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts in light of the evidence presented." (Doc. 37, ¶ 171.) Although Johnson cites to *Napue v. Illinois*, 360 U.S. 264 (1959), in support of this claim, he does not cite to any part of this claim, as presented to the state courts, where he sufficiently pleaded facts to show that the State *knowingly* presented false evidence.

As to his claim that Valerie Ellison's testimony was false—a claim that is inextricably intertwined with the *Brady* claim addressed in Part II of this answer— no evidence was presented that Ellison knew about any reward until many years after Johnson's trial. As to Johnson's claim about the Be-On-The-Lookout ("BOLO") testimony, the evidence at trial was that multiple BOLOs were issued for multiple vehicles on the evening of the murder, *Johnson*, 379 So. 3d at 1005-06 (Doc. 36-56 at 12), meaning that the testimony in question was merely that the vehicle at the Super 8 motel was merely consistent with one of the vehicles law enforcement was looking for. As for the claim that it was false for Officer Evans to testify that the black Monte Carlo was not searched, the evidence showed that Evans did not search

the vehicle on July 19, 1995, the date he responded to the Super 8. *Johnson*, 379 So. 3d at 1006 (Doc. 36-56 at 13.) Johnson's own state court petition admitted that the vehicle was not searched until July 26, *nearly one week* after Evans' involvement in the case. (Doc. 36-17 at 189.) Also, the car was searched by a deputy with the Jefferson County Sheriff's Department, not by Officer Evans (who was employed by the Homewood Police Department). (*Id.*) The state court determination that Johnson had failed to plead sufficient *specific* facts to show a violation of *Napue*, in turn sufficient to potentially warrant a finding of deficient performance for purposes of *Strickland*, was not unreasonable.

For these reasons, Johnson's petition fails to establish that he is entitled to relief under the AEDPA as to this claim.

### I.   The Allegation Trial Counsel Were Ineffective for Failing to Move to Prohibit the Jury from Considering an Aggravating Circumstance.

Johnson asserted this claim as Claim XIX(F)(18) in his state postconviction petition. (Doc. 36-18 at 155.) Importantly, that claim was asserted in support of Johnson's claim that his counsel were ineffective in the guilt phase of trial. (Doc. 36-18 at 136; *compare id.* at 161.) The entirety of Johnson's claim was

> Counsel unreasonably failed to move to prohibit the jury from considering an aggravating circumstance of which no evidence was presented during trial. See Claim XIII, which are incorporated by reference herein. Counsel's failure prejudiced Mr. Johnson. Had counsel moved to prohibit the jury from considering the aggravating circumstance for which there was no evidence, the motion would have

85

been granted and there is a reasonable probability that the result of the trial would have been different.

(Doc. 36-18 at 155.) The state postconviction trial court denied the claim, writing:

> Petitioner avers specifically that trial counsel was ineffective "during the guilt phase of the trial" by unreasonably failing to move to prohibit the jury from considering an aggravating circumstance for which no evidence was presented at trial. This Court previously addressed Petitioner's allegation (raised in Claim XIII of his original Rule 32 Petition) that "the jury was improperly permitted to consider an aggravating circumstance of which no evidence was presented at trial" in Provision (31) of this Order, wherein this Court found specifically that Petitioner's claims are not meritorious. Additionally, the said claims are precluded pursuant to Rules 32.2(a)(3) and 32.2(a)(5), Alabama Rules of Criminal Procedure. Furthermore, the Court found specifically [in Provision (31) of this Order] that there was more than ample evidence presented to support the fact that Deputy William Hardy was "on duty" at the time of his murder. In support of this finding the Court relied on *Whitely v. Food Giant, Inc.*, 721 So. 2d 207 (Ala. Civ. App. 1998), *Dinmark v. Farrior*, 510 So. 2d 819, 821 (Ala. 1987), *Ex parte Kennedy*, 486 So. 2d 493, 495 (Ala. 1986), *Driskill v. State*, 376 So. 2d 678, 679 (Ala. 1979), and *Hutto v. State*, [] 304 So. 2d 29, 33 (Ala. Crim. App. [1974]). Since consideration, by the jury, of the aggravating circumstance about which Petitioner now complains was appropriate, his ineffective assistance of trial counsel claim also fails. Trial counsel is not ineffective for failing to raise an objection which has no merit. *See Palmes v. Wainwright*, 725 F.2d 1511, 1523 (11th Cir [1984]).

(Doc. 36-19 at 100-01.) Johnson appealed the denial of this claim, which was affirmed by the Alabama Court of Criminal Appeals, which found that it was insufficiently pleaded. *Johnson*, 379 So. 3d at 1015-16; (Doc. 36-56 at 20.)

Although the State courts applied Rule 32.6(b) of the Alabama Rules of Criminal Procedure, a state procedural bar, because that procedural bar focuses on

the sufficiency of a pleading federal courts treat it as a ruling on the merits, subject to review under AEDPA deference. *See Borden*, 646 F.3d at 808. Thus, this Court must review the state court decision "focusing in on the factors for determining whether the [state court] petition presented a case sufficient to warrant relief under *Strickland v. Washington." Id.* at 813. The Court must do so in the light of the state court requirement that the "petition must contain a *clear and specific statement* of the grounds upon which relief is sought, *including full disclosure of the factual basis of those grounds*. A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings." ALA. R. CRIM. P. 32.6(b) (emphasis added).

Johnson's petition contains the familiar accusation that this adjudication of his claim "was contrary to, and an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts in light of the evidence presented." (Doc. 37, ¶ 178.) Johnson's petition does not cite to any "clearly established federal law" in support of his claim that the state court adjudication is not entitled to AEDPA deference or review. Furthermore, Johnson's entire claim was predicated on another claim (Claim XIII) which was denied and which is not being challenged in this proceeding. Because there was no underlying merit to that claim, Johnson's counsel could not have been ineffective for failing to object, as noted by the trial court.

For these reasons, Johnson's petition fails to establish that he is entitled to relief under the AEDPA as to this claim.

**J.      The Allegation Trial Counsel Were Ineffective for Failing to Present Evidence that the Car Johnson was in on the Night of the Murder was Searched by Police, who Found Nothing.**

Johnson asserted this claim as Claim XIX(F)(20) in his state postconviction petition. (Doc. 36-18 at 156.) The state trial court denied relief, based on the fact that it had denied the underlying substantive claim (Claim IV),[68] and pursuant to Rule 32.6(b) because Johnson failed to plead what evidence should have been introduced to rebut Officer Evans' testimony or to plead how such evidence would have affected the outcome of his trial. (Doc. 36-19 at 101.) Johnson appealed this denial of relief and the Alabama Court of Criminal Appeals affirmed, agreeing that the claim was insufficiently specific. *Johnson*, 379 So. 3d at 1016; (Doc. 36-56 at 20.)

Although the State courts applied Rule 32.6(b) of the Alabama Rules of Criminal Procedure, a state procedural bar, because that procedural bar focuses on the sufficiency of a pleading federal courts treat it as a ruling on the merits, subject to review under AEDPA deference. *See Borden*, 646 F.3d at 808. Thus, this Court must review the state court decision "focusing in on the factors for determining whether the [state court] petition presented a case sufficient to warrant relief under *Strickland v. Washington.*" *Id.* at 813. The Court must do so in the light of the state

---

[68] *See* (Doc. 36-19 at 61-63), for the state trial court's adjudication of that claim.

court requirement that the "petition must contain a *clear and specific statement* of the grounds upon which relief is sought, *including full disclosure of the factual basis of those grounds.* A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings." ALA. R. CRIM. P. 32.6(b) (emphasis added).

Johnson's petition contains the familiar accusation that this adjudication of his claim "was contrary to, and an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts in light of the evidence presented." (Doc. 37, ¶ 181.) Johnson's petition does not cite to any "clearly established federal law" in support of his claim that the state court adjudication is not entitled to AEDPA deference or review. Furthermore, Johnson's entire claim was predicated on another claim (Claim IV) which was denied by the state courts, supporting a finding that counsel were not ineffective (i.e., because there was no underlying merit to the substantive claim, Johnson's counsel could not have been ineffective for failing to object). Additionally, as to Officer Evans' testimony, the state court findings of fact are presumed correct; that is, on the night that Evans responded to the Super 8 motel a "taxi was called for Ford, Henderson, and Chambers because none of them could produce a driver's license, but the vehicle was not searched or towed; it remained in the motel parking lot." *Johnson*, 379 So. 3d at 1006; (Doc. 36-56 at 13.) *See also* 28 U.S.C. § 2254(e) (establishing

presumption of correctness of state court factual determinations); *McNair*, 416 F.3d at 1297. The best that Johnson could plead is that the vehicle was searched one week later. (Doc. 36-17 at 189.) Johnson's petition fails to establish how the fact that an unsecured car was searched one week after Johnson's encounter with Officer Evans would have altered the outcome of his trial.

