FILED

2024 Oct-28  AM 09:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

_____

TOFOREST JOHNSON,                     )
                                      )
Petitioner,                           )
                                      )          Case No. 2:16-cv-01945-RDP
v.                                    )
                                      )          CAPITAL CASE
TERRY RAYBON,                         )
Warden of William C. Holman           )
Correctional Facility,                )
                                      )
Respondent.                           )
_____       )

**PETITIONER'S REPLY BRIEF IN SUPPORT OF
PETITION FOR WRIT OF HABEAS CORPUS**

Patrick Mulvaney
Southern Center for Human Rights
60 Walton Street, NW
Atlanta, GA 30303
Tel: (404) 688-1202
Fax: (404) 688-9440
pmulvaney@schr.org

Ty Alper
U.C. Berkeley School of Law
Berkeley, CA 94720-7200
Tel: (510) 643-7849
Fax: (510) 643-4625
talper@law.berkeley.edu

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................. i

TABLE OF AUTHORITIES...................................................................................... iii

INTRODUCTION ..................................................................................................... 1

STANDARD UNDER 28 U.S.C. § 2254 ................................................................. 4

ARGUMENT ............................................................................................................ 6

I.   The prosecution struck Black prospective jurors on the basis of race at
     Johnson's capital trial........................................................................................ 6

     A.   The state court's decision on this issue was unreasonable with respect to
          both the law and the facts. ...................................................................... 7

     B.   Johnson established a prima facie case and is entitled to proceed to steps
          two and three of the *Batson* process. ..................................................... 19

II.  The State withheld material evidence, violating Johnson's due process rights. ............ 20

     A.   The state court's decision was based on an unreasonable determination of
          the facts in light of the state-court record. ............................................. 22

     B.   The state court's decision constitutes an unreasonable application of
          clearly established federal law. .............................................................. 29

III. The State violated Johnson's due process rights when it knowingly presented
     false testimony against him................................................................................ 32

IV.  Trial counsel for Johnson were constitutionally ineffective. ......................................... 35

     A.   Counsel rendered ineffective assistance at the guilt phase. ................................ 36

          1.   The state court's rulings on this claim were unreasonable on both the
               law and the facts. ............................................................................ 37

          2.   Under a proper review, Johnson's counsel were ineffective at the
               guilt phase. ..................................................................................... 49

     B.   Counsel rendered ineffective assistance at the penalty phase before the
          jury and the judicial sentencing proceeding. ......................................... 53

          1.   The state courts prevented Johnson from presenting evidence
               regarding the representation he received at the penalty phase before
               the jury. ......................................................................................... 56

2.  The state court's procedural ruling preventing Johnson from presenting evidence does not preclude federal review.................................. 60

3.  The state court's merits ruling regarding counsel's failure to investigate and present mitigating evidence is not entitled to deference. ................................................................................................. 63

4.  This Court should hold additional proceedings and find that Johnson's attorneys were ineffective with respect to sentencing................. 70

V.  Appellate counsel for Johnson was constitutionally ineffective.................................... 72

VI. The Alabama death penalty statute and the procedure resulting in Johnson's sentence of death violate the United States Constitution............................................. 76

CONCLUSION.................................................................................................................... 76

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Adkins v. Warden*, 710 F.3d 1241 (11th Cir. 2013) ........................................................ 18

*Ake v. Oklahoma*, 470 U.S. 68 (1985) ........................................................................... 34

*Apprendi v. New Jersey*, 530 U.S. 466 (2000) .............................................................. 76

*Banks v. Dretke*, 540 U.S. 668 (2004) .................................................................... passim

*Batson v. Kentucky*, 476 U.S. 79 (1986) ................................................................. passim

*Bouie v. City of Columbia*, 378 U.S. 347 (1964) ........................................................... 23

*Brady v. Maryland*, 373 U.S. 83 (1963) ................................................... 3, 20, 21, 30

*Brumfield v. Cain*, 576 U.S. 305 (2015) ..................................................................... 4, 6

*Bui v. Haley*, 321 F.3d 1304 (11th Cir. 2003) ..................................................... 5, 18, 23

*Caldwell v. Mississippi*, 472 U.S. 320 (1985) ............................................................... 76

*Card v. Dugger*, 911 F.2d 1494 (11th Cir. 1990) ......................................................... 60

*Cooper v. Sec'y, Dept. of Corr.*, 646 F.3d 1328 (11th Cir. 2011) ........................... 6, 43, 69

*Daniel v. Comm'r, Ala. Dept. of Corr.*, 822 F.3d 1248 (11th Cir. 2016) ............... passim

*Debruce v. Comm'r, Ala. Dept. of Corr.*, 758 F.3d 1263 (11th Cir. 2014) .......... 43, 67, 68, 75

*Evitts v. Lucey*, 469 U.S. 387 (1985) ........................................................................... 74

*Ex Parte Ingram*, 675 So. 2d 863 (Ala. 1996) ....................................................... 61, 74

*Ex parte Johnson*, 823 So. 2d 57 (Ala. 2001) ............................................................... 9

*Farina v. Sec'y, Fla. Dept. of Corr.*, 536 Fed. App'x 966 (11th Cir. 2013) ................... 6

*Ferrell v. Hall*, 640 F.3d 1199 (11th Cir. 2011) ............................................................ 5

*Flowers v. Mississippi*, 588 U.S. 284 (2019) ......................................................... 15, 18

*Ford v. Georgia*, 498 U.S. 411 (1991) ....................................................................... 6, 9

*Foster v. Chatman*, 578 U.S. 488 (2016) ............................................................... 18, 34

*Gadsden Times v. Doe*, 345 So. 2d 1361 (Ala. Civ. App. 1977) ....................... 21, 24, 25

*Harris v. Hardy*, 680 F.2d 942 (7th Cir. 2012) ............................................................. 18

*Jackson v. Virginia*, 443 U.S. 307 (1979) ...................................................................... 1

*Johnson v. Alabama*, 582 U.S. 927 (2017) .................................................................... 35

*Johnson v. California*, 545 U.S. 162 (2005) ............................................................ 8, 19

*Johnson v. Martin*, 3 F.4th 1210 (10th Cir. 2021) ...................................................... 20

*Johnson v. Sec'y, Dept. of Corr.*, 643 F.3d 907 (11th Cir. 2011) ....................... 5, 43, 69

*Johnson v. State*, 379 So. 3d 994 (Ala. Crim. App. 2007) .................................... passim

*Johnson v. State*, 823 So. 2d 1 (Ala. Crim. App. 2001) ....................................... passim

*Jones v. Sec'y, Dept. of Corr.*, 778 Fed. Appx. 626 (11th Cir. 2019) ......................... 63

*Jones v. Walker*, 540 F.3d 1277 (11th Cir. 2008) ............................... 19, 22, 36, 70

*Judd v. Haley*, 250 F.3d 1308 (11th Cir. 2001) ............................... 34, 57, 60, 63

*Kimmelman v. Morrison*, 477 U.S. 365 (1986) ...................................................... 66, 75

*Kyles v. Whitley*, 514 U.S. 419 (1995) ............................................................ 22, 30, 31

*Lockyer v. Andrade*, 538 U.S. 63 (2003) ................................................................. 2, 30

*Madison v. Comm'r, Ala. Dept. of Corr.*, 677 F.3d 1333 (11th Cir. 2012) ........... passim

*Madison v. State*, 718 So. 2d 90 (Ala. Crim. App. 1997) ...................................... 15, 16

*McGahee v. Ala. Dept. of Corr.*, 560 F.3d 1252 (11th Cir. 2009) ......................... passim

*McWilliams v. Dunn*, 582 U.S. 183 (2017) .................................................................... 4

*Miller v. Ala. Dept. of Corr.*, 826 Fed. Appx. 743 (11th Cir. 2020) ........................... 76

*Miller-El v. Cockrell*, 537 U.S. 322 (2003) .................................................... 4, 5, 6, 23

*Miller-El v. Dretke*, 545 U.S. 231 (2005) ............................................................... passim

*Morgan v. Disciplinary Bd. of the Ala. State Bar*, 776 So. 2d 103 (Ala. 2000) ........... 73

*NAACP v. State of Ala. ex rel. Patterson*, 357 U.S. 449 (1958) .................................. 23

*Napue v. Illinois*, 360 U.S. 264 (1959) ........................................................................ 33

*Panetti v. Quarterman*, 551 U.S. 930 (2007) ........................................................ 2, 30

*Picard v. O'Connor*, 404 U.S. 270 (1971) ............................................................ 7

*Porter v. McCollum*, 558 U.S. 30 (2009) ......................................................... 5, 14

*Powers v. Ohio*, 499 U.S. 400 (1991) ......................................................10, 11, 19

*Rice v. White*, 660 F.3d 242 (6th Cir. 2011) ....................................................... 18

*Ring v. Arizona*, 536 U.S. 584 (2002) ................................................................ 76

*Rompilla v. Beard*, 545 U.S. 374 (2005) .................................................. 5, 65, 66, 68

*Spencer v. Kemp*, 781 F.2d 1458 (11th Cir. 1986) .............................................. 60

*Strickland v. Washington*, 466 U.S. 668 (1984) ........................................... passim

*Swain v. Alabama*, 380 U.S. 202 (1965) ......................................................... 9, 16

*Tennard v. Dretke*, 542 U.S. 274 (2004) ........................................................... 69

*United States v. Bagley*, 473 U.S. 667 (1985) ............................................... 22, 31

*United States v. Baxter*, 778 Fed. Appx. 617 (11th Cir. 2019) .......................... 13

*United States v. Hill*, 643 F.3d 807 (11th Cir. 2011) ......................................... 10

*Upshaw v. Singletary*, 70 F.3d 576 (11th Cir. 1995) ......................................... 62

*Vill. of Arlington Heights v. Metro. Hous. Devel. Corp.*, 429 U.S. 252 (1977) ............ 13

*Walker v. Girdich*, 410 F.3d 120 (2d Cir. 2005) ................................................ 18

*Ward v. Hall*, 592 F.3d 1144 (11th Cir. 2010) ............................................. 22, 23

*Wiggins v. Smith*, 539 U.S. 510 (2003) ......................................................... passim

*Williams v. Allen*, 542 F.3d 1326 (11th Cir. 2008) ..................................... 5, 50, 68

*Williams v. Taylor*, 529 U.S. 362 (2000) ....................................................... passim

**Rules and Statutes**

28 U.S.C. § 2241 ................................................................................................... 4

28 U.S.C. § 2254 .......................................................................................... passim

Ala. R. Crim. P. 24 ............................................................................................. 61

Ala. R. Crim. P. 32 ....................................................................................... 61, 74

**Other Authorities**

Russell Stetler, et al., *Mitigation Works: Empirical Evidence of Highly Aggravated Cases Where the Death Penalty Was Rejected at Sentencing*, 51 Hofstra L. Rev. 89 (2022).............. 69

## INTRODUCTION

As the Supreme Court has recognized, habeas corpus serves as a "guard against extreme malfunctions in the state criminal justice systems." *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979). This case—the case of Toforest Johnson—involves a malfunction so extreme that both the original lead trial prosecutor and the Office of the Jefferson County District Attorney now support a new trial.

The problems with the case began early on, when the State's prosecutors pursued conflicting theories of the offense in various court proceedings. They ultimately obtained a conviction and death sentence against Johnson in 1998, despite the fact that their evidence against him contradicted the evidence they presented in other proceedings both before and after his trial.[1] From there, the passage of time has exposed additional problems. Alibi witnesses have come forward, and suppressed evidence has been revealed.[2] Even while this habeas case was stayed from 2017 to 2023, the State went from claiming that its file contained "nothing about anyone applying for a reward or being granted a reward" to admitting that it paid its key witness $5,000 without informing Johnson or his counsel. (Doc. 36-63 at 40; Doc. 36-60 at 66.) In the words of the Office of the District Attorney: "The evidence in this case has unraveled over 20 years. It has not been possible, until recently, to fully appreciate the full extent to which the foundation of this conviction has disintegrated." Jefferson County District Attorney's

---

[1] (*See* Doc. 36-60 at 94 (State's theory in the grand jury proceeding); Doc. 36-36 at 27 (State's theory at Ardragus Ford's first trial); Doc. 36-31 at 184 (State's theory at Johnson's first trial); Doc. 36-5 at 81-82, 120 (State's theory at Johnson's second trial); Doc. 36-25 at 112-15 (State's theory at Ford's second trial).)

[2] (*See* Doc. 36-25 at 136-44, 166-202; Doc. 36-26 at 3-25, 57-202; Doc. 36-27 at 3-30; Doc. 36-60 at 65-81.)

Supplemental Amicus Curiae Brief in Support of Petitioner 5, *State v. Johnson*, No. CC-1996-386.61 (Jefferson Cty. Cir. Ct. May 20, 2024).

Respondent does not mention any of that in his pleadings. Instead, Respondent answers Johnson's petition by mechanically block-quoting the rulings of the state courts and claiming that AEDPA precludes relief because the facts of Johnson's case are not identical to the facts of Supreme Court cases. (*See*, *e.g.*, Doc. 38 (block-quoting the state courts' rulings); Doc. 41 at 14 (arguing that *Banks v. Dretke*, 540 U.S. 668 (2004), "has no application to this case" because there the State secretly paid a witness who was an informant, but in this case the State secretly paid a witness who was not an informant).) However, the Supreme Court has held explicitly that "AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied." *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007). The key question under 28 U.S.C. § 2254(d)(1) is whether the state court unreasonably applied "the governing legal principle" under Supreme Court law, not whether the facts are identical to the facts in a Supreme Court case. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003); *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003). Respondent also suggests that this Court has virtually no ability to review state-court factual findings (Doc. 38 at 49), but that position is misguided as well. Under § 2254(d)(2), federal courts are directed to conduct de novo review when a state court's decision was based on an unreasonable determination of the facts. *See*, *e.g.*, *Miller-El v. Dretke*, 545 U.S. 231, 266 (2005) (holding that the Texas court's factual determinations regarding jury discrimination were unreasonable under § 2254(d)(2) and that the petitioner was entitled to relief).

Respondent's request for total deference to the state courts is particularly unfounded given how the state-court proceedings unfolded. The state circuit court, which initially dismissed

Johnson's entire post-conviction petition without a hearing, was reversed on 17 different rulings across three separate appellate proceedings. *Johnson v. State*, 379 So. 3d 994, 1045-46, 1063-64 (Ala. Crim. App. 2007). At first glance, that might reflect well on the Alabama Court of Criminal Appeals, which was responsible for many of the reversals. But with each of those reversals, the State conceded to the appellate court that the circuit court had made an error; and each time, the error was one that the State itself had persuaded the circuit court to make in the first place, over Johnson's objection.[3] In other words, the circuit court did whatever the State requested—even when the requests involved errors so obvious that the State later felt compelled to correct them—and the appellate court corrected those errors *only* when the State requested correction. To be clear, it was never enough for Johnson to identify errors; his arguments were rejected unless and until the State changed its mind and conceded error. Nothing about that process inspires confidence. As this Court considers the rulings of the state post-conviction courts, it should keep in mind that those rulings were not the product of a well-functioning adversarial process.

Meaningful review is essential in this capital habeas case. The constitutional issues and the unraveling of the State's evidence over time are directly intertwined. The State obtained its conviction against Johnson after engaging in race discrimination in jury selection in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). It paid its key witness $5,000 without informing the defense, contravening *Brady v. Maryland*, 373 U.S. 83 (1963). And it capitalized on defense counsel's unreasonable performance, which constituted ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984). Today, the very same office that prosecuted the

---

[3] (*Compare* Doc. 36-16 at 48-49, 85-86, 89, 93-99, 108-111; Doc. 36-36 at 90-110, 143; Doc. 36-21 at 43-47 (the State's erroneous arguments), *with Johnson v. State*, 379 So. 3d 994, 1017-18, 1045-46, 1063-64 (Ala. Crim. App. 2007) (the subsequent appellate decisions).)

case has "no confidence in the integrity of Johnson's conviction."  District Attorney's Supplemental Brief at 6.  This case reflects an extreme malfunction in the state criminal justice system, and habeas relief is warranted.

## STANDARD UNDER 28 U.S.C. § 2254

Habeas corpus protects individuals who are "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. §§ 2241, 2254(a).  To obtain habeas relief, a petitioner in state custody must demonstrate that he meets the requirements of 28 U.S.C. § 2254. Those requirements include, for a claim adjudicated on the merits by a state court, that the state court's adjudication of the claim:

> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

§ 2254(d); *see Wiggins v. Smith*, 539 U.S. 510, 520 (2003).

Respondent presents the standard of § 2254(d) as virtually insurmountable, but the Supreme Court has rejected that view, granting relief in a broad range of habeas cases.  *See, e.g.*, *McWilliams v. Dunn*, 582 U.S. 183, 197-99 (2017) (holding, under § 2254(d), that the defendant was denied his right to expert assistance); *Miller-El v. Dretke*, 545 U.S. 231, 266 (2005) (holding, under § 2254(d), that the State engaged in race discrimination in jury selection); *Williams v. Taylor*, 529 U.S. 362, 390-99 (2000) (holding, under § 2254(d), that the defendant was denied effective assistance of counsel).  As the Court has explained, "in the context of federal habeas, deference does not imply abandonment or abdication of judicial review."  *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *see also Brumfield v. Cain*, 576 U.S. 305, 314 (2015) (same).

Under § 2254(d)(1), a state court decision does not warrant deference where the court "applies a rule that contradicts the governing law" or its "application of clearly established federal law was objectively unreasonable." *Williams v. Taylor*, 529 U.S. at 405, 409. In some cases, a decision is objectively unreasonable because the result it reaches is unreasonable under the governing standard, regardless of the rationale supporting it. *See, e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 389 (2005); *Johnson v. Sec'y, Dept. of Corr.*, 643 F.3d 907, 935 (11th Cir. 2011); *Ferrell v. Hall*, 640 F.3d 1199, 1233 (11th Cir. 2011). In other cases, a decision's analysis shows that the state court unreasonably applied the law. For example, some constitutional standards require a court to review all relevant circumstances to determine whether a constitutional violation occurred. *See, e.g.*, *Batson v. Kentucky*, 476 U.S. 79, 96 (1986). As the Eleventh Circuit has explained, "where a legal standard requires a state court to review all of the relevant evidence to a claim, the state court's failure to do so is an unreasonable application of law." *McGahee v. Ala. Dept. of Corr.*, 560 F.3d 1252, 1262 (11th Cir. 2009). Similarly, a state court's decision is unreasonable when the court ignores or discounts important evidence, *see, e.g.*, *Porter v. McCollum*, 558 U.S. 30, 43 (2009) (per curiam), or focuses on irrelevant factors, *see, e.g.*, *Williams v. Allen*, 542 F.3d 1326, 1343-44 (11th Cir. 2008).

