FILED
2026 Sep-01 AM 11:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| TOFOREST JOHNSON,<br>*Petitioner*,<br><br>v.<br><br>TERRY RAYBON,<br>Warden of William C. Holman Correctional Facility,<br>*Respondent*. | ) | Case No. 2:16-cv-01945-HDM<br><br>CAPITAL CASE |

**PETITIONER'S RESPONSE TO THE COURT'S ORDER REGARDING THE INVOLVEMENT OF BRADLEY ATTORNEYS IN THIS CASE**

Petitioner Toforest Johnson respectfully submits this response to the Court's order (Doc. 58) requiring the parties to provide information about any involvement in this case by attorneys from the law firm of Bradley Arant Boult Cummings LLP ("Bradley").

The Court requested information about the following: the precise issues raised by the Bradley attorneys on Johnson's behalf (and dates any Bradley attorneys appeared in the case), whether the issues raised by the Bradley attorneys are before the Court in this federal habeas corpus case, and whether any continuing financial or client relationship exists between Bradley and Petitioner Johnson.

Johnson addresses each request in turn.

## I. <u>Precise Issues Raised by Bradley on Johnson's Behalf and Dates Bradley Attorneys Appeared in the Case</u>

Bradley attorneys have been involved in Johnson's case at two separate stages: his original post-conviction proceeding and his second post-conviction proceeding. In both proceedings, Bradley attorneys represented the Innocence Project in support of Johnson's position.

### A. Original Post-Conviction Proceeding

After his conviction and death sentence were affirmed on direct review, Johnson sought post-conviction relief in the Alabama courts. He argued, among other claims, that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), at his capital trial by suppressing evidence that it paid its key witness $5,000 for her testimony. The Alabama courts denied relief, *see Johnson v. State*, 379 So. 3d 994, 1065–79 (Ala. Crim. App. 2022), and on April 17, 2023, Johnson filed a petition for certiorari in the United States Supreme Court.

On behalf of the Innocence Project, Bradley attorneys Lindsey C. Boney IV and Virginia N. Adamson filed an amicus brief in the Supreme Court in support of Johnson. In the brief, which was filed on May 22, 2023, the Bradley attorneys made two principal arguments. *See* Appendix A (Brief for the Innocence Project as *Amicus Curiae* in Support of Petitioner). First, the Bradley brief urged the Court to grant Johnson's petition and review the *Brady* issue. *See id.* at 4–5 ("Johnson correctly argues that the court below should have found, consistent with the evidence, that the

State suppressed evidence that Violet Ellison testified for a reward that she anticipated receiving at the time of her testimony."). The Bradley brief also argued that "the troubling case against Toforest Johnson is not limited to a *Brady* violation" and that "[i]f ever a case bore the hallmarks of a wrongful conviction, Toforest Johnson's is it." *Id.* at 3, 4, 7–10.

### B. Second Post-Conviction Proceeding

While his original petition was still active in state court, Johnson filed a second petition for post-conviction relief in 2020 after the Jefferson County District Attorney and the original trial prosecutor called for a new trial because the State's evidence had "unraveled over 20 years." *See* Jefferson County District Attorney's Supplemental Amicus Curiae Brief in Support of Petitioner 5, *State v. Johnson*, No. CC-1996-386.61 (Jefferson Cty. Cir. Ct. May 20, 2024) (District Attorney's brief); Amended Rule 32 Petition for Relief from Conviction and Sentence, *State v. Johnson*, No. CC-1996-386.61 (Jefferson Cty. Cir. Ct. Nov. 14, 2024) (Johnson's amended petition).

On March 9, 2021, Bradley attorneys Lindsey C. Boney IV, Dylan C. Black, and Carson S. Phillips entered an appearance and filed an amicus brief on behalf of the Innocence Project in the Jefferson County Circuit Court in support of Johnson's position. *See* Appendix B (The Innocence Project's *Amicus Curiae* Brief in Support of Petitioner (2021)). In that brief, the Bradley attorneys explained why three

particular aspects of Johnson's conviction supported the District Attorney's conclusion that the conviction should be overturned: (1) the fact that prosecutors in Johnson's case presented inconsistent theories at different trials, *id*. at 3 ("Over the course of three years, the State presented five different theories regarding who killed Deputy Hardy."); (2) the fact that prosecutors relied on an unreliable "earwitness'" identification, *id.* at 8–9 (recounting the ways in which the testimony of witness Violet Ellison was unreliable); and (3) that the lead prosecutor who obtained the conviction and the current elected District Attorney have both called for the conviction to be overturned, *id.* at 9 ("[P]rosecutorial doubt about the reliability of a conviction or the strength of the State's case should not be taken lightly.").

Bradley attorneys Lindsey C. Boney IV and Danner Kline then filed a second amicus brief in the case on March 12, 2025, after Johnson amended his petition. *See* Appendix C (The Innocence Project's *Amicus Curiae* Brief in Support of Petitioner (2025)).[1] In this brief, the Bradley attorneys argued that the State's position in the second post-conviction proceedings (that Johnson's petition should be dismissed) "would nullify the critical role of conviction integrity review in remedying wrongful convictions." *Id.* at 12.

[1] Mr. Kline entered his appearance in the case on March 12, 2025.

## II. Whether the Issues Bradley Raised Appear in the Federal Petition

### A. Issues Bradley Raised in Original Post-Conviction Proceeding

In the federal habeas action in this Court, Johnson has presented the same *Brady* issue that was the subject of Bradley's amicus brief in the United States Supreme Court. (*See* Doc. 37 at 27–38) (the *Brady* claim in Johnson's petition); (Doc. 44 at 27–39) (discussion of the *Brady* claim in Johnson's reply brief).[2] In this claim, Johnson asks this Court to find that the state court's determination of the *Brady* issue "involved an unreasonable application of clearly established federal law and was based on an unreasonable determination of the facts in light of the evidence in the record." (Doc. 37 at 28.) He further requests that the Court find that the State suppressed material information that was favorable to the defense, in violation of Johnson's constitutional rights. *See id.*

### B. Issues Bradley Raised in Second Post-Conviction Proceeding

Johnson's pleadings in this Court reflect some of the issues Bradley raised on behalf of the Innocence Project in the second post-conviction proceedings. (*See, e.g.*, Doc. 37 at 8–17) (describing the various and inconsistent theories the State presented throughout the proceedings in this case); (Doc. 44 at 8) ("This case—the

[2] The Supreme Court denied certiorari on October 2, 2023. *Johnson v. Alabama*, 144 S. Ct. 37 (2023).

case of Toforest Johnson—involves a malfunction so extreme that both the original lead trial prosecutor and the Office of the Jefferson County District Attorney now support a new trial."). However, the proceedings on Johnson's second petition for post-conviction relief remain pending in state court at this time, and the claims raised therein are not currently before the Court.

## III. Any Continuing Financial or Client Relationship Between Bradley and Johnson

There is no continuing financial or client relationship between Bradley and Johnson. Bradley attorneys Lindsey C. Boney IV and Danner Kline remain counsel for the Innocence Project in its role as an amicus party in Johnson's second post-conviction proceeding in the Jefferson County Circuit Court.

Respectfully submitted,

/s/ Ty Alper

Ty Alper
U.C. Berkeley School of Law
353 Law Building
Berkeley, CA 94720-7200
Tel: (510) 643-7849
talper@law.berkeley.edu

Patrick Mulvaney
Southern Center for Human Rights
60 Walton Street, NW
Atlanta, GA 30303
Tel: (404) 688-1202
pmulvaney@schr.org

*Counsel for Toforest Johnson*

## Certificate of Service

I hereby certify that on September 1, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will notify the following counsel of record: **Lauren A. Simpson**.

/s/ Ty Alper
Ty Alper
U.C. Berkeley School of Law
353 Law Building
Berkeley, CA 94720-7200
Tel: (510) 643-7849
talper@law.berkeley.edu

# APPENDIX A

Brief for the Innocence Project as *Amicus Curiae* in Support of Petitioner (2023)

No. 22-7337

In the
# Supreme Court of the United States

TOFOREST ONESHA JOHNSON,
*Petitioner,*

*v.*

STATE OF ALABAMA,
*Respondent.*

On Petition for Writ of Certiorari to
the Alabama Court of Criminal Appeals

## BRIEF FOR THE INNOCENCE PROJECT AS *AMICUS CURIAE* IN SUPPORT OF PETITIONER

Lindsey C Boney IV
*Counsel of Record*
Virginia N. Adamson
BRADLEY ARANT BOULT CUMMINGS LLP
1819 Fifth Avenue North
Birmingham, AL 35203
Phone: (205) 521-8914
lboney@bradley.com

Adnan Sultan
THE INNOCENCE PROJECT, INC.
40 Worth Street, Suite 701
New York, NY 10013

*Counsel for Amicus Curiae*

May 22, 2023

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................... ii

INTEREST OF AMICUS CURIAE ............................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................ 3

ARGUMENT ............................................................ 4

I. Disclosure of Ellison's ulterior motive for testifying would have demolished an already weak case. .......................................... 5

II. This case bears numerous hallmarks of a wrongful conviction. ........................................ 7

A. The State pursued inconsistent prosecutorial theories. .................................. 7

B. The State relied on an unreliable "earwitness identification." ......................... 10

C. The State's star witness was incentivized to provide testimony leading to a conviction. ............................... 16

D. The prosecutors now doubt the validity of Johnson's conviction. .................. 18

CONCLUSION ....................................................... 22

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Bankhead v. State*,
182 S.W.3d 253 (Mo. Ct. App. 2006) ....................9

*Baze v. Rees*,
553 U.S. 35 (2008) ....................1

*Berger v. United States*,
295 U.S. 78 (1935) ....................7

*Bradshaw v. Stumpf*,
545 U.S. 175 (2005) ....................8

*Drake v. Kemp*,
762 F.2d 1449 (11th Cir. 1985) ....................8

*Elonis v. United States*,
575 U.S. 723 (2015) ....................1

*Ford v. Wainwright*,
477 U.S. 399 (1986) ....................16

*Furman v. Georgia*,
408 U.S. 238 (1972) ....................12

*Glossip v. Gross*,
576 U.S. 863 (2015) ....................1

*Imbler v. Pachtman*,
424 U.S. 409 (1976) ....................21

*Kyles v. Whitley*,
514 U.S. 419 (1995) ....................5

*Perry v. New Hampshire*,
565 U.S. 228 (2012) ..... 11

*Ramos v. Louisiana*,
590 U.S. ----, 140 S. Ct. 1390 (2020) ..... 7

*Smith v. Groose*,
205 F.3d 1045 (8th Cir. 2000) ..... 9

*Strickler v. Greene*,
527 U.S. 263 (1999) ..... 5, 7

*Thompson v. Calderon*,
120 F.3d 1045 (9th Cir. 1997) ..... 8

*United States v. Bagley*,
472 U.S. 667 (1985) ..... 5

*United States v. Wade*,
388 U.S. 218 (1967) ..... 11

*Young v. United States*,
315 U.S. 257 (1942) ..... 18, 21

**Statutes**

18 U.S.C. § 201(c)(2) ..... 16

**Other Authorities**

ALA. R. OF PROF'L CONDUCT 3.4(b) ..... 16

Beth Shelburne, *District Attorney Urges New Trial for Man on Alabama's Death Row*, WBRC (June 12, 2020, 12:22 PM), https://www.wbrc.com/2020/06/12/district-attorney-urges-new-trial-man-alabamas-death-row/ .......... 20

