FILED
2026 Sep-08 AM 11:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| TOFOREST JOHNSON,<br>*Petitioner*, | ) | |
| v. | ) | Case No. 2:16-cv-1945-AMM |
| TERRY RAYBON,<br>Warden of William C. Holman<br>Correctional Facility,<br>*Respondent*. | ) | CAPITAL CASE |

**PETITIONER'S NOTICE REGARDING THE INVOLVEMENT OF BRADLEY ATTORNEYS IN THIS CASE**

Petitioner Toforest Johnson respectfully submits this notice regarding involvement in this case by attorneys from the law firm of Bradley Arant Boult Cummings LLP ("Bradley"). In response to an order (Doc. 58) from Judge Mooty requiring the parties to provide information about Bradley's involvement in this case, Johnson filed a response (Doc. 60) that detailed, as requested, the precise issues raised by the Bradley attorneys on Johnson's behalf (and dates any Bradley attorneys appeared in the case), whether the issues raised by the Bradley attorneys are before the Court in this federal habeas corpus case, and whether any continuing financial or client relationship exists between Bradley and Petitioner Johnson.

In light of the fact that the Court to which this case has been assigned also was previously employed as counsel at Bradley, Johnson submits this notice to inform the Court that his prior response inadvertently omitted one additional brief that Bradley attorneys had filed in the case.

In addition to the filings detailed in the previous response (Doc. 60), Bradley attorney Lindsay C Boney IV entered an appearance in the original state court postconviction proceedings on December 12, 2019, as counsel for the Innocence Project in support of Johnson. On that same date, Boney and Bradley attorney Dylan C. Black filed an amicus brief in the Jefferson County Circuit Court. *See* Appendix A (The Innocence Project's *Amicus Curiae* Brief in Support of Petitioner). That brief supported Johnson's then-pending claim under *Brady v. Maryland*, 373 U.S. 83 (1963), and also argued that other aspects of the case provided important context for the court's consideration. *See, e.g., id.* at 2 ("The whole picture of this case is very troubling—and especially when seen against that backdrop, the State's *Brady* violations cannot be easily swept away.").

Undersigned counsel respectfully submits this notice to ensure that the record is complete with respect to the information Judge Mooty requested.

Respectfully submitted,

/s/ Ty Alper

Ty Alper
U.C. Berkeley School of Law
353 Law Building
Berkeley, CA 94720-7200
Tel: (510) 643-7849
talper@law.berkeley.edu

Patrick Mulvaney
Southern Center for Human Rights
60 Walton Street, NW
Atlanta, GA 30303
Tel: (404) 688-1202
pmulvaney@schr.org

*Counsel for Toforest Johnson*

**Certificate of Service**

I hereby certify that on September 8, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will notify the following counsel of record: **Lauren A. Simpson**.

/s/ Ty Alper
Ty Alper
U.C. Berkeley School of Law
353 Law Building
Berkeley, CA 94720-7200
Tel: (510) 643-7849
talper@law.berkeley.edu

# APPENDIX A

## The Innocence Project's *Amicus Curiae* Brief in Support of Petitioner (2019)

ELECTRONICALLY FILED
12/12/2019 2:21 PM
01-CC-1996-000386.60
CIRCUIT COURT OF
JEFFERSON COUNTY, ALABAMA
JACQUELINE ANDERSON SMITH, CLERK

**IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA**
**TENTH JUDICIAL CIRCUIT**
**CRIMINAL DIVISION**

**TOFOREST O. JOHNSON,**

**Petitioner,**

**v.**

**STATE OF ALABAMA,**

**Respondent.**

**CASE NO: CC-1996-386.60**

**THE INNOCENCE PROJECT'S *AMICUS CURIAE* BRIEF**
**IN SUPPORT OF PETITIONER**

Wrongful convictions are no longer an "'unreal dream'—[but] instead an undeniable reality."[1] Jessica Roth, *Informant Witnesses and the Risk of Wrongful Convictions*, 53 Am. Crim. L. Rev. 737, 738 (2016).

If ever a case bore the hallmarks of a wrongful conviction, Toforest Johnson's is it. Inconsistent prosecutorial theories, a prosecution that depends on a single "earwitness" identification—and an incentivized earwitness at that—and later-expressed prosecutorial doubt about the strength of the case . . . Toforest Johnson's case checks all of these boxes.