For these reasons, Johnson's petition fails to establish that he is entitled to relief under the AEDPA as to this claim.

### K.   The Claim Trial Counsel Were Ineffective for Failing to Question Ellison About the Reward Offer.

Johnson asserted this claim as Claim XIX(F)(8) in his state postconviction petition. (Doc. 36-18 at 148-49.) The state trial court denied relief, and Johnson appealed. On appeal, the Alabama Court of Criminal Appeals affirmed, observing:

> Johnson argues that his trial attorneys were ineffective for failing to establish how widely publicized the reward offer was and whether Violet Ellison was aware of the reward.
>
> The circuit court made the following findings on this claim:
>
>> "There was no evidence presented that the reward motivated Ms. Ellison to call the police or that it affected her testimony in any way. There certainly was no showing that Johnson was prejudiced in failing to cross-examine Ms. Ellison about any potential reward. Johnson's claim is without merit and he has failed to meet the required burden of proof relative to this claim."
>
> (Return to remand, C. 916.)[69]

---

[69] (Doc. 36-27 at 118.)

Bender testified that he had no reason to question Ellison about the reward because he had no information that she was aware of, or that she had inquired about, the reward. Bender said:

> "There was nothing to indicate to me that [Ellison] was connected, associated with, looking for, going to receive a reward in any way; so there was no reason for me to pry into this lady's financial affairs. There just wasn't."

(Return to remand, Suppl. R. 258.)[70] At the postconviction hearing, Johnson presented no evidence indicating that Ellison knew about the reward, that she attempted to get the reward, or that she received any reward for her testimony at Johnson's trial. We agree with the circuit court that Johnson failed to satisfy the *Strickland* test in regard to this claim.

*Johnson*, 379 So. 3d at 1037-38; (Doc. 36-56 at 37.) Johnson's petition again asserts, without argument or explanation, that this adjudication of his claim "was contrary to, and an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts in light of the evidence presented." (Doc. 37, ¶ 184.)

Johnson's claim cites to *no* "clearly established federal law" as determined by the Supreme Court. Johnson fails to even acknowledge Ellison's testimony that she did not learn about the existence of the reward until she was contacted by District Attorney Barber *years* after Johnson's trial. Johnson does not point to the state court record to show that the resolution of his claim was based on an unreasonable

---

[70] (Doc. 36-37 at 142.) The wisdom of counsel's view is borne out in Ellison's testimony at the postconviction evidentiary hearing.

determination of the facts. In short, Johnson has not shown that he is entitled to relief, or further proceedings, under the AEDPA. For this reason, this claim should be denied.

**L.    The Claim Trial Counsel Were Ineffective During the Penalty Phase for Failing to Present Available, Compelling Mitigating Evidence.**

The Alabama Court of Criminal Appeals was the last state court to adjudicate this claim. That court affirmed the denial of relief, writing:

> Johnson next argues that the circuit court erred in denying his claim that his trial counsel were ineffective for failing to conduct further investigation and to present more mitigation evidence at the penalty phase of his capital-murder trial.
>
> We quote extensively from the circuit court's findings of fact on this claim:
>
> > "In addition to Mr. [Darryl] Bender and Mr. [Erskine] Mathis, Johnson called 11 witnesses at the [postconviction] evidentiary hearing.... Johnson's first witness on the mitigation issue on remand was his paternal uncle, Elmer Johnson. Elmer testified that he and Johnson's father, Ron Sr., and their other siblings grew up in poverty. There were times that they did not have enough food. Their father was a miner and also made moonshine. Their father was also physically abusive toward the children and sometimes would take the children to a shot house where he bought and drank liquor. Elmer said his father was mean when he had been drinking and that his mother and father sometimes fought. He remembers seeing bruises on his mother's face. He testified that his mother shot his father, leaving a scar on his jaw and that his parents eventually were divorced.
> >
> > "Elmer testified that Johnson's father started drinking at a young age, and was drunk everyday. Johnson's father took Johnson to a shot house and Johnson saw his father drunk often. Elmer

testified that he witnessed Ron Sr. whip Johnson and on one occasion saw Johnson's father shoot at him. He testified that he 'mostly used to whip them when he was drunk.'

"Elmer described Johnson's mother Donna Johnson's parenting as 'unconcerned,' often leaving Johnson alone with his brother, Ron Jr., whom he cared for. Elmer also testified that when Johnson's aunt, Celia Green, was reported missing that Johnson was very hurt, as she had been like a mother to him. Johnson often cried about the disappearance of 'Mom' and said he really needed her.' This witness served in the Army and had no criminal record that was presented as a part of the evidence.

"Johnson also called another paternal uncle and his father's twin brother, Donald Johnson. Donald testified about growing up with Ron Sr. and their other siblings. They grew up in a coal miner community often scavenging for coal at a dump for fuel to heat their home. His father would get drunk on the weekends and his parents would fight. According to this witness, Johnson's father observed his father swing a hammer at his mother and [break] her arm. Donald also testified about the kids being home one night when his mother shot his father in the jaw. His brother, [Johnson's] father, never graduated from high school, could not read or write, and worked on a garbage truck. Johnson stayed with this witness Donald and his wife Rosa on weekends and in the summer. Johnson had to abide by his rules and fulfill duties around the house. He would have allowed Johnson to live with his family full time, but did not want to split Johnson up from his brother. This witness has been employed all his adult life and will retire from [the University of Alabama at Birmingham] this year. He graduated from high school and no evidence was presented of a criminal record.

"Johnson's mother, Donna Johnson, testified that she got pregnant with Johnson at age 17. After she got pregnant, she and Ron Sr. married. Donna testified that Ron Sr. drank every day. She also testified that they separated because of Ron Sr.'s infidelity. At some point Donna moved with her family to the Tuxedo Housing Project, also known as the Brickyard. Donna testified that there was significant crime at the Brickyard. Donna

worked night shifts, 8 p.m. to 8 a.m. Her boyfriend, Jesse Stephens, used and sold drugs from her home.

"Donna testified that growing up, her stepfather, Drake Burks, drank heavily and treated Donna and her siblings different than his own children. According to this witness he abused her sexually. She also said that Burks would fight with Donna's mother when he drank. Donna testified that she was too young to be a mother and that Johnson's Aunt Celia 'raised my baby.' She testified that she went to Mr. Bender's office to meet with him before testifying at the trial. Johnson's mother has a history of unemployment. There was no evidence of a criminal record of this witness introduced at the hearing.

"Johnson's maternal aunt, Cornell Brown, testified she and Donna were raised in a house with 14 children and they were poor. Ms. Brown also stated that Drake Burks made sexual advances toward her and Donna. After Donna became pregnant, she dropped out of high school. She also testified about Ron Sr. cheating on Donna. Ms. Brown testified that after Donna and Ron Sr. separated, Donna moved with her boys to the Brickyard. She also lived there too for part of the time. Ms. Brown stated that the Brickyard was a high crime area and she often heard guns being fired. She also testified that Donna's boyfriend, Jesse Stephens, sold and used drugs. She would help Donna and her nephews out financially.

"Ronald Johnson, Jr., Johnson's younger brother by six years, testified about growing up in Pratt City. Ron Jr. testified that his father drank daily and sometimes took him and Johnson to a shot house. Ron Jr. testified that after his mother and father separated that [his mother], he, and Johnson, moved to the Brickyard. Ron Jr. saw drugs being sold in the Brickyard and also heard gunshots. Jesse smoked crack in the house with him and Johnson and was violent toward his mother Donna. Ron Jr. also testified that friends of his and Johnson's were victims of homicide. Ron Jr. also gave testimony of how the disappearance of their Aunt Celia Green had hurt Johnson. The witness is on probation for selling drugs.

"Vicky Thomas, Johnson's cousin, testified that she and Johnson were close growing up. She attended college on a full scholarship and has her own tax office. She has been employed for 17 years with AT&T. She had also witnessed Johnson's father drunk. She testified that Johnson would come over and stay at her house on the weekends, and no one ever 'came after him.' He followed the rules of her household. Ms. Thomas expressed her opinion about the Brickyard and stated that Johnson had lost friends to homicide. She was away at college during the trial. This witness has no criminal record.