Separately, a state court decision does not warrant deference under § 2254(d)(2) where it rests on an objectively unreasonable determination of the facts in light of the evidence in the record. *See, e.g.*, *Miller-El v. Cockrell*, 537 U.S. at 340, 348. A state court's factual conclusion may be unreasonable because it is simply inconsistent with the record. *See, e.g.*, *Miller-El v. Dretke*, 545 U.S. at 266; *Bui v. Haley*, 321 F.3d 1304, 1315-16 (11th Cir. 2003). Additionally, distorted or exaggerated characterizations of the record can qualify as unreasonable determinations. *See, e.g.*, *Farina v. Sec'y, Fla. Dept. of Corr.*, 536 Fed. App'x 966, 978 (11th

Cir. 2013) (per curiam) (unpublished); *Cooper v. Sec'y, Dept. of Corr.*, 646 F.3d 1328, 1353 (11th Cir. 2011).  A state court decision also may be based on an unreasonable determination of the facts where it rests on unreliable data or factfinding procedures.  *See, e.g.*, *Brumfield*, 576 U.S. at 315-16.

In short, federal courts grant deference to state court decisions, but "[d]eference does not by definition preclude relief."  *Miller-El v. Cockrell*, 537 U.S. at 340.  Habeas corpus provides a critical protection against wrongful, unconstitutional convictions, and this case underscores the importance of federal habeas review.

## ARGUMENT

I.     **The prosecution struck Black prospective jurors on the basis of race at Johnson's capital trial.**

Respondent attempts to defend the state court's decision that Johnson failed to establish a prima facie case of race discrimination under *Batson v. Kentucky*, 476 U.S. 79 (1986), but the state court's decision is indefensible on both the law and the facts.  The question at the prima facie stage should not have been close.  Johnson, a Black man, was charged with capital murder; the prosecutors struck six of the nine Black prospective jurors who were qualified to serve; several of the struck jurors said nothing in voir dire that provided the prosecution with an obvious reason to strike them; and several of the struck jurors made statements that suggested they would be favorable jurors for the prosecution.  Those circumstances were more than sufficient to establish a prima facie case.

The state court's decision to the contrary was unreasonable across the board:

- ▪     The state court suggested that Johnson was required to present *documentary* evidence regarding the race of the prospective jurors, *Johnson v. State*, 823 So. 2d 1, 18 (Ala. Crim. App. 2001), but the Supreme Court has made clear that no such requirement exists, *Ford v. Georgia*, 498 U.S. 411, 415 (1991);

- The state court asserted that Johnson's counsel failed to present any facts other than statistics in support of his *Batson* objection, *Johnson*, 823 So. 2d at 19, but counsel identified numerous additional facts, and *Batson* requires consideration of "all relevant circumstances," *Batson*, 476 U.S. at 96;

- The state court faulted Johnson for failing to present evidence that the prosecutors had a history of striking Black jurors on the basis of race, *Johnson*, 823 So. 2d at 20, but the key holding of *Batson* was that historical evidence is not required, *Batson*, 476 U.S. at 95-96;

- The state court concluded that it "cannot presume that there are no valid race-neutral reasons" for the strikes at issue, *Johnson*, 823 So. 2d at 20, but at the first step of the *Batson* process, Johnson was not required to show that there were no valid race-neutral reasons for the strikes, *Batson*, 476 U.S. at 96-97; and

- The state court terminated its *Batson* inquiry at step one, *Johnson*, 823 So. 2d at 19-21, but in doing so, it required Johnson to show significantly more than what is required to establish a prima facie case, *Batson*, 476 U.S. at 96-97.

Respondent ignores several of these errors and doubles down on others. Under a proper analysis, this Court should find that Johnson plainly established a prima facie case under *Batson*.[4] The Court then should hold a hearing to complete the three-step process. *See Madison v. Comm'r, Ala. Dept. of Corr.*, 677 F.3d 1333, 1339 (11th Cir. 2012).

A.    **The state court's decision on this issue was unreasonable with respect to both the law and the facts.**

The state court's decision denying a prima facie case constitutes an unreasonable application of *Batson* and is based on an unreasonable determination of the facts in the state-court record. As the Supreme Court has made clear, the burden for establishing a prima facie

---

[4] Respondent attempts to make a partial exhaustion argument by separating *Batson* from other cases decided under *Batson*, as if Johnson were pursuing a separate claim for each case he cites. (*See* Doc. 41 at 10-11.) However, the claim at issue is clearly an equal protection claim under *Batson*—that Johnson established a prima facie case of race discrimination when he made his *Batson* objection—which is the same claim that was raised and exhausted in the state courts. (Doc. 36-2 at 60-65; Doc. 36-8 at 63-67.) There is no question that the state courts had a "fair opportunity to consider the equal protection claim and to correct that asserted constitutional defect," *Picard v. O'Connor*, 404 U.S. 270, 275 (1971), as the state court's decision reflects, *Johnson*, 823 So. 2d at 17-21.

case is not a heavy one; the defendant must show simply that the relevant circumstances are sufficient to permit an inference of discrimination.  *See Batson*, 476 U.S. at 96 (framing the step one question as whether the "relevant circumstances raise an inference" of discriminatory intent); *see also Madison v. Comm'r, Ala. Dept. of Corr.*, 677 F.3d at 1337 ("'[A] defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial court to draw an inference that discrimination has occurred.'" (quoting *Johnson v. California*, 545 U.S. 162, 170 (2005))).  In *Batson*, the Supreme Court provided examples of the types of evidence that could support a prima facie case, including "a 'pattern' of strikes against black jurors included in the particular venire."  *Id.* at 97.  The Court also emphasized that "all relevant circumstances" should be considered.  *Id.* at 96.  Significantly, the defendant is not required to prove purposeful discrimination at step one, nor is he required to show that it is more likely than not that discrimination occurred.  *See Batson*, 476 U.S. at 96-97; *see also Johnson v. California*, 545 U.S. at 170 ("We did not intend the first step to be so onerous that a defendant would have to persuade the judge—on the basis of all the facts, some of which are impossible for the defendant to know with certainty—that the challenge was more likely than not the product of purposeful discrimination.").  Here, the state court invented new obstacles that exist nowhere in the Supreme Court's *Batson* jurisprudence, and it demanded far more than is required for a prima facie case.

    As an initial matter, Respondent does not defend the state court's suggestion that Johnson was required to present *documentary* evidence regarding the race of the prospective jurors.  *See Johnson v. State*, 823 So. 2d at 18-19.  This is not surprising because both the Supreme Court and the Eleventh Circuit have held that no such requirement exists, as long as counsel stated the race of the prospective jurors in his *Batson* objection and those statements were not disputed.  *See*

8

*Ford*, 498 U.S. at 415-25 (holding that the defendant's claim was properly raised under *Batson* where the record did not contain documents regarding race but "it [was] undisputed that the prosecution exercised 9 of its 10 peremptory challenges to strike black prospective jurors");[5] *McGahee*, 560 F.3d at 1258-70 & n.6 (granting relief under *Batson* in a § 2254 case based on defense counsel's undisputed representations even though the documentary record "d[id] not reflect the race of the jurors, nor which jurors were struck"). Here, defense counsel made clear representations regarding the race of the prospective jurors in his *Batson* objection. (Doc. 36-2 at 60-65.) Neither the trial court nor the prosecutors disputed those representations contemporaneously, and Respondent does not dispute them now.[6]

With respect to the ruling that Johnson failed to establish a prima facie case, the state court minimized several relevant circumstances and disregarded others altogether. Respondent does the same. For example, Respondent relies heavily on the state court's claim that Johnson provided nothing "other than statistics and his counsel's opinion that no valid reasons for striking [the six Black] jurors were revealed during voir dire." (Doc. 38 at 22 (quoting *Johnson*, 823 So. 2d at 19).) That characterization is unreasonable both legally and factually. *See McGahee*, 560 F.3d at 1264-65 (holding that the state court engaged in an unreasonable application of *Batson* under § 2254(d)(1) because it failed to consider "all relevant circumstances"); *Miller-El v. Dretke*, 545 U.S. at 240, 266 (holding that the state court's *Batson* analysis was based on an

---

[5] The fact that the challenge in *Ford* was made initially under *Swain v. Alabama*, 380 U.S. 202 (1965), is immaterial. (*See* Doc. 41 at 10-11.) Johnson's claim is an equal protection claim under *Batson*, and the Court's holding in *Ford* was that the defendant's claim was properly raised for purposes of *Batson*, despite the absence of documentary evidence regarding race. *Ford*, 498 U.S. at 415-25.

[6] The state court's discussion of documentary evidence is misguided for another reason as well: such evidence is often not even available to defense counsel in Alabama trials. *See Ex parte Johnson*, 823 So. 2d 57, 59 (Ala. 2001) (Johnstone, J., dissenting) (explaining that jury lists in Alabama "do not state the race of any venireperson").

unreasonable determination of the facts under § 2254(d)(2) because it was inconsistent with the record).  The actual step-one case looks nothing like the state court described it.  Four points warrant emphasis.

**First**, the trial involved a Black man charged with capital murder, and the prosecution used the strikes at issue to exclude Black prospective jurors.  Johnson's counsel stated clearly in his *Batson* objection that Johnson was Black and that the defense was challenging the State's "racially motivated strikes" of six Black prospective jurors: "Carolyn Burgess, a black female," "Annette Wilson, a black female," "Cedric Beavers, a black male," "Flora Williams, a black female," "Frank Range, a black male," and "Charles Hope, Jr., a black male."  (Doc. 36-2 at 61-62.)  Counsel also noted the shared racial identity of Johnson and the struck jurors.  (*See, e.g.*, Doc. 36-2 at 65 ("I see no reason whatsoever for [Williams] to have been struck other than the fact that she is a black woman and this defendant is a black man.").)

The Supreme Court has recognized that where the defendant and the struck jurors are the same race, a prima facie showing is more likely to be found.  As the Court has explained, "Racial identity between the defendant and the excused person might in some cases be the explanation for the prosecution's adoption of the forbidden stereotype, and if the alleged race bias takes this form, it may provide one of the easier cases to establish . . . a prima facie case . . . ." *Powers v. Ohio*, 499 U.S. 400, 416 (1991); *see also United States v. Hill*, 643 F.3d 807, 840 (11th Cir. 2011) ("The fact that the defendants are the same race as the struck jurors . . . can be relevant to the prima facie case question.").  Here, the fact that Johnson and the struck jurors shared a racial identity supported an inference of discrimination.

Nevertheless, other than block-quoting the *Batson* objection made by Johnson's counsel, the state court did not mention Johnson's race—or the fact that Johnson was the same race as the

10

struck jurors—in its step-one analysis.  *See Johnson*, 823 So. 2d at 17-21.  The state court

claimed instead that there were no circumstances supporting an inference of discrimination

"other than statistics and his counsel's opinion."  *Id.* at 19.  Respondent defends the state court's

dismissive approach, all without acknowledging that the shared racial identity of Johnson and the

struck jurors makes this "one of the easier cases [in which] to establish . . . a prima facie case."

*Powers*, 499 U.S. at 416.

**Second**, the State struck Black prospective jurors disproportionately.  As Johnson's

counsel told the trial court, there were "nine Black members of a 42-member venire."  (Doc. 36-

2 at 65; *see also* Doc. 36-2 at 60-61.)  The prosecution then used its peremptory strikes to

exclude six of the nine Black prospective jurors.  In other words, even though Black prospective

jurors represented just 21 percent of the qualified panel, the prosecution used 67 percent of its

strikes to exclude Black prospective jurors.  (*See* Doc. 36-2 at 61-62 (Johnson's counsel

identifying the Black jurors and explaining the State's strikes).)

In *Batson*, the Supreme Court explained that "a 'pattern' of strikes against black jurors

included in the particular venire might give rise to an inference of discrimination."  *Batson*, 476

U.S. at 97; *see also Miller-El v. Dretke*, 545 U.S. at 241 (explaining the prosecution's pattern of

strikes and observing that "[h]appenstance is unlikely to produce this disparity").  Here, the

pattern of strikes is unmistakable, and the exclusion rate for Black prospective jurors is

significantly higher than the exclusion rate for white prospective jurors.  Yet the state court

placed no weight on any of that; instead, it referenced the numbers only in passing, when stating

incorrectly that Johnson did not present anything "other than statistics and his counsel's

opinion."  *Johnson*, 823 So. 2d at 19.  Respondent repeats the state court's error; it claims that

"[n]umbers alone are insufficient to establish a prima facie case," without acknowledging either

11

the strength of the numbers *or* the fact that there were other indications of discrimination beyond the numbers.  (Doc. 41 at 11.)

**Third**, several of the Black prospective jurors who were struck by the prosecution did not reveal anything in voir dire that provided the prosecution with an obvious reason to strike them. In his *Batson* objection, Johnson's counsel stated: "Number 584, Mr. [Frank] Range said nothing whatsoever yesterday to give anybody, either the State or the Defense, a reason to strike him, and other than the fact that he is black and this defendant is black, I see no reason for it." (Doc. 36-2 at 62.)  The record confirms that counsel's assertion was accurate.  The only question Range answered in group voir dire was that he had heard about the case.  (Doc. 36-1 at 69-71.)  Both parties then had an opportunity for individual voir dire, and it quickly became clear that Range remembered virtually nothing about the case.  (Doc. 36-2 at 51-54.)  He said that he thought that the offense happened by a hotel, but other than that, he could not remember any of the facts, nor could he recall any of the suspects' names.  (Doc. 36-2 at 51-52.)  His vague familiarity with the case was similar to that of many other prospective jurors.  (*See*, *e.g.*, Doc. 36-1 at 128-29 (Brown), 159-61 (Crane), 161-65 (Duke), 182-86 (Grimes), 187-89 (Hicks), 201 (Lipsitz); Doc. 36-2 at 3 (Lipsitz cont'd), 4-7 (McRae), 20-21 (Rouse), 33-36 (Tipton), 37-40 (Tully), 41-46 (Weingarten).)  There was nothing unique about it.

The state court's analysis confirms that Range did not say anything that provided the prosecution with an obvious reason to strike him.  In an effort to bolster its holding, the state court claimed that "a review of voir dire reveals valid race-neutral reasons for striking at least three of the six jurors allegedly struck by the State, specifically, juror nos. 391, 659, and 479."

*Johnson*, 823 So. 2d at 20.  Despite engaging in that speculation, the state court did *not* find that the transcript revealed an obvious reason for the strike of Range.[7]

Johnson's counsel addressed this point with respect to additional jurors as well.  He stated in his *Batson* objection that Annette Wilson and Cedric Beavers, both of whom were Black prospective jurors struck by the prosecution, also said nothing in voir dire that gave the prosecution an obvious reason to want to strike them.  (Doc. 36-2 at 63-64.)  Those statements, like the statements regarding Range, are fully supported by the record.  (Doc. 36 at 192-205; Doc. 36-1 at 3-121.)  The state court evidently agreed; when it claimed that the record provided clear reasons for several of the prosecution's strikes, it said nothing about Wilson or Beavers.

The fact that the record provided no clear reason for the prosecution to strike half of the Black prospective jurors it struck certainly supports an inference of discrimination at step one. *See Batson*, 476 U.S. at 96-97; *Vill. of Arlington Heights v. Metro. Hous. Devel. Corp.*, 429 U.S. 252, 564 (1977) ("Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action . . . ."); *United States v. Baxter*, 778 Fed. Appx. 617, 620 (11th Cir. 2019) (stating, when explaining that the government established a prima facie case under *Batson*, that "as the government noted, Juror M had not given any responses that would offer a facially race-neutral reason for using a peremptory strike").  Nevertheless, the state court dismissed this point as "counsel's opinion" and said nothing else about it.  *Johnson*, 823 So. 2d at

---

[7] The state court's attempt to assert "valid race-neutral reasons" for any strikes was itself contrary to *Batson*.  The question in a *Batson* analysis is not whether the court can imagine a race-neutral reason for a strike; instead, the question is whether the prosecutor's *actual reason* for the strike was race-neutral.  *See Miller-El v. Dretke*, 545 U.S. at 252 ("A *Batson* challenge does not call for a mere exercise in thinking up any rational basis.").  Regardless, when a state court attempts to claim reasons for the prosecution's strikes and still does not identify any obvious reasons for three of them, that simply highlights that the record supports a prima facie case.

19; *see Porter v. McCollum*, 558 U.S. 30, 43 (2009) (per curiam) (declining to grant deference where the state court "unreasonably discounted" relevant evidence).

Respondent gives short shrift to this point as well, claiming that the "pivotal fact" is that the juror questionnaires were not included in the direct-appeal record.  (Doc. 41 at 11.) However, the Supreme Court has made clear that prosecutors rarely exercise strikes for reasons that go unaddressed in voir dire.  As the Court explained in *Miller-El*, a case decided under § 2254(d), "[t]he State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination."  *Miller-El v. Dretke*, 545 U.S. at 246.  Respondent's unsupported speculation that the prosecutors may have struck Black prospective jurors for reasons that were based on juror questionnaires—even though those reasons were not addressed in voir dire— highlights that a full *Batson* hearing is necessary.

**Fourth**, several of the struck Black prospective jurors made statements in voir dire that suggested they would be favorable jurors for the prosecution.  As Johnson's counsel told the trial court, Black prospective juror Charles Hope had a brother who was a Birmingham police officer, yet the prosecutors still struck him.  (Doc. 36-2 at 63.)  Johnson's counsel stated: "[H]is brother, Lieutenant James Hope is a Birmingham police officer, which might give some indication that the Defense might want to strike him, but I can't for the life of me understand why the State would, other than it's because of the fact that he's black."  (Doc. 36-2 at 63; *see also* Doc. 36-1 at 99 (Hope stating that his brother was a police officer "[h]ere, [in] Birmingham").)  Counsel also noted that the prosecutors struck Flora Williams, a Black woman who had two first cousins who were police officers, as well as several Black jurors who had been victims of crime.  (*See* Doc. 36-2 at 64-65; *see also* Doc. 36-1 at 102 (Williams stating, "I have two first cousins that are

14

police officers, one in Pittsburgh, Pennsylvania, and one in Mobile."); Doc. 36-1 at 92 (Williams

stating, "My house was broken into, and when we got there he was still there."); Doc. 36-1 at 90

(Annette Wilson stating that she had been the victim of a crime).)

Johnson's counsel was correct that those facts were relevant.  In its *Batson* decisions, the

Supreme Court has often noted that a struck juror appeared favorable to the party that struck

them.  For example, in *Miller-El*, the Court introduced one of the jurors struck by the prosecution

as "Billy Jean Fields, a black man who expressed unwavering support for the death penalty."

*Miller-El v. Dretke*, 545 U.S. at 242; *see also*, *e.g.*, *Flowers v. Mississippi*, 588 U.S. 284, 312

(2019) ("In this case, Carolyn Wright was a black prospective juror who said she was strongly in

favor of the death penalty as a general matter.  And she had a family member who was a prison

security guard.  Yet the State exercised a peremptory strike against Wright.").  Here, by contrast,

the state court declined to acknowledge that several of the struck jurors had made statements that

suggested they would be favorable jurors for the prosecution.  *See Johnson*, 823 So. 2d at 19.

Respondent makes no attempt to address this point.