Christopher Sherrin, *Earwitness Evidence: The Reliability of Voice Identifications*, 52 OSGOODE HALL L.J. 819 (2015) .......... 14

Christopher T. Robertson & D. Alex Winkelman, *Incentives, Lies, and Disclosure*, 20 U. PA. J. CONST. L. 33 (2017) .......... 16

Cindy E. Laub, Lindsey E. Wylie, & Brian H. Bornstein, *Can The Courts Tell An Ear From An Eye? Legal Approaches to Voice Identification Evidence*, 37 LAW & PSYCHOL. REV. 119 (2013) .......... 14

*Conviction Integrity Units*, NAT'L REGISTRY OF EXONERATIONS, https://www.law.umich.edu/special/exoneration/Pages/Conviction-Integrity-Units.aspx (last visited May 3, 2023) .......... 21

*Innocence*, DEATH PENALTY INFO. CTR., https://deathpenaltyinfo.org/policy-issues/innocence (last visited May 19, 2023) .......... 1

*Ex-Louisiana Prosecutor Apologizes for 'the misery I have caused' Freed Inmate*, GUARDIAN (Mar. 25, 2015, 4:20 PM), https://www.theguardian.com/us-news/2015/mar/25/former-louisiana-prosecutor-exonerated-death-row-inmate-apologizes ............................................ 18

*How Eyewitness Misidentification Can Send Innocent People to Prison*, INNOCENCE PROJECT, https://innocenceproject.org/how-eyewitness-misidentification-can-send-innocent-people-to-prison/ (last visited May 18, 2023) ........................................ 11

INNOCENCE PROJECT, https://innocenceproject.org/exonerations-data/ (last visited May 19, 2023) .................. 2

The Innocence Project, *Larry Fuller*, NAT'L REGISTRY OF EXONERATIONS (before June 2012), https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3224 ............................................................ 14

Jessica K. Swanner & Denise R. Beike, *Incentives Increase the Rate of False but Not True Secondary Confessions from Informants with an Allegiance to a Suspect,* 34 LAW & HUM. BEHAV. 418 (2010) .................................................... 10, 16

Jessica Roth, *Informant Witnesses and the Risk of Wrongful Convictions*, 53 AM. CRIM. L. REV. 737 (2016) ................................ 1

Kaitlin Jackson & Samuel Gross, *Tainted Identifications*, NAT'L REGISTRY OF EXONERATIONS (Sept. 22, 2016), https://www.law.umich.edu/special/exoneration/Pages/taintedids.aspx ....................... 12

Maurice Possley, *Frank Sealie*, NAT'L REGISTRY OF EXONERATIONS (last updated Oct. 31, 2016), https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4659 ................................................ 18

Maurice Possley, *James C. Anderson*, NAT'L REGISTRY OF EXONERATIONS (Feb. 16, 2014), https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4378 ................................................ 13

Michael Q. English, *A Prosecutor's Use of Inconsistent Factual Theories of a Crime in Successive Trials: Zealous Advocacy or a Due Process Violation?*, 68 FORDHAM L. REV. 525 (1999) ........................................................ 9

NAT'L RESEARCH COUNCIL, IDENTIFYING THE CULPRIT: ASSESSING EYEWITNESS IDENTIFICATION 2 (Nat'l Academies Press 2014) ........................................... 13

Radley Balko, *An Illusion of Justice: The Baffling Conviction and Death Sentence of Toforest Johnson Reveal a Broken System*, WASH. POST (Sept. 5, 2019) .......... 19

Rob Warden, *How Mistaken and Perjured Eyewitness Identification Testimony Put 46 Innocent Americans on Death Row*, CTR. ON WRONGFUL CONVICTIONS, NW. L. SCH. (May 2, 2001), https://files.deathpenaltyinfo.org/legacy/files/pdf/StudyCWC2001.pdf .......... 12

Sara Conway, *A New Era of Eyewitness Identification Law: Putting Eyewitness Testimony on Trial*, 50 NEW ENG. L. REV. 81 (2015) .......... 12

Stephanie Denzel, *Freddie Lee Gaines*, NAT'L REGISTRY OF EXONERATIONS (before June 2012) https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3226 .......... 13

Thomas Albright & Jed Rakoff, *Eyewitnesses Aren't as Reliable as You Might Think*, WASH. POST (Jan. 13, 2015) .......... 12

Tom Jackman, *Va. Attorney General Launches Conviction Integrity Unit to Identify Wrongful Convictions*, WASH. POST (Jan. 16, 2021) .......... 21

## INTEREST OF *AMICUS CURIAE*[1]

Wrongful convictions are not an "'unreal dream'—[but] instead an undeniable reality." Jessica Roth, *Informant Witnesses and the Risk of Wrongful Convictions*, 53 AM. CRIM. L. REV. 737, 738 (2016) (citation omitted); *see, e.g.*, *Elonis v. United States*, 575 U.S. 723, 742 (2015) (Alito, J., concurring in part and dissenting in part) (observing that if certain criminal-procedure protections are not followed "a defendant may be wrongly convicted"); *Baze v. Rees*, 553 U.S. 35, 86 (2008) (Stevens, J., concurring in the judgment) ("[A]bundant evidence accumulated in recent years has resulted in the exoneration of an unacceptable number of defendants found guilty of capital offenses."); *cf. Glossip v. Gross*, 576 U.S. 863, 895 (2015) (Scalia, J., concurring) (convictions can be "unreliable").[2]

The Innocence Project is a non-profit organization and law-school clinic dedicated primarily to providing *pro bono* legal services to indigent prisoners whose actual innocence may be established through post-conviction evidence. Its mission is to free the staggering number of innocent people who remain

---

[1] Pursuant to Supreme Court Rule 37, *amicus* states that no counsel for any party authored this brief in whole or in part, and that no entity or person, aside from *amicus* or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief. Counsel for the parties received notice of the intent to file this brief at least ten days before its filing.

[2] To date, 192 death-row inmates have been exonerated. *See Innocence*, DEATH PENALTY INFO. CTR., https://deathpenaltyinfo.org/policy-issues/innocence (last visited May 19, 2023).

incarcerated and to bring reform to the system responsible for their unjust imprisonment.

For more than thirty years, the Innocence Project has fulfilled this mission by helping courts identify the signs of wrongful convictions and prevent future injustice. It has provided representation or assistance in most of the 375 DNA exonerations in the United States, as well as numerous exonerations based on constitutional violations.[3] The Innocence Project also works to prevent future miscarriages of justice by researching the root causes of wrongful convictions, participating as *amicus curiae* in cases of broader significance, and pursuing reform initiatives designed to enhance the truth-seeking function of the criminal-justice system. As a leading national advocate for the imprisoned, the Innocence Project is dedicated to improving the criminal-justice system and has a compelling interest in ensuring the fundamental dignity of those held in our nation's prisons.

The Innocence Project files this brief as *amicus curiae* to urge the Court to grant certiorari because this capital case presents numerous warning signs—far beyond the alleged *Brady* violation—that strongly point to Petitioner Toforest Johnson's innocence.

---

[3] Since its founding in 1992, the Innocence Project has been involved in 243 exonerations. *See* INNOCENCE PROJECT, https://innocenceproject.org/exonerations-data/ (last visited May 19, 2023).

## INTRODUCTION AND SUMMARY OF ARGUMENT

If ever a case bore the hallmarks of a wrongful conviction, Toforest Johnson's is it. Inconsistent prosecutorial theories, a prosecution that depends on a single "earwitness" identification (who was paid an undisclosed reward for her testimony, no less), and later-expressed prosecutorial doubt about the strength of the case . . . this case checks all the boxes.

Indeed, the signs of wrongful conviction fairly cry out from the record. Individually, each warrants a new trial—but together, they cannot be easily swept away, particularly now that both the lead trial prosecutor and the current district attorney support Johnson's request for a new trial. The Innocence Project respectfully urges the Court to grant the petition for certiorari.

* * *

Over the course of grand-jury proceedings and four trials, the State of Alabama presented *at least five different, contradictory theories* of who shot Deputy Sheriff William Hardy. This prosecutorial tactic is suspect in general. But here, it virtually ensures that the State knowingly prosecuted at least one innocent person—the forensic evidence and witness testimony made clear that this was a single-shooter crime.

The State's case against Johnson, who has always maintained his innocence, depended on the testimony of Violet Ellison, who claims to have overheard Johnson confess to the crime on a three-way phone call. Eye- or ear-witness identifications are generally unreliable, but here, doubly so: Ellison was not present when the crime occurred; she claimed to

overhear facts that were inconsistent with the physical evidence, the State's prosecutorial theories, and even her own notes; she was paid by the State for her testimony after she testified, in an undisclosed payment; and although she identified Johnson based on overhearing a phone call, she did not know him and did not know his voice.

Considering these facts, it is unsurprising that the lead trial prosecutor has expressed doubt about the strength of the State's case and that the current district attorney, following an independent review, now supports a new trial "in the interest of justice."[4]

Each of these aspects of Johnson's case is a hallmark of wrongful conviction, a red flag that should stop reviewing courts in their tracks. All of them *combined in a single case* should create unavoidable doubt in the outcome of the trial.

## ARGUMENT

The Court should grant review because the troubling case against Toforest Johnson is not limited to a *Brady* violation—the case was incredibly weak from the start and is only made weaker in the light of the State's suppressed evidence. Johnson correctly argues that the court below should have found, consistent with the evidence, that the State suppressed evidence that Violet Ellison testified for a reward that she anticipated receiving at the time of

---

[4] *See* C3. Supp-3 11. This brief employs the same record citation conventions as the petition for certiorari. "T.C." and "T.R." refer to the trial record. "C." and "R." refer to the record from the initial post-conviction proceedings. "C1." and "R1." refer to the first remand record. "C2." and "R2." refer to the second remand record. "C3." and "R3." refer to the third remand record.

her testimony. This Court should correct that error because the disclosure of the ulterior motive of the State's star witness would have shattered the already weak case against Johnson. Indeed, the conclusion of the district attorney's recent review of the case highlights the materiality of that suppression.

## I. Disclosure of Ellison's ulterior motive for testifying would have demolished an already weak case.

A correct resolution of the *Brady* claim is especially important because Johnson's case bears so many hallmarks of a wrongful conviction. This will be significant at the merits stage because if this Court agrees with Johnson that the State suppressed the evidence of Ellison's motive for testifying, the next step in the *Brady* analysis—either on remand or in this Court, *see* Pet. 23–25—is whether the disclosure would have made a different result "'reasonab[ly] probab[le].'" *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (quoting *United States v. Bagley*, 472 U.S. 667, 682 (1985)). This materiality standard is met when the suppressed evidence would produce a "significantly weaker case" for the prosecution, based on the "cumulative effect of the evidence." *Kyles v. Whitley*, 514 U.S. 419, 440–41, 454 (1995).

The Court should grant certiorari here because the *Brady* violation described in the petition is just one of many troubling aspects of the prosecution's case against Toforest Johnson.