* * *

The Innocence Project's mission is to free the staggering number of innocent people who remain incarcerated and to bring reform to the system responsible for their unjust imprisonment.[2]

[1] To date, 166 people have been exonerated from death row after a wrongful conviction. *See* Death Penalty Information Center, *Innocence By the Numbers*, https://deathpenaltyinfo.org/policy-issues/innocence/innocence-by-the-numbers (last visited Nov. 30, 2019).

[2] As explained in the accompanying motion for leave to file this brief, the Innocence Project is a non-profit organization and law school clinic dedicated primarily to providing pro bono legal services to indigent prisoners whose actual innocence may be established through post-conviction evidence. The Innocence Project has provided representation or assistance in most of the 367

For almost 30 years, the Innocence Project has fulfilled this mission by helping courts identify the signs of wrongful convictions and prevent future injustice. In this case, the signs of wrongful conviction fairly cry out from all over the record. Although the issue currently before the Court, of course, concerns violations of *Brady v Maryland*, 373 U.S. 83 (1963), arising from the State's undisclosed promise of payment to the State's star witness, Violet Ellison, the Innocence Project respectfully urges the Court to assess the question presented in the broader context of the many other characteristics of a wrongful conviction that Mr. Johnson's case presents.

The whole picture of this case is very troubling—and especially when seen against that backdrop, the State's *Brady* violations cannot be easily swept away.

## I. ANATOMY OF A WRONGFUL CONVICTION

In its pursuit of a conviction for the murder of Deputy Hardy, the State presented over the course of four trials *at least five different, contradictory theories* of who shot Deputy Hardy. This prosecutorial tactic virtually ensures that the State is knowingly prosecuting at least one innocent person. The State's case against Mr. Johnson—who has *always* maintained his innocence—also depended entirely on the testimony of Ms. Ellison, who was not present when the crime occurred, whose knowledge of the case was influenced by media reports and other sources before she came

DNA exonerations in the United States, as well as numerous exonerations based on constitutional violations. The Innocence Project also seeks to prevent future miscarriages of justice by researching their causes, participating as *amicus curiae* in cases of broader significance to the criminal justice system, and pursuing reform initiatives designed to enhance the truth-seeking function of the criminal justice system. The Innocence Project's work both serves as a check on the awesome power of the state over criminal defendants and helps ensure a safer and more just society. The Innocence Project has expertise in bringing legal challenges to the constitutionality of procedures and practices that implicate the rights of incarcerated populations. As a leading national advocate for the imprisoned that has represented numerous individuals who have spent years, even decades, in solitary confinement, the Innocence Project is dedicated to improving the criminal justice system, and has a compelling interest in ensuring the fundamental dignity of those held in our nation's prisons.

forward, and who was incentivized by the State's offer of payment for testimony leading to Mr. Johnson's conviction. Indeed—and these facts are, candidly, difficult to wrap one's mind around—although Ms. Ellison contends that she overheard part of a phone call on which she supposedly heard Mr. Johnson confess to the crime, she did not know Mr. Johnson, did not know who he was, and *did not even know his voice* (before or after that phone call). It is not surprising, then, that the lead prosecutor in Mr. Johnson's case has expressed doubt as to the strength of the State's case against Mr. Johnson.

Each of these aspects of Mr. Johnson's case is a hallmark of wrongful conviction, a red flag that should stop the State and reviewing courts in their tracks. All of them combined *in a single case*, like this one, should create unavoidable doubt in the outcome of the trial.

### A. Inconsistent Prosecutorial Theories

A prosecutor's job is to "search for truth in criminal trials." *Strickler v. Greene*, 527 U.S. 263, 281 (1999). Thus, a prosecutor has a corresponding "duty to refrain from improper methods calculated to produce a wrongful conviction." *Berger v. United States*, 295 U.S. 78, 88 (1935). That responsibility precludes advancing inconsistent theories on the same facts about the same crime, when only one person can be responsible. Doing otherwise, as the State did in searching for a conviction in this case, is improper, promotes unreliability in convictions, and is completely incompatible with the rule that "in a criminal prosecution [the obligation of the prosecutor] is not that it shall win a case, but that justice shall be done." *Id.* at 88.