"Latrice Taylor, a friend and former neighbor from the Brickyard, testified that Donna was 'treated bad' by Jesse Stephens. She also testified that Donna sometimes left Johnson and Ron Jr. with Jesse and that Johnson took care of his brother alone. Ms. Taylor said there was a lot of crime and violence at the Brickyard. She said that she and Johnson witnessed a man killed near their homes, and that Johnson had been shot himself. The witness graduated from high school and is on disability. No criminal record of this witness was introduced at the hearing.

"Johnson called his cousin Antonio Green. Mr. Green testified about his observations of Ron Sr.'s drinking. Mr. Green also testified that he had seen Ron Sr. verbally and physically abuse Johnson as well as Donna. He heard Johnson's father call Johnson worthless and said he wished he (Johnson) had never been born. Mr. Green stated that his mother, Celia, and Johnson had a mother-son type relationship. Celia disappeared on October 12, 1990, when Johnson was 16 or 17 years old. According to Mr. Green, Johnson showed a lot of grief when Celia disappeared and he did not see as much of him thereafter. He testified that after his mother Celia's disappearance he would see Johnson drunk and that he smoked marijuana. This witness graduated from high school and has been employed for over 16 years at the railroad. He testified in the second trial in the penalty phase. This witness had no criminal record introduced at the hearing.

"Johnson presented Ms. Lori James–Townes, a licensed clinical social worker, currently working in the Maryland Public

Defender's office. Ms. James–Townes listened to the testimony of witnesses and expressed her opinions as to certain 'risk' factors she found present in Johnson's background. The risk factors she testified to included a history of family violence, alcohol and drug usage, poverty, community violence, school failure, unresolved grief due to the loss of his Aunt Celia, dysfunctional family, and abandonment issues. According to Ms. James–Townes, these factors adversely affected Johnson's development, and he was susceptible to repeating behavior or being damaged in all areas of risk. She testified that 'love' in Johnson's family did not buffer or remove him from the risks his family suffered. In Johnson's case the risks outweighed the love in the family and for Johnson, and created a dysfunctional family.

"....

"Mr. Bender testified that at the time of Johnson's second trial he had handled 6 or 7 capital murder cases. Mr. Bender assumed the primary responsibility for the investigation and development of the mitigation in this case although Mr. Mathis presented the evidence at the sentencing. Mr. Mathis has very little memory of his participation in working on mitigation in this case. Mr. Bender's testimony, as well as his time sheets, clearly establish that he investigated numerous aspects of Johnson's background for potential mitigation evidence. Mr. Bender contacted numerous members of Johnson's family, neighbors, and friends as well as staff members at Jefferson County Youth Detention Center to learn about Johnson's behavior and attitude while he was incarcerated. He also contacted pastors and members of Johnson's church, St. John's Baptist Church of Pratt City. Mr. Bender testified he grew up in the Pratt City area himself. Mr. Bender investigated aspects of Johnson's school background as well as had a number of meetings with Johnson's mother, Donna. He also consulted with defense attorney Joe Morgan for ideas on mitigation. Mr. Bender's time sheets establish that he spent a minimum of 98.8 hours investigating potential mitigation. Mr. Bender testified that the time list was not reflective of all the time he spent preparing for the mitigation presentation in this case. He testified that the way he prepared for a capital case he would have presented all the mitigation at the penalty phase in front of the

jury, not holding anything back to present to Judge [Alfred] Bahakel. Therefore, all the evidence he had developed for mitigation purposes was presented at trial and was heard by Judge Bahakel.

"....

"... While this Court finds the lay and the expert mitigation witnesses called at the evidentiary hearing credible and their testimony compelling, given the findings of the jury and the trial judge of the two aggravating circumstances, this Court finds that such evidence would have had minimal, if any, additional mitigation value in the judge's weighing process. It is apparent to this Court, given the facts of this case, that the murder of Deputy Hardy cannot be explained or mitigated based upon the risk factors testified to by Johnson's mitigation expert that had affected Johnson's development. This murder was not the culmination of Johnson having been subjected to physical abuse, poor parenting, poverty, alcohol or drug abuse or any combination of any of these events or conditions in his childhood or adolescence. Except for a drug case, [Johnson] had not had any other contact with law enforcement and had never gotten into trouble, according to his mother's testimony at the sentencing hearing at the penalty phase of the trial. She testified that he had never hurt anyone. He was described by Tony Green as a well mannered and decent person growing up, 'the good guy all around.' There was certainly no evidence presented to the jury or judge that [Johnson] had ever been violent, or suffered in any way from violence against him in childhood. The deputy in uniform in this case was shot twice in the forehead at close range according to the coroner. Violet Ellison had testified at trial that Johnson said in a three-way jail conversation 'I shot the f___ in the head and saw his head go back. He shouldn't have been messing in my s___.' Even if the judge had heard all the mitigation evidence presented at the evidentiary hearing and had considered it in total to be a nonstatutory mitigator, given the horrific, cold-blooded facts of this case, the jury's recommendation for death, and the two aggravating circumstances found by the judge, this Court finds it not 'reasonably probable' that Judge Bahakel would have weighed

the aggravating factors and mitigating factors, and come to any different result. Additionally, this Court finds that although Mr. Bender and Mr. Mathis or any lawyer in hindsight could have presented more detail and called additional witnesses such as in the evidentiary hearing, it could have posed as much harm as good. For instance, a number of Johnson's family members and friends were exposed to poverty, alcoholism, violence, and abuse during their youth and adulthood; however, they did not find themselves in the same position as Johnson and achieved jobs and education without criminal records.

".....

"At Johnson's trial the State proved beyond a reasonable doubt that two statutory aggravating circumstances existed: (1) that Johnson murdered Deputy Hardy while Johnson was under a sentence of imprisonment; and (2) that Johnson murdered Deputy Hardy to disrupt or to hinder the lawful exercise of a governmental function or the enforcement of laws. While Johnson's age at the time of the offense, 22 years, was considered by the trial court as a statutory mitigating circumstance, this court finds that it was not a strong one when weighing it against the aggravators proven by the State. Following an extensive mitigation investigation by Mr. Bender, he and Mr. Mathis strategically chose to present evidence from the witnesses they called at the penalty phase in an attempt to humanize Johnson and to rely on a plea for mercy. Additional friends and family, or even a mitigation expert, while perhaps available to testify during the second trial, would have been subject to a much more rigorous cross-examination than they were at the evidentiary, and possibly rebutted by the State....

"This Court finds that even if the evidence presented at the evidentiary hearing had been presented during the judicial sentencing hearing, it would not have altered the balance of the aggravating and mitigating circumstances and would have had no impact on the final sentence imposed. This Court finds that Johnson failed to prove by a preponderance of the evidence that Mr. Bender and Mr. Mathis were ineffective for failing to present

additional mitigation evidence via records or witness testimony related to his background at the judicial sentencing hearing."

(Return to Second Remand, Second Suppl. C. 34–47.)[71]

At the postconviction evidentiary hearing, Johnson presented the testimony of seven relatives: Johnson's mother, Donna Johnson; his brother, Ronald Johnson; three uncles, Elmer Johnson, Cornell Brown, and Donald Johnson; and two cousins, Vicky Thomas and Antonio Green.

Elmer Johnson, Johnson's paternal uncle, testified that Johnson's father frequently drank and would get angry and that Johnson's father would "whip [Johnson and his brother] ... when he was drunk." Antonio Green, Johnson's cousin, testified that Johnson's father is an alcoholic, that when he drinks in excess he would be verbally and physically abusive to Johnson. Ronald Johnson, Johnson's younger brother, testified that his father drank a lot and would frequently take him and Johnson to a shot house in the neighborhood, that when his mother and father separated he moved with his mother and Johnson to Ensley to a project called the Brickyard, that his mother's boyfriend, Jesse Stephens, moved in with them, and that Stephens drank and would become violent toward him and his mother. Johnson's other four relatives did not testify concerning any physical abuse that took place during Johnson's childhood.

Bender, at the postconviction evidentiary hearing, testified that he could not remember whether he was told by Johnson or his mother about physical abuse in the Johnson household. The following occurred:

> "[Assistant attorney general]: And concerning his background and his upbringing — ToForest's upbringing — you spoke several times to his mother, Donna; correct?

> "[Bender]: Spoke often to his mother.

---

[71] (Doc. 36-52 at 34-48.)

"[Assistant attorney general]: And to your client, ToForest; correct?

"[Bender]: Yes.

"[Assistant attorney general]: And the purpose of that for mitigation, you were trying to find out information? Whether to use it or not, you still wanted to know concerning —

"[Bender]: His history.

"[Assistant attorney general]: — how the family unit and how the upbringing occurred; right?

"[Bender]: Correct.

"[Assistant attorney general]: Were you told that there was domestic violence in the family?