The circumstances above were more than sufficient to support an inference of

discrimination, but the state court demanded additional evidence—in clear violation of *Batson*.

The state court reasoned that because a prior state-court decision had included a list of types of

evidence that could support a prima facie case, the court could fault Johnson for not presenting

specific types of evidence that were included on the list.  *Johnson*, 823 So. 2d at 19.[8]  Using that

approach, the court relied on the fact that Johnson "did not offer evidence, nor even allege" that

---

[8] The state court cited *Madison v. State*, 718 So. 2d 90, 101-02 (Ala. Crim. App. 1997), but the
Eleventh Circuit later held that the decision in *Madison*—which was made by the same state
court at issue here—was "contrary to clearly established federal law under 28 U.S.C.
§ 2254(d)(1) because the court increased Madison's prima facie burden beyond what *Batson*
requires."  *Madison v. Comm'r, Ala. Dept. of Corr.*, 677 F.3d at 1338.

"the prosecutor had a history of using peremptory challenges in a manner that discriminated against black veniremembers" or that "black and white veniremembers were treated differently." *Id.* at 20. That approach is incompatible with *Batson*.

The critical point of *Batson* is that a defendant is *not* required to establish a history of discrimination. Under *Swain v. Alabama*, 380 U.S. 202 (1965), which governed peremptory strikes before *Batson*, a defendant was required to show that the State was striking Black jurors "in case after case, whatever the circumstances." *Id.* at 223. That ended with *Batson*. As the Supreme Court has explained:

> *Swain*'s demand to make out a continuity of discrimination over time . . . turned out to be difficult to the point of unworkable, and in *Batson v. Kentucky*, we recognized that this requirement to show an extended pattern imposed a "crippling burden of proof" that left prosecutors' use of peremptories "largely immune from constitutional scrutiny." By *Batson*'s day, the law implementing equal protection elsewhere had evolved into less discouraging standards for assessing a claim of purposeful discrimination, and we accordingly held that a defendant could make out a prima facie case of discriminatory jury selection by "the totality of the relevant facts" about a prosecutor's conduct during the defendant's own trial.

*Miller-El v. Dretke*, 545 U.S. at 239; *see also Batson*, 476 at 95-96. It is impermissible for a court to require a defendant to present historical evidence to meet step one under *Batson*. Yet the state court based its ruling in part on the fact that Johnson failed to present evidence that "the prosecutor had a history of using peremptory challenges in a manner that discriminated against black veniremembers." *Johnson*, 823 So. 2d at 20.

The state court's claim that Johnson failed to show that "black and white veniremembers were treated differently" reflects an erroneous analysis as well. The court was looking for evidence of "disparate treatment of veniremembers with the same characteristics or type of responses." *Johnson*, 823 So. 2d at 19 (quoting *Madison v. State*, 718 So. 2d 90, 101-02 (Ala. Crim. App. 1998)). But the primary way for a defendant to show that kind of disparate treatment

16

is by conducting a comparative juror analysis based on the reasons the prosecution provides for its strikes.  The opportunity for that arises at step three—not at step one—because it turns on the race-neutral reasons that the prosecution offers.  *See*, *e.g.*, *Miller-El v. Dretke*, 545 U.S. at 241 ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step.").  Here, the trial court terminated the *Batson* process at step one, making it impossible for Johnson to conduct a meaningful comparative juror analysis.

The state court also conflated the various steps of the *Batson* process, declaring toward the end of its analysis that it "cannot presume that there are no valid race-neutral reasons when the record is incomplete on the issue."  *Johnson*, 823 So. 2d at 20-21.  Under a proper *Batson* analysis, step one has nothing to do with presuming or concluding that there are valid race-neutral reasons for the prosecutors' strikes.  The question at step one is whether the relevant circumstances are sufficient to "raise an inference" of discrimination.  *Batson*, 476 U.S. at 96.  It is not until steps two and three—neither of which was reached in this case—that the court must determine whether the prosecution has proffered race-neutral reasons and whether those race-neutral reasons were the actual reasons for the strikes.  *See Batson*, 476 U.S. at 96; *Madison v. Comm'r, Ala. Dept. of Corr.*, 677 F.3d at 1337 ("It is not until the third step of the *Batson* framework, after considering the objection as well as the reasons proffered for the strike, that a judge decides whether there is sufficient persuasive evidence to prove discrimination.").

Respondent tacks on an additional error that is not even included in the state-court decision, arguing that Johnson did not establish a prima facie case of discrimination because the prosecutors did not obtain an all-white jury.  (Doc. 38 at 27; Doc. 41 at 9-10.)  The Supreme

Court has never suggested that the presence of a Black citizen on the final jury negates a prima facie case.  To the contrary, the Court has made clear that "even a single instance of race discrimination against a prospective juror is impermissible."  *Flowers*, 588 U.S. at 300; *see also Foster v. Chatman*, 578 U.S. 488, 514 (2016) ("Two peremptory strikes on the basis of race are two more than the Constitution allows."); *Batson*, 476 U.S. at 96-97 (explaining the three-step process for challenging a strike or strikes).  Consistent with that principle, many federal habeas courts have found that state prosecutors violated *Batson* by striking Black prospective jurors even though other Black prospective jurors were seated.[9]

Under both § 2254(d)(1) and § 2254(d)(2), the state court's decision warrants no deference.  The state court engaged in an unreasonable application of *Batson*'s first step by discounting the circumstances indicating discrimination, faulting Johnson for failing to present evidence that is not required, and demanding far too great a showing.  *See* § 2254(d)(1); *Batson*, 476 at 96-97; *McGahee*, 560 F.3d at 1262.  The state court also relied on an unreasonable determination of the facts by holding that Johnson's counsel presented "no evidence, beyond statistics and his counsel's opinion," *Johnson*, 823 So. 2d at 19, when counsel highlighted numerous circumstances that, viewed collectively, were more than sufficient to establish a prima facie case.  *See* § 2254(d)(2); *Miller-El v. Dretke*, 545 U.S. at 266; *Bui v. Haley*, 321 F.3d 1304, 1315-16 (11th Cir. 2003).

---

[9] *See, e.g.*, *Adkins v. Warden*, 710 F.3d 1241, 1244, 1258 (11th Cir. 2013) (granting *Batson* relief under § 2254 even though the prosecution did not strike two of the Black prospective jurors and one of them served on the jury); *Harris v. Hardy*, 680 F.2d 942, 946, 965 (7th Cir. 2012) (granting *Batson* relief under § 2254 where two Black citizens served on the jury); *Rice v. White*, 660 F.3d 242, 246, 256-57 (6th Cir. 2011) (granting *Batson* relief under § 2254 where the trial court believed that the *Batson* problem was "cured" because there were other Black citizens on the jury); *Walker v. Girdich*, 410 F.3d 120, 121-24 (2d Cir. 2005) (granting *Batson* relief under § 2254 even though five Black jurors served).

**B.    Johnson established a prima facie case and is entitled to proceed to steps two and three of the *Batson* process.**

Because the state court's decision on the *Batson* issue is not entitled to deference under § 2254(d), this Court should conduct a de novo review of the issue, find that Johnson established a prima facie case, and conduct a hearing to complete the *Batson* process.  As the Eleventh Circuit has explained, "Where we have determined that a state court decision is an unreasonable application of federal law under 28 U.S.C. § 2254(d), we are unconstrained by § 2254's deference and must undertake a de novo review of the record."  *McGahee*, 560 F.3d at 1266; *see also*, *e.g.*, *Jones v. Walker*, 540 F.3d 1277, 1288 n.5 (11th Cir. 2008) ("[B]ecause . . . the petitioner has met the requirement of § 2254(d)(2) by showing the state courts made an unreasonable factual determination, we review Jones' claim de novo, without deference to the Georgia Supreme Court's decision.").

Under a proper analysis, Johnson plainly established a prima facie case.  He was required to show only that the circumstances were sufficient to "raise an inference" of discrimination. *Batson*, 476 U.S. at 96; *Johnson v. California*, 545 U.S. at 170; *Madison v. Comm'r, Ala. Dept. of Corr.*, 677 F.3d at 1337.  He made that showing.  The Supreme Court has recognized that a case in which a Black capital defendant objects to the prosecution striking Black jurors is "one of the easier cases" in which to establish a prima facie case.  *Powers*, 499 U.S. at 416.  The prosecution in this case struck six of the nine Black prospective jurors, which was clearly "a 'pattern' of strikes."  *Batson*, 476 U.S. at 97.  In addition, the voir dire transcript shows not only that there were no obvious reasons for several of the prosecution's strikes, but also that several of the struck jurors made statements indicating that they would be favorable jurors for the prosecution. *See supra* Part I(A).

When a federal habeas court determines in a § 2254 analysis that the petitioner established a prima facie case under *Batson*, the proper course of action is for the court to hold an evidentiary hearing and complete the *Batson* process.  In *Madison*, the Eleventh Circuit held that the state court unreasonably failed to recognize the defendant's prima facie case, and it remanded the case to the district court for steps two and three.  *Madison*, 677 F.3d at 1339; *see also id.* ("[W]e reverse the district court's order and remand the case for the district court to complete the final two steps of the *Batson* proceedings.").  Other circuits have taken the same approach.  *See, e.g.*, *Johnson v. Martin*, 3 F.4th 1210, 1227 (10th Cir. 2021) (holding that the state court's decision denying a prima facie case of discrimination was not entitled to deference under § 2254(d), that the petitioner established a prima facie case, and that the appropriate remedy was a remand to the district court for an evidentiary hearing).

Here, as in *Madison*, this Court should find that the state court's decision at step one was unreasonable, that the evidence was sufficient to raise an inference of discrimination, and that a hearing is required to complete the *Batson* process.  Johnson respectfully submits that if a hearing were granted, he would then demonstrate that the prosecution's strikes of the Black prospective jurors violated *Batson* and the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and therefore his conviction and sentence should be vacated.

## II.    The State withheld material evidence, violating Johnson's due process rights.

Respondent does not dispute that the State paid its key witness $5,000 for her testimony and concealed the payment for 18 years.  Instead, Respondent defends the state court's conclusion that the witness, Violet Ellison, was not aware of the State's reward offer before trial, and therefore the State did not violate *Brady v. Maryland*, 373 U.S. 83 (1963).  (Doc. 38 at 27-49; Doc. 41 at 12-15.)  That conclusion is unreasonable both factually and legally.  *See*

20

§ 2254(d).  The State's own paperwork shows that Ellison received the payment because she provided information "pursuant to the public offer of a reward" (Doc. 36-60 at 73), and under longstanding Alabama law, she would have been eligible for the reward payment *only* if she knew about the offer when she provided information, *see Gadsden Times v. Doe*, 345 So. 2d 1361, 1363 (Ala. Civ. App. 1977).

The state court went to great lengths to deny relief under *Brady*.  *Johnson v. State*, 379 So. 3d 994, 1065-79 (Ala. Crim. App. 2007).  In its decision following multiple remands, the court recognized that under *Gadsden Times*, a person claiming a reward in Alabama "must have knowledge of [the] reward at the time of performing the services for which the reward is offered in order to be entitled to the reward."  *Id.* at 1069.  However, the court then stated that the *Gadsden Times* rule applies only to private rewards, not to public rewards, which enabled the court to conclude that Ellison being eligible for the reward (as confirmed by multiple state attorneys) did not necessarily mean that she knew about it prior to Johnson's trial.  *Id.* at 1070-71.  No Alabama court had ever made that distinction between private rewards and public rewards before.  The state court simply created a new rule out of thin air and then used the new rule to interpret events that had occurred decades earlier.  At the same time, the court disregarded critical facts that would have undermined its conclusion, including the fact that the State affirmatively misrepresented the contents of its own files when concealing the payment to Ellison.  (*See* Doc. 36-63 at 40 (the State claiming, in 2018, that its files contained "[n]othing about anyone applying for a reward or being granted a reward" even though the files contained a copy of a $5,000 check made out to Ellison in 2001).)

The United States Supreme Court held in *Brady* that the prosecution is prohibited from suppressing material evidence in a criminal case.  *Brady*, 373 U.S. at 87.  Material evidence

includes evidence concerning a witness's hope or expectation of being paid by the prosecution.
*See Banks v. Dretke*, 540 U.S. 668, 691 (2004); *Kyles v. Whitley*, 514 U.S. 419, 442 & n.13
(1995); *United States v. Bagley*, 473 U.S. 667, 676 (1985).  Here, the State paid Ellison a \$5,000
reward that she could claim *only* if she had knowledge of it when she came forward.  Yet the
State never informed Johnson or his counsel of any connection between Ellison and the reward.
This was a clear violation of *Brady*, and Johnson is entitled to a new trial.

> **A.      The state court's decision was based on an unreasonable determination of the facts in light of the state-court record.**

The state court's decision relies on the factual determination that Johnson "did not prove
that, at any time before or during Johnson's trial, Ellison knew about or hoped to get a reward."
*Johnson*, 379 So. 3d at 1079.  Respondent argues that this Court owes "absolute deference" to
that factual determination for two reasons—first, that federal courts are not permitted to "second-
guess" state-court factual determinations under AEDPA, and second, that the state court's
determination was based on state law.  (Doc. 38 at 48-49; Doc. 41 at 8-9.)  Respondent is
incorrect on both points.

With respect to AEDPA, the Supreme Court has recognized repeatedly that federal courts
should not defer blindly to state-court factual determinations.  Consistent with the language of
§ 2254(d)(2), federal courts conduct de novo review where a state court relied on an
unreasonable determination of the facts.  In *Miller-El v. Dretke*, 545 U.S. 231 (2005), the
Supreme Court held that a state court's factual determinations—including determinations about
the credibility of individuals—were unreasonable because they were belied by the totality of the
evidence.  *Id.* at 247-66.  Similarly, the Eleventh Circuit has found state-court factual
determinations unreasonable in numerous cases.  *See, e.g.*, *Ward v. Hall*, 592 F.3d 1144, 1177-78
(11th Cir. 2010); *Jones v. Walker*, 540 F.3d 1277, 1288 (11th Cir. 2008); *Bui v. Haley*, 321 F.3d

1304, 1315 (11th Cir. 2003).  Therefore, the fact that the state court credited Ellison's testimony

that she was unaware of the reward when she came forward does not end the inquiry.  The

deference required by § 2254(d)(2) "does not by definition preclude relief," *Miller-El v. Cockrell*,

537 U.S. 322, 340 (2003), and it should not preclude relief here.

As for state law, the question of whether Ellison knew about the reward at the time of

Johnson's trial was not "decided on a state law basis," as Respondent suggests.  (*See* Doc. 41 at

15.)  The question was decided based on the evidence *in light of the state law that was in place*

*from 1995 to 2001*, which is a matter of historical fact.  Federal issues often involve "the status

of state law [at] a given moment in the past," *Bouie v. City of Columbia*, 378 U.S. 347, 354

(1964), and when that situation arises, federal courts are not bound by state courts' *subsequent*

interpretations of the law.  *See NAACP v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 456

(1958) (refusing to allow a retroactive change to Alabama law to affect the petitioner's case

because it was impossible "to reconcile the . . . holding of the Alabama Supreme Court in the

present case with its past unambiguous holdings"); *Ward*, 592 F.3d at 1177-78 (holding that a

Georgia court relied on an unreasonable determination of the facts under § 2254(d)(2) in part

because its ruling was inconsistent with the Georgia Supreme Court's case law at the relevant

time).  Therefore, the state court's conclusion is not subject to "absolute" or "unconditional"

deference; it is subject to the same reasonableness analysis as any other factual determination

made by a state court.

A proper understanding of Alabama's reward law in the period of 1995 to 2001 is critical

to making a reasonable determination of the facts with respect to the State's payment to Ellison.

The law at issue concerns *when* a person must learn about a reward in order to be eligible for it.

In the 1977 case of *Gadsden Times v. Doe*, 345 So. 2d 1361 (Ala. Civ. App. 1977), the Alabama

Court of Civil Appeals discussed the legal landscape and clarified the rule for Alabama:

> Jurisdictions are split over whether one must have knowledge of a reward at the time of performing the services for which the reward is offered in order to be entitled to the reward.  53 A.L.R. 542.  *Alabama, however, as do the majority of jurisdictions, requires such knowledge.*

*Id.* at 1363 (emphasis added).  That was the controlling law regarding reward eligibility in

Alabama in 1995, when the reward offer was made in Johnson's case; in 1998, when Ellison

testified at Johnson's trial; and in 2001, when the State paid Ellison $5,000.

The status of the law at those times is significant because the State ultimately determined

that Ellison was eligible for $5,000 of state funds.  In fact, three different state attorneys

determined that she was entitled to the payment.  (Doc. 36-30 at 70-82.)  The attorneys sent

multiple e-mails to each other discussing the wording of their request, and they submitted

paperwork stating that "Ellison, pursuant to the public offer of a reward, gave information

leading to the conviction of Toforest Johnson in the Circuit Court of Jefferson County, Alabama,

in the death of Mr. Hardy."  (Doc. 36-30 at 80-81; Doc. 36-30 at 73.)

The only reasonable interpretation of that evidence is that the State paid Ellison because

she provided information pursuant to the State's reward offer (as its own documents say) and

because she conveyed to the State that she knew about the reward offer when she came forward

(as the law required for eligibility).  The state attorneys tasked with handling the reward payment

never would have authorized the payment unless they first determined Ellison's eligibility in

accordance with longstanding state law.  *See Banks*, 540 U.S. at 696 ("Ordinarily, we presume

that public officials have properly discharged their official duties.").

However, in its 2022 decision in this case, the state court found for the first time that the

knowledge requirement from *Gadsden Times* applies only to *private* rewards, not to *public*

rewards—and therefore Ellison was eligible for the reward after Johnson's trial regardless of whether she had previous knowledge of it. *Johnson*, 379 So. 3d at 1069-71. To support its decision, the state court pointed to the fact that a private party offered the reward at issue in *Gadsden Times*. *Id.* (citing *Gadsden Times*, 345 So. 2d at 1364). The state court then declared, without any support, that the rule for public rewards is different.[10]

To be clear, the court in *Gadsden Times* made no distinction between private and public rewards. The issue in the case was "whether one must have knowledge of a reward at the time of performing the services for which the reward is offered in order to be entitled to the reward." *Gadsden Times*, 345 So. 2d at 1363. The answer was yes. Moreover, the record from the case contradicts the state court's analysis and makes clear that the knowledge requirement applied equally to private and public rewards. The witness in *Gadsden Times* attempted to collect two rewards—a public reward, offered by the Governor, and a private reward, offered by the newspaper. The record shows that the witness received the public reward, and he was entitled to it *because he was aware of it when he came forward*.[11] At the same time, the witness was not entitled to the private reward *because he was not aware of that reward at the time he came forward*. *Id.* at 1364. The entire point of *Gadsden Times* was to clarify that a witness in Alabama is entitled to a reward—private or public—*only* if he had knowledge of the reward offer when he came forward. *Id.* at 1363-64.