The discussion below reveals just how weak the case for conviction was in the first place. Johnson's case displays *four* hallmarks of a wrongful conviction. All of them should independently undermine

confidence in the trial's outcome, but together—in combination with the suppressed *Brady* evidence—they are devastating to the State's case:

- The State's inconsistent prosecutorial theories show that no forensic evidence pointed to Johnson and emphasize that Ellison's testimony was essential to his eventual conviction. *See infra* Part II.A.
- Eyewitness or earwitness identification is problematic in general—and Ellison's identification was particularly suspect—yet the State relied on Ellison's testimony as the lynchpin of its case. This highlights both the influence her identification likely exerted on the jury and the significance of impeaching it. *See infra* Part II.B.
- The real danger of conviction based on incentivized witness testimony stresses the importance of safeguards, such as disclosure, cross-examination, and a cautionary jury instruction—but none of that happened here. *See infra* Part II.C.
- The lead prosecutor's own belief that the case against Johnson was not strong because it rested on Ellison's testimony—an opinion affirmed more recently by an independent re-investigation—confirms that the disclosure of the promised reward would have dramatically weakened Ellison's already unreliable testimony. Indeed, the district attorney's recent review expressly identifies the suppression of the reward as a reason why a new trial is necessary. *See infra* Part II.D.

The non-disclosure of Ellison's motive to testify for reward money is just one disquieting piece of a concerningly weak case for conviction.

## II. This case bears numerous hallmarks of a wrongful conviction.

### A. The State pursued inconsistent prosecutorial theories.

Prosecutors must "search for truth in criminal trials," *Strickler v. Greene*, 527 U.S. 263, 281 (1999), and have a corresponding "duty to refrain from improper methods calculated to produce a wrongful conviction," *Berger v. United States*, 295 U.S. 78, 88 (1935). *See also Ramos v. Louisiana*, 590 U.S. ----, 140 S. Ct. 1390, 1401 (2020) (recognizing the constitutional importance of "safeguarding against overzealous prosecutions"). That responsibility precludes advancing inconsistent theories on the same facts about the same crime, when only one person can be responsible. Doing otherwise promotes unreliability in convictions and is incompatible with the constitutional mandate that a prosecutor's obligation "is not that it shall win a case, but that justice shall be done." *Berger*, 295 U.S. at 88.

The State presented five different theories, over the course of three years, regarding who killed Deputy Hardy. *See* C3. Supp-3 10 ¶ 1; *see also generally* C3. Supp-1 63. The inconsistent theories were particularly problematic because the forensic evidence, supported by the testimony of State witnesses, made clear that *a single shooter* fired two shots in rapid succession from *the same gun*. *See* T.R. 389, 545–51, 886–87.

*First*, in January 1996, the lead detective testified before the grand jury that his investigation revealed that Ardragus Ford and Omar Berry shot Deputy Hardy. C3. 495. *Second*, in November 1997, at Ardragus Ford's first trial, the State advanced the theory that Ford was the shooter. C3. Supp-1 63. *Third*, at Johnson's first trial in December 1997, the State argued that Johnson pulled the trigger and killed Deputy Hardy. C3. Supp-1 63. *Fourth*, at Johnson's second trial in August 1998—the trial that led to his wrongful conviction, which is the basis of this petition—the State proceeded on the theory that *both* Johnson *and* Quintez Wilson shot Deputy Hardy. C3. Supp-1 63; T.R. 903–04. *Fifth*, and finally, in Ardragus Ford's second trial in June 1999 (*i.e.*, *after* Johnson was convicted), the State returned to the theory that Ford shot Deputy Hardy. C3. Supp-1 63.

This history—which begins and ends with the State advancing the theory, embraced by the State's lead detective, that Ardragus Ford killed Deputy Hardy—proves that the State has prosecuted at least one innocent person in connection with the crime. That cannot be squared with a "search for truth."[5]

[5] *Cf. Bradshaw v. Stumpf*, 545 U.S. 175, 186–88 (2005) (holding prosecutor's use of inconsistent theories could have affected defendant's sentencing and remanding for consideration of whether it violated due process); *see also Drake v. Kemp*, 762 F.2d 1449, 1479 (11th Cir. 1985) (Clark, J., concurring) (inconsistent theories of the same crime "reduce criminal trials to mere gamesmanship and rob them of their supposed purpose of a search for truth"); *Thompson v. Calderon*, 120 F.3d 1045, 1058–59 (9th Cir. 1997) (en banc) (holding that it violates due process for the State to argue in one defendant's trial that he alone committed a murder, then argue in a subsequent trial that another defendant actually committed the same crime), *vacated*

The concept that inconsistent prosecutorial theories can lead to a wrongful conviction is not theoretical—it unfortunately happens. In *Bankhead v. State*, 182 S.W.3d 253, 259 (Mo. Ct. App. 2006), for example, the court affirmed vacatur of a murder conviction because the State "selectively presented contradictory evidence and arguments in three different cases depending upon which defendant was before the trial court." And in *Smith v. Groose*, 205 F.3d 1045, 1051–54 (8th Cir. 2000), the Eighth Circuit vacated a murder conviction because "[t]he State's use of factually contradictory theories . . . fatally infected [the] conviction."

That inconsistent prosecutorial theories similarly infected this capital case is the first wrongful-conviction hallmark that reveals the weakness of the case against Johnson—and that should give pause as to his trial's outcome and the significance of Ellison's non-disclosed motive to testify. In fact, *five months after* Violet Ellison approached the police with her story implicating Johnson, the State's lead detective provided sworn testimony to the grand jury that *someone else* killed Deputy Hardy. C3. 488; T.R. 693. In other words, the lead detective's grand-jury testimony shows that the State itself did not believe

---

*on other grounds*, 523 U.S. 538 (1998); Michael Q. English, *A Prosecutor's Use of Inconsistent Factual Theories of a Crime in Successive Trials: Zealous Advocacy or a Due Process Violation?*, 68 FORDHAM L. REV. 525, 528 (1999) ("[A] prosecutor violates both the Due Process Clause and her ethical obligations when she argues inconsistent factual theories of a crime in successive trials without taking affirmative steps to repudiate the factual theory used in the first trial.").

Ellison's testimony, even though it eventually formed the basis of the case against Johnson.

### B. The State relied on an unreliable "earwitness identification."

This case involves "earwitness identification"—*i.e.*, Ellison testified that she *overheard* Johnson admit, on a three-way phone call, to involvement in the crime.[6] In fact, Ellison was the State's star witness: The prosecution described her expected testimony in detail at the climax of its opening statement, exhorting the jury that if they found Ellison to be someone "they c[ould] trust," then they would "be convinced" that Johnson shot Deputy Hardy.[7]

Yet, earwitness identification is an identification method even less reliable than its troubled cousin, *eyewitness* identification. *Nearly half* of death-row exonerations have involved this sort of false "secondary confession"—*i.e.*, a statement made by a third-party about someone else's supposed (but later proved to be false) admission of guilt.[8] That number

---

[6] *See* T.R. 312–16 (State's opening), 663–719 (V. Ellison testimony), 905–11 (State's closing).

[7] T.R. 316 ("I want you to listen to Mrs. Ellison, I want you to pay attention to her testimony. Look at her, ask yourself if she is a person that you would trust, that you can trust, that you believe if there is any way that she could have gotten the information that she tells you from anywhere else other than [Johnson]. And I submit to you that if you do that, at the close of this case you'll be convinced . . . .").

[8] *See* Jessica K. Swanner & Denise R. Beike, *Incentives Increase the Rate of False but Not True Secondary Confessions from Informants with an Allegiance to a Suspect,* 34 LAW & HUM. BEHAV. 418 (2010) (noting that false secondary confessions were "present in 46% of the wrongful convictions in death row cases").

alone is staggering, but in light of the fact that Johnson was convicted on the basis of a single earwitness, who overheard a phone call in which Johnson purportedly confessed to the crime—even though the witness had never met him and did not know his voice (T.R. 713–14; C3. Supp-1 64 (citing C3.202–03))—the presence of earwitness identification should be a huge red flag.

* * *

Witness identification is problematic—not just in earwitness identifications, but even in the far more common (but no more reliable) realm of eyewitness identification. *See, e.g.*, *Perry v. New Hampshire*, 565 U.S. 228, 244–45 (2012) ("We do not doubt either the importance or the fallibility of eyewitness identifications." (citing "studies showing that eyewitness misidentifications are the leading cause of wrongful convictions" and "research indicating that as many as one in three eyewitness identifications is inaccurate")); *United States v. Wade*, 388 U.S. 218, 228 (1967) ("The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification."). The Innocence Project's work has revealed that mistaken *eyewitness* identifications contributed to approximately 69% of the 375 wrongful convictions in the United States that have been overturned by post-conviction DNA evidence.[9]

---

[9] *How Eyewitness Misidentification Can Send Innocent People to Prison*, INNOCENCE PROJECT, https://innocenceproject.org/how-eyewitness-misidentification-can-send-innocent-people-to-prison/ (last visited May 19, 2023). The pairing between mistaken eyewitness identification and wrongful conviction is not limited to cases where innocence is proven by DNA evidence,

This propensity of mistaken eyewitness identification to lead to wrongful convictions is just as prevalent in capital cases. In fact, the Center on Wrongful Convictions conducted a study of eighty-six defendants who were sentenced to death after *Furman v. Georgia*, 408 U.S. 238 (1972), but were later exonerated, and they concluded that eyewitness testimony played a role in forty-six of those eighty-six wrongful convictions.[10] *More than half*. And, as in this case, in thirty-three of those forty-six cases, eyewitness (or, here, earwitness) testimony was *the only evidence* connecting the defendant to the crime.[11]

Simply put, convictions (like this one) that are based on the testimony of a single witness are unreliable, even when (unlike here) those witnesses were present at the scene, and even when (again, unlike here) the witnesses were themselves the victims of the crime.[12] There are numerous examples

---

of course. As of April 2014, 75% of the 1,365 exonerations examined by the National Registry of Exonerations involved some type of false identification. *See* Kaitlin Jackson & Samuel Gross, *Tainted Identifications*, NAT'L REGISTRY OF EXONERATIONS (Sept. 22, 2016), https://www.law.umich.edu/special/exoneration/Pages/taintedids.aspx.

[10] *See* Rob Warden, *How Mistaken and Perjured Eyewitness Identification Testimony Put 46 Innocent Americans on Death Row*, CTR. ON WRONGFUL CONVICTIONS, NW. L. SCH. at 2–3 (May 2, 2001), https://files.deathpenaltyinfo.org/legacy/files/pdf/StudyCWC2001.pdf.

[11] *Ibid.*

[12] *See generally* Sara Conway, *A New Era of Eyewitness Identification Law: Putting Eyewitness Testimony on Trial*, 50 NEW ENG. L. REV. 81 (2015); *see also, e.g.*, Thomas Albright & Jed Rakoff, *Eyewitnesses Aren't as Reliable as You Might Think*, WASH. POST (Jan. 13, 2015), https://www.washingtonpost.com/

of the dangers of relying so heavily on witness identifications—again, even when the witness is *the actual victim*—but to highlight just a few:

- In Jefferson County, Alabama, Freddie Lee Gaines was convicted of second-degree murder. A survivor of the shooting identified Gaines, but years later, another man confessed, and Gaines's conviction was vacated.[13]
- In Bronx County, New York, James Anderson was identified by the victim as the intruder who threatened her with a knife and burgled her apartment. Anderson insisted that he had been hospitalized at the time, but a jury convicted him. Before sentencing, hospital records arrived corroborating Anderson's story; his convictions were vacated.[14]
- In Dallas County, Texas, a rape victim identified Larry Fuller as her attacker and a

---

opinions/eyewitnesses-arent-as-reliable-as-you-might-think/ 2015/01/30/fe1bc26c-7a74-11e4-9a27-6fdbc612bff8_story.html (noting that "accounts of events promulgated by attorneys and news media" can reinforce a witness's beliefs regardless of the accuracy of the identification); NAT'L RESEARCH COUNCIL, IDENTIFYING THE CULPRIT: ASSESSING EYEWITNESS IDENTIFICATION 2 (Nat'l Academies Press 2014) ("The fidelity of our memories to actual events may be compromised by many factors at all stages of processing, from encoding to storage to retrieval.").