Over the course of three years, the State presented five different theories regarding who killed Deputy Hardy. *See generally* Pet'r Post-Hr'g Br. at 5. The inconsistent theories were particularly problematic because it was clear early on that *a single shooter* fired two shots in rapid succession from *the same gun*. *See* TR 389, 886–87. *First*, in January 1996, at the grand jury proceeding, the State sought indictments against Ardragus Ford and Omar Berry for Deputy

Hardy's murder. *Second*, in November 1997, at Ardragus Ford's first trial, the State advanced the theory that he was the shooter. *Third*, at Mr. Johnson's first trial in December 1997, the State argued that Mr. Johnson pulled the trigger and killed Deputy Hardy. *Fourth*, at Mr. Johnson's second trial in August 1998, the State proceeded on the theory that *both* Mr. Johnson and Quintez Wilson shot Deputy Hardy. *Fifth*, and finally, the State returned to the theory that Ardragus Ford shot Deputy Hardy in Mr. Ford's second trial in June 1999.

This history—beginning and ending with the State advancing the theory that Ardragus Ford killed Deputy Hardy, when there is no dispute that there was a single shooter using a single gun—proves that the State has prosecuted at least one innocent man in connection with Deputy Hardy's murder. That cannot be squared with a "search for truth" or the imposition of anything like justice, and is constitutionally unsound. *See Drake v. Kemp*, 762 F.2d 1449, 1479 (11th Cir. 1985) (Clark, J., concurring) (inconsistent theories of the same crime "reduce criminal trials to mere gamesmanship and rob them of their supposed purpose of a search for truth"); *Thompson v. Calderon*, 120 F.3d 1045, 1058–59 (9th Cir. 1997) (en banc) (holding that it violates due process for the State to argue in one defendant's trial that he alone committed a murder, then arguing in a subsequent trial that another defendant actually committed the same crime), *vacated on other grounds*, 523 U.S. 538 (1998); *see also* Michael Q. English, *A Prosecutor's Use of Inconsistent Factual Theories of a Crime in Successive Trials: Zealous Advocacy or a Due Process Violation?*, 68 Fordham L. Rev. 525, 528 (1999) ("[A] prosecutor violates both the Due Process Clause and her ethical obligations when she argues inconsistent factual theories of a crime in successive trials without taking affirmative steps to repudiate the factual theory used in the first trial."). Because "death is different," *Ford v. Wainwright*, 477 U.S. 399, 411 (1986), the use of inconsistent

prosecutorial theories is particularly antithetical to the increased need for reliability in capital cases.

The concept that inconsistent prosecutorial theories can lead to wrongful convictions is not theoretical—it unfortunately happens. *See, e.g.*, *Bankhead v. State*, 182 S.W.3d 253, 259 (Mo. Ct. App. 2006) (affirming order vacating murder conviction because the state "selectively presented contradictory evidence and arguments in three different cases depending upon which defendant was before the trial court"); *Smith v. Groose*, 205 F.3d 1045, 1051–54 (8th Cir. 2000) (vacating murder conviction because "[t]he State's use of factually contradictory theories . . . fatally infected [the] conviction"). That inconsistent prosecutorial theories similarly infected Mr. Johnson's case is the first wrongful-conviction hallmark that should give the Court pause.

### B. Unreliable Witness Identification

This case involves "earwitness identification," in which a witness testified she heard the defendant admit involvement in the crime. This is an identification method even less reliable than eyewitness identification. *Nearly half* of death-row exonerations have involved this sort of false "secondary confession"—*i.e.*, a statement made by a third-party about someone else's supposed (but later proved to be false) admission of guilt.[3] That number alone is staggering, but in light of the fact that Toforest Johnson was convicted on the basis of *a single earwitness*, who purportedly overheard a phone call in which Johnson purportedly confessed to the crime—even though she had never met Johnson, did not know him (or even who he was), and did not know his voice—the presence of earwitness identification in this case should be a huge red flag.

---

[3] *See* Jessica K. Swanner & Denise R. Beike, *Incentives Increase The Rate of False But Not True Secondary Confessions From Informants With an Allegiance to a Suspect,* 34 Law & Hum. Behav. 418 (2010) (noting that false secondary confessions were "present in 46% of the wrongful convictions in death row cases" (citations omitted)).