"[Bender]: I don't remember that. It could have been, but I don't remember that. I don't remember her saying — let me — I'll answer it this way. I don't remember the specifics of any conversation that I had with her. But what I gathered from it all was that she was strong, that she did a heck of a job with what she had."

(Return to Second Remand, R. 489–90.)[72]

Nothing in the record indicates that counsel had been told by Johnson or his mother about physical abuse in the Johnson household. A review of the record of Johnson's trial shows that the presentence report states that Johnson had a good relationship with his father and that his mother was the "parent that unders[tood] him." (Trial Record, R. 88.)[73]

"'A defense attorney is not required to investigate all leads, however, and "there is no per se rule that evidence of a criminal defendant's troubled childhood must always be presented as mitigating evidence in

---

[72] (Doc. 36-49 at 202; Doc. 36-50 at 3.)
[73] (Doc. 36 at 92.)

the penalty phase of a capital case." ' *Bolender* [*v. Singletary*], 16 F.3d [1547,] at 1557 [(11th Cir. 1994)] (footnote omitted) (quoting *Devier v. Zant*, 3 F.3d 1445, 1453 (11th Cir.1993)). 'Indeed, "[c]ounsel has no absolute duty to present mitigating character evidence at all, and trial counsel's failure to present mitigating evidence is not per se ineffective assistance of counsel."' *Bolender*, 16 F.3d at 1557 (citations omitted)."

*Marek v. Singletary*, 62 F.3d 1295, 1300 (11th Cir. 1995).

> "'In evaluating the reasonableness of a defense attorney's investigation, we weigh heavily the information provided by the defendant.' *Newland v. Hall*, 527 F.3d 1162, 1202 (11th Cir. 2008). Indeed, a defense attorney 'does not render ineffective assistance by failing to discover and develop evidence of childhood abuse that his client does not mention to him.' *Id.* Here, there is no evidence that [the appellant] mentioned to his trial or appellate counsel or to any mental health experts (before trial or even afterward) that he had any family history of mental illness or that there was significant internal strife or dysfunction in his family."

*DeYoung v. Schofield*, 609 F.3d 1260, 1288 (11th Cir. 2010). "The Constitution imposes no burden on counsel to scour a defendant's background for potential abuse given the defendant's contrary representations or failure to mention the abuse." *Stewart v. Secretary, Dep't of Corr.*, 476 F.3d 1193, 1211 (11th Cir. 2007).

More importantly, it is clear from a review of the record that this is not a case where trial counsel conducted no investigation into mitigation evidence or where counsel were ignorant as to what evidence constituted mitigating evidence. The State submitted Bender's attorney-fee declarations for Johnson's first trial that ended in a mistrial and his second trial that ended in his conviction and sentence of death. Bender's attorney declarations show that, in Johnson's first trial, Bender spent 111 hours in out-of-court preparation on the case—57 of those hours were used to investigate mitigation. This itemization shows that Bender spoke to Johnson's mother on multiple occasions, that he contacted the Birmingham Board of Education to obtain Johnson's school records, that he talked to the principal of Johnson's high school, that he spoke to members of Johnson's family on multiple occasions, that he spoke to

Johnson's aunt who lived in Detroit, Michigan, that he spoke to numerous possible mitigation witnesses, that he talked with the staff at the Jefferson County Youth Detention Center, and that he spoke to Johnson's pastor. For the second trial, Bender billed for 81 hours for his out-of-court time spent on the case; 41 of those hours were spent in investigating mitigation. This itemization shows that Bender went to Pratt City, where Johnson was raised, to speak with various people, and that he spoke to Johnson's mother on multiple occasions.

When considering whether a postconviction petitioner alleging ineffectiveness of counsel can establish prejudice in the penalty phase of a capital-murder trial, we may "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 534 [] (2003).

At the penalty phase, counsel presented the testimony of Donna Johnson, Johnson's mother; Bessie Burts, Johnson's maternal grandmother; and Antonio Green, Johnson's cousin. Johnson's mother testified that Johnson is the older of her two children; that Johnson has a younger brother; that she raised the two children by herself; that Johnson was living with her at the time of the murder; that Johnson attended, but did not graduate from, high school; that he got a job at a Shoney's restaurant after he left high school; that Johnson has many aunts, uncles, and cousins; that Johnson has five children; that Johnson had never been in trouble for hurting anyone but had only been involved with drugs; that she loved her son; and that she hoped the jury would spare Johnson's life. She further testified that she and Johnson's father had been separated for 19 years and that approximately 1 year before trial Johnson's father got hit by a motor vehicle and was rendered blind as a result of the accident.

Bessie Burts testified that she has a close relationship with Johnson, that she has 15 grandchildren, that she had never known Johnson to hurt anyone, that she loved her grandson, and that she prayed that the jury would spare Johnson's life.

Antonio Green testified that he is Johnson's first cousin; that Johnson's mother had a difficult time raising Johnson and there was no father around for Johnson; that Johnson was a decent person "growing up";

that his grandfather tried to help Johnson's mother, but he was old; and that he hoped the jury would spare Johnson's life.

It is true that no testimony was elicited that Johnson's father had been physically abusive to Johnson when he drank. However,

> "[e]vidence of childhood abuse has been described as a double-edged sword. *See Johnson v. Cockrell*, 306 F.3d 249, 253 (5th Cir. 2002) (evidence of brain injury, abusive childhood, and drug and alcohol abuse was 'double edged' because it would support a finding of future dangerousness). *See also Miniel v. Cockrell*, 339 F.3d 331 (5th Cir. 2003); *Harris v. Cockrell*, 313 F.3d 238 (5th Cir. 2002)."

*Davis v. State*, 9 So. 3d 539, 566 (Ala. Crim. App. 2008). Two statutory aggravating circumstances were proven by the State: that Johnson committed the murder while under a sentence of imprisonment and that Johnson murdered Deputy Hardy to disrupt or to hinder a governmental function or the enforcement of laws. Johnson was 22 years of age at the time of the murder. The postconviction court found that the omitted mitigation evidence would not have resulted in a different sentence. After reweighing all the mitigating circumstances, including the omitted mitigation, against the aggravating circumstances, we agree with the circuit court that the omitted mitigation would not have changed Johnson's sentence. Johnson failed to satisfy the *Strickland* standard in regard to this claim and is due no relief.

For the foregoing reasons, we affirm the circuit court's denial of Johnson's postconviction petition.

*Johnson*, 379 So. 3d at 1054-61; (Doc. 36-56 at 50-55.) Johnson's petition alleges that the Alabama Court of Criminal Appeals applied a procedural bar to this claim (Doc. 37, ¶ 191), but the above-quoted portion of the state court decision shows that he is incorrect. That court's review began, "Johnson next argues that the circuit court erred in denying his claim that his trial counsel were ineffective for failing to conduct

further investigation *and to present more mitigation evidence at the penalty phase of his capital-murder trial*." *Johnson*, 379 So. 3d at 1034 (emphasis added).

Interestingly, because Johnson's petition alleges that this claim was denied based on a state procedural bar, his petition does not allege that the foregoing state court determination was contrary to, or an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts in light of the evidence presented. Nor does Johnson's petition plead the existence of cause and prejudice to overcome the application of the bar he contends was applied to the claim. As such, Johnson has not pleaded any grounds for further AEDPA review of this claim.[74] Because Johnson has not shown that he is entitled to relief or further proceedings under the AEDPA, this claim should be denied.

**M.   The Claim Trial Counsel Were Ineffective for Failing to Investigate and Present Mitigating Evidence in the Sentencing Phase of the Trial.**

This claim is identical to Johnson's previous claim, except that Johnson alleged that the additional mitigating evidence should have been introduced at the judicial sentencing hearing, rather than during the penalty phase of his trial. The state trial court specifically denied that claim. (Doc. 36-52 at 34-48.) On appeal, the

---

[74] The same would hold true if Johnson had been correct that the adequate and independent state law procedural bar he cites had been applied. Johnson's petition asks for an evidentiary hearing on this claim, but the petition provides no allegations that would constitute "cause" or "prejudice" allowing Johnson to avoid application of the state law procedural bar.

Alabama Court of Criminal Appeals reviewed the evidence presented at the evidentiary hearing both as to the sentencing hearing and the penalty phase of trial. *See Johnson*, 379 So. 3d at 1060 (citing *Wiggins*, 539 U.S. at 534) (noting that when "considering whether a postconviction petitioner alleging ineffectiveness of counsel can establish prejudice *in the penalty phase of a capital-murder trial*," the court may "reweigh the evidence in aggravation against the totality of available mitigating evidence.") (emphasis added). Accordingly, the block-cited portion of the Alabama Court of Criminal Appeals' decision contained in the previous section also applies to the adjudication of this claim.