---

[10] The state court cited the statute that authorizes the Governor to pay rewards in criminal cases, noting that the statute does not contain a specific knowledge requirement. *Johnson*, 379 So. 3d at 1071 & n.6 (citing Ala. Code § 15-9-1). But that statute does not in any way exempt public rewards from the general body of law regarding reward eligibility.

[11] *See* Transcript at 200, *Gadsden Times v. Doe*, 345 So. 2d 1361 (Ala. Civ. App. 1977) (Witness: "When I talked to Chief Cary the thing I remember most, there was a reward of $6,000. . . ." Counsel: "Did the $6,000 include the Thousand Dollar State reward?" Witness: "Yes, it did."). The record from *Gadsden Times* is available at the Alabama Department of Archives & History, which is located at 624 Washington Avenue, Montgomery, Alabama 36104.

Once that legal context is properly understood, the evidence points to one conclusion: Ellison knew about the reward from the start, which is why the State paid her in the end. Significantly for purposes of *Brady*, it is undisputed that State officials did not have any substantive discussions with Ellison between the 1998 trial and the 2001 payment. (Doc. 36-61 at 68-70.) Therefore, the only way they could have known that she qualified was if they had already known, prior to trial, that she was aware of the reward offer.

The state court's decision is particularly unreasonable in light of the State's own conduct over the course of the case, which Respondent declines to address. If there were nothing problematic about the State's $5,000 payment to Ellison, there would have been no reason for the State to conceal the payment *for 18 years*. Yet the State did exactly that—it paid Ellison without informing Johnson or his counsel, and it then prevented Johnson from obtaining information about the payment from 2001 to 2019. Even when Johnson raised his *Brady* claim regarding Ellison and the reward, the State denied the allegations and continued to conceal the fact that the payment had been made. (Doc. 36-16 at 49.) If not for a retired state employee informing Johnson's counsel in 2018 that the State maintained a confidential reward file, Johnson never would have obtained the documents about the payment.

The following timeline shows the State's representations about the payment over the years:

| Year | State's Representations About the Payment to Ellison |
|------|-------------------------------------------------------|
| 2001 | When the State paid Ellison a $5,000 reward, it filed the paperwork *ex parte*, and it did not disclose anything about the payment to Johnson or his counsel.  (Doc. 36-60 at 70-78.) |
| 2005 | In response to Johnson's claim under *Brady* that Ellison was hoping to receive a reward and was paid $5,000, the State explicitly denied the allegations, and it did not disclose anything about the reward payment.  (Doc. 36-16 at 49.) |
| 2017 | The State agreed that the Supreme Court should GVR Johnson's case due to an error below, but it asserted that the *Brady* claim should be summarily dismissed on other grounds, and it did not disclose anything about the reward payment.  (Doc. 36-57 at 146-47.) |
| 2018 | On remand, counsel for the State asserted in a hearing that the State's file contained "[n]othing about anyone applying for a reward or being granted a reward."  (Doc. 36-63 at 40.) |
| 2019 | After a retired state employee disclosed to Johnson's counsel that the State had maintained a confidential reward file, the State disclosed—for the first time—its file regarding the $5,000 payment to Ellison. (Doc. 36-58 at 95-96; Doc. 36-60 at 65-81.) |

When the State finally produced the relevant documents in 2019, it claimed that the documents had not been disclosed earlier because they were "misfiled."  (Doc. 36-60 at 65.)  The State offered this explanation without any acknowledgment that Johnson had been trying to obtain the documents for 18 years while incarcerated on death row based on Ellison's testimony.[12]

_____

[12] The State attempted to dispute that it disclosed the documents only because a retired state employee spoke out about the separate reward file.  (Doc. 36-66 at 110.)  But the timeline speaks for itself.  On December 20, 2018, Johnson filed a "Renewed Motion for Discovery in Light of Disclosures to Date."  (Doc. 36-58 at 94-97.)  In the motion, he explained that the State still had not produced any documents concerning Ellison and the reward.  (Doc. 36-58 at 96.)  He also informed the court that a retired state employee had told his counsel "that the District Attorney's

Respondent also declines to address the fact that Ellison's testimony at the state post-conviction hearing conflicted directly with the State's own representations about how the reward payment came about.  In its opening statement at the post-conviction hearing in 2019, the State said that *Ellison contacted the district attorney's office* in 2001 to seek the reward.  (*See* Doc. 36-60 at 166 ("[S]he made an inquiry to the district attorney's office.  And she made an application.").)[13]  That explanation was difficult to believe; why would a witness who had never heard of a reward offer when she came forward in 1995 and testified in 1998 suddenly seek payment in 2001?  Ellison then testified at the post-conviction hearing, and her story was different.  She testified that *the district attorney's office contacted her* and told her to come in, sign some papers, and get $5,000: "I didn't know anything about a reward until approximately three years later . . . when I got a call from the district attorney's office . . . asking me to come in and sign some papers."  (Doc. 36-61 at 4-5.)  Ellison's explanation made even less sense; why would the State contact a witness, out of the blue, three years after a trial, to pay her a $5,000 reward she knew nothing about?  The only logical explanation is that the State had discussed the reward with Ellison at the time of the trial, and the payment simply followed the affirmance of

---

office maintained a separate reward file" containing documents about payments to witnesses. (Doc. 36-58 at 96.)  The following day, the court issued another discovery order, this time specifically instructing the State to produce "any separate file containing any documentation whatsoever, regarding a reward request, offer, or payment in this case."  (Doc. 36-58 at 36.) Within one month of that order, the State produced its reward file for the first time.  (Doc. 36-60 at 65.)  This was 18 years after the payment to Ellison (Doc. 36-60 at 66), 14 years after Johnson first raised his *Brady* claim regarding the reward (Doc. 36-17 at 173-81), and three months after the State declared in open court that its files contained "nothing" about anyone seeking or receiving a reward (Doc. 36-63 at 40).

[13] The state court refused to consider the State's opening statement at the post-conviction hearing on the ground that opening statements are not evidence.  *See Johnson*, 379 So. 3d at 1076-77. But federal courts often look to the actions and representations of state actors when evaluating *Brady* claims.  *See Banks*, 540 U.S. at 694-96.  The fact that Ellison and the State could not keep their stories straight about their interactions with each other is clearly relevant to the suppression issue in this case.

Johnson's conviction on direct appeal.  *See Johnson*, 823 So. 2d at 57.  Respondent makes no attempt to address the discrepancies between the accounts of Ellison and the State, relying instead on the argument that this Court is powerless to review state-court determinations, no matter how implausible.

When everything in the record is considered together—the legal context surrounding the payment to Ellison, the State's concealment of the payment for 18 years, and the conflicting stories about how the payment came about—the state court's conclusion "blinks reality."  *Miller-El v. Dretke*, 545 U.S. at 266.  The determination that Ellison had no knowledge of the reward at the time of Johnson's trial constitutes an unreasonable determination of the facts and warrants no deference under § 2254(d)(2).

**B.      The state court's decision constitutes an unreasonable application of clearly established federal law.**

Beyond its factual errors, the state court engaged in an unreasonable application of clearly established Supreme Court law.  Respondent argues that the state court's decision cannot be unreasonable under § 2254(d)(1) because the facts of Johnson's case are not "materially indistinguishable" from the facts of a Supreme Court case applying *Brady*.  (Doc. 38 at 47-48.) That argument is based on a misunderstanding of § 2254(d)(1).  Johnson is not required to show that his case is identical to a Supreme Court case; he simply must show that the state court applied the Supreme Court's *Brady* law in an unreasonable manner—and he has made that showing.

Respondent's approach conflates the two provisions of § 2254(d)(1).  As the Supreme Court has explained, the "contrary to" and "unreasonable application" provisions each have their own independent meaning.  The "contrary to" provision applies to situations in which "[a] state court applies a rule that contradicts the governing law" or "[a] state court confronts a set of facts

29

that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). The "unreasonable application" provision applies to situations in which a state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* at 407-08. Nevertheless, Respondent argues that Johnson cannot establish an "unreasonable application" unless he can show that his case is "materially indistinguishable" from a Supreme Court case. (Doc. 38 at 47-48.) Stated differently, Respondent's position is that Johnson cannot establish an "unreasonable application" unless he can meet the separate "contrary to" standard. That approach is wrong.

To establish that the state court engaged in an "unreasonable application" of *Brady*, Johnson must show only that the state court unreasonably applied the "governing legal principles" of the Supreme Court's *Brady* cases. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003). As the Supreme Court has explained: "AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied. Nor does AEDPA prohibit a federal court from finding an application of a principle unreasonable when it involves a set of facts different from those of the case in which the principle was announced." *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007). The "governing legal principles" of *Brady*, *Banks*, *Kyles*, and *Bagley* are the following:

> **(1)     the prosecution is prohibited from suppressing evidence that is favorable to the defense and material**, *see Brady*, 373 U.S. at 87 ("[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."); *see also Banks*, 540 U.S. at 691 ("[There are] three components or essential elements of a *Brady* prosecutorial misconduct claim: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."); *Kyles*, 514 U.S. at 432 (same principle); and

    **(2)**    **evidence concerning a witness's hope of obtaining payment from the State is favorable to the defense and may be material**, *see Banks*, 540 U.S. at 691 ("[B]eyond genuine debate, the suppressed evidence relevant here, Farr's paid informant status, qualifies as evidence advantageous to Banks."); *id.* at 701 (the suppressed evidence was material because "Farr's testimony was the centerpiece of [the prosecution's] case); *Kyles*, 514 U.S. at 442 n.13 ("[T]he *Brady* evidence would have revealed at least two motives for Beanie to come forward [including that] he was interested in reward money. . . ."); *Bagley*, 473 U.S. at 676 (recognizing the power of impeachment based on financial incentives and explaining that "[the] possibility of a reward gave [prosecution witnesses] a direct, personal stake in respondent's conviction").

The state court unreasonably applied those governing principles. The State made a secret payment to Ellison, its key witness, pursuant to a reward offer, and Ellison would not have been eligible for the payment unless she had knowledge of the offer when she came forward.

        Respondent's attempts to distinguish the facts of Johnson's case from the facts of *Banks*, *Kyles*, and *Bagley* are irrelevant. According to Respondent, *Banks* has "no application" because it "dealt with a paid informant"; *Kyles* is irrelevant because the prosecution there also suppressed other, non-reward evidence; and *Bagley* has no bearing because the Supreme Court remanded the case to allow the lower court to make the ultimate materiality finding in the first instance. (Doc. 38 at 48-49; Doc. 41 at 14.) Those distinctions are inconsequential; Respondent simply compared the facts of the cases and found one factual difference for each case. But the Supreme Court has applied the "unreasonable application" provision of § 2254(d)(1) in many cases in which the facts were not identical to the facts of a Supreme Court case. *See*, *e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 528-29 (2003) (holding that the state court unreasonably applied *Strickland v. Washington*, 466 U.S. 668 (1984), in failing to find counsel ineffective even though *Strickland* did not involve a finding that counsel were ineffective). The key question is whether the state court applied the "governing principles" of *Brady* in an unreasonable manner, and here, the state

court did exactly that by holding that the State's payment and reward documents did not establish suppression.

Because the state court's decision under *Brady* is not entitled to deference under § 2254(d), this Court should "undertake a de novo review of the record." *McGahee v. Ala. Dept. of Corr.*, 560 F.3d 1252, 1266 (11th Cir. 2009). The record shows that the State suppressed evidence that Ellison was hoping to receive a reward and ultimately obtained $5,000 in exchange for her testimony. That evidence was favorable to the defense and material. The primary issue for the jury was whether to believe Ellison or not. To address this, the prosecutor argued that Ellison was an unimpeachable witness with no reason to lie. (*See, e.g.*, Doc. 36-5 at 83 ("Violet Ellison was one of those people that just happens to be in the right place for us sometimes . . . ."); Doc. 36-5 at 88 ("[S]he told you her conscience wouldn't let her do it. And that's exactly the kind of response you would expect from a person who got into the case like she did . . . .").) If Johnson's counsel had known that Ellison was hoping to receive a $5,000 payment in exchange for her testimony, they would have used that information to expose her reason to lie, thereby changing the course of the trial.

Under a proper analysis, Johnson is entitled to relief from his conviction and death sentence under *Brady* and the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

### III.   The State violated Johnson's due process rights when it knowingly presented false testimony against him.

In addition to his claim that the State suppressed material evidence, Johnson alleged that the State knowingly presented false evidence against him, including evidence that Violet Ellison came forward because "[her] conscience bothered [her]" when she actually "came forward pursuant to the reward offer in the case." (Doc. 37 at 38 (citing *Napue v. Illinois*, 360 U.S. 264,

269 (1959)).)  The state courts summarily dismissed this claim on the ground that it "could have been, but [was] not, raised on direct appeal." *Johnson v. State*, 379 So. 3d 994, 1012 (Ala. Crim. App. 2007).  Now, in this Court, Respondent argues that the state court's ruling constitutes an adequate and independent state ground barring review.  (Doc. 38 at 50-51; Doc. 41 at 15-16.)  However, the state court's procedural ruling is directly intertwined with the federal issue of whether the State presented false evidence.  If Johnson can establish that the State knowingly presented false evidence against him and concealed that the evidence was false, he necessarily would overcome any reasonable application of the state procedural bar.

Johnson's claim involves three categories of false evidence:

▪ Ellison testified that she came forward because of her conscience, but the State knew that she came forward pursuant to the reward offer (Doc. 36-4 at 86; Doc. 37 at 38);

▪ Officer James Evans testified that he approached the car in which Johnson was riding on the night of the offense because a witness at the hotel had described seeing a 1972 black Monte Carlo, yet no such description had been provided (Doc. # 36-3 at 151; Doc. 37 at 38-39); and

▪ Officer Evans testified that the car in which Johnson was riding on the night of the offense was never searched, despite the fact that the prosecution knew that the police had searched the car and found nothing incriminating (Doc. # 36-3 at 160; Doc. 37 at 39-40).

In the state post-conviction proceedings, the State argued that this claim could have been raised at trial or on direct appeal and was therefore procedurally barred.  (Doc. 36-16 at 53-54.)  Johnson responded by requesting an opportunity to present evidence to disprove the procedural bar (Doc. 36-16 at 188-89), but the circuit court summarily dismissed the claim (Doc. 36-19 at 63).  The appellate court then affirmed on appeal, holding that the claim could have been raised in the trial court.  *Johnson*, 379 So. 3d at 1012.  As a result, Johnson was never given an

opportunity to prove that the State concealed the fact that its evidence was false throughout the trial and direct-appeal proceedings.

The Supreme Court has recognized that a state procedural ruling does not bar federal review where the procedural ruling is intertwined with the merits of the federal issue. *See Ake v. Oklahoma*, 470 U.S. 68, 75 (1985) ("[W]hen resolution of the state procedural law question depends on a federal constitutional ruling, the state-law prong of the court's holding is not independent of federal law . . . ."); *see also Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001) (explaining that for a state-court ruling to constitute an adequate and independent state ground, it "may not be intertwined with an interpretation of federal law"). Here, the point of Johnson's claim is that the State concealed that its evidence was false throughout the trial proceedings; if that were proven true, it necessarily would undermine the state procedural ruling that Johnson could have presented the claim at trial—and therefore, the state ruling would not be an "adequate and independent" state ground. *See Foster v. Chatman*, 578 U.S. 488, 497-98 (2016) (holding that there was no adequate and independent state ground because the state procedural bar would be applicable only if the constitutional claim was without merit). For the same reason, if Johnson's federal claim were found meritorious, he necessarily would overcome any procedural default by showing cause and prejudice. *See Banks v. Dretke*, 540 U.S. 668, 691 (2004) (explaining that in due process cases involving the concealment of evidence, cause and prejudice "parallel" the components of the constitutional claim).

Respondent's reliance on the state court's 2007 ruling is particularly problematic in light of the developments of the past 17 years. At the time of the 2007 ruling, the State still had not disclosed that it paid Ellison $5,000 for her testimony, and it continued to conceal the payment long after that. In 2018, the State's counsel declared in open court that its files contained

"[n]othing about anyone applying for a reward or being granted a reward."  (Doc. 36-63 at 40.)

But in 2019, the State was forced to disclose, for the first time, a file documenting its payment to

Ellison.  (Doc. 36-60 at 65-81); *see supra* Part II (explaining the timeline in detail).  In other

words, developments since 2007 demonstrate that the State concealed that its evidence was false.

Those developments undermine Respondent's argument that the procedural ruling from 2007

resolves the issue.

Because the state court's ruling does not preclude federal review, Johnson respectfully

respects that this Court consider the claim on the merits, hold an evidentiary hearing, and vacate

Johnson's conviction under *Napue* and the Fifth, Sixth, Eighth, and Fourteenth Amendments to

the United States Constitution.

## IV.    Trial counsel for Johnson were constitutionally ineffective.

Johnson's trial attorneys were ineffective with respect to both the guilt phase and the

penalty phase in this capital case.  In state post-conviction proceedings, Johnson challenged his

counsel's performance, and the state courts denied relief.  *Johnson v. State*, 379 So. 3d 994,

1012-63 (Ala. Crim. App. 2007).  However, the process was plagued by repeated errors and

constitutional infirmities.  The circuit court, which was reversed on 16 rulings relating to

ineffective assistance of counsel across multiple appellate proceedings, permitted evidence on

some aspects of counsel's representation but not others.  *Id.*[14]  The court ultimately denied relief

---

[14] The court also was reversed on the *Brady* issue, for a total of 17 reversals.  *Johnson v. Alabama*, 582 U.S. 927, 927 (2017); *Johnson v. State*, 379 So. 3d at 1063-64.  Each of the 17 followed the same path: the State sought a summary dismissal order on a particular aspect of the petition and the circuit court agreed, but then the State conceded error on appeal, leading to reversal.  (*Compare* Doc. 36-16 at 48-49, 85-86, 89, 93-100, 108-111; Doc. 36-36 at 90-110, 143; Doc. 36-21 at 43-47 (the State's erroneous arguments), *with Johnson v. State*, 379 So. 3d at 1017-18, 1045-46, 1063-64 (the subsequent appellate decisions).)  The state courts never granted a hearing because Johnson requested one; they granted a hearing *only* after the State won dismissal of a certain part of the petition and then conceded error on appeal.

in a series of disjointed orders that contravene both the law and record.  (*See* Doc. 36-19 at 56-133 (2006 order summarily dismissing all claims); Doc. 36-27 at 108-23 (2008 order following the first remand and hearing); Doc. 36-52 at 3-48 (2014 order following the second remand and hearing).)  Nevertheless, Respondent urges this Court to defer to the state court's rulings.  (Doc. 38 at 51-92; Doc. 41 at 11-29.)  This Court should find that the state court's rulings are unreasonable and undeserving of deference.  *See* § 2254(d); *McGahee v. Ala. Dept. of Corr.*, 560 F.3d 1252, 1266 (11th Cir. 2009) (holding that the state court's decision was unreasonable and therefore was not entitled to deference); *Jones v. Walker*, 540 F.3d 1277, 1288 n.5 (11th Cir. 2008) (same).