[13] Stephanie Denzel, *Freddie Lee Gaines*, NAT'L REGISTRY OF EXONERATIONS (before June 2012) https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3226.

[14] Maurice Possley, *James C. Anderson*, NAT'L REGISTRY OF EXONERATIONS (Feb. 16, 2014), https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4378.

> forensic analyst testified that Fuller could not be excluded. Eighteen years later, DNA testing excluded Fuller, and his conviction was vacated.[15]

Earwitnesses who (as in this case) identify a suspect based solely on hearing the suspect's voice—especially when they do not know the suspect or his voice—are even less reliable than eyewitnesses. *See, e.g.*, Cindy E. Laub, Lindsey E. Wylie, & Brian H. Bornstein, *Can The Courts Tell An Ear From An Eye? Legal Approaches to Voice Identification Evidence*, 37 LAW & PSYCHOL. REV. 119, 124–25 (2013) ("[V]oice recognition by itself is poor, such that earwitness identifications are less accurate than eyewitness identifications."); Christopher Sherrin, *Earwitness Evidence: The Reliability of Voice Identifications*, 52 OSGOODE HALL L.J. 819, 822 (2015) (collecting studies identifying earwitness testimony as "extremely inaccurate[] and likely to produce high false identifications" (internal quotations omitted)).

* * *

That is the kind of notoriously unreliable witness testimony that put Toforest Johnson on death row. Both times that Johnson was on trial, the State's case hinged on Ellison's testimony. *See* C3. Supp-3 11 ¶ 4; T.R. 316, 905–16; C3. Supp-1 63. Yet, Ellison was not present when the murder occurred, so she was not an eyewitness. *See* C3. Supp-1 63–64; C3. Supp-3 11 ¶ 4. Her contribution to the evidence was far more attenuated: She listened in on a three-way phone call

---

[15] The Innocence Project, *Larry Fuller*, NAT'L REGISTRY OF EXONERATIONS (before June 2012), https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3224.

initiated by her daughter, and she testified that she overheard a man who said his name was "Toforest" say he shot Deputy Hardy and that another man had shot a second time. *See* T.R. 668–85, 711; C3. Supp-1 63–64.

That testimony was, of course, inconsistent with the physical evidence; as already explained in Part II.A above (*see also* T.R. 545, 551, 886–87), there was only one shooter, not two different people who shot as Ellison testified (T.R. 683–84, 711). Moreover, like unreliable eyewitness testimony later shown to have contributed to a wrongful conviction, Ellison's testimony is rife with other indicia of unreliability. She had never met Toforest Johnson and did not know his voice. T.R. 713–14; C3. Supp-1 64 (citing C3.202–03). And, critically, she had heard media coverage of the murder and Johnson's status as a suspect *before* she overheard the conversation about which she testified. C3. Supp-1 72–73 (citing T.R. 667, 706–07, 711; C3. 134–137). The influence of that knowledge on the significance Ellison attached to what she thought she heard is reflected in her own allegedly contemporaneous notes of the eavesdropped conversation, in which she identified the person she overheard speaking as "Johnson," despite the fact that she later testified that the speaker referred to himself only as "Toforest." C3. Supp-1 73–74 (citing T.R. 717; C3. 537–40).

Just as can occur even with eyewitnesses, Ellison was influenced by reports about the case, and her recollection of what she heard was not hers alone. Those facts further evidence the weakness of the case against Johnson and should undermine confidence in his conviction.

### C. The State's star witness was incentivized to provide testimony leading to a conviction.

Incentivized witnesses are yet another hallmark of wrongful convictions. Any incentive offered to a witness is highly relevant because "[i]ncentives provide a motive to lie." *See* Swanner, *supra*, at 427. To protect against tainted testimony, statutes and professional-conduct codes prevent inducement or payment, other than reimbursement of actual expenses, to any witness testifying under oath. *See e.g.*, 18 U.S.C. § 201(c)(2); ALA. R. OF PROF'L CONDUCT 3.4(b).

The dangers of incentivized witnesses are present with *all* witnesses who are offered an incentive, but in capital cases, where life and liberty are on the line, the consequences of introducing those dangers into trial are much more serious. *Cf. Ford v. Wainwright*, 477 U.S. 399, 411 (1986) ("[D]eath is different."). So, the State's promise to pay a reward—and its later, undisclosed payment to Ellison—for testimony leading to a conviction for Deputy Hardy's murder is another huge red flag in this case.

Historically, it has been assumed that dangers from incentives given to witnesses are "adequately mitigated by disclosure, cross-examination, and cautionary jury instructions." Christopher T. Robertson & D. Alex Winkelman, *Incentives, Lies, and Disclosure*, 20 U. PA. J. CONST. L. 33, 42 (2017) (internal quotations omitted). The undeniable reality is that innocent people have been and continue to be convicted based on the testimony of witnesses who have an incentive to help obtain a conviction. *See* Swanner, *supra*, at 418.

This danger is even more acute when the prosecution fails to disclose a witness's incentive. Non-disclosure prevents the jury from learning about evidence that renders the witness's testimony potentially unreliable. It also forecloses the defense from effectively cross-examining the witness and precludes the defense and the trial court from recognizing the need for a cautionary jury instruction. Thus, Johnson's petition rightly argues that the State's suppression of evidence about Ellison's incentive to testify warrants reversal.

Indeed, here, not only was there a motive for Ellison to fabricate what she heard—because the State offered to pay a financial reward for helpful information—but the State never disclosed Ellison's knowledge of the offer and instead emphasized, in both opening and closing the trial, that she *came forward on her own* and that she *had no reason to lie*. *See* T.R. 316 (opening); T.R. 905–11 (closing); *see also supra* n. 7; C3. Supp-1 64. Not so.[16]

The (hidden) incentive payment to Ellison brands Johnson's case with yet another hallmark of wrongful conviction.

---

[16] Johnson's trial counsel requested the disclosure of *Brady* material and the trial court ordered discovery (*see* C3. 482–87), but the State never disclosed anything, before or during trial, that connected Ellison to the reward offer. Moreover, not only did she have a financial motive for testifying, but Ellison and the victim's wife had known each other for more than fifteen years. *See* C1. Supp-1 242. The State's promise of a reward for assisting in the successful prosecution of someone for the murder of her friend's husband made Ellison's testimony doubly unreliable.

### D. The prosecutors now doubt the validity of Johnson's conviction.

In the light of a prosecutor's charge to pursue justice, not convictions, prosecutorial doubt about the reliability of a conviction, or the strength of the State's case, should not be taken lightly. *See, e.g.*, *Young v. United States*, 315 U.S. 257, 258 (1942) ("The public trust reposed in the law enforcement officers of the Government requires that they be quick to confess error when, in their opinion, a miscarriage of justice may result from their remaining silent. . . . The considered judgment of the law enforcement officers that reversible error has been committed is entitled to great weight . . . .").

The Innocence Project has found over the course of its more than thirty years that when a prosecutor becomes convinced of holes in the State's case, that is a crucial tipping point. Indeed, when prosecutors arrive at doubts about the strength of their case *on their own*, that is a particularly (and extremely) powerful indicator of a wrongful conviction. When that happens, the reasons for the doubt should be extensively examined, and the prosecution should be encouraged to reconsider the case. Innocent people can walk free: The exonerations of Glenn Ford in Louisiana and Frank Sealie in Alabama are just two examples that evidence the point.[17]

---

[17] *See Ex-Louisiana Prosecutor Apologizes for 'the misery I have caused' Freed Inmate*, GUARDIAN (Mar. 25, 2015, 4:20 PM), https://www.theguardian.com/us-news/2015/mar/25/former-louisiana-prosecutor-exonerated-death-row-inmate-apologizes; Maurice Possley, *Frank Sealie*, NAT'L REGISTRY OF EXONERATIONS (last updated Oct. 31, 2016), https://www.law.

There is serious prosecutorial doubt here too. Both the lead prosecutor in Johnson's trial, Jeff Wallace, and the current Jefferson County district attorney, Danny Carr, have expressed their concerns about the validity of Johnson's conviction. That is incredibly significant and another powerful indicator of a wrongful conviction—particularly alongside the other evidentiary issues that have surfaced in the years since Johnson's conviction.

***Lead Trial Prosecutor Jeff Wallace.*** Wallace was the lead prosecutor at Johnson's trial. He has since testified under oath that he "[did not] think the State's case [against Johnson] was very strong, because it depended on the testimony of Violet Ellison." *See* C3. 455.[18]

That is a telling concession because without Ellison's testimony, there would have been no case against Johnson. It also recognizes that the State's dependence on a single earwitness identification, by a witness whom the State promised to pay for her testimony (without informing the defense or the jury), introduces serious reliability problems and leads to the increased risk that an innocent man will be punished for someone else's crime.

---

umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4659.

[18] *See also* Radley Balko, *An Illusion of Justice: The Baffling Conviction and Death Sentence of Toforest Johnson Reveal a Broken System*, WASH. POST (Sept. 5, 2019), https://www.washingtonpost.com/opinions/2019/09/05/an-alabama-man-has-been-death-row-years-he-is-almost-certainly-innocent/?arc404=true.

According to a recent filing by the district attorney's office, Wallace continues to "express[] concerns about this case" and "supports [Johnson's] request" for a new trial. C3. Supp-3 11 ¶ 5.

***District Attorney Danny Carr.*** The prosecutorial doubt extends beyond the original trial team. In June 2020, the current Jefferson County district attorney, having "determined that [his office's] duty to seek justice requires intervention in this case," filed a brief in support of Johnson, asking the circuit court to "in the interest of justice . . . grant[] a new trial." C3. Supp-3 10–11.

The district attorney's filing was the culmination of a nine-months-long, independent review of this case that included meeting with Wallace, "reviewing the case files, interviewing witnesses, and consulting with the family of Deputy Hardy."[19] *See* C3. Supp-3 at 11 ¶ 5. In addition to reinforcing Wallace's continued "concerns about this case," the district attorney was moved by, among other things, these various wrongful-conviction hallmarks—*e.g.*, the inconsistent prosecutorial theories, the significance of Ellison's earwitness testimony, and the fact that Ellison "was subsequently paid $5,000 which was never mentioned during trial." C3. Supp-3 10–11 ¶¶ 1, 4–5. Indeed, the fact that the district attorney expressly highlighted the *Brady* violation that is the subject of this petition is powerful evidence of the materiality of that suppressed evidence.