That is so because witness identification is problematic: not just in earwitness identifications, but even in the far more common—but no more reliable—realm of eyewitness identification. The Innocence Project's work has revealed that mistaken *eyewitness* identifications contributed to approximately 71% of the 367 wrongful convictions in the United States overturned by post-conviction DNA evidence.[4] This propensity of mistaken eyewitness identification to lead to wrongful convictions is just as prevalent in capital cases. In fact, the Center on Wrongful Convictions conducted a study of 86 defendants who were sentenced to death after *Furman v. Georgia* but were later exonerated, and they concluded that eyewitness testimony played a role in 46 of those 86 wrongful convictions. More than half. And in 33 of those 46 cases, like in this case, eyewitness (or, here, earwitness) testimony was *the only evidence* connecting the defendant to the crime. *See* Rob Warden, *How Mistaken and Perjured Eyewitness Identification Testimony Put 46 Innocent Americans on Death Row*, Center on Wrongful Convictions, Nw. L. Sch. at 2–3 (May 2, 2001), https://files.deathpenaltyinfo.org/legacy/files/pdf/StudyCWC2001.pdf.

Simply put, convictions based on the testimony of a single witness are unreliable, even when (unlike here) those witnesses were present at the scene, and even when the witnesses (again, unlike here) were themselves the victims of the crime. *See generally* Sara Conway, *A New Era of Eyewitness Identification Law: Putting Eyewitness Testimony on Trial*, 50 New Eng. L. Rev. 81 (2015); *see also, e.g.*, Thomas Albright & Jed Rakoff, *Eyewitnesses Aren't As Reliable As You Might Think*, The Washington Post, Jan 13, 2015,

[4] The pairing between mistaken eyewitness identification and wrongful conviction is not limited to cases where innocence is proven by DNA evidence, of course. As of April 2014, 75% of 1,365 exonerations examined by the National Registry of Exonerations involved some type of false identification. *See* Kaitlin Jackson & Samuel Gross, *Tainted Identifications*, The Nat'l Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/taintedids.aspx (Sept. 22, 2016).

https://www.washingtonpost.com/opinions/eyewitnesses-arent-as-reliable-as-you-might-think/2015/01/30/fe1bc26c-7a74-11e4-9a27-6fdbc612bff8_story.html (noting that "accounts of events promulgated by attorneys and news media" can reinforce a witness's beliefs regardless of the accuracy of the identification); Nat'l Research Council, *Identifying the Culprit: Assessing Eyewitness Identification* 2 (The Nat'l Academies Press, 2014) ("The fidelity of our memories to actual events may be compromised by many factors at all stages of processing, from encoding to storage to retrieval.").

Two local examples illustrate the dangers of relying so heavily on witness identifications:

- In Jefferson County, Freddie Lee Gaines was convicted of second-degree murder. At his trial, one of the three victims (who had survived the shooting) testified that Mr. Gaines shot the victims. In 1990, another man provided a detailed confession to the 1972 murders, and Mr. Gaines's conviction was vacated.[5]

- In Madison County, a survivor of an attack testified that Timothy Gurley and two other men splashed him with gasoline and lit him on fire. Mr. Gurley denied involvement, but the jury convicted him of attempted murder and arson. The next year, the survivor recanted his identification of Mr. Gurley and admitted that while he was unconscious for several weeks after the fire, his family and others filled his head with false memories. Subsequently, the court vacated the conviction and dismissed the charges against Mr. Gurley.[6]

* * *

Earwitnesses who (as in this case) identify a suspect based solely on hearing the suspect's voice—especially when they do not know the suspect, his voice, or (again, as in this case) *they have never even met the suspect*—are even less reliable than eyewitnesses. Cindy E. Laub, Lindsey E. Wylie, & Brian H. Bornstein, *Can The Courts Tell An Ear From An Eye? Legal Approaches to Voice Identification Evidence*, 37 Law & Psychol. Rev. 119, 124–25 (2013) ("[V]oice recognition

---

[5] Stephanie Denzel, *Freddie Lee Gaines*, The Nat'l Registry of Exonerations (before June 2012) https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3226.

[6] Maurice Possley, *Timothy Gurley*, The Nat'l Registry of Exonerations (July 5, 2016) https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4931.

by itself is poor, such that earwitness identifications are less accurate than eyewitness identifications."); Christopher Sherrin, *Earwitness Evidence: The Reliability of Voice Identifications*, 52 Osgood Hall L.J. 819, 822 (collecting studies identifying earwitness testimony as "extremely inaccurate[] and likely to produce high false identifications" (internal quotations omitted)).