Johnson's asserts that the state court adjudication of his claim "was contrary to, and an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts in light of the evidence presented." (Doc. 37, ¶ 225.) Once again, however, his petition is devoid of any argument or citation to authority to support his bald claim. Johnson does not attempt to explain how the state court decision was an unreasonable determination of the facts, rather than merely an unfavorable reweighing of the evidence (in conformity with *Wiggins*, 539 U.S. at 534, based on the facts elicited at the evidentiary hearing. Because Johnson has not shown that he is entitled to relief or further proceedings under the AEDPA, this claim should be denied.

## V.    THE ALLEGATION JOHNSON RECEIVED INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL.

Johnson asserted this claim in his state court third-amended petition for postconviction relief. (Doc. 36-19 at 194-200.)[75] Here, Johnson reasserts his claims that appellate counsel were ineffective for (1) failing to raise in the Alabama Court of Criminal Appeals alleged errors pertaining to the issue of whether Deputy Hardy was on duty at the time of the murder, and (2) for failing to adequately raise specific ineffective assistance of counsel claims in a motion for a new trial and on direct appeal. Each of his claims are answered, individually, below.

### A.    The allegation of ineffective assistance of appellate counsel pertaining to the failure to assert errors pertaining to the issue of whether Deputy Hardy was on duty at the time of the murder.

Johnson asserted this as Claim XII in his state court petition for postconviction relief. (Doc. 36-18 at 21-24.) In denying this claim, the state trial court wrote:

> Petitioner's claim has no merit. Initially, the Court would point out that on review of post-conviction relief, counsel is presumed to be adequate. See *Zeigler v. State*, 443 So. 2d 1303, 1306 (Ala. Crim. App. 1983). Secondly, the Alabama Supreme Court has adopted a two-prong test based on *Strickland v. Washington*, 406 U.S. 668 (1984) to determine the effectiveness of counsel. First, Petitioner has the burden of proving that his counsel was deficient. Second, Petitioner must prove that his trial counsel's performance prejudiced Petitioner to such a degree that, but for the ineffective performance of his lawyers, the outcome would have been different. See *Ex parte Lawley*, 512 So. 2d 1370, 1372 (Ala. Crim. App. 1987). To prove prejudice, "the defendant must show that there is a reasonable probability that, but for the ineffective

---

[75] Johnson's amended petition cites to Doc. 36-18, which appears to be a scrivener's error.

106

performance of his lawyers, the outcome would have been different. 466 U.S. at 694, 104 S. Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. [sic] Furthermore, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." 466 U.S. 689, 104 S. Ct. 2052. "The standards for determining whether appellate counsel was ineffective are the same as those for determining whether trial counsel was ineffective." *Jones v. State*, 816 So. 2d 1067, 1071 (Ala. Crim. App. 2000), overruled on other grounds by *Brown v. State*, 903 So. 2d 159 (Ala. Crim. App. 2004).

This Court would further point out that in representing a defendant on appeal, the best appellate attorneys make strategic decisions narrowing the issues that they will raise on appeal rather than attempting to raise every conceivable issue. See *Jones v. Barnes*, 463 U.S. 745, 750-51, 103 S. Ct. 3308, 3312, 77 L.Ed.2d 987 (1983). Petitioner accuses the Court of Criminal Appeals of making mistakes of act and law in rendering their decision on appeal; and further accuses appellate counsel of ineffective assistance for failing to argue the appellate court's mistakes to the Alabama Supreme Court in the Petition for Writ of Certiorari. (It is noted that Petitioner appears to be relying on Justice Johnstone's dissent from denial of certiorari in raising this claim.) This Court finds specifically that appellate counsel's representation of Petitioner on certiorari, as well as on direct appeal, did not fall outside "the wide range of reasonable professional assistance" and that Petitioner not only failed to establish the "performance deficiency" component of this claim, but also failed to establish the "prejudice component". *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984).

Petitioner accuses the Alabama Court of Criminal Appeals of being unaware "of its own mistaken understanding of the record and the governing law." Apparently counsel for Petitioner has a "mistaken understanding of the record and the governing law." The court record clearly reflects that at the time Deputy William Hardy exited the Crown Sterling Suites and went into the parking lot he was wearing his Jefferson County Sheriff's Department uniform, including his hat. In considering the evidence and testimony presented, most likely Deputy William Hardy was murdered *because* Petitioner considered him to be

"on duty" in his law enforcement capacity rather than in his capacity of security guard. Section 13A-5-40(a)(5), *Code of Alabama, 1975*, defines the following capital offense: "Murder of any police officer, sheriff, deputy, state trooper, federal law enforcement officer, or other state or federal peace officer of any kind, or prison or jail guard, while such guard is on duty, regardless of whether the defendant knew or should have known the victim was an officer or guard on duty, or because of some official or job-related act or performance of such officer or guard." The evidence and testimony, as well as the law relating to Petitioner's crime, were properly presented for jury consideration, and after due deliberation Petitioner was found guilty of capital murder. Petitioner's claims are invalid, and he has failed to meet the required burden of proof pursuant to Rule 32.3, Alabama Rules of Criminal Procedure.

(Doc. 36-19 at 72-73; Vol. 20, Tab # R-51, pp. 24-25.) On appeal, the Alabama Court of Criminal Appeals found that "Johnson failed to raise these claims with sufficient specificity" as required by Rule 32.6(b). *Johnson*, 379 So. 3d at 1017; (Doc. 36-56 at 21.)

Johnson clearly conceded that this adequate and independent state law ground was applied to this claim in his petition for certiorari before the Alabama Supreme Court. Johnson's petition for writ of certiorari argued the following as to this claim (in conjunction with multiple other claims):

> The Court of Criminal Appeals denied the following claim[]: Claim XII (alleging that appellate counsel failed to raise a claim regarding whether Deputy Hardy was 'on duty'), C.1219.

> Certiorari is appropriate pursuant to Rule 39(a)(1)(D) because the Court of Criminal Appeals' holding that these claims were "insufficiently pleaded," *Johnson*, 2007 WL 2812234, at *14, conflicts with *Ex parte Boatwright*. Mr. Johnson pled each of the above claims sufficiently, alleging specific facts that, if proven true at a hearing, demonstrated

both deficient performance and prejudice. *See Strickland*, 466 U.S. at 696. Accordingly, Mr. Johnson should have been granted an evidentiary hearing on each of these claims.

The failure to grant a hearing on these claims violated Mr. Johnson's rights to due process, a fair trial, and a reliable sentence protected by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.

(Doc. 36-56 at 175, 177.) Not only did Johnson concede the application of the state procedural bar, his argument failed to fairly present his substantive federal claim to the Alabama Supreme Court.

A habeas claim is not deemed exhausted unless the state prisoner has "invoke[d] one complete round of the State's established appellate review process." *O'Sullivan*, 526 U.S. at 845. For Alabama prisoners, this includes filing a petition for discretionary review in the Alabama Supreme Court. *See Smith*, 256 F.3d at 1140-41. "To satisfy the exhaustion requirement, 'petitioners [must] present their claims to the state courts such that the reasonable reader would understand each claim's particular legal basis and specific factual foundation.'" *Hunt v. Comm'r, Ala. Dep't of Corrs.*, 666 F.3d 708, 730-31 (11th Cir. 2012) (quoting *Kelley v. Sec'y, Dep't of Corrs.*, 377 F.3d 1317, 1344-45 (11th Cir. 2004). The above-quoted argument—constituting Johnson's assertion of error in the Alabama Supreme Court—did not provide that court the specific factual foundation for his federal claim (much less factual foundation for his claim of error in applying the state law procedural bar).

109

Additionally, the underlying substantive issue was decided adversely to Johnson on direct appeal. There, the state court held that "when an off-duty police officer witnesses a criminal offense or suspects criminal activity, the officer's status changes and, from that point on, he is considered to be acting in his capacity as a police officer and not in his capacity as a private citizen, i.e., he is considered to be 'on duty.' Here, the State presented sufficient evidence from which the jury could have reasonably inferred that Deputy Hardy was 'on duty' at the time of his death." *Johnson*, 823 So. 2d at 43. As this constitutes the law of the case, Johnson cannot establish prejudice for *Strickland* purposes. For this reason, his claim is due to be denied.

### B. The allegation of ineffective assistance of appellate counsel pertaining to the failure to assert specific ineffective assistance of counsel claims in a motion for a new trial and on direct appeal.