To establish ineffective assistance of counsel, a petitioner must demonstrate that (1) his counsel performed deficiently, and (2) their deficient performance resulted in prejudice. *Strickland v. Washington*, 466 U.S. 668, 692 (1984).  The deficient performance inquiry turns on whether counsel's acts and omissions were unreasonable "under prevailing professional norms." *Id.* at 688.  As for prejudice, the standard is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  Here, the two attorneys, Darryl Bender and Erskine Mathis, performed deficiently at every stage of the trial, and their deficient performance resulted in prejudice.

### A.  Counsel rendered ineffective assistance at the guilt phase.

In a case in which the prosecution had weak evidence[15] and Johnson maintained his innocence, defense counsel had every incentive to challenge the prosecution's case.  Yet they conducted an extremely limited investigation and failed to prepare effectively for trial.  (Doc. 37

---

[15] (*See* Doc. 36-47 at 138 (the lead trial prosecutor testifying, "I don't think the State's case was very strong, because it depended on the testimony of Violet Ellison in my opinion.").)

at 40-42.)  Specifically, they failed to present available evidence that the man observed at the scene immediately after the shooting could not have been Johnson.  (Doc. 37 at 47-54.)  They failed to demonstrate that the police searched the car in which Johnson was riding on the night of the offense but found nothing incriminating.  (Doc. 37 at 72-73.)  They failed to identify and present available alibi witnesses who saw Johnson on the other side of Birmingham at the time of the offense.  (Doc. 37 at 54-60.)  They failed to investigate whether someone other than Johnson made the critical phone calls from the jail, in which someone allegedly referred to himself as "Toforest" and made inculpatory statements.  (Doc. 37 at 42-47.)  They even failed to present a consistent defense theory, instead introducing testimony that directly contradicted their own position.  (Doc. 37 at 62-63.)  And they failed to object to the fact that the prosecution argued inconsistent theories in separate court proceedings—at times claiming that Ardragus Ford, *not Toforest Johnson*, was the person who shot Deputy Hardy.  (Doc. 37 at 63-67.)  Taken together, counsel's failures constituted deficient performance, and they prejudiced Johnson's defense.

The state court considered the various parts of this claim in isolation and never considered counsel's representation as a whole, which was unreasonable in light of the Supreme Court's *Strickland* case law and the record of the state-court proceedings.  *See* § 2254(d).  In addition, the court reached unreasonable conclusions regarding counsel's decisions and their impact on the trial.  This Court should consider counsel's guilt-phase representation in its entirety, hold an evidentiary hearing to complete the record, and vacate Johnson's conviction.

### 1.   The state court's rulings on this claim were unreasonable on both the law and the facts.

The Supreme Court has held that a court conducting an ineffective-assistance-of-counsel inquiry must evaluate the reasonableness of counsel's performance as a whole.  In *Strickland*, the Court stated, "[T]he performance inquiry must be whether counsel's assistance was reasonable

*considering all the circumstances*." *Strickland*, 466 U.S. at 688 (emphasis added).  The task is not to examine each moment of the representation in isolation, but instead to examine whether counsel performed reasonably.  The same principle applies for the prejudice inquiry.  To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional *errors*, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694 (emphasis added); *see also id.* at 696 ("[A] court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.").  The Court's use of the plural "errors" in the *Strickland* standard leaves no doubt that the assessment must account for the combined effect of counsel's deficiencies.  The Eleventh Circuit, when applying § 2254(d), has recognized that a cumulative approach under *Strickland* is required as a matter of clearly established federal law. *See Daniel v. Comm'r, Ala. Dept. of Corr.*, 822 F.3d 1248, 1277 (11th Cir. 2016) (holding, under § 2254(d), that the Alabama Court of Criminal Appeals "unreasonably failed to consider the prejudicial effect of trial counsel's deficient performance based on the 'totality of available mitigating evidence,' as established Supreme Court precedent clearly requires" (quoting *Wiggins v. Smith*, 539 U.S. 510, 534 (2003))).

The Supreme Court's decision in *Williams v. Taylor*, 529 U.S. 362 (2000), is instructive.  On § 2254(d) review, the Court found that counsel performed deficiently under *Strickland* in a capital sentencing proceeding based on a series of errors: counsel "failed to introduce available evidence that Williams was 'borderline mentally retarded' and did not advance beyond sixth grade in school"; "failed to seek prison records regarding Williams' commendations for helping to crack a prison drug ring"; and "failed even to return the phone call of a certified public accountant who had offered to testify that he had visited Williams frequently when Williams was

incarcerated as part of a prison ministry program, that Williams seemed to thrive in a more regimented and structured environment, and that Williams was proud of the carpentry degree he earned while in prison." *Id.* at 396. Those "omissions" showed that counsel's performance was deficient. *Id.* Significantly, the Court did not evaluate whether any *one omission*—such as counsel's failure to return the accountant's phone call—was itself sufficient to establish deficient performance. Instead, the Court reviewed counsel's performance as a whole. And when evaluating the effects of counsel's deficiencies, the Court again took a cumulative approach. In fact, the Court held that the state court's prejudice determination was unreasonable because it failed to evaluate "the totality of the available mitigation evidence." *Id.* at 397-98. Although *Williams* involved a capital sentencing determination, the same *Strickland* standard applies to claims of ineffective assistance of counsel at the guilt phase.

Here, in the state post-conviction proceedings, Johnson alleged that his trial attorneys performed deficiently at the guilt phase and that their deficient performance resulted in prejudice. (Doc. 36-18 at 41.) In support of his claim, Johnson included more than 60 pages of factual allegations regarding his attorneys' guilt-phase errors and the ways in which they affected the case. (Doc. 36-18 at 41-64, 115-18, 124-61.) Although he utilized subheadings for organizational purposes, he stated that he did not intend for each section, paragraph, or sentence to be evaluated individually: "By virtue of the individual and cumulative effect of the deficient performance of counsel, as described herein, Mr. Johnson was denied his right to effective assistance of trial counsel . . . ." (Doc. 36-18 at 41.)[16] Johnson also confirmed that he did not

---

[16] Johnson raised the same allegation in this federal habeas corpus proceeding: "The individual and cumulative effect of counsel's deficient performance denied Mr. Johnson his right to effective assistance of counsel in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution." (Doc. 37 at 40.)

intend for any of the subdivisions in his petition to narrow the scope of his claims: "While he points to particular paragraphs for the assistance of the Court and opposing counsel, he does not intend to exclude any other portion of facts alleged here in support of his grounds for relief." (Doc. 36-17 at 164-65.)

Nevertheless, the state courts divided Johnson's claim of ineffective assistance of counsel at the guilt phase into numerous sub-claims and then evaluated each one in isolation, devoid of any context. *See Johnson*, 379 So. 3d at 1015-16, 1030-44, 1049-54. For example, Johnson alleged that his attorneys unreasonably failed to present available witnesses to counter the prosecution's case, and the state circuit court handled the witnesses in three different ways. For one category of witnesses, the court issued a summary dismissal order and never considered any evidence. (*See, e.g.*, Doc. 36-19 at 98-99 (summarily dismissing the allegation that counsel failed to call John Renfro, who saw a white car speed away from the crime scene shortly after the offense, which was significant because Johnson was riding in a black car that night).) For another category of witnesses, the court issued a summary dismissal order, got reversed, permitted Johnson to present evidence about the witnesses at a 2008 hearing, and then denied relief. (*See, e.g.*, Doc. 36-27 at 115-17 (finding that counsel did not perform unreasonably by failing to call alibi witnesses who could have testified that they saw Johnson at a night club at the time of the offense).) And for a third category, the court issued a summary dismissal order, got reversed, issued another summary dismissal order, got reversed again, permitted Johnson to present evidence about the witnesses at a 2014 hearing, and then denied relief again. (*See, e.g.*, Doc. 36-52 at 4-10 (finding that counsel did not perform unreasonably by failing to call Marshall Cummings, who would have testified that he looked down at the crime scene immediately after the shooting and saw a person who could not have been Johnson).)

Throughout the state post-conviction process, Johnson objected repeatedly.  He argued that the state courts were required to evaluate the various aspects of his ineffective-assistance-of-counsel claim "individually and cumulatively."  (Doc. 36-41 at 119; *see also* Doc. 36-18 at 41; Doc. 36-21 at 195-201; Doc. 36-42 at 110.)  He urged the state courts not to "allow the State to cherry pick the claims on which it would like to have a hearing."  (Doc. 36-21 at 201.)  He explained that "some of the claims that the State concedes deserve a hearing are inextricably linked with claims for which it does not."  (Doc. 36-21 at 199.)  He objected to the court permitting evidence regarding certain aspects of counsel's performance while simultaneously prohibiting evidence about counsel's decision to hire an investigator who was incapable of doing any actual investigation.  (Doc. 36-42 at 57-58.)[17]  And throughout the proceedings, he continuously requested a full and fair opportunity to present evidence in support of his entire claim under *Strickland*.  (*See, e.g.*, Doc. 36-18 at 41; Doc. 36-21 at 195-201; Doc. 36-41 at 119; Doc. 36-42 at 110.)  Despite those efforts, neither the circuit court nor the state appellate court ever conducted any analysis of counsel's guilt-phase performance as a whole.  *See Johnson*, 379 So. 3d at 1015-16, 1030-44, 1049-54.

The state court's approach was contrary to, and involved an unreasonable application of, *Strickland*, *Williams*, and the Supreme Court's other cases addressing the right to effective assistance of counsel.  As noted above, those cases require courts to evaluate counsel's performance "considering all the circumstances."  *Strickland*, 466 U.S. at 688.  It is not possible

---

[17] As explained in the petition, the attorneys delegated their investigation to Steve Saxon, who was suffering from severe mental health issues.  (Doc. 37 at 40-42.)  On one of the days in which Saxon was supposedly working on the case, according to his timesheet, he was instead at a hospital being evaluated for suicidal ideation and possible bipolar disorder.  (Doc. 37 at 41.)  He also was arrested twice for harassing women during the time he was purportedly working on the case.  (Doc. 37 at 41.)  He never contacted any witnesses and never obtained any documents. (Doc. 37 at 41.)

for a court to consider "all the circumstances" when it breaks the petitioner's claim into pieces, permits evidence on some parts but not others, and issues decisions about various parts in separate rulings based on multiple hearings held years apart.  The state courts' failure to consider the totality of the circumstances was unreasonable under both § 2254(d)(1) and § 2254(d)(2).  *See*, *e.g.*, *Daniel*, 822 F.3d at 1277 (holding that the state court unreasonably applied *Strickland* because it failed to consider the "totality" of the evidence); *McGahee*, 560 F.3d at 1264-65 (holding that the state court unreasonably applied *Batson v. Kentucky*, 476 U.S. 79 (1986), because it failed to consider "all relevant circumstances").

In addition to defending the state court's piecemeal approach, Respondent attempts to take it a step further, arguing that for certain allegations, Johnson's habeas petition "does not cite to a single prior decision of the Supreme Court."  (Doc. 38 at 56; *see also*, *e.g.*, Doc. 38 at 65, 74, 79.)  To be clear, at the beginning of his ineffective-assistance-of-counsel claim, Johnson cited *Strickland v. Washington*, 466 U.S. 668 (1984), and stated that "[t]here is a reasonable probability that, but for counsel's deficient performance, the outcome of the trial would have been different."  (Doc. 37 at 42; *see also* Doc. 38 at 65, 69.)  Johnson also stated that "[t]he individual and cumulative effect of counsel's deficient performance" resulted in prejudice, and he then detailed counsel's errors.  (Doc. 37 at 40, 42-74.)  Even Respondent, elsewhere in his pleadings, acknowledges that Johnson raised his entire ineffective-assistance-of-counsel claim under *Strickland*.  (*See* Doc. 38 at 51 ("Johnson asserts several claims that he received the ineffective assistance of trial counsel in violation of *Strickland v. Washington*."); *see also* Doc. 41 at 17 (same acknowledgement).)  The argument that Johnson "does not cite to a single prior

decision of the Supreme Court" provides another example of the problems that arise when a party or court divides a claim into pieces and refuses to consider it as a whole.[18]

Even beyond the problems with taking a piecemeal approach to a constitutional claim, the state court's analysis cannot withstand scrutiny.  For those aspects of the claim on which evidence was permitted, the state court relied largely on the testimony of Johnson's trial attorney Darryl Bender to find that the defense made reasonable strategic decisions about how to proceed in the case.  *Johnson*, 379 So. 3d at 1031-44, 1049-54.  Respondent defends the state court's rulings, arguing that federal courts have no ability to review factual determinations.  (*See* Doc. 41 at 19-21; Doc. 38 at 6-7, 51-82.)  However, § 2254(d)(2) specifically authorizes federal courts to consider constitutional claims without deference if a state court's ruling is based on an unreasonable determination of the facts.  Here, the state court failed to recognize that many of Bender's "strategic" explanations contradict the trial record and the other evidence in the case.  It would be one thing for an attorney to misremember an isolated fact when testifying about his

---

[18] Respondent also argues repeatedly that Johnson must show that the facts of his case are identical to the facts of a Supreme Court case.  (*See, e.g.*, Doc. 79.)  However, as explained in Part II, *supra*, Respondent's pleadings conflate the "contrary to" and "unreasonable application" provisions of § 2254(d)(1).  To establish an "unreasonable application" of "clearly established Federal law" in this context, Johnson must show only that the state court unreasonably applied the governing principle of *Strickland*, which is that a petitioner establishes ineffective assistance of counsel by showing deficient performance and prejudice.  *Strickland*, 466 U.S. at 692.  Separately, Respondent claims that Eleventh Circuit cases applying *Strickland* under § 2254(d) are not relevant because they do not constitute "clearly established Federal law."  (Doc. 38 at 55-56.)  But such cases are certainly relevant in that they demonstrate the proper way to apply the "clearly established Federal law" of *Strickland* in the context of § 2254(d).  *See, e.g.*, *Debruce v. Comm'r, Ala. Dept. of Corr.*, 758 F.3d 1263, 1274-76 (11th Cir. 2014) (citing numerous Eleventh Circuit cases applying *Strickland* under § 2254(d) when holding that the state court unreasonably applied *Strickland*); *Cooper v. Sec'y, Dept. of Corr.*, 646 F.3d 1328, 1354 (11th Cir. 2011) (explaining that "[t]his case is strikingly similar to [*Johnson v. Sec'y, Dept. of Corr.*, 643 F.3d 907, 936 (11th Cir. 2011), another § 2254(d) case applying *Strickland*]" when holding that the state court's prejudice determination was unreasonable).

performance years later; it is quite another for an attorney to claim repeatedly that he has recollections that are demonstrably false.

The discrepancies between Bender's testimony and the rest of the record are extreme. Take, for example, Bender's claim that he had strategic reasons for not calling Marshall Cummings and Sergeant Tony Richardson as witnesses.  At Johnson's first trial, those two witnesses—considered together—offered helpful testimony, placing an alternative suspect at the scene of the shooting.  Cummings, a guest at the hotel, testified that he heard gunshots, looked out his window, and saw a "six foot tall" man get into a "light-colored" car through the driver's side door and then drive away with the car lights off.  (Doc. 36-44 at 4-6, 30-31.)  Sergeant Richardson testified that the car in which Johnson was riding on the night of the shooting was a *black* car with an *inoperable* driver's side door.  (Doc. 36-44 at 43-44.)  And Johnson is five feet, five inches tall.  (Doc. 36-23 at 3.)

The state court relied on Bender's testimony that "[c]ounsel made a strategic decision not to call Cummings at Johnson's second trial based on conversations with the jurors from Johnson's first trial." *Johnson*, 379 So. 3d at 1052.  Any reasonable review of the record undermines the state court's conclusion.  Bender testified that he declined to call Cummings because he spoke to "all 14" of the jurors after the first trial, and their comments convinced him not to call Cummings again.  (Doc. 36-49 at 185, 189.)  But the record reflects that *eight* of the jurors from the first trial stated that they did not speak with Bender or any other defense attorney or investigator about the case following the first trial.  (*See* Doc. 36-51 at 34-46.)[19]  Bender also

_____

[19] The circuit court attempted to rationalize this, stating, "While the affidavits . . . may conflict with Mr. Bender's testimony of when and where or if he spoke to jurors following his first trial, the affidavits do not refute Mr. Bender's explicit testimony concerning his memory about how those jurors characterized the impact of Mr. Cummings's testimony . . . ."  (Doc. 36-52 at 7.)  But

testified that the jury *did* hear testimony about the inoperable car door.  He said that *if* he did not present the testimony from Richardson, as he promised in his opening statement, it must have been because the prosecution elicited the testimony first.  He stated: "Whether it was me or whether it was [the prosecutor], Tony [Richardson] gave them the information that I told them that he would.  And that was that the door was not working . . . ."  (Doc. 36-49 at 194.)  The record directly refutes that statement; it shows that neither the defense nor the prosecution presented testimony from Richardson or anyone else about the inoperable driver's side door of the car in which Johnson was riding.

Similarly, Bender claimed that the defense decided not to call certain alibi witnesses for reasons that are plainly inaccurate.  The issue of Johnson's alibi is significant—at least ten people have come forward and testified that both Johnson and his co-defendant Ardragus Ford were at Tee's Place, a night club on the other side of Birmingham, at the time of the offense.  (*See* Doc. 36-25 at 136-202; Doc. 36-26 at 3-202; Doc. 36-27 at 3-30.)  Yet at Johnson's second trial, the defense called just two alibi witnesses, both of whom were cross-examined aggressively by the prosecution.  (Doc. 36-5 at 18-41 (Dunning), 42-59 (Farris).)  At one of the post-conviction hearings, Bender was asked about three other alibi witnesses who had testified at Johnson's first trial—Kim Colvin, Barbetta Hunt, and Velonique Sanders.  (Doc. 36-37 at 156-57.)  Bender responded that he declined to call one of the three because the witness "from the time of the first trial to the second trial had been convicted of something."  (Doc. 36-37 at 157.)  The state court accepted that explanation, *Johnson*, 379 So. 3d at 1035, even though none of the

---

if Bender did not speak with the jurors, that *does* refute his testimony that he remembered how the jurors characterized Cummings's testimony.

three witnesses at issue were actually convicted of a criminal offense between Johnson's two trials.  (Doc. 36-27 at 31-38.)[20]

Bender even contradicted the record with respect to the central evidence in the case, yet the state courts still accepted what he said.  For example, Bender stated that Violet Ellison, the State's key witness, "testified in the second trial when she did not testify in the first one," and her testimony was "the difference" between the hung jury and the guilty verdict.  (Doc. 36-49 at 122.)  But Ellison *did* testify at the first trial, as the record reflects.  (*See* Doc. 36-30 at 37-114.)  Nevertheless, the state court declared that "[t]he primary evidence presented by the State against Johnson at his second trial that had not been presented at his first trial was the testimony of Violet Ellison."  *Johnson*, 379 So. 3d at 1053.