---

[19] Beth Shelburne, *District Attorney Urges New Trial for Man on Alabama's Death Row*, WBRC (June 12, 2020, 12:22 PM), https://www.wbrc.com/2020/06/12/district-attorney-urges-new-trial-man-alabamas-death-row/.

The Court should give "great weight" to Wallace's lingering concerns and the district attorney's independent review of this case. *Young*, 315 U.S. at 258. These sorts of conviction integrity reviews are crucial to the legitimacy of the criminal-justice system. Increasingly, prosecutors have exercised their duty to ensure justice—and to remedy unjust convictions—by establishing formal conviction-integrity-review units. *See Imbler v. Pachtman*, 424 U.S. 409, 427 n.25 (1976).[20] And the mission could not be more important: Wrongful convictions distort the criminal-justice system by punishing the innocent while the guilty go free. Conviction integrity reviews, such as District Attorney Carr's independent review in this case, exist to fix that distortion.

* * *

Against that backdrop—(1) a prosecution pursued via inconsistent theories of who committed the crime; (2) a conviction secured on the back of testimony from a single earwitness, who identified the defendant (whom she did not know) by overhearing his voice

---

[20] As of May 2023, at least seven states have established statewide "Conviction Integrity Units" or "Conviction Review Units" that work to prevent, identify, and remedy false convictions. In addition to statewide Conviction Integrity Units, at least ninety independent units have been established by prosecutor's offices around the nation. *See Conviction Integrity Units*, NAT'L REGISTRY OF EXONERATIONS, https:// www.law.umich.edu/special/exoneration/Pages/Conviction-Integrity-Units.aspx (last visited May 3, 2023). These units have helped to exonerate more than 461 people in the last decade alone. *See* Tom Jackman, *Va. Attorney General Launches Conviction Integrity Unit to Identify Wrongful Convictions*, WASH. POST (Jan. 16, 2021), https://www.washingtonpost. com/crime-law/2021/01/16/herring-wrongful-convictions/.

while eavesdropping on a phone call; (3) a publicized reward for testimony leading to a conviction that was later paid out in an undisclosed payment; (4) a case so tenuous that even the prosecutor decries it as weak and a conviction that the district attorney's office no longer stands behind—the Court's review takes on heightened significance.

Dozens of innocent people have been convicted in cases that present *just one* hallmark of wrongful conviction. Here, the presence of *all* of these hallmarks *in a single case* cries out for relief for Toforest Johnson—particularly in the light of the district attorney's support for a new trial, predicated in part on the very subject of this petition, following his recently completed independent review of the case.

## CONCLUSION

The Innocence Project is proud to have assisted in freeing hundreds of innocent people since 1992, and it is working to free those still-wrongfully-incarcerated people who have been convicted despite their innocence. In that spirit, the Innocence Project respectfully urges this Court to consider Johnson's petition for a writ of certiorari against the backdrop of the numerous troubling indicia of a wrongful conviction that his capital case presents, and to grant the petition.

Respectfully submitted,

Adnan Sultan
THE INNOCENCE PROJECT, INC.
40 Worth Street, Suite 701
New York, NY 10013

Lindsey C Boney IV
*Counsel of Record*
Virginia N. Adamson
BRADLEY ARANT BOULT CUMMINGS LLP
1819 Fifth Avenue North
Birmingham, AL 35203
Phone: (205) 521-8914
lboney@bradley.com

*Counsel for Amicus Curiae*

May 22, 2023

# APPENDIX B

## The Innocence Project's *Amicus Curiae* Brief in Support of Petitioner (2021)

ELECTRONICALLY FILED
3/9/2021 9:39 AM
01-CC-1996-000386.61
CIRCUIT COURT OF
JEFFERSON COUNTY, ALABAMA
JACQUELINE ANDERSON SMITH, CLERK

**IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA
TENTH JUDICIAL CIRCUIT
CRIMINAL DIVISION**

| | | |
|---|---|---|
| **TOFOREST O. JOHNSON,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| **v.** | ) | |
| | ) | **CASE NO: CC-1996-386.61** |
| **STATE OF ALABAMA,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| | ) | |

**THE INNOCENCE PROJECT'S *AMICUS CURIAE* BRIEF
IN SUPPORT OF PETITIONER**

Wrongful convictions are no longer an "'unreal dream'—[but] instead an undeniable reality."[1] Jessica Roth, *Informant Witnesses and the Risk of Wrongful Convictions*, 53 AM. CRIM. L. REV. 737, 738 (2016).

If ever a case bore the hallmarks of a wrongful conviction, Toforest Johnson's is it. Inconsistent prosecutorial theories, a prosecution that depends on a single "earwitness" identification—and a compensated earwitness at that—and later-expressed prosecutorial doubt about the strength of the case . . . Toforest Johnson's case checks all of these boxes.

* * *

The Innocence Project's mission is to free the staggering number of innocent people who remain incarcerated and to bring reform to the system responsible for their unjust imprisonment.[2]

[1] To date, 185 people have been exonerated from death row after a wrongful conviction. *See* Death Penalty Information Center, *Innocence*, https://deathpenaltyinfo.org/policy-issues/innocence (last visited Feb. 19, 2021).

[2] As explained in the accompanying motion for leave to file this brief, the Innocence Project is a non-profit organization and law school clinic dedicated primarily to providing pro bono legal services to indigent prisoners whose actual innocence may be established through post-conviction evidence. The Innocence Project has provided representation or assistance in most of the 375

For almost 30 years, the Innocence Project has fulfilled this mission by helping courts identify the signs of wrongful convictions and prevent future injustice.

In this case, the signs of wrongful conviction fairly cry out from all over the record. These signs—each of which individually should be enough for the Court to grant a new trial—cannot be easily swept away, as the Jefferson County District Attorney's recent filing asking the Court to grant Mr. Johnson a new trial recognizes. Therefore, the Innocence Project respectfully urges the Court to assess Mr. Johnson's recent Rule 32 petition in the context of the many characteristics of a wrongful conviction that Mr. Johnson's case presents and grant Mr. Johnson a new trial.

## ANATOMY OF A WRONGFUL CONVICTION

The State presented over the course of four trials *at least five different, contradictory theories* of who shot Deputy William Hardy. This prosecutorial tactic virtually ensures that the State is knowingly prosecuting at least one innocent person.

The State's case against Mr. Johnson—who has *always* maintained his innocence—depended entirely on the testimony of Violet Ellison, who was not present when the crime occurred, whose knowledge of the case was influenced by media reports and other sources before

---

DNA exonerations in the United States, as well as numerous exonerations based on constitutional violations. *See* Innocence Project, https://innocenceproject.org/dna-exonerations-in-the-united-states/. The Innocence Project also seeks to prevent future miscarriages of justice by researching their causes, participating as *amicus curiae* in cases of broader significance to the criminal justice system, and pursuing reform initiatives designed to enhance the truth-seeking function of the criminal justice system. The Innocence Project's work both serves as a check on the awesome power of the state over criminal defendants and helps ensure a safer and more just society. The Innocence Project frequently challenges the constitutionality of procedures and practices that implicate the rights of incarcerated populations. As a leading national advocate for the imprisoned that has represented numerous individuals who have spent years, even decades, in solitary confinement, the Innocence Project is dedicated to improving the criminal justice system, and has a compelling interest in ensuring the fundamental dignity of those held in our nation's prisons.

The Innocence Project previously filed a similar amicus brief in this case in support of Toforest Johnson but is filing again in light of the changed procedural posture of the case.

she came forward, and who was paid by the State for her testimony, a fact that was never presented to the defense or the jury at the time of trial. Indeed—and these facts are, candidly, difficult to wrap one's mind around—although Ms. Ellison contends that she overheard part of a phone call on which she supposedly heard Mr. Johnson confess to the crime, she did not know Mr. Johnson, did not know who he was, and *did not even know his voice* (before or after that phone call). It is not surprising, then, that the lead prosecutor in Mr. Johnson's case has expressed doubt about the strength of the State's case against Mr. Johnson. And the District Attorney has recently echoed this doubt in asking, "in the interest of justice," the Court to grant Mr. Johnson a new trial. *See* Jefferson Cnty. Dist. Att'y's *Amicus Curiae* Br. In Support of Pet'r (Doc. 326) (June 12, 2020) ("DA Carr Filing"), at 2.

Each of these aspects of Mr. Johnson's case is a hallmark of wrongful conviction, a red flag that should stop the State and reviewing courts in their tracks. All of them combined *in a single case*, like this one, should create unavoidable doubt in the outcome of the trial.

## I. Inconsistent Prosecutorial Theories

A prosecutor's job is to "search for truth in criminal trials." *Strickler v. Greene*, 527 U.S. 263, 281 (1999). Thus, a prosecutor has a corresponding "duty to refrain from improper methods calculated to produce a wrongful conviction." *Berger v. United States*, 295 U.S. 78, 88 (1935). That responsibility precludes advancing inconsistent theories on the same facts about the same crime, when only one person can be responsible. Doing otherwise, as the State did in searching for a conviction in this case, is improper, promotes unreliability in convictions, and is completely incompatible with the rule that "in a criminal prosecution [the obligation of the prosecutor] is not that it shall win a case, but that justice shall be done." *Id.* at 88.

Over the course of three years, the State presented five different theories regarding who killed Deputy Hardy. *See* DA Carr Filing ¶ 1; *see also generally* Pet'r Post-Hr'g Br. at 5. The

inconsistent theories were particularly problematic because it was clear early on that *a single shooter* fired two shots in rapid succession from *the same gun*. *See* TR 389, 886–87. *First*, in January 1996, the lead detective testified under oath in grand jury proceedings that his investigation revealed that Ardragus Ford and Omar Berry shot Deputy Hardy. Pet'r Exh. 21, at 6.[3] *Second*, in November 1997, at Ardragus Ford's first trial, the State advanced the theory that Ford was the shooter. *Third*, at Mr. Johnson's first trial in December 1997, the State argued that Mr. Johnson pulled the trigger and killed Deputy Hardy. *Fourth*, at Mr. Johnson's second trial in August 1998, the State proceeded on the theory that *both* Mr. Johnson and Quintez Wilson shot Deputy Hardy. *Fifth*, and finally, in Ardragus Ford's second trial in June 1999, the State returned to the theory that Ford shot Deputy Hardy.

This history—beginning and ending with the State advancing the theory that Ardragus Ford killed Deputy Hardy, and where there is no dispute that there was a single shooter using a single gun—proves that the State has prosecuted at least one innocent man in connection with Deputy Hardy's murder. That cannot be squared with a "search for truth" or the imposition of anything like justice, and is constitutionally unsound. *See Drake v. Kemp*, 762 F.2d 1449, 1479 (11th Cir. 1985) (Clark, J., concurring) (inconsistent theories of the same crime "reduce criminal trials to mere gamesmanship and rob them of their supposed purpose of a search for truth"); *Thompson v. Calderon*, 120 F.3d 1045, 1058–59 (9th Cir. 1997) (en banc) (holding that it violates due process for the State to argue in one defendant's trial that he alone committed a murder, then arguing in a subsequent trial that another defendant actually committed the same crime), *vacated on other*

[3] Detective Richardson provided this testimony five months *after* Violet Ellison came forward to the police with her story implicating Johnson. The lead detective's grand jury testimony shows that the State itself did not believe Ellison's testimony, even though it eventually formed the basis of the entire case against Johnson.