That is the kind of notoriously unreliable witness testimony that put Toforest Johnson on death row. In each of Mr. Johnson's two trials for the murder of Deputy Hardy, the prosecution's case hinged on the testimony of a single witness, Violet Ellison. *See* Pet'r Post-Hr'g Br. 5. Ms. Ellison was not present when the murder occurred, so she was not an eyewitness. *See id.* at 5–6. Her contribution to the evidence was more attenuated: She listened in on a phone call initiated by her daughter, and she contends that she overheard a man who said his name was "Toforest" say he shot Deputy Hardy and that another man had shot a second time. *See id.* Like unreliable eyewitness testimony later shown to have contributed to a wrongful conviction, Ms. Ellison's testimony is rife with indicia of unreliability. *See generally* Pet'r Post-Hr'g Br. 5–6 (citing Pet'r Exh. 50–51). She did not know Toforest Johnson and did not know what his voice sounded like. *Id.* But, critically, she had heard media coverage of the murder and Mr. Johnson's status as a suspect. Pet'r Post-Hr'g Br. 14–15 (citing TR. 667, 706–07, 711). When she overheard the conversation about which she testified, she had already been tainted by these news reports. *Id.* The influence of the media reports on the significance Ms. Ellison attached to what she thought she heard is reflected in her own notes of the conversation, in which she identified the person she heard speaking as "Johnson," despite the fact that she says she heard the speaker refer to himself only as "Toforest." Pet'r Post-Hr'g Br. 14–15 (citing TR. 667, 706–07, 717; Pet'r Exhs. 24, 25).

As the above-referenced research has proven can occur even with eyewitnesses, Ms. Ellison was subconsciously influenced by the media reports about Mr. Johnson, and her recollection of what she heard was not hers alone. Those facts also should give the Court pause.

### C. An Incentivized Witness

Incentivized witnesses are yet another hallmark of wrongful convictions. Any incentive offered to a witness is highly relevant because "[i]ncentives provide a motive to lie." *See* Swanner, *supra*, at 427. To protect against incentivized witnesses, statutes and professional conduct codes prevent inducement or payment, other than reimbursement of actual expenses, to any witness testifying under oath. *See e.g.,* 18 U.S.C. § 201(c)(2); Ala. R. of Prof'l Conduct 3.4(b). The dangers of incentivized witnesses are present with *all* witnesses who are offered an incentive, but in capital cases, where life and liberty are on the line, the consequences of introducing those dangers into trial are much more serious. So, the State's promise to pay Violet Ellison for testimony leading to a conviction for Deputy Hardy's murder is another huge red flag in this case.

Historically, it has been assumed that dangers from incentives given to witnesses are "adequately mitigated by disclosure, cross-examination, and cautionary jury instructions." Christopher T. Robertson & D. Alex Winkelman, *Incentives, Lies, and Disclosure*, 20 U. Pa. J. Const. L. 33, 42 (2017) (internal quotations omitted). But recent data suggests that current safeguards do not prevent innocent people from conviction because juries "fail to sufficiently discount for this risk of false testimony," even when told about the incentive.[7] The undeniable reality is that innocent people have been and continue to be convicted based on the testimony of witnesses who have an incentive to help obtain a conviction.[8]

---

[7] *See* Robertson, *supra*, at 83; Swanner, *supra*, at 427.

[8] *See* Swanner, *supra*, at 418.

In Mr. Johnson's case, not only was there a motive for Ms. Ellison to lie about what she heard—because the State offered to pay a financial reward for helpful information—but the State never disclosed the offer and instead suggested during its closing argument that Ms. Ellison *had no reason to lie*. Pet'r Post-Hr'g Br. 6 (citing TR. 905, 910; *see also* Pet'r Exh. 6, at 9, 14). Not so. In addition to the very fact of the payment, which presumably should be reason enough, Ms. Ellison had a particular motive—she needed the money. Pet'r Post-Hr'g Br. 19 (citing Pet'r Exh. 23; Evid. Hr'g 74, 77, 81). Testifying against Mr. Johnson provided Ms. Ellison with an opportunity to fix her money problems. Not only that, she and Deputy Hardy's wife had known each other for more than 15 years. *See* Pet'r ROR1 242 (citing Patricia Hardy's testimony at Johnson's first trial). By contrast, she had no connection or relationship with Mr. Johnson—indeed, she didn't even know what his voice sounded like. Pet'r Post-Hr'g Br. 6 (citing Pet'r Exh. 5, at 50–51). So, the State's promise of a reward to persons assisting in the successful prosecution of someone for the murder of her friend's husband makes Ms. Ellison's testimony doubly unreliable.