Johnson alleges that his appellate counsel were ineffective for asserting—and alternatively for not asserting a number of claims of ineffective assistance of counsel in the motion for a new trial and on direct appeal, such as:

- That the State knowingly presented a prosecution theory against him that was inconsistent with the theory used against his codefendant.
- That the trial court improperly considered a youthful offender adjudication and arrests that had not resulted in convictions.
- That trial counsel was ineffective because of inadequate resources.
- That trial counsel was ineffective for entrusting the investigation of the case to a brain-damaged, suicidal, racist, alcoholic homeless man with an IQ of 63.
- That the lack of a competent investigation prejudiced Johnson.

- That trial counsel performed deficiently in failing to call various experts at trial.
- That trial counsel was ineffective for failing to object to the manner of execution.[76]
- That trial counsel failed to present 'extensive mitigating evidence' that they failed to uncover.

Johnson asserted this appellate IAC claim in Claim XX(10) and (11) of his state postconviction petition. (Doc. 37, ¶ 236 (citing Doc. 36-18 at 170-73).) The state trial court denied this claim, writing:

> Petitioner claims specifically that appellate counsel was constitutionally ineffective by performing deficiently… by failing to supplement the record post-trial; [and] by unreasonably and inadequately raising certain, specific allegations of ineffective assistance of trial counsel on direct appeal…
>
> Petitioner claims specifically that he was denied effective assistance of appellate counsel "by virtue of the individual and cumulative effect of the deficient performance" of appellate counsel in violation of his constitutional rights… In support of his contention, Petitioner cites *Williams (Terry) v. Taylor*, 529 U.S. 362 (2000) and *Strickland v. Washington*, 466 U.S. 668 (1984). This Court agrees with Petitioner that *Strickland* is the applicable standard, however, Petitioner's allegations not only fall short of this established standard, they are in direct contradiction when applied thereto.[77] In *Strickland* the Supreme Court established that a petitioner must show that counsel's performance was deficient and that he was prejudiced by the said deficient performance. The Supreme Court found that "judicial scrutiny

---

[76] At the time of Johnson's trial, Alabama's method of execution was electrocution. After Johnson's trial and sentencing, the default method of execution became lethal injection. Because this negates any possible prejudice resulting from appellate counsel's failure to adequate challenge trial counsel's failure to challenge electrocution as unconstitutional, it is not addressed further in this answer.

[77] As *Strickland* is the controlling legal precedent, Johnson is not entitled to habeas relief on the ground that the state courts failed to apply the correct legal rule. *See Williams*, 529 U.S. at 405.

of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client the same way." *Strickland v. Washington*, 466 U.S. 668 [] (1984). Additionally, this Court would point out that "effective representation does not entitle the defendant to error-free trial, and showing that counsel made a mistake unfavorable to the defendant is not sufficient to establish inadequate representation." *Saffold v. State*, 570 So. 2d 727, 731 (Ala. Crim. App. 1990).

\*        \*        \*

Petitioner specifically claims that appellate counsel was constitutionally ineffective for failing to supplement the record post-trial. Petitioner lists issues, repeatedly redundant to this petition, which he contends appellate counsel should have supplemented the record. Each of these issues was raised and denied on direct appeal. (This Court has previously addressed these claims individually, and will not do so *again* in response to this claim.) The Court finds Petitioner's claim to be insufficiently specific when applied to Rule 32.6(b), Alabama Rules of Criminal Procedure. The Court further finds that Petitioner has failed to show that appellate counsel was deficient, and how the outcome would have been different had appellate counsel "supplemented the record post-trial." Petitioner is not entitled to relief by virtue of this claim, as he has failed to meet his required burden of proof.

112

Petitioner claims specifically that appellate counsel was constitutionally ineffective by unreasonably and inadequately raising certain, specific allegations of ineffective assistance of trial counsel on direct appeal. It is interesting to note that while Petitioner now faults appellate counsel for raising certain issues of ineffective assistance against trial counsel, he previously, in the instant petition, criticized appellate counsel for failing to raise certain issues of ineffective assistance. Furthermore, while Petitioner cites appellate counsel of being deficient for raising these claims, he turns around in his petition, as amended, and makes identical allegations. It would seem, according to Petitioner, that appellate counsel did nothing right. Specifically, Petitioner accusses appellate counsel of raising the said claims "without having conducting any investigation whatsoever" but neglects to state specifically what investigations should have been conducted and what they would have revealed. He has also failed to show how the outcome would have been different had appellate counsel not raised the ineffective assistance of counsel claims against trial counsel. The record reflects that appellate counsel was detailed in their address of trial counsel's purported ineffectiveness, and the Court of Criminal Appeals was just as detailed in their denial of said claims. Petitioner has provided nothing of substance to support his assertions; his claims are insufficiently specific and fail when apply to Rule 32.6(b), Alabama Rules of Criminal Procedure.

(Doc. 36-19 at 61-64.) On appeal, the Alabama Court of Criminal Appeals affirmed the denial of relief as to this claim, noting "Claims XX(10) and XX(11) are generic assertions that appellate counsel rendered ineffective assistance by raising, in the motion for new trial and on appeal, claims of ineffective assistance of trial counsel. This Court, in its 2007 opinion, addressed several specific claims alleging ineffective assistance of appellate counsel. The generic assertions in Claims XX(10) and XX(11) are insufficiently pleaded and, moreover, are without merit." *Johnson*, 379 So. 3d at 1063 (Doc. 36-56 at 56.).

Although the State courts applied Rule 32.6(b) of the Alabama Rules of Criminal Procedure, a state procedural bar, because that procedural bar focuses on the sufficiency of a pleading federal courts treat it as a ruling on the merits, subject to review under AEDPA deference. *See Borden*, 646 F.3d at 808. Thus, this Court must review the state court decision "focusing in on the factos for determining whether the [state court] petition presented a case sufficient to warrant relief under *Strickland v. Washington." Id.* at 813. The Court must do so in the light of the state court requirement that the "petition must contain a *clear and specific statement* of the grounds upon which relief is sought, *including full disclosure of the factual basis of those grounds*. A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings." ALA. R. CRIM. P. 32.6(b) (emphasis added).

The state courts correctly noted that Claims XX(10) and (11) of the state court petition failed to plead facts which, if true, would have shown that appellate counsel's performance fell outside the wide range of reasonable professional assistance (i.e., that no reasonable lawyer would have asserted these claims). They further noted that Johnson failed to plead facts sufficient to establish prejudice under *Strickland*. In fact, Johnson pleads only that had appellate counsel not raised these claims, other lawyers (i.e., Johnson's current counsel) could have raised them later. But as the state trial court observed, quoting *Strickland*, "There are countless ways

114

to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client the same way." *Strickland v. Washington*, 466 U.S. 668 [] (1984).

Johnson's state court presentation of this claim involved no attempt to show deficient performance. While he alleged that appellate counsel did not have to present these claims, he did not explain *what* about the claims made them inappropriate or inadequate for presentation to the state appellate courts on direct appeal. Johnson made bald allegations about the lack of any investigation or record-gathering activities, but he did not tie those alleged shortcomings to the specific arguments presented on appeal by appellate counsel. Johnson's state court petition did not explain how the arguments were deficient, choosing instead to simply assert that the issues should not have been raised at all. In short, Johnson alleged deficient performance because counsel failed to secure appellate relief; but that is not the standard for an IAC claim.

Equally important, Johnson failed to show that had the procedural bars not applied to his current counsel's efforts to resurrect these claims, the outcome of the proceeding would have been different. He could not do so, because the state courts answered that question, too. For example, as to Johnson's claim that the State presented inconsistent prosecution theories, the state courts found no merit to his claim. As the Alabama Court of Criminal Appeals explained:

Many courts have recognized that the government may argue inconsistent theories in cases involving multiple defendants. In addressing this issue, federal courts have upheld the State's presentation of inconsistent evidence in codefendants' trials. The United States Court of Appeals for the Fifth Circuit has stated:

> "[The defendant] argues that his constitutional due process rights were violated when the government presented inconsistent theories at two criminal trials—namely, at Cooper's [codefendants'] trial the government argued that Cooper shot Marshall, and at [the defendant's] trial, the government argued that [the defendant] shot Marshall. We have held, though, 'a prosecutor can make inconsistent arguments at the separate trials of codefendants without violating the due process clause.' *Beathard v. Johnson*, 177 F.3d 340, 348 (5th Cir. 1999); *see also Nichols v. Scott*, 69 F.3d 1255, 1272 (5th Cir. 1995) ('Two things, however, may be said about the rather amorphous doctrine of judicial estoppel. First, there is no indication in the authorities that it is constitutionally mandated. Second, it has apparently never been applied against the government in a criminal case.'). In any event, the inconsistencies were immaterial to the conviction since [the defendant] could have been convicted for the same offense, carjacking resulting in death and aiding and abetting the same, under both theories. *See United States v. Paul*, 217 F.3d 989, 998–99 (8th Cir. 2000) ('When it cannot be determined which of two codefendants' guns caused a fatal wound and either defendant could have been convicted under either theory, the prosecution's argument at both trials that the defendant on trial pulled the trigger is not factually inconsistent.'); *cf. Bradshaw v. Stumpf*, 545 U.S. 175, 187 [] (2005) (upholding a guilty plea where the defendant's assertions of inconsistency related entirely to which individual shot the victim but where 'the precise identity of the triggerman was immaterial to [defendant]'s conviction for aggravated murder.')."