Perhaps most strikingly, the state court took different, inconsistent views of Bender's trial strategy when evaluating different aspects of Johnson's claim.  Following the 2008 hearing, the state court concluded that it was reasonable for Bender to call Yolanda Chambers as a witness because he was trying to show that Chambers was lying and that she was responsible for Johnson being arrested in the first place.  The court stated: "Trial counsel wanted to show that Johnson became a suspect because of the statements from Ms. Chambers and that she had offered many inconsistent statements.  Trial counsel apparently sought to establish that the more reasonable explanation was that Johnson was at Tee's Place and could not have killed Deputy Hardy."  *Johnson*, 379 So. 3d at 1036 (quoting Doc. 36-27 at 117).  But six years later, following the 2014 hearing, the court justified Bender's decision not to call other witnesses by stating that those

---

[20] Respondent argues that Velonique Sanders had a criminal conviction from 1996, which was before Johnson's first trial.  (Doc. 41 at 15.)  That, however, does not provide any explanation for why Bender called Sanders at the first trial in 1997 but not the second trial in 1998, particularly since Sanders was not questioned about the matter at the first trial.  (*See* Doc. 36-31 at 56-78 (Sanders's testimony at Johnson's first trial).)

witnesses would have offered testimony that contradicted Chambers's account.  Specifically, the court found, "[I]n light of Johnson's eliciting this testimony from Ms. Chambers . . . the testimony [that Johnson was not present at the crime scene] was not necessary or relevant in the second trial, and even contradictory to Ms. Chambers's testimony and Johnson's theory of the case." *Johnson*, 379 So. 3d at 1051.  Those findings cannot be reconciled.  If the reason to call Chambers was to show that she was lying, then it would not make any sense to decline to call other witnesses because they contradicted Chambers.  Yet the state court made those inconsistent findings, and Respondent defends them now.  (*See* Doc. 41 at 20; 25.)  This is another example of why courts should not evaluate different aspects of the same ineffective-assistance-of-counsel claim in separate proceedings years apart.

The state courts also credited several of Bender's explanations as reasonable without addressing whether they were supported by a reasonable investigation.  In *Strickland*, the Supreme Court stated: "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  *Strickland*, 466 U.S. at 690-91.  Here, the state court relied on Bender's "strategy" to hold that it was reasonable for the defense not to present certain evidence, including evidence that another incarcerated person, Fred Carter, made the inculpatory phone calls that were attributed to Johnson.  *Johnson*, 379 So. 3d at 1042-44.  But Bender never investigated or even considered the possibility that someone other than Johnson made the calls.  (Doc. 36-37 at 130.)

Despite the many problems with Bender's explanations, the state court accepted them at every turn.  *See Johnson*, 379 So. 3d at 1035, 1037, 1042-44, 1049-54.  The court considered

each of the defense's omissions in isolation and never confronted the fact that Bender's purported strategies repeatedly contradicted each other and the record.  The court also refused to permit Johnson to present evidence—including further testimony from Bender—on several key issues, including the qualifications of the defense investigator; the failure of the defense to call John Renfro, who saw a car fleeing from the crime scene that did not match the car in which Johnson was riding; or the fact that the police searched the car in which Johnson was riding but found nothing incriminating.  *Johnson*, 379 So. 3d at 1015-16.[21]  In short, the court's deficient performance analysis was unreasonable both factually and legally.  *See* § 2254(d); *Strickland*, 466 U.S. at 688 (requiring consideration of "all the circumstances"); *Miller-El v. Dretke*, 545 U.S. 231, 266 (2005) (holding that the state court relied on an unreasonable determination of the facts where the prosecutor's claim was contradicted by the other evidence in the case).

With respect to the prejudice analysis, the state courts again failed to evaluate the totality of the evidence.  They purported to conduct multiple prejudice analyses, with each one limited to a specific act or omission.  For example, the state court held based on the 2008 hearing that there was no prejudice resulting from counsel's failure to call alibi witnesses.  *Johnson*, 379 So. 3d at 1036.  It then held years later, based on the 2014 hearing, that there was no prejudice resulting from counsel's failure to call Marshall Cummings to testify about the man he observed at the crime scene.  *Johnson*, 379 So. 3d at 1054.  Those points are plainly related—together, they rebut the prosecution's argument that Johnson was present at the scene of the offense.  But under the state court's approach, they were treated as separate issues.  That approach was unreasonable

---

[21] Respondent argues that the State's evidence at trial that the car was not searched is presumed to be correct.  (*See* Doc. 41 at 34.)  But Johnson was never permitted to present evidence that the car was searched, and the whole point of the allegation is that such evidence was readily available.  Respondent should not be permitted to rely on a presumption of correctness while simultaneously preventing Johnson from rebutting the presumption.

under *Strickland* and the record in the case. *See Williams*, 529 U.S. at 397-98 (holding that the state court conducted an unreasonable prejudice analysis because it failed to evaluate the totality of the evidence); *Daniel*, 822 F.3d at 1277 (same).

By dividing Johnson's claim as it did, the state court also disregarded the principle that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 696. The case against Johnson was extremely thin. It turned on one witness, Violet Ellison, who claimed that she overheard a man say on a telephone call that his name was "Toforest" and that he committed the offense. Even the lead prosecutor testified in the post-conviction proceedings, "I don't think the State's case was very strong, because it depended on the testimony of Violet Ellison in my opinion." (Doc. 36-47 at 138.) Yet despite conducting multiple prejudice assessments, the state court never mentioned the weakness of the prosecution's case. *See*, *e.g.*, *Johnson*, 379 So. 3d at 1036, 1044, 1054.

The state court's conclusion that Johnson received effective assistance of counsel was objectively unreasonable. *See* § 2254(d). Counsel's representation "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. The state court's decision to the contrary "blinks reality" and does not warrant deference. *Miller-El v. Dretke*, 545 U.S. 231, 266 (2005); *see* § 2254(d).

> **2.      Under a proper review, Johnson's counsel were ineffective at the guilt phase.**

After finding the state court's decision unreasonable, this Court should conduct further proceedings and find that Johnson's counsel were ineffective at the guilt phase. The Supreme Court has recognized that effective assistance of counsel is "critical to the ability of the adversarial system to produce just results." *Strickland*, 466 U.S. at 685. The failures of

Johnson's counsel undermined the integrity of the proceedings, and the result is a conviction that even the District Attorney and the trial prosecutor no longer support. Under a proper review, Johnson's counsel performed deficiently, and their deficient performance was prejudicial.

With respect to performance, counsel failed to take reasonable steps to support their own defense theory. They argued that Johnson was not present at the crime scene and instead was at Tee's Place when the shooting occurred. In light of that, they had every reason to develop evidence supporting that theory. *See Williams v. Allen*, 542 F.3d 1326, 1340 (11th Cir. 2008) (emphasizing that since counsel's defense focused on a certain theory, they had "every incentive" to develop the strongest evidence in support of that theory); *see also Wiggins*, 539 U.S. at 532 (same principle). Yet they failed to develop and present such evidence, and their defense was more harmful to Johnson than anything the prosecution presented. Three points about counsel's performance warrant emphasis.

First, the attorneys made several key decisions that were based on inadequate investigation. The attorneys never interviewed several credible alibi witnesses, and they never investigated whether someone other than Johnson could have made the critical phone calls from the jail. The Supreme Court has made clear that a decision can be considered reasonable *only* if the investigation underlying it was reasonable. *See Wiggins*, 539 U.S. at 523 (emphasizing that courts must focus on "whether the investigation supporting counsel's decision . . . was itself reasonable"); *Strickland*, 466 U.S. at 690-91 (same principle). This point highlights that further evidentiary proceedings are required. The state courts prohibited Johnson from presenting evidence that his trial counsel hired an investigator who was struggling with personal and mental health problems and was incapable of conducting any actual investigation. *Johnson*, 379 So. 3d at 1015. Because counsel's approach to the investigation was unreasonable from the start, an

evidentiary hearing is necessary to complete the record.  *See Daniel*, 822 F.3d at 1280-81

(remanding for an evidentiary hearing under § 2254(e)(2) where the petitioner "tried, but was not

given the opportunity to develop the factual bases of the claim in state court").

Second, counsel did not even present the evidence that they promised in their opening

statement.  They told the jury that Sergeant Tony Richardson would testify that the car observed

at the scene did not have a working driver's side door, which meant that it could not have been

the car in which Johnson was riding.  (*See* Doc. 36-2 at 117-18 ("Tony Richardson will tell you

that the driver's side door on Ardragus Ford's car will not open.").)  Yet they never called

Richardson or Marshall Cummings, the eyewitness who saw the car at the scene, even though

both witnesses had offered the promised testimony at Johnson's first trial.  (*See* Doc. 36-43 at 77-

106 (Cummings); Doc. 36-43 at 109-36 (Richardson).)[22]  Similarly, counsel told the jury that

they would present evidence that the police had searched the car in which Johnson was riding on

the night of the offense and found nothing.  (*See* Doc. 36-2 at 117 ("Tony Richardson will tell

you this, because they pulled that car, put it under lock and key and they searched that car from

front to back.").)  That evidence was readily available, but counsel never presented it.  In

*Wiggins*, the Supreme Court recognized that when an attorney promises to present certain

evidence and then fails to do so, that is a clear sign of deficient performance.  *See Wiggins*, 539

U.S. at 536 (holding that counsel were ineffective in part because "[c]ounsel told the sentencing

jury '[y]ou're going to hear that Kevin Wiggins has had a difficult life,' but never followed up on

this suggestion").  The state court permitted evidence on some of these issues but not others,

which further underscores the importance of further evidentiary proceedings.

---

[22] Both Cummings and Richardson testified by affidavit in the state post-conviction proceedings
that if they had been called at Johnson's second trial, they would have provided the same
testimony that they provided at the first trial.  (Doc. 36-43 at 75; Doc. 36-43 at 107.)

Third, counsel presented evidence that directly contradicted their own defense theory. The prosecution presented no direct evidence suggesting that Johnson was present at the crime scene, yet defense counsel then called Yolanda Chambers, who testified that Johnson was present at the scene but was not the shooter.  (Doc. 36-4 at 103-94.)  Counsel offered Chambers's testimony without making any effort to reconcile their inconsistent theories.  Meanwhile, they did nothing to contest the prosecution's use of inconsistent theories at the various trials of Johnson and Ford.  (Doc. 37 at 63-67.)

The effects of counsel's deficient performance were significant.  The starting point in any prejudice analysis is the overall strength of the prosecution's case, *Strickland*, 466 U.S. at 696, and here, the prosecution's case was weak.  The prosecution relied on Ellison, whose account was not even consistent with the physical evidence.  For example, Ellison claimed that the man on the call said that there were two shooters, but the physical evidence indicated one.  (*Compare* Doc. 36-4 at 61, *with* Doc. 36-2 at 167; Doc. 36-5 at 64-65.)  Ellison's account was so lacking in credibility that the prosecution presented a completely different theory to the grand jury and to the juries at both of Ford's trials.[23]  There was ample evidence available to counter Ellison's testimony, from Marshall Cummings's observations at the crime scene to alibi witnesses.  But instead of presenting a coherent and compelling defense, counsel presented testimony from a defense witness that Johnson was present at the crime scene even though the defense theory was that he was not.

The result of Johnson's first trial further supports a finding of prejudice.  At that trial, counsel took some of the steps that they promised but failed to take at the second trial, and the

---

[23] (*See* Doc. 36-60 at 94 (State's theory in the grand jury proceeding); Doc. 36-36 at 27 (State's theory at Ford's first trial); Doc. 36-25 at 112-15 (the State's theory at Ford's second trial).)

jury was unable to reach a verdict.  (Doc. 36-27 at 87.)  In all, there were four trials in this

case—two for Johnson, and two for Ford.  (Doc. 36-27 at 87.)  The results were two hung juries,

an acquittal for Ford, and a conviction for Johnson.  (Doc. 36-27 at 87.)  If Johnson's counsel had

performed reasonably at the second trial by presenting the available evidence and by maintaining

a coherent defense theory, there is a reasonable probability that Johnson would not have been

convicted of capital murder.

The independent investigation conducted by the Office of the District Attorney in 2019

and 2020 underscores the importance of this claim.  In its report, the Office of the District

Attorney stated, "The jury and judges who previously assessed this case did not have the benefit

of all of the information that we have access to now."  Jefferson County District Attorney's

Supplemental Amicus Curiae Brief in Support of Petitioner 5-6, *State v. Johnson*, No. CC-1996-

386.61 (Jefferson Cty. Cir. Ct. May 20, 2024).  That statement is certainly accurate.  One of the

reasons the jury never learned the full picture of the case is that Johnson was denied effective

assistance of counsel.

Because the state post-conviction court never held an evidentiary hearing on Johnson's

entire claim of ineffective assistance of counsel, Johnson respectfully requests an opportunity to

present additional evidence in support of his claim.  *See Daniel*, 822 F.3d at 1280-81;

§ 2254(e)(2).  Following those further proceedings, Johnson respectfully requests that the Court

vacate his conviction under *Strickland* and the Fifth, Sixth, Eighth, and Fourteenth Amendments

to the United States Constitution.

**B.      Counsel rendered ineffective assistance at the penalty phase before the jury
and the judicial sentencing proceeding.**

Johnson's attorneys also were ineffective with respect to sentencing.  They did not collect

a single social-history record regarding Johnson or his family, nor did they conduct any

meaningful mitigation interviews.  At the penalty phase before the jury, they called just three witnesses, who testified for a total of 17 pages of transcript.  (Doc. 36-6 at 87-104).  The jury responded by voting 10 to 2 for a death sentence.  (Doc. 36-6 at 155.)  The judicial sentencing proceeding was next, and the attorneys presented no additional evidence there.  (Doc. 36-6 at 160-71.)  As the trial court stated when imposing the death penalty, "the only evidence arguably presented in mitigation was the fact that at the time the offense occurred the defendant was 22 years of age."  (Doc. 36 at 106.)

The absence of an actual life-history presentation was particularly prejudicial in light of the compelling evidence that was available—including evidence that Johnson was subjected to violence and abuse as a child.[24]  Johnson's father, who struggled with alcoholism, often beat Johnson's mother, and he beat Johnson and his brother as well.  (Doc. 36-49 at 81-86; Doc. 36-47 at 169-72; Doc. 36-47 at 154.)  At times, Johnson tried to protect his mother, but he was just a child, and the abuse continued.  (Doc. 36-49 at 84.)  When his mother eventually left his father, she moved in with another man who smoked crack in front of the children and, like Johnson's father, was physically abusive.  (Doc. 36-48 at 42-44, 69.)  The family's surroundings were chaotic and challenging as well.  Throughout the neighborhood, drugs were sold openly, and gun violence was common.  (Doc. 36-48 at 44; Doc. 36-49 at 61-63.)  Johnson knew five people who were murdered, and as a teenager, he was shot in the chest.  (Doc. 36-48 at 92-94; Doc. 36-49 at 67-68.)  The one person who provided the most comfort and support to Johnson, his Aunt Celia, went missing when Johnson was 16.  (Doc. 36-49 at 6-7; Doc. 36-48 at 31, 50, 71; Doc. 36-49 at

---

[24] To be clear, Johnson maintains that he is innocent of the offense for which he was convicted. But regardless of the guilt or innocence of a client, capital defense counsel have an obligation to investigate the client's life history and to present evidence showing that the client is not among the most deserving of execution.  *See Wiggins*, 539 U.S. at 522, 526-27.

5-7; Doc. 36-44 at 172-73.)  This is precisely the type of evidence that would have been valuable at sentencing, but the jury and the judge never heard any of it.

In his habeas petition, Johnson explained that the state court summarily dismissed his allegation regarding counsel's failure to present mitigating evidence *at the penalty phase before the jury*.  (Doc. 37 at 74-77.)  The court allowed him to present evidence only with respect to his allegation regarding counsel's failure to present mitigating evidence *at the judicial sentencing proceeding*.  (Doc. 37 at 74-77.)  Respondent claims that the state court did no such thing and instead considered the two issues together.  (Doc. 38 at 103-04; Doc. 41 at 36.)  The record, however, refutes Respondent's position.

In light of the manner in which the state courts handled these issues, four points warrant discussion.  First, the state courts precluded Johnson from presenting evidence regarding counsel's representation at the penalty phase before the jury, which the State confirmed repeatedly on the record.  Second, the state court's preclusion ruling with respect to the penalty phase before the jury was manifestly unfair and does not bar federal review of that issue.  Third, the state court's ruling that Johnson's attorneys were effective at the judicial sentencing proceeding was unreasonable under § 2254(d) and warrants no deference.  Also, if that ruling were construed to encompass the penalty phase before the jury, it was unreasonable on that score as well.  Fourth, because the state court's rulings do not bar relief and a full hearing was never held, this Court should hold additional proceedings and find that Johnson was denied effective assistance of counsel with respect to sentencing.

**1.    The state courts prevented Johnson from presenting evidence regarding the representation he received at the penalty phase before the jury.**

Respondent suggests that the state court did not apply a procedural bar on the allegation that Johnson's trial counsel failed to present available mitigating evidence at the penalty phase before the jury.  (Doc. 38 at 103-04; Doc. 41 at 36.)  According to Respondent, because the state court used the phrase "penalty phase" at two points in its decision addressing counsel's performance *at the judicial sentencing proceeding*, the state courts considered the two phases together.  (Doc. 38 at 103-04; Doc. 41 at 36.)  The record, however, shows that the State itself requested and obtained dismissal of Johnson's allegation regarding the penalty phase before the jury, and as a result, Johnson was permitted to present evidence only as to the judicial sentencing proceeding.  To address Respondent's argument, it is necessary to summarize the relevant state-court proceedings.

In his post-conviction petition in state court, Johnson alleged that his attorneys rendered ineffective assistance of counsel by failing to investigate and present available mitigating evidence at *both* the penalty phase before the jury *and* the judicial sentencing proceeding. (Doc. 36-15 at 107-125, 129-80; Doc. 36-16 at 14-16 (second amended petition); Doc. 36-18 at 41-60, 64-115, 161-64 (third amended petition).)  Johnson alleged that he was denied effective assistance of counsel due to the "individual and cumulative effect of the deficient performance of counsel," although he used subheadings to designate particular aspects of his claim.  (Doc. 36-15 at 107; Doc. 36-18 at 41.)  Part XIX(G) was titled, "Trial Counsel Were Ineffective During the Penalty Phase," and that section addressed the penalty phase before the jury.  (Doc. 36-16 at 14; Doc. 36-18 at 161-63.)  The following section, Part XIX(H), was titled, "Trial Counsel Was Ineffective During the Sentencing Hearing;" that section addressed the judicial sentencing

proceeding.  (Doc. 36-16 at 16; Doc. 36-18 at 163-64.)  The circuit court initially dismissed

Johnson's entire petition at the State's request (Doc. 36-19 at 56-133), but multiple reversals and

remands followed.

On appeal of the initial order, the State defended the circuit court's dismissal of Part

XIX(G), which concerned the penalty phase before the jury.  The State argued the following:

> In Claim XIX(G), Johnson argues that trial counsel were ineffective at the penalty phase in failing to present the "extensive mitigating evidence" that they failed to uncover.  Johnson's claim was dismissed by the circuit court on several grounds, including the procedural bar of Rule 32.2(a)(4) as it was raised or addressed on appeal.  As this claim was addressed by this Court on direct appeal, Rule 32.2(a)(4) precludes Johnson from obtaining relief.