*grounds*, 523 U.S. 538 (1998); *see also* Michael Q. English, *A Prosecutor's Use of Inconsistent Factual Theories of a Crime in Successive Trials: Zealous Advocacy or a Due Process Violation?*, 68 FORDHAM L. REV. 525, 528 (1999) ("[A] prosecutor violates both the Due Process Clause and her ethical obligations when she argues inconsistent factual theories of a crime in successive trials without taking affirmative steps to repudiate the factual theory used in the first trial."). Because "death is different," *Ford v. Wainwright*, 477 U.S. 399, 411 (1986), the use of inconsistent prosecutorial theories is particularly antithetical to the increased need for reliability in capital cases.

The concept that inconsistent prosecutorial theories can lead to wrongful convictions is not theoretical—it unfortunately happens. *See, e.g.*, *Bankhead v. State*, 182 S.W.3d 253, 259 (Mo. Ct. App. 2006) (affirming order vacating murder conviction because the State "selectively presented contradictory evidence and arguments in three different cases depending upon which defendant was before the trial court"); *Smith v. Groose*, 205 F.3d 1045, 1051–54 (8th Cir. 2000) (vacating murder conviction because "[t]he State's use of factually contradictory theories . . . fatally infected [the] conviction"). That inconsistent prosecutorial theories similarly infected Mr. Johnson's case is the first wrongful-conviction hallmark that should give the Court pause.

## II. Unreliable Witness Identification

This case involves "earwitness identification," in which a witness testified she heard the defendant admit involvement in the crime. This is an identification method even less reliable than eyewitness identification. *Nearly half* of death-row exonerations have involved this sort of false "secondary confession"—*i.e.*, a statement made by a third-party about someone else's supposed (but later proved to be false) admission of guilt.[4] That number alone is staggering, but in light of

[4] *See* Jessica K. Swanner & Denise R. Beike, *Incentives Increase The Rate of False But Not True Secondary Confessions From Informants With an Allegiance to a Suspect,* 34 LAW & HUM. BEHAV.

the fact that Toforest Johnson was convicted on the basis of *a single earwitness*, Violet Ellison, who purportedly overheard a phone call in which Johnson purportedly confessed to the crime—even though Ms. Ellison had never met Johnson, did not know him (or even who he was), and did not know his voice—the presence of earwitness identification in this case should be a huge red flag.

That is so because witness identification is problematic: not just in earwitness identifications, but even in the far more common—but no more reliable—realm of eyewitness identification. The Innocence Project's work has revealed that mistaken *eyewitness* identifications contributed to approximately 69% of the 375 wrongful convictions in the United States overturned by post-conviction DNA evidence.[5] This propensity of mistaken eyewitness identification to lead to wrongful convictions is just as prevalent in capital cases. In fact, the Center on Wrongful Convictions conducted a study of 86 defendants who were sentenced to death after *Furman v. Georgia* but were later exonerated, and they concluded that eyewitness testimony played a role in 46 of those 86 wrongful convictions. More than half. And in 33 of those 46 cases, like in this case, eyewitness (or, here, earwitness) testimony was *the only evidence* connecting the defendant

418 (2010) (noting that false secondary confessions were "present in 46% of the wrongful convictions in death row cases" (citations omitted)).

[5] The pairing between mistaken eyewitness identification and wrongful conviction is not limited to cases where innocence is proven by DNA evidence, of course. As of April 2014, 75% of 1,365 exonerations examined by the National Registry of Exonerations involved some type of false identification. *See* Kaitlin Jackson & Samuel Gross, *Tainted Identifications*, The Nat'l Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/taintedids.aspx (Sept. 22, 2016); *see also* Innocence Project, *How eyewitness misidentification can send innocent people to prison*, https://innocenceproject.org/how-eyewitness-misidentification-can-send-innocent-people-to-prison/ (last visited Feb. 24, 2021).

to the crime.[6] Simply put, convictions based on the testimony of a single witness are unreliable, even when (unlike here) those witnesses were present at the scene, and even when the witnesses (again, unlike here) were themselves the victims of the crime.[7]

Two local examples illustrate the dangers of relying so heavily on witness identifications:

- In Jefferson County, Freddie Lee Gaines was convicted of second-degree murder. At his trial, one of the three victims (who had survived the shooting) testified that Mr. Gaines shot the victims. In 1990, another man provided a detailed confession to the 1972 murders, and Mr. Gaines's conviction was vacated.[8]
- In Madison County, a survivor of an attack testified that Timothy Gurley and two other men splashed him with gasoline and lit him on fire. Mr. Gurley denied involvement, but the jury convicted him of attempted murder and arson. The next year, the survivor recanted his identification of Mr. Gurley and admitted that while he was unconscious for several weeks after the fire, his family and others filled his head with false memories. Subsequently, the court vacated the conviction and dismissed the charges against Mr. Gurley.[9]

* * *

Earwitnesses who (as in this case) identify a suspect based solely on hearing the suspect's voice—especially when they do not know the suspect, his voice, or (again, as in this case) *they*

---

[6] *See* Rob Warden, *How Mistaken and Perjured Eyewitness Identification Testimony Put 46 Innocent Americans on Death Row*, Center on Wrongful Convictions, NW. L. SCH. at 2–3 (May 2, 2001), https://files.deathpenaltyinfo.org/legacy/files/pdf/StudyCWC2001.pdf.

[7] *See generally* Sara Conway, *A New Era of Eyewitness Identification Law: Putting Eyewitness Testimony on Trial*, 50 NEW ENG. L. REV. 81 (2015); *see also, e.g.*, Thomas Albright & Jed Rakoff, *Eyewitnesses Aren't As Reliable As You Might Think*, THE WASHINGTON POST, Jan 13, 2015, https://www.washingtonpost.com/opinions/eyewitnesses-arent-as-reliable-as-you-might-think/2015/01/30/fe1bc26c-7a74-11e4-9a27-6fdbc612bff8_story.html (noting that "accounts of events promulgated by attorneys and news media" can reinforce a witness's beliefs regardless of the accuracy of the identification); Nat'l Research Council, *Identifying the Culprit: Assessing Eyewitness Identification* 2 (The Nat'l Academies Press, 2014) ("The fidelity of our memories to actual events may be compromised by many factors at all stages of processing, from encoding to storage to retrieval.").

[8] Stephanie Denzel, *Freddie Lee Gaines*, The Nat'l Registry of Exonerations (before June 2012) https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3226.

[9] Maurice Possley, *Timothy Gurley*, The Nat'l Registry of Exonerations (July 5, 2016) https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4931.

*have never even met the suspect*—are even less reliable than eyewitnesses. *See, e.g.*, Cindy E. Laub, Lindsey E. Wylie, & Brian H. Bornstein, *Can The Courts Tell An Ear From An Eye? Legal Approaches to Voice Identification Evidence*, 37 LAW & PSYCHOL. REV. 119, 124–25 (2013) ("[V]oice recognition by itself is poor, such that earwitness identifications are less accurate than eyewitness identifications."); Christopher Sherrin, *Earwitness Evidence: The Reliability of Voice Identifications*, 52 OSGOOD HALL L.J. 819, 822 (collecting studies identifying earwitness testimony as "extremely inaccurate[] and likely to produce high false identifications" (internal quotations omitted)).

That is the kind of notoriously unreliable witness testimony that put Toforest Johnson on death row. In each of Mr. Johnson's two trials for the murder of Deputy Hardy, the prosecution's case hinged on Ms. Ellison's testimony. *See* DA Carr Filing ¶ 4; Pet'r Post-Hr'g Br. 5. Ms. Ellison was not present when the murder occurred, so she was not an eyewitness. *See id.* at 5–6; DA Carr Filing ¶ 4. Her contribution to the evidence was more attenuated: She listened in on a phone call initiated by her daughter, and she contends that she overheard a man who said his name was "Toforest" say he shot Deputy Hardy and that another man had shot a second time. *See* Pet'r Post-Hr'g Br. 5–6. That testimony was, of course, inconsistent with the physical evidence—as already explained in Part I above (*see also See* TR 389, 886–87), there was only one shooter, not two different people who shot, as Ms. Ellison suggested. Moreover, like unreliable eyewitness testimony later shown to have contributed to a wrongful conviction, Ms. Ellison's testimony is rife with other indicia of unreliability. *See generally id.* (citing Pet'r Exh. 50–51). She did not know Toforest Johnson and did not know what his voice sounded like. *Id.* But, critically, she had heard media coverage of the murder and Mr. Johnson's status as a suspect. Pet'r Post-Hr'g Br. 14–15 (citing TR. 667, 706–07, 711). When she overheard the conversation about which she testified,

she had already been tainted by these news reports. *Id.* The influence of the media reports on the significance Ms. Ellison attached to what she thought she heard is reflected in her own notes of the conversation, in which she identified the person she heard speaking as "Johnson," despite the fact that she says she heard the speaker refer to himself only as "Toforest." Pet'r Post-Hr'g Br. 14–15 (citing TR. 667, 706–07, 717; Pet'r Exhs. 24, 25).

As the above-referenced research has proven can occur even with eyewitnesses, Ms. Ellison was subconsciously influenced by the media reports about Mr. Johnson, and her recollection of what she heard was not hers alone. Those facts also should give the Court pause.

## III. Prosecutorial Doubt

In light of a prosecutor's charge to pursue justice, not convictions, prosecutorial doubt about the reliability of a conviction or the strength of the State's case should not be taken lightly. *See, e.g.*, *Young v. United States*, 315 U.S. 257, 258 (1942) ("The public trust reposed in the law enforcement officers of the Government requires that they be quick to confess error when, in their opinion, a miscarriage of justice may result from their remaining silent. . . . The considered judgment of the law enforcement officers that reversible error has been committed is entitled to great weight . . . .").

The Innocence Project has found over the course of its almost 30 years that it is a crucial tipping point when a prosecutor becomes convinced of holes in the State's case. Indeed, when prosecutors arrive at doubts about the strength of their case *on their own*, that is a particularly (and extremely) powerful indicator of wrongful conviction: The reasons for the doubt should be extensively considered, and the prosecution should be encouraged to reconsider the case. Innocent

people can walk free when this happens. The recent exonerations of Glenn Ford in Louisiana and Frank Sealie here in Alabama evidence the point.[10]

There is serious prosecutorial doubt here too, of course—both the original lead prosecutor in Mr. Johnson's trial, Jeff Wallace, and the current Jefferson County District Attorney, Danny Carr, have taken the important step of expressing their concern about the continued viability of the verdict in this case. That is incredibly significant and should be a tipping point—another powerful indicator of a wrongful conviction, particularly in light of all the other evidentiary issues with the State's case that have come to light in the years since Mr. Johnson's conviction.