The hidden incentive payment to Ms. Ellison, added to her relationship with the victim's wife, brand Mr. Johnson's case with yet another harbinger of a wrongful conviction.

### D. Prosecutorial Doubt

In light of a prosecutor's charge with the pursuit of justice, not the pursuit of convictions, prosecutorial doubt about the reliability of a conviction or the strength of the State's case should not be taken lightly. The Innocence Project has found over the course of its 28 years that it is a crucial tipping point when a prosecutor becomes convinced of holes in the State's case.

Indeed, when prosecutors arrive at doubts about the strength of their case *on their own*, that is a particularly (and extremely) powerful indicator of wrongful conviction. The reasons for the doubt should be extensively considered, and the prosecution should be encouraged to reconsider

the case. Innocent people can walk free when this happens. The recent exonerations of Glenn Ford in Louisiana and Frank Sealie here in Alabama demonstrate the point. *See* The Guardian, *Ex-Louisiana prosecutor apologizes for 'the misery I have caused' freed inmate*, (Mar. 25, 2015), https://www.theguardian.com/us-news/2015/mar/25/former-louisiana-prosecutor-exonerated-death-row-inmate-apologizes; Maurice Possley, *Frank Sealie*, The Nat'l Registry of Exonerations, (last updated Oct. 31, 2016), https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4659.

There is serious prosecutorial doubt here too, of course. The lead prosecutor in this case has expressed doubt about the strength of the State's case against Mr. Johnson. In 2014, prosecutor Jeff Wallace testified under oath that he "[did not] think the State's case [against Mr. Johnson] was very strong . . . because it depended on the testimony of Violet Ellison." Radley Balko, *An illusion of justice: The baffling conviction and death sentence of Toforest Johnson reveal a broken system*, (Sept. 5, 2019), https://www.washingtonpost.com/opinions/2019/09/05/an-alabama-man-has-been-death-row-years-he-is-almost-certainly-innocent/?arc404=true; *see* Pet'r Post-Hr'g Br. 23 (citing Pet'r Exh. 12, at 15). This is a telling concession, because without Ms. Ellison's testimony there would have been no case against Mr. Johnson. It also recognizes that the State's dependence on a single earwitness identification, by a witness who was incentivized, introduces serious reliability problems and leads to the increased risk that an innocent man will be punished for someone else's crime. Again, this is yet another indicator of a wrongful conviction.

## II. THE TROUBLING CASE AGAINST TOFOREST JOHNSON IS NOT LIMITED TO VIOLATIONS OF *BRADY*

Against that backdrop—a prosecution secured via inconsistent theories of who committed the crime, a conviction secured on the back of testimony from a single earwitness who identified the defendant by hearing his voice for the first time on a phone call after having been promised

payment for testimony leading to a conviction, a liability case so tenuous that even the prosecutor says it was not very strong—the Court's review of the *Brady* issues takes on heightened significance. Dozens of innocent people have been convicted in cases that present *just one* of these hallmarks of wrongful conviction. Here, of course, the presence of *all* of these hallmarks *in a single case* cries out for relief for Toforest Johnson.

* * *

The Innocence Project is proud to have assisted in freeing some 367 of those innocent people since 1992, and it is working to free those still-wrongfully-incarcerated people who have been convicted despite their innocence. In that spirit, the Innocence Project respectfully urges this Court to consider the *Brady* issues before it against the backdrop of the numerous troubling indicia of wrongful convictions that Mr. Johnson's case presents.

Respectfully submitted,

/s/ Lindsey C Boney IV

Lindsey C Boney IV
Dylan C. Black
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203
Telephone: (205) 521-8914
lboney@bradley.com
dblack@bradley.com

Adnan Sultan
THE INNOCENCE PROJECT, INC.
40 Worth Street, Suite 701
New York, New York 10013
Telephone: (212) 364-5352
asultan@innocenceproject.org

*Counsel for The Innocence Project*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 12, 2019, the foregoing document was filed electronically with the Clerk using the Alafile system and served via email on the following counsel:

Steve Marshall
Jon B. Hayden
Office of the Attorney General
Capital Litigation Division
501 Washington Avenue
Montgomery, AL 36130-0152
jhayden@ago.state.al.us

Patrick Mulvaney, Esq.
pmulvaney@schr.org

Ty Alper, Esq.
talper@law.berkeley.edu

Kathryn Miller, Esq.
kathryn.miller@yu.edu

/s/ Lindsey C Boney IV
OF COUNSEL