*United States v. Frye*, 489 F.3d 201, 214 (5th Cir. 2007).

> "Courts presented with situations where there are genuine evidentiary disputes as to who was responsible for a crime among

various defendants have shown greater willingness to permit a prosecutor to argue inconsistent theories in separate trials. *See Beathard v. Johnson*, 177 F.3d 340, 348 (5th Cir. 1999) ('The record does not support such a claim. Price had two live eyewitnesses to the crime, both charged with capital murder and both accusing the other of being the most culpable.... Price, as well as every juror involved, knew that both of the stories could not have been true.'); *Parker v. Singletary*, 974 F.2d 1562, 1578 (11th Cir. 1992) ('But no due process violation occurred, because there was no necessary contradiction between the state's positions in the trials of the three co-defendants. Given the uncertainty of the evidence, it was proper for the prosecutors in the other co-defendants' cases to argue alternate theories as to the facts of the murder.')"

*United States v. Ganadonegro*, 854 F. Supp. 2d 1088, 1098 (D.N.M. 2012).

Other state courts addressing this issue have reached the same conclusion.

"[W]e are in accord with the courts that hold that a due process violation will only be found when the demonstrated inconsistency exists at the core of the State's case. Discrepancies based on rational inferences from ambiguous evidence will not support a due process violation provided the two theories are supported by consistent underlying facts. We recognize that the evidence presented at multiple trials is going to change to an extent based on relevancy to the particular defendant and other practical matters. The underlying core facts, however, should not change. The few courts that have found due process violations did so in cases where the inconsistencies were inherent to the State's whole theory of the case or where the varying material facts were irreconcilable. It is this type of inconsistency that renders the conviction fundamentally unfair, thus violating due process."

*Sifrit v. State*, [] 857 A.2d 65, 82 (2004).

117

> "Courts have ... found no due process violation stemming from inconsistent arguments as to who was the killer in the relatively common circumstance where each defendant can be held equally guilty as an aider and abettor upon the same inconclusive evidence."

*State v. Poe*, [] 822 N.W.2d 831, 845 (2012).

There is no due-process violation when the State argues at one trial that one codefendant shot the victim and at the codefendant's trial argues that that codefendant shot the victim.

> "When it cannot be determined which of two defendants' guns caused a fatal <u>wound</u> and either defendant could have been convicted under either theory, the prosecutor's argument at both trials that the defendant on trial pulled the trigger is not factually inconsistent. Thus, because there was evidence that supported both theories, and since [the defendant] could have been convicted of aiding and abetting under either theory, we find no error."

*United States v. Paul*, 217 F.3d 989, 998–99 (8th Cir. 2000).

Thus, because there is no merit to the legal theory underlying this claim of ineffective assistance, the claim was properly dismissed. *See, e.g.*, *Lee v. State*, 44 So.3d 1145, 1173 (Ala. Crim. App. 2009) (counsel cannot be ineffective for failing to raise a claim that has no merit).

*Johnson*, 379 So. 3d at 1031-34 (Doc. 36-56 at 33-34.) Johnson asserts to this Court that "it was unreasonable for appellate counsel to have raised any claims related to ineffective assistance of trial counsel" because "counsel's only impact on the claims was to allow the State to argue successfully that the claims were procedurally barred during Rule 32 proceedings." (Doc. 37, ¶ 241.) But it is materially misleading for Johnson to suggest to this Court that his claim that the State knowingly presented

inconsistent prosecution theories was found to be procedurally barred by the Alabama Court of Criminal Appeals (Doc. 37 at 99 (first bullet; citing *Johnson*, 379 So. 3d at 1012)) as a suggestion of prejudice, because the procedural bar was applied to the non-ineffective assistance of counsel variant of this claim. *See Johnson*, 379 So. 3d at 1012 ("Johnson makes several different arguments, *other than ineffective-assistance-of-counsel claims*, that are procedurally barred in this Rule 32 proceeding.") (emphasis added). Had appellate counsel *not* raised this non-IAC claim on direct appeal, it would have been barred "because [it] could have been, but [was] not, raised at trial and on direct appeal." *Id*. at 1312 (citing Ala. R. Crim. P. 32.2(a)(3)). In other words, had appellate counsel not raised this issue, it would have never been decided on the merits by an appellate court. But as shown above, appellate counsel's conduct did nothing to prevent consideration of Johnson's "inconsistent prosecution theories" claim of IAC from being decided on the merits by the Alabama Court of Criminal Appeals, meaning he suffered no prejudice.

Similarly, had appellate counsel not raised the claim that the trial court erred in considering a youthful offender adjudication to negate the statutory mitigating circumstance of no significant history of prior criminal activity, it would not have been considered by any appellate court. (Doc. 37 at 99 (second bullet).) Johnson's appellate counsel was partially successful in raising this claim, as noted by the Alabama Court of Criminal Appeals. As noted on direct appeal:

The record indicates that the trial court improperly used Johnson's 1992 youthful offender adjudication for unlawful possession of a controlled substance and his three 1997 arrests that had not (yet) resulted in convictions to negate the statutory mitigating circumstance of no significant history of prior criminal activity. However, notwithstanding Johnson's youthful offender adjudication and numerous arrests, the record reflects that Johnson had a series of misdemeanor convictions and one felony conviction that would have precluded the trial court from finding that Johnson had no significant history of prior criminal activity. Misdemeanor convictions may be used to negate the statutory mitigating circumstance of no significant history of prior criminal activity. *See, e.g.*, *Ex parte Davis, supra*; *Williams v. State,* 601 So. 2d 1062 (Ala. Crim. App. 1991); *McMillian v. State,* 594 So. 2d 1253 (Ala. Crim. App. 1991), *remanded on other grounds*, 594 So. 2d 1288 (Ala. 1992), *on return to remand*, 616 So. 2d 933 (Ala. Crim. App. 1993); *Tomlin v. State,* 516 So. 2d 790 (Ala. Crim. App. 1986), *rev'd on other grounds*, 540 So. 2d 668 (Ala. 1988); and *Richardson v. State,* 376 So. 2d 205 (Ala. Crim. App. 1978), *aff'd*, 376 So. 2d 228 (Ala. 1979). The presentence report reflects that Johnson was convicted in 1991 for disorderly conduct and for drinking in public; in 1992 for driving without a license and with an improper tag; in 1993 for disorderly conduct; and in 1995 for driving while his license was suspended. In addition, Johnson was convicted in 1994 for unlawful possession of a controlled substance, a Class C felony. Because Johnson's felony and misdemeanor convictions were sufficient to negate the statutory mitigating circumstance of no significant history of prior criminal activity, we conclude that the trial court's error in considering Johnson's youthful offender adjudication and arrests was harmless. *See, e.g.*, *Ex parte Davis,* supra, 718 So. 2d at 1178 (trial court's consideration of prior juvenile adjudications held harmless where the defendant had a prior felony conviction for robbery as an adult); and *Madison v. State,* 718 So. 2d 90, 98 (Ala. Crim. App. 1997), *aff'd*, 718 So. 2d 104 (Ala. 1998) (trial court's consideration of prior juvenile adjudications held harmless where the defendant had history of prior felony convictions as an adult).

*Johnson*, 823 So. 2d at 54-55; (Doc. 36-9 at 205.) Johnson has never explained how

*not* raising this claim would have caused a different outcome in his case.

Johnson's petition is equally misleading when it attempts to rely on the procedural bar initially found to exist as to his trial counsel IAC claim regarding the failure to present "extensive mitigating evidence." (Doc. 37 at 100 (citing *Johnson*, 379 So. 3d at 1015).) Johnson received an evidentiary hearing on his claim that trial counsel failed to present any mitigating evidence at the sentencing hearing. *Johnson*, 379 So. 3d at 1018, 1046. An evidentiary hearing was held on that claim and it was denied. The Alabama Court of Criminal Appeals affirmed the denial of Johnson's claim that "his trial counsel were ineffective for failing to conduct further investigation and to present more mitigation evidence at the penalty phase of his capital-murder trial." *Johnson*, 379 So. 3d at 1054. In short, Johnson was not prejudiced by his appellate counsel's performance in this regard, even if the court assumed that performance was deficient.