(Doc. 36-21 at 98 (citations omitted).)[25]  In the same brief, however, the State conceded that

Johnson was entitled to a hearing on Part XIX(H), which concerned the judicial sentencing

proceeding.  The State agreed with Johnson that he "pleaded some of his claims sufficiently to

entitle him to a hearing," and it listed several claims, including XIX(H).  (Doc. 36-21 at 114.)

Johnson responded that he was entitled to an evidentiary hearing with respect to *both* the penalty

phase before the jury *and* the judicial sentencing proceeding.  (Doc. 36-21 at 159-161, 195-201.)

He also argued that the court "should not allow the State to cherry pick the claims on which it

would like to have a hearing."  (Doc. 36-21 at 201.)

The state appellate court did exactly what the State requested.  It held that Johnson's

allegation in Part XIX(G)—that "trial counsel failed to present 'extensive mitigating evidence'"

at the penalty phase before the jury—was "procedurally barred" because it had been "raised on

direct appeal."  *Johnson*, 379 So. 3d at 1015.  At the same time, the court remanded the case for

---

[25] As discussed in Part IV(B)(2), *infra*, the state court's ruling that this claim was addressed on direct appeal was "manifestly unfair" to Johnson.  *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001).  Therefore, the ruling does not preclude federal review.  *Id.*

an evidentiary hearing on several parts of the petition, including Part XIX(H), which it described as Johnson's allegation "[t]hat trial counsel failed to present any mitigating evidence at the sentencing hearing." *Id.* at 1018.

On remand, Johnson's counsel stated that the situation was "impossible" and "unworkable" because the issue regarding the penalty phase before the jury was deemed precluded while the issue regarding the judicial sentencing proceeding was not. (Doc. 36-36 at 97; *see also* Doc. 36-36 at 99 (counsel explaining that because of the appellate court's ruling, "we are kind of stuck with this weird anomaly where the penalty phase [was] precluded and here we are with the sentencing phase").) However, at that point, the State—which had obtained the initial summary dismissal but then argued for the remand—changed positions again and convinced the circuit court to summarily dismiss Part XIX(H) for a second time. (Doc. 36-36 at 92-111; Doc. 36-24 at 16 (the court's dismissal order).)

Johnson then appealed the second dismissal. (Doc. 36-41 at 118-19.) Consistent with the scope of the appellate court's prior remand, the only issue on appeal relating to mitigation was whether Johnson would be permitted to present evidence regarding trial counsel's performance *at the judicial sentencing proceeding*. (*See* Doc. 36-42 at 36 (the State describing the issue as whether "trial counsel were ineffective for not presenting mitigating evidence 'to the sentencing judge'").) In light of the State's past concession, the appellate court remanded again, directing the circuit court to hold an evidentiary hearing on the issue. *See Johnson*, 379 So. 3d at 1046.

On that remand, the State, Johnson, and the circuit court all framed the issue as whether Johnson's counsel "were ineffective for failing to present mitigation evidence *during the sentencing hearing before the trial judge*." (Doc. 36-52 at 3 (emphasis added); *see also* Doc. 36-52 at 19, 25; Doc. 36-51 at 79; Doc. 36-51 at 119.) At one point, the circuit court described the

issue as "whether or not trial counsel was ineffective for their failure to present mitigation evidence." (Doc. 36-47 at 135.)  The State's counsel interjected: "I just wanted to, I guess, remind Your Honor the failure to present mitigation is specifically toward the judicial sentencing. It's not the penalty phase." (Doc. 36-47 at 135.)  The court replied, "Correct." (Doc. 36-47 at 135.)  Consistent with that understanding, both Johnson and the State asked Johnson's trial attorneys questions regarding the judicial sentencing proceeding in particular. (*See* Doc. 36-48 at 158-59, 164; Doc. 36-49 at 125-28.)  Johnson also presented mitigating evidence that was available but not presented by his trial counsel; the court stated that it would "consider the [mitigating] evidence presented at the evidentiary hearing *only* as it would have been considered at the judicial sentencing hearing." (Doc. 36-52 at 12 (emphasis added); *see also* Doc. 36-51 at 67-68 (the State arguing that the court should consider the evidence only in that way).)  Following the hearing, the court denied relief, concluding that "Johnson failed to prove by a preponderance of the evidence that [the attorneys] were ineffective for not presenting additional mitigation evidence, than was presented in the penalty phase of the trial, at the judicial sentencing hearing." (Doc. 36-52 at 25.)  Johnson appealed that ruling, and the appellate court affirmed. *Johnson*, 379 So. 3d at 1054-61.

In short, the state court held a hearing only with respect to the judicial sentencing proceeding, and it precluded Johnson's allegation with respect to the penalty phase before the jury.  Of course, the two issues *should* have been considered together, for many reasons.  But they were not.  As a result, the post-conviction hearing went differently than it otherwise would have gone.  Both parties approached the hearing and questioned witnesses with an eye toward the judicial sentencing proceeding. (*See* Doc. 36-48 at 158-59, 164; Doc. 36-49 at 125-28.)  The circuit court's approach to the evidence was affected as well.  The court stated in its prejudice

analysis that "the jury's recommendation for death" would weigh in favor of a death sentence at

the judicial sentencing proceeding, *Johnson*, 379 So. 3d at 1057-58, but that approach would not

make any sense at a hearing about counsel's representation at the penalty phase before the jury.

### 2.    The state court's procedural ruling preventing Johnson from presenting evidence does not preclude federal review.

Respondent also argues that if the state court *did* dismiss Johnson's claim regarding

counsel's representation at the penalty phase on a procedural ground, that would preclude relief

in federal court because the dismissal ruling would constitute "an adequate and independent state

law basis for denying relief." (Doc. 41 at 37.) Respondent's argument is misplaced. A state

procedural ruling serves as a bar to federal review under the "adequate and independent state

ground" doctrine only if "the state procedural rule is adequate," meaning that it is not applied in

an "arbitrary" fashion and is not "manifestly unfair." *Judd v. Haley*, 250 F.3d 1308, 1313 (11th

Cir. 2001); *see also Spencer v. Kemp*, 781 F.2d 1458, 1470-71 (11th Cir. 1986) (en banc) ("It is a

dominant theme of the Supreme Court case law . . . that a federal habeas petitioner shall not be

denied federal review of a federal constitutional claim on the basis of an asserted state procedural

ground that is manifestly unfair in its treatment of that claim.").[26] Here, the state court's

dismissal ruling was arbitrary, unreasonable, and manifestly unfair.

---

[26] The Eleventh Circuit has established a three-part test for determining whether a state court's procedural ruling constitutes an adequate and independent state ground: "First, the last state court rendering a judgment in the case must clearly and expressly state that it is relying on state procedural rules to resolve the federal claim without reaching the merits of that claim. Secondly, the state court's decision must rest solidly on state law grounds, and may not be 'intertwined with an interpretation of federal law.' Finally, the state procedural rule must be adequate; *i.e.*, it must not be applied in an arbitrary or unprecedented fashion. The state court's procedural rule cannot be 'manifestly unfair' in its treatment of the petitioner's federal constitutional claim to be considered adequate for the purposes of the procedural default doctrine." *Judd*, 250 F.3d at 1313 (citing and quoting *Card v. Dugger*, 911 F.2d 1494, 1516-17 (11th Cir. 1990)).

The state court held that the claim regarding counsel's representation at the penalty phase was "properly dismissed" because it was "raised on direct appeal." *Johnson*, 379 So. 3d at 1015. The court was referring to a two-sentence argument made by Johnson's direct-appeal attorney. (*See* Doc. 36-8 at 94.)[27]  In its decision on direct appeal, the state appellate court responded to that argument as follows:

> Johnson contends that his trial counsel were ineffective for failing to present mitigating evidence at the sentencing phase of the trial.  Johnson's entire argument in this regard is as follows: "No attempt was made to put on any case at the sentencing phase of the trial.  There are groups of experts available who could assist, but none were contacted. . . .  Defense counsel . . . did not conduct a mitigation defense, did not attempt to rebut any part of the probation report, and did not pursue an aggressive and effective defense." (Johnson's brief at p. 78 [Doc. 36-8 at 94].)  Johnson does not allege what type of experts could have assisted his defense, what evidence those experts could have presented, what additional mitigation evidence existed that counsel did not present, or what evidence could have been presented to rebut the probation report.  Clearly, Johnson has failed to show that his counsel were ineffective in this regard.

*Johnson v. State*, 823 So. 2d 1, 51 (Ala. Crim. App. 2001).  By contrast, the allegations in Johnson's post-conviction petition regarding counsel's failure to investigate and present available mitigating evidence spanned more than 60 pages.  (Doc. 36-18 at 41-60, 64-115, 161-64.)  Yet the state court held that the two-sentence argument made by Johnson's direct-appeal attorney was the same as the argument in the post-conviction petition—and therefore the post-conviction argument was barred.  *Johnson*, 379 So. 3d at 1015.[28]

---

[27] The direct-appeal argument followed a similarly perfunctory argument in Johnson's motion for new trial.  (*See* Doc. 36 at 109-10.)

[28] The difference between the two arguments is not surprising.  The Alabama Supreme Court has recognized that it is often not practical for a defendant to raise an ineffective-assistance-of-counsel claim in a motion for new trial and on direct appeal.  *See Ex Parte Ingram*, 675 So. 2d 863, 866 (Ala. 1996) ("When a defendant makes a claim of ineffective assistance of trial counsel, and that claim cannot reasonably be presented in a new trial motion filed within the 30 days allowed by Rule 24.1(b), Ala. R. Crim. P., the proper method for presenting that claim for appellate review is to file a Rule 32, Ala. R. Crim. P., petition for post-conviction relief.").

The process that produced that ruling was unquestionably arbitrary.  After initially dismissing Johnson's entire petition at the State's request, the state courts allowed the State to decide which claims would be remanded for hearings.  *See supra* Parts IV(A)(1), (B)(1); *Johnson*, 379 So. 3d at 1017.  Johnson objected, arguing that the state courts should conduct "an independent review of all of his Rule 32 claims" and should not "merely defer[] to the State's arbitrary selection of claims."  (Doc. 36-21 at 196.)  Those arguments, however, were brushed aside.

Significantly, there was no rhyme or reason to the way in which the State—and by extension, the state courts—divided up Johnson's ineffective-assistance-of-counsel allegations. *See* Doc. 36-21 at 196 (Johnson arguing that "[n]o legal distinction exists between the fifteen claims that the State now concedes deserve a hearing and the remaining claims [on which] the State continues to oppose [a hearing]").  If the direct-appeal attorney's argument barred Part XIX(G), then there is no logical justification as to why that same argument would not bar other allegations in Johnson's post-conviction petition, including the allegations regarding the judicial sentencing proceeding.  As Johnson argued to the state court: "The State's failure to even attempt to distinguish these claims compels one of two conclusions: either the State has selected the claims at random, or it has cherry picked the claims on which it believes it has the best chance of prevailing at an evidentiary hearing.  Either approach is unacceptable, particularly in a death penalty case where Mr. Johnson's life is on the line."  (Doc. 36-21 at 199.)

The inconsistent application of the state procedural rule within this very case confirms that the state court's ruling was arbitrary and "manifestly unfair."  *See Upshaw v. Singletary*, 70 F.3d 576, 580 (11th Cir. 1995) (holding that the state court's ruling on a procedural ground was manifestly unfair because it was inconsistent with the way in which the procedural ground was

usually applied); *see also Jones v. Sec'y, Dept. of Corr.*, 778 Fed. Appx. 626, 633 (11th Cir. 2019) (holding that the state court's ruling was manifestly unfair because it was inconsistent with the record); *Judd*, 250 F.3d at 1318 (holding that the state court's procedural ruling was manifestly unfair because it was inconsistent with the standard governing the claim at issue). Therefore, the ruling is not an adequate and independent state ground.

However, if this Court were to find that the state court's ruling is adequate to bar federal review, it should address the issue of counsel's performance at the penalty phase before the jury through Johnson's claim of ineffective assistance of appellate counsel. The only reason the procedural bar was invoked in the first place is that Johnson's direct-appeal attorney raised a perfunctory argument that trial counsel were ineffective for failing to investigate and present mitigating evidence. That argument was not supported by any investigation or any supporting facts, and as a result, it was promptly rejected. *Johnson*, 823 So. 2d at 51. As explained in Part V, *infra*, the direct-appeal attorney was ineffective for raising the issue in that way.

### 3. The state court's merits ruling regarding counsel's failure to investigate and present mitigating evidence is not entitled to deference.

With respect to the state court's merits ruling that Johnson's attorneys were effective at the judicial sentencing proceeding, that ruling was unreasonable under § 2254(d). In addition, to the extent that the ruling also encompassed the penalty phase before the jury, as Respondent suggests, it was unreasonable with respect to that phase as well.[29]

---

[29] Johnson recognizes that the evidence at a hearing regarding the penalty phase before the jury would overlap significantly with the evidence at a hearing regarding the judicial sentencing proceeding. But as noted above, the hearing would have gone very differently if the parties and the court were not focused solely on the judicial sentencing proceeding. In any event, it is profoundly unfair for a state court to split an issue in two, arbitrarily deny the petitioner a hearing on the first part, receive evidence on the second part, and then use the evidence and conclusions from the hearing on the second part to deny relief on the first part.

As noted above with respect to the guilt phase, the *Strickland* standard requires courts to evaluate counsel's representation as a whole.  The Supreme Court stated in *Strickland* that "the performance inquiry must be whether counsel's assistance was reasonable *considering all the circumstances*."  *Strickland*, 466 U.S. at 688 (emphasis added).  And with respect to prejudice in a capital sentencing case, the court must consider "the totality of the available mitigating evidence."  *Williams v. Taylor*, 529 U.S. at 397-98; *see also Strickland*, 466 U.S. at 694 (holding that the prejudice analysis must account for the effects of counsel's "unprofessional errors"); *Daniel*, 822 F.3d at 1277 (holding, under § 2254(d), that the Alabama Court of Criminal Appeals unreasonably failed to consider the totality of the evidence in its prejudice analysis).

Johnson argued repeatedly that the only fair way to consider counsel's representation with respect to sentencing was to consider the penalty phase and the judicial sentencing proceeding together.  (Doc. 36-23 at 178; Doc. 36-21 at 196; *see also* Doc. 36-36 at 97 (arguing that "[i]t seems impossible, unworkable" to evaluate the issues separately).)  But the state courts never engaged in that analysis.  (*See* Doc. 36-52 at 12 (the circuit court stating that it would "consider the testimony and evidence presented at the evidentiary hearing *only* as it would have been considered at the judicial sentencing hearing" (emphasis added))); *Johnson*, 379 So. 3d at 1015, 1018, 1046, 1054-61.  Instead, they determined which parts of Johnson's petition would get hearings based on the State's concessions, and they separated the issue of representation at the penalty phase before the jury from the issue of representation at the judicial sentencing proceeding.  *Id.* at 1018, 1046.  That approach was unreasonable under *Strickland* and the record in the case.  *See* § 2254(d).

The state court's conclusions about counsel's mitigation investigation—made in the context of the court's analysis of the judicial sentencing proceeding—were unreasonable as well.

Under *Strickland*, the standard for deficient performance is whether counsel performed reasonably under prevailing professional norms, and those norms require a "thorough investigation of the defendant's background."  *Wiggins*, 539 U.S. at 522; *see also Williams*, 529 U.S. at 396.  The state court, however, held that "importantly, it is clear from a review of the record that this is not a case where trial counsel conducted no investigation into mitigating evidence or where counsel were ignorant as to what evidence constituted mitigating evidence." *Johnson*, 379 So. 3d at 1060.  The fact that counsel conducted *some* mitigation investigation and knew what mitigation was does not in any way foreclose a finding of deficient performance.  As the Supreme Court has explained: "*Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy.  Rather, a reviewing court must consider the reasonableness of the investigation to support that strategy." *Wiggins*, 539 U.S. at 527.  In many capital cases in which the Supreme Court has found deficient performance with respect to sentencing, counsel conducted *some* mitigation investigation but failed to conduct the kind of "thorough investigation" that *Strickland* requires.  *See*, *e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 381-83 (2005) (holding, under § 2254(d), that the state court unreasonably failed to find deficient performance even though counsel made "a number of efforts, including interviews with [the defendant] and some members of his family"); *Wiggins*, 539 U.S. at 522 (holding, under § 2254(d), that the state court unreasonably failed to find deficient performance even though counsel gathered some information about the client's background and arranged for a psychologist to evaluate the client).

When explaining counsel's duty to conduct a "thorough investigation," the Supreme Court has emphasized the importance of obtaining records regarding the client.  In *Williams*, the Court held that "trial counsel did not fulfill their obligation to conduct a thorough investigation"

because they failed to obtain "extensive records graphically describing Williams' nightmarish childhood." *Williams*, 529 U.S. at 395. Similarly, in *Rompilla*, the Court held that trial counsel were ineffective because they failed to review the file on their client's prior conviction, which would have led them to other records that "pictured [the client's] childhood and mental health very differently from anything defense counsel had seen or heard." *Rompilla*, 545 U.S. at 383-90. And in *Porter v. McCollum*, the Court held that trial counsel were ineffective in part because they did not even take the "first step" of obtaining "any of Porter's school, medical, or military service records." *Porter v. McCollum*, 558 U.S. 30, 39 (2009).

Yet here, the state court did not flinch at the fact that Johnson's counsel did not obtain a single life-history record regarding Johnson or his family. (Doc. 36-47 at 103-05.) The state court also disregarded attorney Darryl Bender's explanation for *why* the defense did not obtain any records. Bender testified that if he had obtained records that contained unhelpful information, he would have been required to disclose them to the prosecution. (Doc. 36-49 at 168-75.) That is entirely inaccurate; defense counsel in a capital case would be required to disclose records only if they intended to present them. There is no support for the notion that a capital defense team should decline to search for records based on the possibility that certain records could be unhelpful. *Cf. Williams*, 529 U.S. at 396 (holding that counsel had an obligation to obtain additional records even though "not all of the additional [records were] favorable"). Counsel's failure to obtain records was based on a misunderstanding of the law and cannot possibly constitute a reasonable decision. *See Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986) (clarifying that a decision based on "ignorance of the law" is not reasonable); *see also Williams*, 529 U.S. at 395 (holding that counsel performed deficiently where they failed to obtain life-history records "not because of any strategic calculation but because they incorrectly

thought that state law barred access to such records"); *Debruce v. Comm'r, Ala. Dept. of Corr.*, 758 F.3d 1263, 1273 (11th Cir. 2014) (holding, in a 2254(d) analysis under *Strickland*, that "a strategic decision cannot be reasonable if it is based on a misunderstanding of the law").