***Lead Trial Prosecutor Jeff Wallace.*** Jeff Wallace was the State's lead prosecutor in Mr. Johnson's trial. In 2014, Wallace testified under oath that he "[did not] think the State's case [against Mr. Johnson] was very strong . . . because it depended on the testimony of Violet Ellison." *See* Pet'r Post-Hr'g Br. 23 (citing Pet'r Exh. 12, at 15).[11] This is a telling concession because without Ms. Ellison's testimony, there would have been no case against Mr. Johnson. It also recognizes that the State's dependence on a single earwitness identification, by a witness who the State paid for her testimony (without informing the defense or the jury), introduces serious reliability problems and leads to the increased risk that an innocent man will be punished for someone else's crime. According to the District Attorney's recent filing, Wallace continues to

[10] *See* The Guardian, *Ex-Louisiana prosecutor apologizes for 'the misery I have caused' freed inmate*, (Mar. 25, 2015), https://www.theguardian.com/us-news/2015/mar/25/former-louisiana-prosecutor-exonerated-death-row-inmate-apologizes; Maurice Possley, *Frank Sealie*, The Nat'l Registry of Exonerations, (last updated Oct. 31, 2016), https://www.law.umich.edu/special/exoneration/Pages/ casedetail.aspx?caseid=4659.

[11] *See also* Radley Balko, *An illusion of justice: The baffling conviction and death sentence of Toforest Johnson reveal a broken system*, THE WASHINGTON POST, Sept. 5, 2019, https://www.washingtonpost.com/opinions/2019/09/05/an-alabama-man-has-been-death-row-years-he-is-almost-certainly-innocent/?arc404=true.

"express[] concerns about this case" and "supports [Mr. Johnson's] request" for a new trial. DA Carr Filing ¶ 5.

***District Attorney Danny Carr.*** But the prosecutorial doubt in this case extends beyond the original trial team. On June 12, 2020, the current Jefferson County District Attorney, having "determined that its duty to seek justice requires intervention in this case," filed a brief in support of Mr. Johnson in which it asked the Court to "in the interest of justice . . . grant[] a new trial." *Id.* at 1–2. The District Attorney's filing was the culmination of a *nine-months-long*, independent review of this case that included meeting with Wallace (*id.* ¶ 5), and "reviewing the case files, interviewing witnesses, and consulting with the family of Deputy Hardy."[12] In addition to reinforcing Wallace's continued "concerns about this case," the District Attorney was moved by, among other things, the several wrongful-conviction hallmarks described above—*e.g.*, the inconsistent prosecutorial theories, the significance of Violet Ellison's earwitness testimony, and the fact that Ellison "was subsequently paid $5,000 which was never mentioned during trial." DA Carr Filing ¶¶ 1, 4–5.

The Court should give "great weight" to Wallace's lingering concerns and the District Attorney's independent review of this case. *Young*, 315 U.S. at 258. These sorts of conviction-integrity reviews are crucial to the legitimacy of the criminal justice system. Increasingly, prosecutors across the nation have exercised their duty to ensure justice—and to remedy unjust convictions—by establishing formal conviction integrity review units. *See Imbler v. Pachtman*, 424 U.S. 409, 427 n.25 (1976).[13] Here, the District Attorney undertook its review of Mr. Johnson's

---

[12] Beth Shelburne, *District Attorney Urges New Trial for Man on Alabama's Death Row*, WBRC, June 12, 2020, https://www.wbrc.com/2020/06/12/district-attorney-urges-new-trial-man-alabamas-death-row/.

[13] As of February 2021, at least seven states have established state-wide "Conviction Integrity Units" or "Conviction Review Units" that work to prevent, identify, and remedy false convictions.

case before the Office's recent decisions to establish conviction review units in both the Birmingham and Bessemer Divisions,[14] a precursor to the formal process these units will undertake to identify and remedy wrongful convictions. And the mission could not be more important: Wrongful convictions distort the criminal justice system by punishing the innocent while the guilty go free. Conviction integrity reviews, such as District Attorney Carr's independent review in this case, exist to fix that distortion.

* * *

Against that backdrop—a prosecution secured via inconsistent theories of who committed the crime, a conviction secured on the back of testimony from a single earwitness who identified the defendant by hearing his voice for the first time on a phone call after having been promised payment for testimony leading to a conviction, a liability case so tenuous that even the prosecutor says it was not strong, and a conviction that the District Attorney's office no longer stands behind—the Court's review of Mr. Johnson's Rule 32 petition takes on heightened significance. Dozens of innocent people have been convicted in cases that present *just one* of these hallmarks of wrongful conviction. Here, of course, the presence of *all* of these hallmarks *in a single case*—

---

In addition to statewide Conviction Integrity Units, at least 73 independent units have been established by prosecutor's offices around the nation. *See* The Nat'l Registry of Exonerations, *Conviction Integrity Units*, https://www.law.umich.edu/special/exoneration/Pages/Conviction-IntegrityUnits.aspx#:~:text=A%20Conviction%20Integrity%20Unit%20(CIU,Conviction%20Review%20Units%20(CRUs) (last visited February 19, 2021). These units have helped to exonerate more than 461 people in the last decade alone. *See* Tom Jackman, *Va. attorney general launches Conviction Integrity Unit to identify wrongful convictions*, THE WASHINGTON POST, January 16, 2021, https://www.washingtonpost.com/crime-law/2021/01/16/herring-wrongful-convictions/.

[14] *See* Carol Robinson, *'We seek justice': Jefferson County district attorneys to tackle wrongful convictions*, AL.com, November 30, 2020, https://www.al.com/news/birmingham/2020/11/we-seek-justice-jefferson-county-district-attorneys-to-tackle-wrongful-convictions.html; *see also* Associated Press, *Prosecutors Start Conviction Review Unit*, US NEWS AND WORLD REPORT, December 5, 2020, https://www.usnews.com/news/best-states/alabama/articles/2020-12-05/prosecutors-start-conviction-review-units.

particularly in light of the Jefferson County District Attorney's recent filing asking the Court to grant a new trial—cries out for relief for Toforest Johnson.

## CONCLUSION

The Innocence Project is proud to have set itself, for the last nearly 30 years, to the work of freeing those still-wrongfully-incarcerated people who have been convicted despite their innocence. In that spirit, the Innocence Project respectfully urges this Court to consider the numerous troubling indicia of wrongful convictions that Mr. Johnson's case presents and grant Mr. Johnson's Rule 32 petition.

Respectfully submitted,

/s/ Lindsey C Boney IV

Lindsey C Boney IV
Dylan C. Black
Carson S. Phillips
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203
Telephone: (205) 521-8000
lboney@bradley.com
dblack@bradley.com
caphillips@bradley.com

Adnan Sultan
THE INNOCENCE PROJECT, INC.
40 Worth Street, Suite 701
New York, New York 10013
Telephone: (212) 364-5352
asultan@innocenceproject.org

*Counsel for The Innocence Project*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 9, 2021, the foregoing document was filed electronically with the Clerk using the Alafile system and served via email on the following counsel:

Steve Marshall
Jon B. Hayden
Office of the Attorney General
Capital Litigation Division
501 Washington Avenue
Montgomery, AL 36130-0152
jhayden@ago.state.al.us

Ty Alper, Esq.
talper@law.berkeley.edu

Danny Carr
Jefferson County District Attorney
carrd@jccal.org

Kathryn Miller, Esq.
kathryn.miller@yu.edu

Katherine Moss, Esq.
kmoss@schr.org

Patrick Mulvaney, Esq.
pmulvaney@schr.org

/s/ Lindsey C Boney IV
OF COUNSEL

# APPENDIX C

The Innocence Project's *Amicus Curiae* Brief in Support of Petitioner (2025)

**IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA**
**TENTH JUDICIAL CIRCUIT**
**CRIMINAL DIVISION**

| | | |
|---|---|---|
| **TOFOREST O. JOHNSON,** | ) | |
| **Petitioner,** | ) | |
| **v.** | ) | **CASE NO: CC-1996-000386.61** |
| **STATE OF ALABAMA,** | ) | |
| **Respondent.** | ) | |

COURTESY COPY

## THE INNOCENCE PROJECT'S *AMICUS CURIAE* BRIEF IN SUPPORT OF PETITIONER

This case presents extraordinary and unprecedented facts that have developed since Toforest Johnson's conviction in 1998. Most critically for present purposes, the lead prosecutor who tried Mr. Johnson's case for the State—the prosecutor *who secured his conviction*—now believes that Mr. Johnson deserves a new trial. He is joined by District Attorney Danny Carr, who concluded a new trial is warranted after reviewing the complete body of evidence. No court has ever examined that evidence holistically, but it is critical to fundamental fairness that this Court take a close look at the entire record, now that it is presented with the opportunity.

> We fail in our primary duty of protecting the innocent and punishing the guilty if we intentionally slam the courthouse doors against one who is, in fact, innocent of wrongdoing. . . . Our criminal justice system makes two promises to its citizens: a fundamentally fair trial and an accurate result. If either of those two promises are not met, the criminal justice system itself falls into disrepute.

*Ex parte Thompson*, 153 S.W.3d 416, 421 (Tex. Crim. App. 2005) (Cochran, J., concurring).

A comprehensive review of the evidence reveals why a reasonable prosecutor would now lack confidence in Mr. Johnson's conviction and exposes the fundamental weaknesses in the case against Mr. Johnson. Physical evidence contradicts the State's key witness. That witness, whose

testimony was central to the prosecution, had financial incentives that were concealed from the defense. Prosecutors advanced shifting and conflicting theories about who committed the crime. Meanwhile, unchallenged alibi witnesses who were never presented at trial place Mr. Johnson miles away at the time of the murder. Viewed together, these facts reveal a more than reasonable basis for concern about the viability of the conviction—and show that the conviction cannot be allowed to stand.

The State's position in defending Mr. Johnson's conviction despite all of this evidence threatens to undermine one of the mechanisms designed to correct wrongful convictions: conviction integrity reviews. Prosecutors across the country have recognized that justice does not end with conviction, and conviction integrity reviews—whether conducted by formally designated Conviction Review Units (CRUs) or otherwise—have played a crucial role in identifying and overturning a host of wrongful convictions. Jefferson County District Attorney Danny Carr took the bold and important step of creating a CRU in 2021.

COURTESY COPY

The State would have the Court disregard the District Attorney's determination even though it compellingly shows that the facts used to support Mr. Johnson's conviction have unraveled. If accepted, this position would render conviction integrity review meaningless, denying courts the ability to act on credible, prosecutor-initiated findings of wrongful convictions. The State elevates form over substance in arguing that District Attorney Carr reviewed Mr. Johnson's case before Jefferson County had formally established its CRU. This is a distinction without any difference—conviction integrity reviews routinely happen outside a formal CRU. After all, it's the substance of any independent review that matters, not how the review was designated. Worse, the State's argument misses the fundamental point: Prosecutors have an ethical obligation to pursue justice even after conviction, whether through their own conscience, a

formally designated CRU, or an equivalent thorough and comprehensive review such as the one District Attorney Carr conducted in this case. The name given the review doesn't matter.

Here, District Attorney Carr reviewed "the entire prosecution and law enforcement file in this matter; trial and post-conviction transcripts; pleadings filed by the State and the defense; interviews with trial prosecutors, defense and post-conviction counsel, and witnesses; recordings of witness interviews with investigators; and consultations with the victim's family." Doc. 92 at 2. There is little more that he could have reviewed or done to assess the integrity of the conviction in this case—and his conclusions following that independent review are "entitled to great weight." *Young v. United States*, 315 U.S. 257, 258 (1942).

COURTESY COPY

The Innocence Project has worked alongside prosecutors who have looked at the integrity of certain convictions with fresh eyes, in the light of new evidence—in jurisdictions with and without formal CRUs—so it is well positioned to affirm that what matters is the substance, scope, and quality of the reinvestigation, not its institutional label. The State's formalistic argument masks the fact that its position would not only render formal CRUs obsolete but also nullify any prosecutor's good-faith effort to correct a miscarriage of justice, regardless of the mechanism used to uncover it.