Because Johnson failed to plead sufficient facts to create a material issue of genuine fact as to his ineffective assistance of appellate counsel claims, the state courts did not err in denying those claims on the pleadings. Johnson is not entitled to habeas relief under the AEDPA.

## VI.  THE ALLEGATION ALABAMA'S DEATH PENALTY STATUTE AND PROCEDURES ARE UNCONSTITUTIONAL.

Johnson asserted this claim in his state court third-amended petition for postconviction relief. (Doc. 36-19 at 194-200.)[78] In denying this claim, the state trial court wrote:

> (49)   Petitioner asserts that "the Alabama Death Penalty Statute and the procedure resulting in his sentence of death violate the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.
>
> Petitioner devotes approximately six and one-half pages to describing the sequence of a capital murder trial, of which this Court is already exceedingly familiar, then proceeds to allege how this process violated his constitutional rights.
>
> Petitioner's assertion that his constitutional rights were violated because the jury's role in the penalty phase of his trial was "advisory" does not warrant relief because there is no material issue of law or fact present as required by Rule 32.7, Alabama Rules of Criminal Procedure. In *Harris v. Alabama*, 513 U.S. at 515, 115 S. Ct. 1031, 130 L. Ed.2d 1004 (1995) the Supreme Court stated "[t]he Constitution permits the trial judge, acting alone, to impose a capital sentence. It is thus not offended when the State further requires the sentencing judge to consider a jury's recommendation and trusts the judge to give it the proper weight."
>
> Petitioner's contention that his constitutional rights were violated because the two (2) aggravating circumstances relied upon by the trial Court, in rendering its sentence of death, were not pled in the indictment does not warrant relief because there is no material issue of law or fact present as required by Rule 32.7, Alabama Rules of Criminal Procedure. Neither *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L.#d.2d 556 (2002) nor Apprendi v. New Jersey [sic], 530 U.S. 466, 120 S. Ct. 2348, 147 L.Ed.2d 435 (2000) require that an accused be

---

[78] Johnson's amended petition cites to Doc. 36-18, which appears to be a scrivener's error.

provided with advanced notice of all aggravating circumstances upon which the prosecution intends to rely. The appellate courts in Alabama have taken a like stand in designating the aggravating circumstances set forth in § 13A-5-49, *Code of Alabama, 1975* as being exclusive, and finding that this statutory notice puts a defendant charged with a felony on notice of those circumstances against which he/she may be required to defend. "The aggravating circumstances enumerated in § 13A-5-49 that may lead to the imposition of the death penalty in a capital case are not elements of the offense and are not required to be set forth in the indictment." *Dobard v. State*, 435 So. 2d 1338, 1347 (Ala. Crim. App. 1982), *aff'd*, 435 So. 2d 1351 (Ala. 1983).

Petitioner's allegations that his constitutional rights were violated because the jury did not make the conclusive determination as to the aggravating factors in his case, that it is unknown which aggravating factors the jury found to exist, that neither the trial court nor the jury found the aggravating factors outweighed the mitigating factors beyond a reasonable doubt, does not warrant relief because there is no material issue of law or fact present as required by Rule 32.7, Alabama Rules of Criminal Procedure. Juries are not required to divulge on which aggravating circumstance(s) they relied in recommending sentences of death. The Court of Criminal Appeals stated, in *Haney v. State*, 603 So. 2d 368, 388 (Ala. Crim. App. 1991), *aff'd*, 603 So. 2d 412 (Ala. 1992), "We have previously addressed this issue and concluded that there is no statutory or constitutional requirement that the jury make specific findings of aggravating or mitigating circumstances during the sentencing phase of a capital case under Alabama's capital offense statute." Also "[t]he law does not require that a jury make every factual determination; instead, it requires the jury to find beyond a reasonable doubt only those facts that result in an increase in a defendant's authorized punishment or expose a defendant to a greater punishment. Determining whether aggravating circumstances outweigh mitigating circumstances is not a finding of fact or an element of the offense. While the existence of an aggravating or mitigating circumstance is a fact susceptible to proof under a reasonable doubt or preponderance standard, their relative weight is not. The process of weighing circumstances is a matter for judge and jury, and unlike facts, is not susceptible to proof by either party." *Ex parte Waldrop*, 859 So. 2d 1181, 2002 Ala. LEXIS 336 (Ala. 2002).

(Doc. 36-19 at 115-17; Vol. 20, Tab # R-51, pp. 67-69.) The Alabama Court of Criminal Appeals affirmed the trial court's resolution of this issue, finding no merit to Johnson's allegations of error. *Johnson*, 379 So. 3d at 1062 n.1; (Doc. 36-56 at 55, 68 n.1 (bottom)).

Nonetheless, Johnson did not properly exhaust this claim in state court. A habeas claim is not deemed exhausted unless the state prisoner has "invoke[d] one complete round of the State's established appellate review process." *O'Sullivan*, 526 U.S. at 845. For Alabama prisoners, this includes filing a petition for discretionary review in the Alabama Supreme Court. *See Smith*, 256 F.3d at 1140-41. The entirety of Johnson's briefing of this issue in the Alabama Supreme Court stated:

> In Claim XXIV of the Third Amended Petition, Mr. Johnson alleged that the Alabama death penalty statute and the procedure resulting in Mr. Johnson's sentence of death violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. C.1392. Mr. Johnson appealed to the Court of Criminal Appeals. *See* Brief of the Petitioner at 103-04, *Johnson*, 2007 WL 2812234 at *1. Certiorari is appropriate pursuant to Rule 39(a)(1)(D) because the Court of Criminal Appeals' holding that "claim XXIV [is] without merit," *Johnson*, 2016 WL 685183, at *1 n.1, conflicts with *Ring v. Arizona*, 536 U.S. 584 (2002); *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

(Doc. 36-57 at 25-26.) Johnson's claim, at most, is limited to *Ring* and *Apprendi* in this federal forum, but such a ruling would be charitable to Johnson. *See Hunt*, 666 F.3d at 730-31 (quoting *Kelley*, 377 F.3d at 1344-45 ("To satisfy the exhaustion requirement, 'petitioners [must] present their claims to the state courts such that the

reasonable reader would understand each claim's particular legal basis and specific factual foundation.'").

If the Court finds Johnson's claim was "fairly presented" to the Alabama Supreme Court, the state court resolution of this claim must be reviewed in the light of the clearly established federal law as determined by the Supreme Court on the date the state court decision was made under the AEDPA. *Cullen*, 563 U.S. at 181-82. And, clearly established federal law "refers to the holdings, opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision." *Carey*, 549 U.S. at 74 (quoting *Williams*, 529 U.S. at 412). As noted by the State trial court—the last court to issue a detailed reason for the denial of this claim—*Harris v. Alabama*, 513 U.S. 504 (1995), is the controlling Supreme Court precedent. The holding in that case, *as to Alabama's sentencing scheme*, was that the "Constitution permits the trial judge, acting alone, to impose a capital sentence. It is thus not offended when a State further requires the sentencing judge to consider a jury's recommendation and trusts the judge to give it the proper weight." *Id*. at 515. Though Johnson's habeas petition contains a single, boilerplate sentence that "the state court denial was contrary to, and an unreasonable application of, clearly established federal law," he does not identify or discuss how the state court decision was violative of *Harris*.

And while Johnson mentions *Ring v. Arizona*, 536 U.S. 584 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), in his argument, he fails to acknowledge that neither of these cases applied retroactively to cases, such as his, that were beyond direct appeal. *See Schriro v. Summerlin*, 542 U.S. 348 (2004). Johnson cannot argue that the state courts improperly applied these decisions to his postconviction claim, when neither *Ring* nor *Apprendi* would be properly applied to a postconviction claim.

## CONCLUSION

For the grounds set forth in the answer, and that will be further argued in Respondent's brief, Johnson's habeas petition should be denied.

Respectfully submitted,

Steve Marshall
*Attorney General*
BY—


/s/ James R. Houts
James R. Houts (ASB-1321-T77J)
*Assistant Attorney General*

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of July, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Patrick Mulvaney; Ty Alper. Additionally, courtesy service copies were electronically mailed, as follows:

talper@law.berkley.edu

pmulvaney@schr.org

s/ James R. Houts
James R. Houts (ASB-1321-T77J)
*Assistant Attorney General*

ADDRESS OF COUNSEL:

Office of the Attorney General
Capital Litigation Division
501 Washington Avenue
Montgomery, AL  36130
Office (334) 242-7392
Fax (334) 353-8400
James.Houts@AlabamaAG.gov