In addition to unreasonably applying *Strickland*, the state court relied on numerous unreasonable factual determinations. *See* § 2254(d)(2). For example, the court stated that Bender spent 98 hours investigating mitigation. *See Johnson*, 379 So. 3d at 1060 (stating that Bender spent 57 hours on mitigation investigation prior to Johnson's first trial and another 41 hours in advance of the second trial). Respondent repeats that factual determination in its brief. (Doc. 41 at 38.) But Bender spent many of those hours observing court proceedings, including the trial of Ardragus Ford, Johnson's co-defendant, which had nothing to do with mitigation. (*See*, *e.g.*, Doc. 36-47 at 103-04 (listing 28.5 hours for "trial of co-defendant Ardragus Ford" under "Out of Court Preparation – Mitigation").) In addition, several of the witnesses with whom Bender spoke in those hours were guilt-phase witnesses, not mitigation witnesses. (Doc. 36-49 at 199-200.) To the extent that Bender spoke with any mitigation witnesses, the interviews were perfunctory. For example, Tony Green, one of just three witnesses who testified at the penalty phase, explained at a post-conviction hearing that the full extent of his interaction with counsel was Bender telling him to "get on the stand and beg for [Johnson's] life." (Doc. 36-49 at 97-98; *see also* Doc. 36-48 at 77 (Johnson's mother, who also testified at the penalty phase, explaining that Bender and Mathis never prepared her).) There is no reasonable basis for concluding that defense counsel engaged in an extensive mitigation effort when they collected no records, presented just 17 pages of penalty-phase testimony, and did not even prepare the

witnesses they called.[30]  There is also no mystery as to why counsel never discovered that Johnson's childhood was plagued by violence and abuse.[31]

The state court's determination regarding prejudice was similarly unreasonable.  In dismissing the significance of the physical abuse Johnson endured as a child, the state court described evidence of childhood abuse as a "double-edged sword."  *Johnson*, 379 So. 2d at 1061. But evidence of childhood abuse is exactly the type of mitigating evidence that was at issue in the cases in which the Supreme Court has found *Strickland* prejudice in the context of capital sentencing.  *Williams v. Taylor*, 529 U.S. at 395-98; *Wiggins*, 539 U.S. at 534-35; *Rompilla*, 545 U.S. at 390-93.[32]  There is no reason the evidence of Johnson's difficult childhood should be viewed as harmful when the Supreme Court has viewed similar evidence as mitigating and valuable in other *Strickland* cases.  If anything, evidence of the abuse Johnson endured would be

---

[30] This is particularly true since defense counsel elicited testimony from Tony Green at the penalty phase before the jury that it was "very difficult" for Johnson's mother to raise him because she was a single mother.  (Doc. 36-6 at 102-03.)  Having introduced the theme that Johnson's childhood was challenging, counsel had "every incentive" to develop evidence to support it.  *Wiggins*, 539 U.S. at 532.

[31] Respondent notes that according to the pre-sentence investigation report, Johnson stated "that he has a good relationship with his father" and that "his mother is the one that best understands him."  (Doc. 41 at 38 (quoting Doc. 36 at 92).)  In Respondent's view, those statements suggest that counsel were not at fault for failing to learn about Johnson's traumatic childhood.  (Doc. 41 at 38.)  To be clear, those statements concerned Johnson's relationships with his parents when he was in his 20s; they say nothing about his upbringing.  Moreover, even if Johnson were less than forthcoming with a State probation officer, that certainly would not relieve his own attorneys of their obligation to conduct a reasonable mitigation investigation.  *See Rompilla*, 545 U.S. at 381 (holding that counsel failed to conduct a reasonable mitigation investigation even though their client's "own contributions to any mitigation case were minimal" and "[t]here were times when [the client] was even actively obstructive by sending counsel off on false leads").

[32] *See also*, *e.g.*, *Debruce*, 758 F.3d at 1276 (finding prejudice where counsel failed to present evidence that the defendant had an "alcoholic and disengaged father," had suffered "beatings," and had been raised in a neighborhood with "pervasive violence"); *Williams v. Allen*, 542 F.3d 1326, 1342 (2008) (finding prejudice where counsel failed to present evidence that the defendant was raised in a household "in which severe beatings and other forms of violence occurred on a near constant basis").

even more significant in this case given the trial court's finding that "the only evidence arguably presented in mitigation was the fact that at the time the offense occurred [Johnson] was 22 years of age."  (Doc. 36 at 106.)[33]

The significance of the available mitigating evidence is not diminished by the nature of the offense.  Respondent, echoing the state court's decision, argues that the aggravating evidence was so strong that the case would have resulted in a death sentence regardless.  (Doc. 41 at 37-38.)  That argument is belied by the case law; the Eleventh Circuit has found *Strickland* prejudice with respect to sentencing in numerous cases that were highly aggravated.  *See, e.g.*, *Cooper v. Sec'y, Dept. of Corr.*, 646 F.3d 1328, 1331, 1355-56 (11th Cir. 2011) (finding prejudice at sentencing in a capital case in which the defendant bound three men with duct tape and then killed them with shotguns); *Johnson, Sec'y, Dept. of Corr.*, 643 F.3d at 911, 917, 937 (finding prejudice at sentencing in a capital case in which the defendant had prior violent felonies and then killed two men).  Moreover, there are hundreds of examples of highly aggravated cases in which juries rejected death sentences because the defense presented mitigating evidence.  *See* Russell Stetler, et al., *Mitigation Works: Empirical Evidence of Highly Aggravated Cases Where the Death Penalty Was Rejected at Sentencing*, 51 Hofstra L. Rev. 89 (2022) (identifying more than 600 cases in which juries rejected the death penalty for highly aggravated crimes, including more than 400 cases involving two or more decedents).

---

[33] In the context of discussing prejudice, the state appellate court quoted the circuit court's finding that the murder was not attributable to "physical abuse, poor parenting, poverty, alcohol or drug abuse or any combination of any of these events or conditions in his childhood or adolescence." *Johnson*, 379 So. 3d at 1057 (quoting Doc. 36-52 at 44).  That statement suggests that mitigating evidence must have a "nexus" to the offense—a notion that the Supreme Court has firmly rejected.  *See Tennard v. Dretke*, 542 U.S. 274, 283-86 (2004) (holding that states cannot require a nexus between mitigating evidence and the offense at issue).

The state court also failed to account for the fact that the case at sentencing was extremely close.  Even without the evidence regarding Johnson's traumatic childhood, just ten jurors voted for a death sentence—the minimum required for a death recommendation under Alabama law.  Under *Strickland*, prejudice is more easily shown in cases with a non-unanimous jury vote because the jury's vote indicates that the case was close.  *Strickland*, 466 U.S. at 696 (recognizing that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support"); *Daniel*, 822 F.3d at 1276 (applying *Strickland* under § 2254(d) and holding several factors support a finding of prejudice, including that "even without the substantial and compelling mitigation that trial counsel failed to discover and present, Mr. Daniel's jury voted 10 to 2 for death").  Nevertheless, the state court suggested that the case at sentencing was so clear-cut that a sentence less than death was virtually impossible.

The state court's decision regarding counsel's representation at the judicial sentencing proceeding was unreasonable under § 2254(d), and therefore, this Court should not defer to it. *See* § 2254(d); *McGahee v. Ala. Dept. of Corr.*, 560 F.3d 1252, 1266 (11th Cir. 2009) (holding that the state court's decision was unreasonable and therefore was not entitled to deference); *Jones v. Walker*, 540 F.3d 1277, 1288 n.5 (11th Cir. 2008) (same).

**4.      This Court should hold additional proceedings and find that
Johnson's attorneys were ineffective with respect to sentencing.**

Because the state court's rulings do not preclude relief or warrant deference, this Court should hold further evidentiary proceedings and find that Johnson's attorneys were ineffective with respect to sentencing.  *Strickland*, 466 U.S. at 694.  The Court should consider the representation in its entirety—counsel's approach to the investigation, which was to hire a man who was struggling with personal issues and had no ability to conduct actual fieldwork (Doc. 37

70

at 40-42); counsel's own investigation, which involved no record collection and no meaningful

life-history interviews (Doc. 36-47 at 103-05; *see* Doc. 36-49 at 97-98; Doc. 36-48 at 77);

counsel's presentation at the penalty phase before the jury, which comprised a mere 17 pages of

transcript and left Johnson's traumatic upbringing entirely unexplored (Doc. 36-6 at 87-104); and

counsel's decision to present nothing further at the judicial sentencing proceeding (Doc. 36-6 at

160-71).

     As for prejudice, counsel's deficient performance obscured an extremely compelling

mitigation case.  Credible and compelling witnesses could have explained the trauma that

Johnson endured as a child, and their testimony could have been corroborated by voluminous

records.  (Doc. 36-44 at 172; Doc. 36-45 at 1-101; Doc. 36-46 at 1-101; Doc. 36-47 at 93;

Doc. 36-48 at 36-110; Doc. 36-49 at 66-104.)  The testimony and records could have shown

Johnson as a person who was by no means among the most deserving of execution.  Instead, he

was the baby who was born to a mother who "wasn't ready to have no kids."  (Doc. 36-48 at 70.)

He was the son who "tr[ied] to stop his [mother] from being abused" by his father.  (Doc. 36-49

at 84.)  He was the child who "took out running" when his father "shot at him."  (Doc. 36-47 at

171-72.)  He was the caretaker who looked out for his younger brother.  (Doc. 36-47 at 174.)  He

was the teenager who watched his mother's boyfriend "smoke crack" in their apartment.  (Doc.

36-48 at 42-43, 69.)  He was the nephew who "bounced around from place to place" and was

devastated by the loss of his aunt when he was 16 years old.  (Doc. 36-49 at 94; Doc. 36-48 at

71.)  This is precisely the kind of evidence that can make a difference in a capital case.  And if

just one more juror had refused to vote for a death sentence, Johnson would not have received a

recommendation for death.  *See Daniel*, 822 F.3d at 1276 ("Under Alabama law, if one more

juror voted for a sentence of life without parole, there could have been no recommendation for death.").

 In sum, Johnson was never given a full and fair opportunity to present evidence in support of his allegation that his counsel were ineffective at the penalty phase.  Therefore, this Court should hold an evidentiary hearing to complete the record.  *See id.* at 1280-81 (remanding for an evidentiary hearing under § 2254(e)(2) where the petitioner "tried, but was not given the opportunity to develop the factual bases of the claim in state court").  The Court should then find that the attorneys were ineffective with respect to sentencing, and it should vacate Johnson's death sentence under *Strickland* and the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

## V. Appellate counsel for Johnson was constitutionally ineffective.

 Johnson's appellate attorney rendered ineffective assistance of counsel in an extreme manner.  In his motion for new trial and on direct appeal, the attorney, Joe Morgan, Jr., raised arguments that directly and affirmatively harmed Johnson.  One issue in particular requires emphasis: Morgan's decision to raise a perfunctory claim of ineffective assistance of trial counsel.  That decision and Johnson's claim of ineffective assistance of trial counsel are directly related; the direct-appeal argument ultimately led the state post-conviction courts to procedurally bar Johnson's claim regarding his trial counsel's performance at the penalty phase and certain aspects of trial counsel's performance at the guilt phase.  *See Johnson v. State*, 379 So. 3d 994, 1015 (Ala. Crim. App. 2007) (barring Johnson's claim regarding the representation he received at the penalty phase before the jury); *see id.* (barring Johnson from presenting evidence that his trial counsel unreasonably delegated the investigation to a man who was struggling with personal and mental health issues and was incapable of conducting investigation).  In other words, Morgan's

decision to raise the ineffective-assistance-of-counsel issue on direct appeal prejudiced Johnson by prohibiting him from obtaining meaningful review of the issue in state court.

As explained in Part IV(B)(2), *supra*, the state court's application of the procedural bar to Johnson's claim of ineffective assistance of counsel at the penalty phase was "manifestly unfair" and should not bar federal review.  However, to the extent that this Court declines review of that claim based on the procedural bar applied by the state courts, it should grant an evidentiary hearing regarding appellate counsel's ineffective argument, which is what created the procedural-bar issue in the first place.

Morgan, who was later suspended by the Alabama bar for violating the Alabama Rules of Professional Conduct in nine separate cases,[34] was appointed to represent Johnson shortly after the capital trial.  In a motion for new trial, Morgan stated in vague terms that Johnson was denied effective assistance of counsel at trial.  (Doc. 36 at 109.)  The trial court denied the motion. (Doc. 36 at 17.)  The case then moved to the appellate court, where Morgan raised the issue again.  The following is the entirety of his argument about trial counsel's representation:

> In the case at bar, Defense Counsel did not subpoena telephone records that could have shown that the calls were not made at all, or were of an unusual time, or length of call.  Defense Counsel failed to investigate the facts of the case.
>
> No attempt was made to put on any case at the sentencing phase of the trial.  There are groups of experts available who could assist, but none were contacted.
>
> Defense Counsel did not prepare any requested jury charges, did not use a juror questionnaire, did not conduct a mitigation defense, did not attempt to rebutt [*sic*] any part of the Probation Report, and did not pursue an aggressive and effective defense.

Even the state appellate court recognized that Morgan's argument was plainly inadequate.  When discussing the suggestion that trial counsel failed to investigate, the court commented: "Johnson

---

[34] *See Morgan v. Disciplinary Bd. of the Ala. State Bar*, 776 So. 2d 103, 103 (Ala. 2000).

provides no facts or argument to support this conclusory statement, and this Court is hard-pressed even to consider this to be a 'claim' of ineffective assistance of counsel." *Johnson v. State*, 823 So. 2d 1, 50 (Ala. Crim. App. 2001).

In both his state post-conviction petition and his habeas petition in this Court, Johnson alleged that when Morgan raised the issue of ineffective assistance of trial counsel, he (1) had not reviewed the transcript, (2) had not conducted any investigation, and (3) raised the issue based on a mistake of law.  (Doc. 36-18 at 170-73; Doc. 37 at 98-100.)  Morgan believed that "it was necessary" for him to raise ineffective assistance of counsel "to preserve Mr. Johnson's right to raise such claims in a postconviction proceeding."  (Doc. 37 at 98.)  But that was entirely inaccurate.  Well before Johnson's trial, the Alabama courts had made clear that when an appellate attorney takes on a case after trial and does not have time to review the transcript and investigate the case in time to litigate an ineffective-assistance-of-counsel claim in a motion for new trial, "the proper method for presenting that claim for appellate review is to file a Rule 32, Ala. R. Crim. P., petition for post-conviction relief."  *Ex Parte Ingram*, 675 So. 2d 863, 866 (Ala. 1996).  Moreover, Morgan had no understanding of the potential consequences of raising the claim without any facts or argument to support it.  He had no idea that by raising the claim as he did, he would effectively foreclose any possibility of meaningful state-court review of the issue.

Despite this, the state courts summarily dismissed Johnson's claim that Morgan was ineffective.  Specifically, the state appellate court held that the claim was "insufficiently pleaded, and moreover, [is] without merit."  *Johnson*, 379 So. 3d at 1063.  That conclusion was an unreasonable determination of *Strickland v. Washington*, 466 U.S. 668 (1984), and was based on an unreasonable determination of the facts.  *See* § 2254(d); *Evitts v. Lucey*, 469 U.S. 387, 396 (1985) (holding that a defendant has a right to effective assistance of counsel on direct appeal).

Under *Strickland*, Johnson was required to show that his counsel performed deficiently and that their deficient performance resulted in prejudice.  *Strickland*, 688 U.S. at 694.  Here, Johnson alleged that Morgan raised an issue based on a mistake of law, which was unreasonable.  *See Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986) (clarifying that a decision based on "ignorance of the law" is not reasonable); *see also Debruce v. Comm'r, Ala. Dept. of Corr.*, 758 F.3d 1263, 1273 (11th Cir. 2014) (holding, in a 2254(d) analysis under *Strickland*, that "a strategic decision cannot be reasonable if it is based on a misunderstanding of the law").  And that decision ultimately prohibited Johnson from obtaining full state-court review of his meritorious ineffective-assistance-of-counsel claim.  *See supra* Part IV (addressing the claim of ineffective assistance of counsel).  Because the state court's resolution of this issue was unreasonable and Johnson's allegations, if true, would entitle him to relief, this Court should hold an evidentiary hearing and grant relief.  *See Daniel v. Comm'r, Ala. Dept. of Corr.*, 822 F.3d 1248, 1280-81 (11th Cir. 2016) (remanding for an evidentiary hearing under § 2254(e)(2) where the petitioner pled a facially meritorious claim and was not given the opportunity to present evidence in state court).

In short, the state courts denied Johnson a full and fair opportunity to prove that his trial counsel were ineffective.  They did that, in part, by holding that Morgan had already raised an ineffective-assistance-of-counsel claim on direct appeal.  Because Morgan's decision to raise that claim was unreasonable, it should not serve as an obstacle to meaningful review.  Therefore, Johnson respectfully requests that this Court hold an evidentiary hearing and vacate his conviction and death sentence under *Strickland* and the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**VI.** **The Alabama death penalty statute and the procedure resulting in Johnson's sentence of death violate the United States Constitution.**

Johnson respectfully maintains that his death sentence violates *Ring v. Arizona*, 536 U.S. 584 (2002), *Apprendi v. New Jersey*, 530 U.S. 466 (2000), *Caldwell v. Mississippi*, 472 U.S. 320 (1985), and the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  (*See* Doc. 37 at 102-08.)  Respondent, in his answer and brief, block-quotes the state court's decision and argues that Johnson's arguments are without merit under § 2254(d).  (Doc. 38 at 122-26; Doc. 41 at 49-51.)[35]  Johnson acknowledges that the Eleventh Circuit has rejected similar arguments in other cases.  *See*, *e.g.*, *Miller v. Ala. Dept. of Corr.*, 826 Fed. Appx. 743, 749-50 (11th Cir. 2020).  However, he respectfully maintains that those cases were decided incorrectly and that the state court's decision in this case constitutes an unreasonable application of clearly established federal law, for the reasons set forth in his petition.  (*See* Doc. 37 at 102-08.)  Therefore, Johnson respectfully requests that this Court vacate his death sentence.

## CONCLUSION

Johnson respectfully requests that this Court hold further evidentiary proceedings on Claims I, III, IV, and V and grant a writ of habeas corpus with respect to all claims.

---

[35] Respondent also contends that Johnson's claim is unexhausted, but he concedes that the issue can be decided on the merits.  (Doc. 41 at 50.)

Respectfully submitted,

*/s/ Patrick Mulvaney*
Patrick Mulvaney
60 Walton Street, NW
Atlanta, GA 30303
Tel: (404) 688-1202
Fax: (404) 688-9440
pmulvaney@schr.org

*/s/ Ty Alper*
Ty Alper
U.C. Berkeley School of Law
Berkeley, CA 94720-7200
Tel: (510) 643-7849
Fax: (510) 643-4625
talper@law.berkeley.edu

**CERTIFICATE OF SERVICE**

I hereby certify that on October 28, 2024, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send the filing to the following:

James R. Houts
Assistant Attorney General
Office of the Alabama Attorney General
501 Washington Avenue
Montgomery, AL 36130
James.Houts@AlabamaAG.gov


*/s/ Patrick Mulvaney*
Patrick Mulvaney