## I. The Prosecutor Who Won Mr. Johnson's Conviction Now Believes the Case Has Collapsed and a New Trial is Warranted

In an extraordinary development, the lead prosecutor who secured Toforest Johnson's capital murder conviction—Jeff Wallace—has now concluded that Mr. Johnson deserves a new trial, having previously testified under oath that the case against Mr. Johnson is "weak." Doc. 107 ¶ 28. He continues to "express[] concerns about this case" and "supports [Mr. Johnson's] request" for a new trial. Doc. 92 ¶ 5. Wallace's position marks the first time, so far as the Innocence Project can discern, that a State's lead trial prosecutor has publicly called for a new trial in a capital case

that he/she tried. This is an unprecedented shift, and it did not happen in a vacuum: it arose after Wallace came to appreciate the complete body of evidence that has emerged post-conviction that casts grave doubt on Mr. Johnson's guilt. No court has ever holistically reviewed that aggregated evidence in a single proceeding. Instead, each piece of exculpatory or verdict-impeaching evidence has, to this point, been isolated and assessed in a piecemeal fashion. *See* Doc. 107 ¶ 26 (describing the circuit court's limited focus on "very narrow" evidentiary questions). The result is that Mr. Johnson's conviction remains intact, despite the lead trial prosecutor himself calling for a new trial.

Wallace, who knew "the case better than anyone else" (Doc. 107 ¶ 63), has reached a conclusion that no court has yet been able to reach, but that this Court now can. Wallace has been uniquely positioned to witness the cumulative effect of revelations about this case over the last two decades. Wallace has had the opportunity to synthesize the full picture from its separate elements—from physical evidence contradicting Violet Ellison's testimony, to alibi witnesses placing Johnson elsewhere, to the discovery of the $5,000 payment to the key witness. Wallace's professional assessment has evolved, leading him to conclude that, when viewed comprehensively, the conviction cannot stand. *See Young*, 315 U.S. at 258 ("The public trust reposed in the law enforcement officers of the Government requires that they be quick to confess error when, in their opinion, a miscarriage of justice may result from their remaining silent. . . . The considered judgment of the law enforcement officers that reversible error has been committed is entitled to great weight.").

This is precisely the kind of holistic review—considering both the trial evidence and what has emerged since—that is appropriate for this Court to undertake in light of the shared conclusion of Wallace and District Attorney Carr.

COURTESY COPY

## II. Conviction Integrity Reviews and the Pursuit of Justice

### A. The State's position would render conviction integrity reviews obsolete.

Conviction integrity reviews are, by design, a late-stage safeguard for the reliability of convictions. They unearth new or previously discounted information long after direct appeals or even initial post-conviction proceedings have ended. *See* Doc. 107 ¶¶ 1–2 (noting how the Jefferson County District Attorney initiated a fresh review decades after Mr. Johnson's trial). Conviction review bodies, like CRUs, do not conduct a broad, discretionary reassessment of all convictions but instead focus on extraordinary cases where substantial new evidence suggests a plausible claim of innocence or systemic error. *See* Barry C. Scheck, *Conviction Integrity Units Revisited*, 14 Ohio St. J. Crim. L. 705, 720–28 (2017). Their case selection is guided by rigorous criteria, including referrals from innocence organizations, forensic science re-evaluations, or internal audits uncovering prosecutorial or law enforcement misconduct, ensuring that only the most compelling claims receive full reinvestigation. *Id.*; *see also Conviction Review Unit*, Jefferson County District Attorney's Office, https://www.jeffcoda.org/cru/index.php (last visited Mar. 5, 2025) (listing nine criteria necessary for CRU review). Under the State's theory, however, courts would be prevented from considering even the most compelling findings from a conviction integrity review. In practice, that would mean that any valuable evidence uncovered through a District Attorney's conviction integrity review—no matter how significant—must remain unreviewed by the judiciary.

Prosecutors are duty-bound "not merely to convict," but to ensure that justice is done, even after judgment is entered. ABA CRIMINAL JUSTICE STANDARDS FOR THE PROSECUTORIAL FUNCTION, Standard 3-1.2(b) (4th ed. 2017) ("The primary duty of the prosecutor is to seek justice within the bounds of the law, not merely to convict. . . . The prosecutor should seek to protect the

COURTESY COPY

innocent and convict the guilty, consider the interests of victims and witnesses, and respect the constitutional and legal rights of all persons, including suspects and defendants."); *see also Berger v. United States*, 295 U.S. 78, 88 (1935) ("The [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done."); *Strickler v. Greene*, 527 U.S. 263, 281 (1999) (acknowledging the "special role played by the American prosecutor in the search for truth in criminal trials"). Once a District Attorney concludes that a conviction is not supported by the evidence, the prosecution is ethically obligated to raise that alarm. *Imbler v. Pachtman*, 424 U.S. 409, 427 n.25 (1976) ("[A]fter a conviction the prosecutor also is bound by the ethics of his office to inform the appropriate authority of after-acquired or other information that casts doubt upon the correctness of the conviction."). Yet under the State's theory, the court would be powerless to do anything about it. In effect, conviction integrity reviewers would be relegated to a purely public-notice role, with no real capacity to influence or advance justice in a real, meaningful way.

COURTESY COPY

### B. Conviction integrity reviews reflect the ethical obligation of prosecutors to secure justice, not convictions.

Modern prosecutors acknowledge their ongoing duty to rectify miscarriages of justice. The fact that prosecutors must work "to seek justice, not merely to convict," *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 803 (1987) (quoting the ABA Model Rules of Professional Conduct), has become a structural imperative: the idea of conviction integrity reviews (and formal CRUs) was created precisely because the standard post-conviction legal process does not always detect or immediately rectify wrongful convictions, especially when crucial facts emerge years later. *See* Scheck, *supra*, at 709; *see also* ABA Criminal Justice Standard 3-1.2(b), *supra*.

That evolution is reflected in national data. Conviction-review efforts have led to scores of exonerations, particularly in jurisdictions with well-established CRUs, demonstrating the real and ongoing possibility that a defendant's innocence could remain hidden until a dedicated prosecutorial unit re-examines the case. In 2022 alone, CRUs helped secure 132 exonerations.[1] And then another 60 more in 2023.[2] By institutionalizing the ongoing responsibility of prosecutors to seek *justice not convictions*, conviction integrity reviews, particularly through formal CRUs, give shape to the constitutional principle that convicting an innocent defendant is never acceptable, even if the underlying facts are discovered once procedural deadlines pass.

### C. Multiple courts in other states have granted relief based on conviction integrity reviews.

Other States' courts often rely on the findings of CRUs and equivalent conviction integrity reviews to grant relief when those efforts present newly discovered or reassessed evidence that undermines prior convictions.

COURTESY COPY

- **Cedric Dent** was convicted by a Louisiana jury in 1999 of second-degree murder, based largely on the inconsistent and evolving testimony of a single eyewitness, Jerry Hamilton. In 2022, the Orleans Parish District Attorney's CRU found that key evidence, including undisclosed witness statements and police misconduct, had been withheld, and that Dent's defense was inadequate. Dent was exonerated and released on August 8, 2022, after 23 years in prison.[3]

- **Joyce Watkins** was convicted by a Tennessee jury in 1988 of murder and child sex abuse, based on flawed forensic testimony. In 2021, the Tennessee Innocence Project and the Davidson County District Attorney's CRU uncovered that the medical evidence used at the trial was scientifically invalid and that exculpatory

---

[1] *2022 Annual Report*, The National Registry of Exonerations, 3 (May 8, 2023), https://www.law.umich.edu/special/exoneration/Documents/NRE%20Annual%20Report%20202.2.pdf.

[2] *2023 Annual Report*, The National Registry of Exonerations, 3 (Mar. 18, 2024), https://www.law.umich.edu/special/exoneration/Documents/2023%20Annual%20Report.pdf.

[3] Maurice Possley, *Cedric Dent*, The Nat'l Registry of Exonerations (Sep. 14, 2023), https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=6368.

evidence had been withheld. Watkins' conviction was vacated on January 12, 2022, after 33 years, and the charges were dismissed.[4]

- **Damon Thibodeaux** was convicted by a Louisiana jury in 1997 of rape and murder, largely based on a false confession obtained after nine hours of interrogation and mistaken witness identifications. In 2007, a reinvestigation by the Jefferson Parish District Attorney's Office and the Innocence Project—*i.e.*, a conviction integrity review conducted outside a formal CRU—revealed that DNA evidence excluded Thibodeaux; that no rape had occurred; and that the confession was coerced. On September 29, 2012, Thibodeaux's conviction was vacated, and he was released after 16 years on death row.[5]

In each example, those reviewing the integrity of the convictions did not act alone. A judge reviewed the record and determined that the reviewers' determination was supported by ample evidence and the original conviction could no longer stand. These cases underscore why comprehensive reinvestigations must not be rendered toothless: their discoveries have meaning only when courts remain empowered to grant relief where the facts demand it.

COURTESY COPY

## CONCLUSION

Both the current District Attorney and the lead prosecutor *who tried his case and obtained his death sentence* now believe Toforest Johnson deserves a new trial. They were duty bound to speak up once that made that determination, through an independent review of all the new evidence that has emerged in this case. And their conclusion was more-than-reasonable: Multiple alibi witnesses place Johnson miles away from the crime scene. The sole witness against him had a financial incentive that was concealed from the defense. Physical evidence contradicts that witness's account. And the State pursued contradictory theories about who committed the murder—at times even claiming someone else was the shooter.

---

[4] Maurice Possley, *Joyce Watkins*, The Nat'l Registry of Exonerations (Aug. 16, 2023), https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=6096.

[5] Alexandra Gross, *Damon Thibodeaux*, The Nat'l Registry of Exonerations (Sep. 8, 2021), https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4004.

These facts should be examined holistically, not in isolation as they have been until now. When viewed together, they expose a conviction built on a foundation that has crumbled. The State would have this Court ignore Wallace's conclusion and District Attorney Carr's similar determination after his independent review of the evidence, but the State's position would nullify the critical role of conviction integrity review in remedying wrongful convictions. A system that wholly ignores a prosecutor's determination that his own conviction lacks integrity cannot claim to serve justice.

COURTESY COPY

Respectfully submitted,

*/s/ Lindsey C Boney IV*

Lindsey C Boney IV
Danner Kline
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203
Telephone: (205) 521-8914
lboney@bradley.com
dkline@bradley.com

Adnan Sultan
THE INNOCENCE PROJECT
40 Worth Street, Suite 701
New York, NY 10013
Telephone: (212) 364-5352
asultan@innocenceproject.org

*Counsel for The Innocence Project*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 12, 2025, the foregoing document was filed with the Clerk and served via email on the following counsel:

Lauren Simpson
Assistant Attorney General
501 Washington Avenue
Montgomery, AL 36130-0152
lauren.simpson@alabamaag.gov

Ty Alper
talper@law.berkeley.edu

Katherine Moss
kmoss@schr.org

Patrick Mulvaney
pmulvaney@schr.org

Kathryn Miller
kathryn.miller@yu.edu

COURTESY COPY

*__/s/ Danner Kline__*
OF COUNSEL